## CASE NO. 23-4710

# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID TATUM,

*Defendant-Appellant.*

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## AT CHARLOTTE

---

## JOINT APPENDIX - VOLUME I OF II
## (Pages 1 - 651)

---

<table>
<tr><td>

Steven H. Levin
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
202-429-8169

Evan M. Goldstick
STEPTOE LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
312-378-7506

*Counsel for Appellant*

</td><td>

Amy Elizabeth Ray
Assistant U.S. Attorney
OFFICE OF THE
UNITED STATES ATTORNEY
United States Courthouse
100 Otis Street, Room 233
Asheville, NC 28801
828-271-4661

*Counsel for Appellee*

</td></tr>
</table>

**LANTAGNE LEGAL PRINTING**
**1108 East Main Street, Suite 1201 • Richmond, VA 23219 • 804-644-0477**

# TABLE OF CONTENTS

## VOLUME I OF II

JA Page

District Court Docket [3:22-cr-00157-KDB-DCK-1] ................................................1

Bill of Indictment
    2022.06.21 [ECF3] ...................................................................... 13

Superseding Bill of Indictment
    2022.11.15 [ECF19] ..................................................................... 15

Transcript of Trial Proceedings Volume I - Redacted
Before The Honorable Kenneth D. Bell
    2023.05.02 [ECF88] ..................................................................... 18

    MARISA BROWN
        Direct Examination by Mr. Odulio....................................................... 46
        Cross Examination by Mr. Ames ......................................................... 58

    MICHAEL GREGORY
        Direct Examination by Mr. Odulio....................................................... 64
        Cross Examination by Mr. Ames ......................................................... 70

    DANIEL W. JACKSON
        Direct Examination by Mr. Cervantes.................................................... 73
        Cross Examination by Mr. Ames ......................................................... 85

    JASON WHITT
        Direct Examination by Mr. Cervantes.................................................... 94

Transcript of Trial Proceedings Volume II - Redacted
Before The Honorable Kenneth D. Bell
    2023.05.03 [ECF89] ..................................................................... 151

    JASON WHITT
    Direct Examination by Mr. Cervantes...................................................... 158
    Cross Examination by Mr. Ames .......................................................... 193

M.D.
Direct Examination by Mr. Odulio ........................................................ 282

E.H.
Direct Examination by Mr. Odulio ........................................................ 286

M.C.
Direct Examination by Mr. Cervantes ................................................... 289

E.S.
Direct Examination by Mr. Odulio ........................................................ 292
Cross Examination by Mr. Ames ........................................................... 298

F.L.
Direct Examination by Mr. Cervantes ................................................... 299

SCOTT ATWOOD
Direct Examination by Mr. Ames........................................................... 325

Transcript of Trial Proceedings Volume III - Redacted
Before The Honorable Kenneth D. Bell
   2023.05.04 [ECF90] ........................................................................... 381

   Government's Trial Exhibit:

      Ex. 11:   Rochester Medical Docs (Excerpt)_Redacted ...................... 482

Motion for a Judgment of Acquittal
   2023.05.18 [ECF56] ........................................................................... 493

Government's Response in Opposition to
Defendant's Motion for a Judgment of Acquittal
   2023.05.25 [ECF57] ........................................................................... 502

Order
   2023.06.13 [ECF58] ........................................................................... 512

Transcript of Sentencing Hearing
Before The Honorable Kenneth D. Bell
   2023.11.08 [ECF93] ........................................................................... 521

Judgment in a Criminal Case
  2023.11.09 [ECF81] ................................................................................ 632

Notice of Appeal
  2023.11.21 [ECF86] ................................................................................ 641

Amended Judgment in a Criminal Case
  2024.01.30 [ECF98] ................................................................................ 643


## VOLUME II OF II - SEALED


Presentence Investigation Report (Final)
  2023.08.02 [ECF64] ................................................................................ 652

Statement of Reasons
  2023.11.09 [ECF82] ................................................................................ 683

Reason for Amendment
  2024.01.30 [ECF99] ................................................................................ 687

Query     Reports     Utilities     Help     Log Out

APPEAL,VICWIT

# U.S. District Court
## Western District of North Carolina (Charlotte)
### CRIMINAL DOCKET FOR CASE #: 3:22-cr-00157-KDB-DCK-1

Case title: USA v. Tatum

Date Filed: 06/21/2022

Date Terminated: 11/08/2023

---

Assigned to: District Judge Kenneth D. Bell
Referred to: Magistrate Judge David Keesler

Appeals court case number: 23-4710 4th Circuit

**Defendant (1)**

| | |
|---|---|
| **David Tatum**<br>*TERMINATED: 11/08/2023* | represented by **Ryan Patrick Ames**<br>Law Office of Ryan Ames<br>20619 Torrence Chapel Rd<br>Suite 116 #3015<br>28031<br>Cornelius, NC 28031<br>704-431-3764<br>Email: ryan@rameslegal.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:2252A(a)(5)(B) - ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO<br>(1s) | 120 months imprisonment, 30 years supervised release concurrent, $100 special assessment, $5,000 JVTA assessment, $17,000 AVAA assessment, restitution TBD. **Amended Judgment entered 1/30/2024:** amended to add restitution amount of $30,000; all other terms and conditions of the original judgment remain unchanged. |
| 18:2251(a) and (e) - SEXUAL EXPLOITATION OF CHILDREN<br>(2s) | 360 months imprisonment consecutive to count 1, 30 years supervised release concurrent, $100 special assessment, $5,000 JVTA assessment, $50,000 AVAA assessment, restitution TBD. **Amended Judgment entered 1/30/2024:** amended to add restitution amount of $30,000; all other |

**JA1**

|  |  |
|---|---|
| 18:2252A(a)(1) - ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO (3s) | terms and conditions of the original judgment remain unchanged.<br><br>240 months imprisonment concurrent to all other counts, 30 years supervised release concurrent, $100 special assessment, $5,000 JVTA assessment, $17,000 AVAA assessment, restitution TBD. **Amended Judgment entered 1/30/2024:** amended to add restitution amount of $30,000; all other terms and conditions of the original judgment remain unchanged. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:2252A(a)(5)(B) - POSSESS AND ACCESS WITH INTENT TO VIEW MATERIAL CONSTITUTING/CONTAINING CHILD PORNO (1) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

| **Plaintiff** | | |
|---|---|---|
| **USA** | represented by | **Cortney S. Randall**<br>US Attorneys Office<br>227 West Trade Street, Suite 1650<br>Charlotte, NC 28202<br>704-344-6222<br>Email: Cortney.Randall@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Assistant US Attorney*<br><br>**Mark T. Odulio**<br>U.S. Attorney Office<br>227 W. Trade St., Suite 1700<br>Charlotte, NC 28202<br>704-344-6222<br>Fax: 704-344-6629<br>Email: Mark.Odulio@usdoj.gov<br>*LEAD ATTORNEY* |

**JA2**

*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Benjamin Bain-Creed**
U.S. Attorney's Office
227 West Trade Street
Carillon Building, Suite 1650
Charlotte, NC 28202
704-338-3123
Fax: 704-344-6629
Email: benjamin.bain-creed@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Daniel Cervantes**
DOJ-USAO
227 West Trade Street
Suite 1650
Charlotte, NC 28202
704-344-6222
Email: daniel.cervantes@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/21/2022 | 1 | MOTION to Seal Case by USA as to David Tatum. (mga) (Entered: 06/22/2022) |
| 06/21/2022 | 2 | **ORDER granting 1 Motion to Seal Case as to David Tatum (1) Signed by Magistrate Judge David S. Cayer on 6/21/22. (mga)** (Entered: 06/22/2022) |
| 06/21/2022 | 3 | SEALED INDICTMENT as to David Tatum (1) count(s) 1. (Attachments: # 1 Unredacted Signature Page, # 2 Cover Sheet) (mga) (Entered: 06/22/2022) |
| 06/21/2022 | 4 | Arrest Warrant Issued *(Sealed - Case Participants)* in case as to David Tatum. (Attachments: # 1 Warrant Page Identifier)(mga) (Entered: 06/22/2022) |
| 06/23/2022 | 5 | NOTICE OF ATTORNEY APPEARANCE Cortney S. Randall appearing for USA. (brl) (Entered: 06/23/2022) |
| 06/24/2022 | 6 | NOTICE OF ATTORNEY APPEARANCE Benjamin Bain-Creed appearing for USA. (hms) (Entered: 06/27/2022) |
| 06/26/2022 | | Arrest of David Tatum (mek) (Entered: 06/27/2022) |
| 06/27/2022 | | Set Hearings as to David Tatum: Initial Appearance set for 6/27/2022 11:20 AM in Courtroom #1B, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. (mek) (Entered: 06/27/2022) |
| 06/27/2022 | | ORAL MOTION to Unseal Case by USA as to David Tatum. (mek) (Entered: 06/27/2022) |
| 06/27/2022 | | **ORAL ORDER granting [] Oral Motion to Unseal Case as to David Tatum (1). Entered by Magistrate Judge David S. Cayer on 6/27/2022. (mek)** (Entered: 06/27/2022) |
| 06/27/2022 | | NOTICE OF GENERAL ATTORNEY APPEARANCE: Ryan Patrick Ames appearing for |

**JA3**

| | | David Tatum (mek) (Entered: 06/27/2022) |
|---|---|---|
| 06/27/2022 | | Minute Entry: INITIAL APPEARANCE and ARRAIGNMENT as to David Tatum (1) Count 1 held before Magistrate Judge David S. Cayer. Defendant pled not guilty. Defendant advised of rights & charges. Defendant retained counsel. Defendant released on conditions. Government attorney: Cortney S. Randall. Defendant attorney: Ryan Patrick Ames. Court Reporter: DCR. (mek) (Entered: 06/27/2022) |
| 06/27/2022 | 7 | **Appearance Bond Entered (Restricted) as to David Tatum in amount of $ 25,000. Signed by Magistrate Judge David S. Cayer on 6/27/2022. (mek)** (Entered: 06/27/2022) |
| 06/27/2022 | 8 | **ORDER (Restricted) Setting Conditions of Release as to David Tatum (1) 25KU. Signed by Magistrate Judge David S. Cayer on 6/27/2022. (Attachments: # 1 Additional Conditions) (mek)** (Entered: 06/27/2022) |
| 06/27/2022 | | **SCHEDULING ORDER as to David Tatum. (Click on this link to obtain the Standard Arraignment Order) Docket Call set for 7/5/2022 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Entered by Magistrate Judge David S. Cayer on 6/27/2022. (mek)** (Entered: 06/27/2022) |
| 06/27/2022 | | **Standard Discovery Order in case as to David Tatum. (Click on this link to obtain the Standard Criminal Discovery Order) . Entered by Magistrate Judge David S. Cayer on 6/27/2022. (mek)** (Entered: 06/27/2022) |
| 06/27/2022 | 9 | **ORDER pursuant to the Due Process Protection Act as to David Tatum. Signed by Magistrate Judge David S. Cayer on 6/27/2022. (mek)** (Entered: 06/27/2022) |
| 06/28/2022 | 11 | PRETRIAL REPORT (SEALED - Attorney) as to David Tatum (available to USA, David Tatum) (Clifton E Johnson - sb) (Entered: 06/28/2022) |
| 06/29/2022 | 12 | Arrest Warrant Returned Executed on 6/24/2022 in case as to David Tatum. (kab) (Entered: 06/29/2022) |
| 07/01/2022 | 13 | Consent MOTION to Continue Docket Call/Trial by David Tatum. Responses due by 7/8/2022 (Ames, Ryan) (Entered: 07/01/2022) |
| 07/05/2022 | 14 | **ORDER granting 13 Motion to Continue Docket Call/Trial as to David Tatum (1). Motion to Continue deadline due by 8/22/2022. Status Conference set for 8/25/2022 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call set for 9/6/2022 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 7/5/2022. (nvc)** (Entered: 07/05/2022) |
| 08/16/2022 | 15 | Unopposed MOTION to Continue Docket Call/Trial by David Tatum. Responses due by 8/23/2022 (Ames, Ryan) (Entered: 08/16/2022) |
| 08/17/2022 | 16 | **ORDER granting 15 Motion to Continue Docket Call/Trial as to David Tatum (1). Motion to Continue due by 10/24/2022. Status Conference reset for 10/27/2022 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call reset for 11/7/2022 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 8/17/2022. (mek)** (Entered: 08/17/2022) |
| 10/06/2022 | 17 | Unopposed MOTION to Continue Docket Call/Trial by David Tatum. Responses due by 10/13/2022 (Ames, Ryan) (Entered: 10/06/2022) |

**JA4**

| 10/07/2022 | 18 | **ORDER granting Defendant's 17 Unopposed Motion to Continue Docket Call/Trial as to David Tatum (1). Motion to Continue due by 12/19/2022. Status Conference reset for 12/22/2022 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call reset for 1/3/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 10/7/2022. (mek)** (Entered: 10/07/2022) |
|---|---|---|
| 11/15/2022 | 19 | SUPERSEDING BILL OF INDICTMENT as to David Tatum (1) count(s) 1s, 2s, 3s. (Attachments: # 1 Unredacted Signature Page, # 2 Cover Sheet) (brl) (Entered: 11/16/2022) |
| 11/16/2022 | 20 | **Order on Request to Modify Conditions of Release as to David Tatum. The modification of release is not ordered. Signed by Magistrate Judge David S. Cayer on 11/16/2022. (mek)** Modified text on 11/17/2022 (mek). (Entered: 11/16/2022) |
| 11/16/2022 | | NOTICE OF HEARING as to David Tatum: Arraignment re: Superseding Indictment set for 11/18/2022 10:45 AM in Courtroom #1B, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. *This is your only notice - you will not receive a separate document.*(mga) (Entered: 11/16/2022) |
| 11/16/2022 | 21 | WAIVER of Hearing re: 20 ProbPS42 - Request to Modify Conditions of Release as to David Tatum (Chelsey Padilla - me) (Entered: 11/16/2022) |
| 11/16/2022 | 22 | MOTION for Detention by USA as to David Tatum. Responses due by 11/23/2022 Motions referred to David Keesler (Odulio, Mark) (Entered: 11/16/2022) |
| 11/18/2022 | | Minute Entry: ARRAIGNMENT on Superseding Indictment as to David Tatum (1) Count 1s,2s,3s held before Magistrate Judge David S. Cayer. Defendant pled not guilty. Government attorney: Mark Odulio. Defendant attorney: Ryan Ames. Court Reporter: Digital Court Reporter. (mek) (Entered: 11/18/2022) |
| 11/18/2022 | | Minute Order: MOTION HEARING as to David Tatum held before Magistrate Judge David S. Cayer. The 22 MOTION for Bond Revocation and for Detention is denied and the conditions of release are modified. Modified Conditions to follow. Government attorney: Mark Odulio. Defendant attorney: Ryan Ames. Court reporter: Digital Court Reporter. (mek) (Entered: 11/18/2022) |
| 11/18/2022 | 23 | **MODIFIED ORDER *(Restricted)* Setting Conditions of Release as to David Tatum (1) 25KU. Signed by Magistrate Judge David S. Cayer on 11/18/2022. (Attachments: # 1 Modified Additional Conditions) (mek)** (Entered: 11/18/2022) |
| 12/07/2022 | 25 | Unopposed MOTION to Continue Docket Call/Trial by David Tatum. Responses due by 12/14/2022 (Ames, Ryan) (Entered: 12/07/2022) |
| 12/08/2022 | 26 | **ORDER granting 25 Motion to Continue Docket Call/Trial as to David Tatum (1). Motion to Continue deadline 2/21/2023. Status Conference reset for 2/23/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call reset for 3/6/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 12/8/2022. (mek)** (Entered: 12/08/2022) |
| 01/13/2023 | 27 | TRANSCRIPT of Arraignment and Detention as to David Tatum held on 11/18/22 before Judge Cayer. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the** |

JA5

|  |  |  |
|---|---|---|
|  |  | **court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 4/10/2023. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 01/13/2023) |
| 01/18/2023 | 28 | NOTICE OF ATTORNEY APPEARANCE Daniel Cervantes appearing for USA. (Cervantes, Daniel) (Entered: 01/18/2023) |
| 01/20/2023 | 29 | Original Notice Regarding US Passport *(Sealed - Attorney)* as to David Tatum; (available to: USA, David Tatum) (Chelsey Padilla - me) (Entered: 01/20/2023) |
| 02/09/2023 | 30 | Unopposed MOTION to Continue Docket Call/Trial by David Tatum. Responses due by 2/16/2023 (Ames, Ryan) (Entered: 02/09/2023) |
| 02/09/2023 | 31 | **ORDER granting 30 Motion to Continue Docket Call/Trial as to David Tatum (1). Motion to Continue deadline 4/17/2023. Status Conference RESET for 4/20/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Docket Call RESET for 5/1/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Signed by District Judge Kenneth D. Bell on 2/9/2023. (mek)** (Entered: 02/09/2023) |
| 03/29/2023 | 32 | Request by USA as to David Tatum for notice of alibi/insanity defense. (Cervantes, Daniel) (Entered: 03/29/2023) |
| 03/29/2023 | 33 | Request for reciprocal discovery by USA as to David Tatum. (Cervantes, Daniel) (Entered: 03/29/2023) |
| 04/09/2023 | 34 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to David Tatum *That is Inextricably Intertwined with Charged Conduct and/or Pursuant to Federal Rules of Evidence 414 and 404(b)* (Cervantes, Daniel) (Entered: 04/09/2023) |
| 04/09/2023 | 35 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to David Tatum *Pursuant to Federal Rules of Evidence 803(6), 902(11), and 807* (Cervantes, Daniel) (Entered: 04/09/2023) |
| 04/11/2023 | 36 | MOTION in Limine by USA as to David Tatum. Responses due by 4/18/2023 (Cervantes, Daniel) (Entered: 04/11/2023) |
| 04/17/2023 | 37 | Second MOTION in Limine *to Exclude Certain Evidence and Argument* by USA as to David Tatum. Responses due by 4/24/2023 (Cervantes, Daniel) (Entered: 04/17/2023) |
| 04/20/2023 |  | Minute Order: MOTION HEARING/STATUS CONFERENCE as to David Tatum held before District Judge Kenneth D. Bell granting Government's 36 Motion in Limine. Any motion to suppress by Defendant due 4/24/2023 and Government's response due 4/26/2023. Jury Selection/Trial set for 5/2/2023 at 9:30am in Charlotte, NC. Government attorney: Daniel Cervantes, Mark Odulio. Defendant attorney: Ryan Patrick Ames. Court reporter: Cheryl Nuccio. (mek) (Entered: 04/20/2023) |
| 04/20/2023 |  | NOTICE OF HEARING as to David Tatum: Jury Selection/Trial set for 5/2/2023 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.* (mek) (Entered: 04/20/2023) |
| 04/21/2023 | 38 | NOTICE *of Intent to Introduce Expert Testimony of Jason D. Whitt* by USA as to David Tatum (Cervantes, Daniel) (Entered: 04/21/2023) |
| 04/21/2023 | 39 | NOTICE *of Intent to Introduce Expert Testimony of Daniel W. Jackson* by USA as to David Tatum (Cervantes, Daniel) (Entered: 04/21/2023) |
| 04/24/2023 | 40 | Proposed Jury Instructions by USA as to David Tatum (Bain-Creed, Benjamin) (Entered: 04/24/2023) |

**JA6**

| | | |
|---|---|---|
| 04/24/2023 | 41 | MOTION to Suppress by David Tatum. Responses due by 4/26/2023 (Attachments: # 1 Exhibit A - Warrant Affidavit, # 2 Exhibit B - Signed Warrant, # 3 Exhibit C - C. Martin Interview, # 4 Exhibit D - Initial Report to FBI, # 5 Exhibit E - K. Tatum 4.15 Interview, # 6 Exhibit F - K. Tatum 4.15 Interview 2, # 7 Exhibit G - C. Martin Seizure of USB, # 8 Exhibit H - K. Tatum First Interview) (Ames, Ryan) Modified on 4/26/2023 to correct response date (mek). (Entered: 04/24/2023) |
| 04/25/2023 | 42 | Proposed Jury Instructions by USA as to David Tatum (Odulio, Mark) (Entered: 04/25/2023) |
| 04/25/2023 | 43 | Proposed Voir Dire by USA as to David Tatum (Odulio, Mark) (Entered: 04/25/2023) |
| 04/26/2023 | 44 | RESPONSE in Opposition by USA as to David Tatum re 41 MOTION to Suppress *Evidence and Request for Evidentiary Hearing* (Cervantes, Daniel) (Entered: 04/26/2023) |
| 04/27/2023 | 45 | REPLY TO RESPONSE to Motion by David Tatum re 41 MOTION to Suppress (Ames, Ryan) (Entered: 04/27/2023) |
| 04/27/2023 | | **TEXT-ONLY ORDER denying Defendant's 41 Motion to Suppress as to David Tatum. Written Order to follow. The Jury Selection/Trial in this matter remains set for Tuesday, 5/2/2023 at 9:30am in Courtroom #4B. So Ordered. Entered by District Judge Kenneth D. Bell on 4/27/2023. (mek) (Entered: 04/27/2023)** |
| 05/01/2023 | 46 | **ORDER denying 41 Motion to Suppress and Request for a *Franks* hearing filed by David Tatum. Signed by District Judge Kenneth D. Bell on 5/1/2023. (mek)** (Entered: 05/01/2023) |
| 05/02/2023 | 47 | WITNESS LIST *(Sealed - Participants)* by USA as to David Tatum (Cervantes, Daniel) (Entered: 05/02/2023) |
| 05/02/2023 | 48 | EXHIBIT LIST by USA as to David Tatum (Cervantes, Daniel) (Entered: 05/02/2023) |
| 05/02/2023 | 49 | **ORDER RETURNING TRIAL EXHIBITS as to David Tatum. Signed by District Judge Kenneth D. Bell on 5/2/2023. (mek)** (Entered: 05/02/2023) |
| 05/02/2023 | | Minute Entry: JURY TRIAL as to David Tatum held before District Judge Kenneth D. Bell. Jury selected and sworn. Opening Statements. Evidence Introduced. Evidence continued. Jury Trial set for 5/3/2023 09:00 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell.Government attorney: Daniel Cervantes, Mark Odulio. Defendant attorney: Ryan Patrick Ames. Court Reporter: Cheryl Nuccio. (mek) (Entered: 05/02/2023) |
| 05/03/2023 | 50 | Proposed Jury Instructions by USA as to David Tatum (Odulio, Mark) (Entered: 05/03/2023) |
| 05/03/2023 | | Minute Entry: JURY TRIAL as to David Tatum held before District Judge Kenneth D. Bell. Evidence Introduced. Government rested. Defendant rested. Oral Rule 29 Motion by defendant is denied by court. Jury Trial set for 5/4/2023 09:00 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell.Government attorney: Daniel Cervantes, Mark Odulio. Defendant attorney: Ryan Patrick Ames. Court Reporter: Cheryl Nuccio. (mek) (Entered: 05/03/2023) |
| 05/04/2023 | | **TEXT-ONLY ORDER denying as moot Government's 37 Motion in Limine as to David Tatum (1). Entered by District Judge Kenneth D. Bell on 5/4/2023. (mek)** (Entered: 05/04/2023) |
| 05/04/2023 | | Minute Entry: JURY TRIAL as to David Tatum held before District Judge Kenneth D. Bell. Closing arguments. Courts charge. Jury retired to deliberate. Jury returns verdict of guilty as to Counts 1s, 2s, 3s. Defendant remanded to the custody of the United States |

JA7

| | | Marshal. Government attorney: Daniel Cervantes, Mark Odulio. Defendant attorney: Ryan Patrick Ames. Court Reporter: Cheryl Nuccio. (mek) (Entered: 05/04/2023) |
|---|---|---|
| 05/04/2023 | 51 | JURY VERDICT as to David Tatum (1) Guilty on Count 1s,2s,3s. (Attachment: # 1 Unredacted Signature Page)(mek) (Entered: 05/04/2023) |
| 05/05/2023 | 53 | Jury Note and Judge Response *(Sealed - Court)* as to David Tatum (mek) (Entered: 05/05/2023) |
| 05/08/2023 | 55 | Notice of PSI Interview Preference as to David Tatum (Ames, Ryan) (Entered: 05/08/2023) |
| 05/18/2023 | 56 | MOTION for Acquittal by David Tatum. Responses due by 5/25/2023 (Ames, Ryan) (Entered: 05/18/2023) |
| 05/25/2023 | 57 | RESPONSE to Motion by USA as to David Tatum re 56 MOTION for Acquittal (Cervantes, Daniel) (Entered: 05/25/2023) |
| 06/13/2023 | 58 | **ORDER denying Defendant's 56 Motion for a Judgment of Acquittal under Rule 29 of the Federal Rules of Criminal Procedure, or a New Trial under Rule 33 as to David Tatum (1). Signed by District Judge Kenneth D. Bell on 6/13/2023. (mek)** (Entered: 06/13/2023) |
| 07/06/2023 | 59 | PRESENTENCE INVESTIGATION REPORT (Draft Report) *(SEALED - Attorney)* as to David Tatum. Objections to PSI due 07/20/2023. (available to USA, David Tatum) (Jaclyn Hoffman - arw) (Entered: 07/06/2023) |
| 07/20/2023 | 60 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT *(Sealed - Attorney)* by David Tatum; (available to: USA, David Tatum) (Ames, Ryan) (Entered: 07/20/2023) |
| 07/26/2023 | 61 | RESPONSE to 60 Objection to Presentence Investigation Report *(Sealed - Attorney)* (available to: USA) (Cervantes, Daniel) (Entered: 07/26/2023) |
| 07/26/2023 | 62 | MOTION to Seal *Government's Response to Defendant's Objections to the Presentence Investigation Report* by USA as to David Tatum. Responses due by 8/2/2023 Motions referred to David Keesler (Cervantes, Daniel) (Entered: 07/26/2023) |
| 07/27/2023 | 63 | **ORDER granting 62 Government's Motion to Seal Document No. 61 as to David Tatum (1). Signed by US Magistrate Judge David Keesler on 7/26/23. (mga)** (Entered: 07/27/2023) |
| 08/02/2023 | 64 | PRESENTENCE INVESTIGATION REPORT (Final Report) *(SEALED - Attorney)* as to David Tatum. (available to USA, David Tatum) Schedule for Sentence on or after 8/10/2023. (Jaclyn Hoffman - arw) (Entered: 08/02/2023) |
| 08/28/2023 | 66 | Pro Se MOTION to Appoint Counsel by David Tatum. (Attachments: # 1 Envelope) Motions referred to David Keesler (tlj) (Entered: 08/28/2023) |
| 08/28/2023 | | NOTICE OF HEARING as to David Tatum: Inquiry into Status of Counsel Hearing set for 9/12/2023 10:00 AM in Courtroom #1A, 401 W Trade St, Charlotte, NC 28202 before US Magistrate Judge David Keesler. *This is your only notice - you will not receive a separate document.*(brl) (Entered: 08/28/2023) |
| 09/06/2023 | 67 | LETTER to Judge Bell by Peggy Tatum as to David Tatum (Attachments: # 1 Envelope) (Document Received by Chambers)(brl) (Entered: 09/06/2023) |
| 09/07/2023 | | NOTICE of Cancellation of Inquiry as to Status of Counsel scheduled for 9/12/2023 as to David Tatum (mga) (Entered: 09/07/2023) |
| 09/12/2023 | 68 | Pro Se LETTER by David Tatum (Attachments: # 1 Envelope)(cjs) (Entered: 09/12/2023) |

**JA8**

| | | |
|---|---|---|
| 09/14/2023 | 69 | TRANSCRIPT of Trial Proceedings, Volume I as to David Tatum held on 5/2/23 before Judge Bell. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 12/11/2023. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 09/14/2023) |
| 09/14/2023 | 70 | TRANSCRIPT of Trial Proceedings, Volume II as to David Tatum held on 5/3/23 before Judge Bell. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 12/11/2023. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 09/14/2023) |
| 09/14/2023 | 71 | TRANSCRIPT of Trial Proceedings, Volume III as to David Tatum held on 5/4/23 before Judge Bell. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 12/11/2023. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 09/14/2023) |
| 10/26/2023 | | NOTICE OF HEARING as to David Tatum: Sentencing set for 11/8/2023 10:00 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.*(mek) (Entered: 10/26/2023) |
| 10/31/2023 | 72 | MOTION for Forfeiture of Property by USA as to David Tatum. Responses due by 11/7/2023 (Bain-Creed, Benjamin) (Entered: 10/31/2023) |
| 11/02/2023 | 73 | Unopposed MOTION for Extension of Time to File *Sentencing Materials* by David Tatum. Motions referred to David Keesler (Ames, Ryan) (Entered: 11/02/2023) |
| 11/03/2023 | 74 | **ORDER granting Defendant's 73 Motion for Extension of Time to File Sentencing Materials as to David Tatum (1). Sentencing materials due on or before 11/4/2023. Signed by US Magistrate Judge David Keesler on 11/3/23. (mga)** (Entered: 11/03/2023) |
| 11/04/2023 | 75 | LETTERS of Support Regarding Sentencing by David Tatum (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Ames, Ryan) (Entered: 11/04/2023) |
| 11/06/2023 | 76 | PRESENTENCE INVESTIGATION REPORT (Supplement) *(SEALED - Attorney)* as to David Tatum. (available to USA, David Tatum) - (Attachment: #(1) Victim Impact Statement) - (Jaclyn Hoffman - pjs) (Entered: 11/06/2023) |
| 11/07/2023 | 77 | PRESENTENCE INVESTIGATION REPORT (2nd Supplement) *(SEALED - Attorney)* as to David Tatum. (available to USA, David Tatum) (Jaclyn Hoffman - arw) (Entered: 11/07/2023) |

**JA9**

| | | |
|---|---|---|
| 11/07/2023 | 78 | PRESENTENCE INVESTIGATION REPORT (2nd Supplement) *(SEALED - Attorney)* as to David Tatum. (available to USA, David Tatum) (Attachments: # 1 Victim Statement) (Jaclyn Hoffman - arw) (Entered: 11/07/2023) |
| 11/08/2023 | 79 | LETTERS of Support Regarding Sentencing by David Tatum (Attachments: # 1 Exhibit Laura Tatum - Support Letter)(Ames, Ryan) (Entered: 11/08/2023) |
| 11/08/2023 | 80 | **ORDER granting 72 Motion for Preliminary Order of Forfeiture as to David Tatum (1). Signed by District Judge Kenneth D. Bell on 11/8/2023. (mek)** (Entered: 11/08/2023) |
| 11/08/2023 | | Minute Entry: SENTENCING as to David Tatum held before District Judge Kenneth D. Bell. Factual Basis Found. Government attorney: Daniel Cervantes, Mark Odulio. Defendant attorney: Ryan Patrick Ames. Court Reporter: Cheryl Nuccio. (mek) (Entered: 11/08/2023) |
| 11/08/2023 | | **ORAL ORDER as to David Tatum: The determination of restitution is deferred until 2/5/2024. The deadline to submit documentation with respect to restitution is 2/5/2024. Upon such a determination an Amended Judgment in a Criminal Case (AO 245C) will be entered. Failing such a determination by 2/5/2024, restitution amount becomes $0.00 without further Order of the Court. Entered by District Judge Kenneth D. Bell on 11/8/2023. (mek)** Modified text on 11/8/2023 (clc). (Entered: 11/08/2023) |
| 11/09/2023 | 81 | **JUDGMENT as to David Tatum (1), Count(s) 1s, 120 months imprisonment, 30 years supervised release concurrent; Count(s) 2s, 360 months imprisonment consecutive to count 1, 30 years supervised release concurrent; Count(s) 3s, 240 months imprisonment concurrent to all other counts, 30 years supervised release concurrent; $300 special assessment, $15,000 JVTA assessment, $84,000 AVAA assessment, restitution to be determined; Count(s) 1, Dismissed. Signed by District Judge Kenneth D. Bell on 11/9/2023. (mek)** (Entered: 11/09/2023) |
| 11/09/2023 | 82 | **STATEMENT OF REASONS *(Sealed - Attorney)* re: 81 Judgment (available to: USA, David Tatum). Signed by District Judge Kenneth D. Bell on 11/9/2023. (mek)** (Entered: 11/09/2023) |
| 11/09/2023 | 83 | Joint MOTION for Protective Order *For Redactions Under Rule 49.1(e)(1)* by David Tatum. Responses due by 11/16/2023 (Ames, Ryan) Modified to remove referral on 11/9/2023 (mga). Modified on 11/20/2023 to link to transcripts 69-71(rth). (Entered: 11/09/2023) |
| 11/14/2023 | 84 | Disposition Notice Regarding US Passport *(Sealed - Attorney)* as to David Tatum; (available to: USA, David Tatum) (Chelsea Padilla - arw) (Entered: 11/14/2023) |
| 11/15/2023 | 85 | **ORDER granting 83 Joint Motion to Redact Transcripts under Rule 49.1(e)(1) as to David Tatum (1). Signed by District Judge Kenneth D. Bell on 11/15/2023. (mek)** (Entered: 11/15/2023) |
| 11/21/2023 | 86 | NOTICE OF APPEAL by David Tatum re 81 Judgment,,. Filing fee $ 505, receipt number ANCWDC-6306059. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, Transcript Order Form, and CJA 24 Vouchers.* Note: Your Transcript Order Form (and CJA 24 if applicable) must be served on the District Court as well as the Circuit Court. (Ames, Ryan) (Entered: 11/21/2023) |
| 11/22/2023 | 87 | Transmission of Notice of Appeal as to David Tatum to US Court of Appeals re 86 Notice of Appeal (mek) (Entered: 11/22/2023) |

**JA10**

| 11/27/2023 | 88 | REDACTED TRANSCRIPT in case as to David Tatum re 69 Transcript,, of Trial Proceedings, Volume I held on 5/2/23 before Judge Bell. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 11/27/2023) |
|---|---|---|
| 11/27/2023 | 89 | REDACTED TRANSCRIPT in case as to David Tatum re 70 Transcript,, of Trial Proceedings, Volume II held on 5/3/23 before Judge Bell. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 11/27/2023) |
| 11/27/2023 | 90 | REDACTED TRANSCRIPT in case as to David Tatum re 71 Transcript,, of Trial Proceedings, Volume III held on 5/4/23 before Judge Bell. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 11/27/2023) |
| 11/29/2023 | 91 | USCA Case Number as to David Tatum 23-4710 for 86 Notice of Appeal, USCA Case Manager: Kirsten Hancock. (ejb) (Entered: 11/30/2023) |
| 01/10/2024 | 92 | NOTICE *of Final Forfeiture* by USA as to David Tatum re 80 Order on Motion for Forfeiture of Property (Attachments: # 1 Exhibit A)(Bain-Creed, Benjamin) (Entered: 01/10/2024) |
| 01/12/2024 | 93 | TRANSCRIPT of Sentencing as to David Tatum held on 11/8/23 before Judge Bell, **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov *(Does this satisfy all appellate orders for this reporter? - Yes.)* Release of Transcript Restriction set for 4/8/2024. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 01/12/2024) |
| 01/18/2024 | 94 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT as to David Tatum re 86 Notice of Appeal [23-4710]. Court Reporter: Cheryl Nuccio; Current Deadline: 02/23/2024; Proceedings: Pre-Trial Proceedings: Motion hearing 04/20/2023; Ordering Party(ies): David Tatum. (Attachments: # 1 Transcript Order Form)(nvc) (Entered: 01/18/2024) |
| 01/29/2024 | 95 | SEALED MOTION *(Sealed - Attorney)* Unopposed Motion for Victim Restitution (available to: USA, David Tatum) (Cervantes, Daniel). Modified to remove referral on 1/29/2024 (mga). Modified to correct access on 1/29/2024 (mek). (Entered: 01/29/2024) |
| 01/29/2024 | 96 | MOTION to Seal 95 Sealed Motion for Victim Restitution by USA (Cervantes, Daniel). Modified on 1/29/2024 to correct event type (mek). (Entered: 01/29/2024) |
| 01/29/2024 | | **TEXT-ONLY ORDER granting Government's 96 Motion to Seal 95 Sealed Motion for Victim Restitution as to David Tatum (1). So Ordered. Entered by District Judge Kenneth D. Bell on 1/29/2024. (mek)** (Entered: 01/29/2024) |
| 01/29/2024 | 97 | **SEALED ORDER *(Sealed - Attorney)* granting 95 Sealed Motion for Restitution (available to: USA, David Tatum) as to David Tatum (1). Signed by District Judge Kenneth D. Bell on 1/29/2024. (mek)** (Entered: 01/29/2024) |
| 01/30/2024 | 98 | **AMENDED JUDGMENT as to David Tatum (1), amended to add restitution amount of $30,000; all other terms and conditions of the original judgment remain unchanged. Signed by District Judge Kenneth D. Bell on 1/29/2024. (mek)** (Entered: 01/30/2024) |
| 01/30/2024 | 99 | **REASON for Amendment *(Sealed - Attorney)* as to David Tatum re: 98 Amended Judgment (available to: USA, David Tatum). Signed by District Judge Kenneth D. Bell on 1/29/2024. (mek)** (Entered: 01/30/2024) |

**JA11**

| 02/08/2024 | 100 | TRANSCRIPT of Pretrial Conference as to David Tatum held on 4/20/23 before Judge Bell, **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a** *Notice of Intent to Request Redaction* **and 21 calendar days to file a** *Redaction Request.* **If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** *(Does this satisfy all appellate orders for this reporter? - Yes.)* Release of Transcript Restriction set for 5/6/2024. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 02/08/2024) |

<table>
<tr><td colspan="4" align="center">**PACER Service Center**</td></tr>
<tr><td colspan="4" align="center">**Transaction Receipt**</td></tr>
<tr><td colspan="4" align="center">03/07/2024 14:55:39</td></tr>
<tr><td>**PACER Login:**</td><td>Step0075</td><td>**Client Code:**</td><td>999999.99999</td></tr>
<tr><td>**Description:**</td><td>Docket Report</td><td>**Search Criteria:**</td><td>3:22-cr-00157-KDB-DCK</td></tr>
<tr><td>**Billable Pages:**</td><td>12</td><td>**Cost:**</td><td>1.20</td></tr>
</table>

**JA12**

FILED
CHARLOTTE, NC

JUN 2 1 2022

US DISTRICT COURT
WESTERN DISTRICT OF NC

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| DAVID TATUM | ) |
| | ) |
| | ) |

DOCKET NO. 3:22 cr 157-KDB

**UNDER SEAL**

**BILL OF INDICTMENT**

**Violation:**
**18 U.S.C. § 2252A(a)(5)(B)**

**THE GRAND JURY CHARGES:**

**COUNT ONE**

From in or about August 2021, through on or about September 22, 2021, in Mecklenburg County, within the Western District of North Carolina and elsewhere,

**DAVID TATUM**

did, and did attempt to, knowingly possess, and access with intent to view, any material that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8), and that has been mailed, and shipped and transported using any means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that have been mailed, and shipped and transported in and affecting interstate and foreign commerce by any means, including by computer.

All in violation of Title 18, United States Code, Section 2252A(a)(5)(B).

1

**JA13**

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 2253. The following property is subject to forfeiture in accordance with Section 2253:

a. Any visual depiction or book, magazine, periodical, film, videotape, or other matter which contains any such depiction, which was produced, transported, mailed, shipped, or received during the violations set forth in this bill of indictment;

b. Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from proceeds of the violations;

c. Any property, real or personal, used or intended to be used to commit or promote the violations; and

d. If, as set forth in 21 U.S.C. § 853(p), any property described in (a), (b), or (c) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a), (b) and (c).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

a. Western Digital My Passport Ultra External Drive; SN: WX21E54UX486
b. MacBook Pro; SN: C02PFR7WFVH5
c. Flash drive labeled "Medical School of Wisconsin"

A TRUE BILL:

FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

MARK T. ODULIO
ASSISTANT UNITED STATES ATTORNEY

2

**JA14**

FILED
CHARLOTTE, NC

NOV 1 5 2022

US DISTRICT COURT
WESTERN DISTRICT OF NC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:22CR157 |
|  | ) |  |
|  | ) |  |
|  | ) | **SUPERSEDING BILL OF** |
|  | ) | **INDICTMENT** |
| v. | ) |  |
|  | ) | **Violation:** |
|  | ) | **18 U.S.C. § 2252A(a)(5)(B)** |
| DAVID TATUM | ) | **18 U.S.C. § 2252A(a)(1)** |
|  | ) | **18 U.S.C. § 2251(a)** |
|  | ) |  |

**THE GRAND JURY CHARGES:**

**COUNT ONE**

From in or about July 2016, through on or about September 22, 2021, in Mecklenburg County, within the Western District of North Carolina and elsewhere,

**DAVID TATUM**

did, and did attempt to, knowingly possess, and access with intent to view, any material that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8), and that has been mailed, and shipped and transported using any means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that have been mailed, and shipped and transported in and affecting interstate and foreign commerce by any means, including by computer.

All in violation of Title 18, United States Code, Section 2252A(a)(5)(B).

1

**JA15**

## COUNT TWO

From in or about July 2016, through on or about September 22, 2021, in Mecklenburg County, within the Western District of North Carolina and elsewhere,

**DAVID TATUM**

attempted to and did employ, use, persuade, induce, entice and coerce Child Victim 1 to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct using materials that had been mailed, shipped, or transported in and affecting interstate and foreign commerce by any means, including by computer, and the visual depiction was transported using any means and facility of interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 2251(a) and (e).

## COUNT THREE

From in or about July 2016, through in or about September 22, 2021, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

**DAVID TATUM**

knowingly transported and shipped any child pornography, as defined in Title 18, United States Code, Section 2256(8), using any means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce by any means, including by computer.

All in violation of Title 18, United States Code, Section 2252A(a)(1).

2

**JA16**

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 2253. The following property is subject to forfeiture in accordance with Section 2253:

a. Any visual depiction or book, magazine, periodical, film, videotape, or other matter which contains any such depiction, which was produced, transported, mailed, shipped, or received during the violations set forth in this bill of indictment;

b. Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from proceeds of the violations;

c. Any property, real or personal, used or intended to be used to commit or promote the violations; and

d. If, as set forth in 21 U.S.C. § 853(p), any property described in (a), (b), or (c) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a), (b) and (c).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

a. Western Digital My Passport Ultra External Drive; SN: WX21E54UX486
b. MacBook Pro; SN: C02PFR7WFVH5
c. Flash drive labeled "Medical School of Wisconsin"
d. HP Pavilion Model P7-1074

A TRUE BILL:

_____
FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

_____
MARK T. ODULIO
ASSISTANT UNITED STATES ATTORNEY

3

**JA17**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA          )     DOCKET NO. 3:22-CR-157
                                  )
        vs.                       )     VOLUME I - REDACTED
                                  )
DAVID TATUM,                      )
                                  )
            Defendant.            )
_____    )


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
MAY 2, 2023


APPEARANCES:

On Behalf of the Government:

        DANIEL CERVANTES, ESQ.
        MARK T. ODULIO, ESQ.
        United States Attorney's Office
        227 West Trade Street, Suite 1700
        Charlotte, North Carolina 28202

On Behalf of the Defendant:

        RYAN PATRICK AMES, ESQ.
        SeiferFlatow, PLLC
        2319 Crescent Avenue
        Charlotte, North Carolina 28207


                    Cheryl A. Nuccio, RMR-CRR
                    Official Court Reporter
                    United States District Court
                    Charlotte, North Carolina

I N D E X

GOVERNMENT'S WITNESSES                                    PAGE

MARISA BROWN
    Direct Examination By Mr. Odulio                       29
    Cross Examination By Mr. Ames                          41

MICHAEL GREGORY
    Direct Examination By Mr. Odulio                       47
    Cross Examination By Mr. Ames                          53

DANIEL W. JACKSON
    Direct Examination By Mr. Cervantes                    56
    Cross Examination By Mr. Ames                          68

JASON WHITT
    Direct Examination By Mr. Cervantes                    77


E X H I B I T S

GOVERNMENT'S EXHIBITS

NUMBER                                                ADMITTED

1A  ...................................................32
1B  ...................................................89
1C  ...................................................92
1D  ...................................................93
1E  ...................................................96
1F  ...................................................98
1G  ..................................................100
1H  ..................................................102
1I  ..................................................103
1K  ..................................................104
1M  ..................................................104
1J  ..................................................105
1L  ..................................................105
1N  ..................................................105
1O  ..................................................115
1P  ..................................................116
2A  ...................................................32
2B  ..................................................109
2C  ..................................................111
2B  ..................................................114
2E  ..................................................116
2F  ..................................................117
2G  ..................................................118

E X H I B I T S

GOVERNMENT'S EXHIBITS

NUMBER                                                      ADMITTED

2H  ...............................................118
2I  ...............................................119
3A  ................................................52
3B  ...............................................121
3C  ...............................................121
3E  ...............................................123
3D  ...............................................124
3F  ...............................................124
3G  ...............................................126
3H  ...............................................127
3I  ...............................................127
3J  ...............................................128
4A  ................................................34
5A  ................................................34
9A  ................................................36
9B  ................................................36
9C  ................................................36
9D  ................................................36
9E  ................................................36
9F  ................................................36
9G  ................................................36
9H  ................................................36
9I  ................................................36
11  ...............................................106
12  ................................................64
13A  ................................................50
13B  ................................................50
13C  ................................................50
13D  ................................................50
13E  ................................................50

PROCEEDINGS

(Court back in session at 11:38 AM.)

THE COURT: Are we ready for the jury?

MR. CERVANTES: Yes, Your Honor.

(Jury entered the courtroom.)

THE COURT: Please impanel the jury.

(All 14 jurors were duly impaneled.)

THE COURT: All right. Members of the jury, I want to give you some preliminary instructions that I hope will assist you during this trial.

As I've said several times already, it will be your duty to find from the evidence what the facts are. You and you alone will be the judges of the facts. You will then apply those facts to the law as I give it to you. But nothing the Court may say or do during the course of the trial is intended to indicate or should be taken by you as indicating what I think your verdict should be. I do not have an opinion on that. It's up to you.

The evidence from which you will find the facts will consist of the testimony of the witnesses, documents and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to or that the Court instructs you to find.

Certain things are not evidence and should not be considered by you as evidence.

5

The statements, arguments, and questions by the lawyers are not evidence.

Objections to questions are not evidence. Lawyers have a duty to object when they believe evidence is being offered that's improper under the rules of evidence. You should not be influenced by the objection.

If I sustain an objection, then the witness is not allowed to answer the question.

If I overrule the objection, then the witness is allowed to answer the question and you should treat that answer as you would any other.

But if I sustain an objection and the witness is not allowed to answer, don't guess what the answer should be. That's not evidence.

If I exclude testimony -- sometimes something gets by me. So if I exclude something or strike some testimony, you are to follow the Court's instructions on that and ignore that piece of testimony.

Anything you see or hear outside this courtroom is not evidence. You will find the facts only from what you hear by way of witnesses and exhibits during the course of the trial.

As you know, this is a criminal case and there are three basic rules that we went over during jury selection for criminal cases.

First, the defendant is presumed innocent until proven guilty. The indictment against the defendant brought by the government is only an accusation and nothing more. It is not proof of guilt or anything else. So the defendant starts with a clean slate.

Second, the burden of proof is on the government until the very end of the case. The defendant has no burden to prove his innocence or to present any evidence or to testify. Since the defendant has the right to remain silent, the law prohibits you from drawing any inference against him if he chooses not to testify.

And third, the government must prove the defendant's guilt beyond a reasonable doubt. I will instruct you further on that point at the end of the trial.

The Court instructs you again that you are the sole judges of the credibility of the witnesses and the weight their testimony deserves. While there is no fast and hard rule as to how to judge the credibility of witnesses, I'll give you a few examples of what could lead your determinations.

One, whether the witness has any motive or reason for being truthful or untruthful.

Two, the witness's interest, if any, in the outcome of the case.

Three, whether there appears from the witness's

7

attitude or conduct any bias, prejudice, or feeling which may cause that person's testimony to be influenced.

Fourth, whether the testimony bears what we call the earmarks of truthfulness. That's the sort of thing you do every day. You're talking to somebody and you make decisions. You believe them or you don't believe them.

Next, to what extent, if any, the testimony is corroborated or confirmed by other testimony which is not questioned. Or to what extent, if any, it is corroborated or confirmed by known or admitted facts.

And finally, you may also consider the intelligence and mental capacity of a witness and the witness's opportunity to have accurate knowledge of the matters to which the person testifies.

You may believe all that a witness says, none of what a witness says, believe some, not believe the rest. It's entirely up to you.

There are two types of evidence that are permitted. They're called direct and circumstantial evidence. The classic example of those is if you are standing in a downpour and you're getting soaking wet, that's direct evidence that it's raining. If you went to bed last night and your driveway was dry and this morning it's soaked, that's circumstantial evidence that it rained last night. The law doesn't make any distinction between direct and circumstantial evidence so long

**JA24**

as the jury finds beyond a reasonable doubt each of the elements that the government is required to prove.

During the trial you are not to discuss this case among yourselves or with anyone else.  You're going to get tired of me saying that, but I'm going to say it almost every time we break because it's very important.  Until you retire to deliberate your verdict at the end of the case, you simply are not to discuss this case among yourselves or with anyone else.  And don't let anyone discuss it with you.  If anyone approaches you and tries to discuss this case, bring it to my attention immediately.

Obviously, I don't know if there's going to be any press coverage of this; but if there is, don't watch it. Don't read it.  We want you just as pure at the end of this trial as you are right now.

Obviously, don't do any independent research about any of these matters.  Stay off the internet for these purposes.

And finally, don't form any opinions until all of the evidence is in and you've heard the closing arguments of the lawyers and you've heard the final instructions from the Court.  Then you can start forming opinions.

Of course, if you wish, you may take notes during the trial, but the notes are not a substitute for your memory. We require that each of you remember all of the evidence, not

just what's in your notes.  And if you choose not to take notes, that's fine too; but you can't rely on some other juror's memory just because they took notes.  We need 12 of you independently deciding this case.

Occasionally we have to do something called a sidebar.  You saw one earlier this morning where I just stepped to the side with the lawyers to handle something that I think we can handle pretty quickly without excusing you to the jury room.  But if there's something that I have to deal with that will take longer than just that couple of minutes, we'll excuse you to the jury room where you'll be more comfortable.  But I try to keep those to a minimum.

The exhibits will come in electronically, which I referenced earlier.  It will show up on your screens there. And I want to describe for you how that process is because there will be a time where everybody is seeing something on their screen except for you.

The way it works is one of the lawyers will get a witness to identify an exhibit.  Ask him what it is.  Do they know what it is.  A few other foundation questions like that. And then they ask that it be admitted into evidence.  And if I admit it into evidence, then they may show it to you.  And the reason for doing it that way is if the evidence is inadmissible, I don't want you seeing it.  So don't think your screens aren't working just because we're all looking at

something and you're not. When it's admitted into evidence, either of the counsel can show it to you at any time they like, but not before.

All right. So we're going to begin this trial now and we'll start with opening statements. As I said, the statements of the attorneys are not evidence. They're not even argument at this point. It's a forecast of what counsel believe the evidence will be. Trials are done one witness at a time, one exhibit at a time, and it doesn't always make sense to you why you're seeing and hearing what you're seeing and hearing. So the point of an opening statement is to give you some context or to tell the story in sort of a broad brush enough way that as you hear the evidence, it will make some sense to you, and that's the point of the opening statements.

Defense counsel may give an opening statement as well. He doesn't have to. It's entirely up to him.

And at the close of the government's case, the defense, if they would like, would put on evidence. But again, as I said, they don't have to put on any evidence because they don't have to prove anything because of the presumption of innocence.

All right. So we'll have opening statements, which each side has been given up to 20 minutes, and then we'll take our lunch break.

All right. The jury is with the government for 20

minutes.

MR. CERVANTES: This case is about a child psychiatrist who possessed and accessed child pornography. But he wasn't satisfied with that, so he made his own child pornography. And when the FBI asked him about his images of child pornography, he admitted that he had them. He admitted that he knew that they were under 18. And he admitted that he masturbated to them.

You're going to see and hear evidence that the defendant set up a hidden camera in a bathroom to record his 15-year-old cousin as she came into the bathroom, took her clothes off, got into the shower, showered and left.

You're going to see and hear evidence that the defendant had videos of child pornography depicting 11- to 13-year-old girls having sex with each other.

You're going to see and hear evidence that the defendant had what are called modified images of child pornography. These are images that he got of clothed minors from a website called teengallery.com. He then took those images, put them through another website, made them nude, and saved them into his collection of pornography.

He didn't just stop with those pictures that he just got on Teen Gallery. He did it to girls that he knew personally, and he took images of them when they were minors. You're going to see those as well.

And you're also going to see the history that he has on his computer under a user profile that's identified to him. And this history has a list of 1,118 references to files. And there's something in common about each and every single file listed: the phrase pthc. And you're going to hear that that stands for preteen hardcore.

As a result of the defendant's conduct, he is charged with three counts:

Possession and access with intent to view child pornography.

Count two, production and attempt to produce child pornography, and that's related to the 15-year-old cousin. And production there is with respect to, as in a movie producer, the maker of the video.

Number three, transportation of child pornography, because that video that he made was made in Maine in a family cabin and he transported it here to Charlotte, North Carolina.

I'm going to give you some background on the case. Then we're going to talk about some of the child pornography. And then I'm going to talk about the witnesses that you should expect to hear from.

So on September 21, 2021, the FBI received a report that there was a child psychiatrist in possession of child pornography. That child psychiatrist was identified as Dr. David Tatum.

So the FBI got together to try to collect the evidence. They collected evidence from three different places.

First, they met with the defendant's wife. She gave them two pieces of electronics that you're going to hear about. One is the defendant's phone, an iPhone, and the other one is a hard drive that was password protected.

The second thing that they did was that they went and they talked to the defendant himself at his place of work, which was Atrium Health on Blythe Boulevard, and they talked to him there. And you're going to hear his statements because that interview was recorded.

He said, quote, "I've searched for teens." He said he went to a website called Teen Gallery, he admitted that, to find pictures of his victims.

He said that he went to a DeepFake website to adapt and modify the pictures of teenagers. He said he used a picture of his girlfriend from high school. He made her nude and then said, quote, "I got off on it." The FBI agent asked him whether he meant that he masturbated to it and he said yes.

He admitted that 75 percent of his patients were children, which is evidence that you'll be able to consider to show he knows what children look like.

He admitted that he is into, quote, "voyeuristic

videos," which he explained as, quote, "people being videotaped without their knowledge," like the video of his 15-year-old cousin that he made without her knowledge.

During the interview FBI agents seized two more pieces of evidence:  a MacBook and a thumb drive.

While the FBI was interviewing Dr. Tatum, a separate team went to his house.  His wife was there, opened the door, and agents went to his home office and from there they took an HP computer.  These are the devices that you'll hear about throughout the trial.

So let's talk about child pornography.  The government doesn't intend to play you every single minute of the videos.  Two of them alone are each an hour long. Instead, the government will play the portions that we deem are necessary for you all to see what it is so that you can make your own mind up.  But those videos in their entirety will be made part of the record in evidence.

So there's four types of child pornography that the defendant had.  Let's talk about them.

So the first one is the production video.  In 2016, July of 2016, Dr. Tatum and his family went to their cabin in Maine.  It's a cabin on a pond called Songo Pond.  And he set up a camera in a bathroom.  You will see the video.  He sets it up.  His 15-year-old cousin -- and he leaves the bathroom. Shortly after, 20 seconds after, his 15-year-old cousin comes

into the bathroom.  She takes off her clothes and gets into the shower.  Pay attention to the angle of the video.  You'll see that it's coming from the bottom directed right toward the crotch area.

In short, the evidence will show that he used his 15-year-old cousin.  Her name is M.C..  It will show that he used M.C. to make this video.

You will know that he set it up because you'll see the video.  And in the video, the first thing you see is someone coming into the bathroom to set up the camera.  You'll see that he puts it into an area.  You'll see that he adjusts it.  You'll see that he takes a step back.  He then looks at the angle with a slight lean, and you're going to see his face on the video of him setting it up.  And then he flushes the toilet as if to make it sound to anyone listening that he used the toilet.  And then he leaves.  Twenty seconds later M.C. comes in, showers, and leaves.  Guess who comes back 20 minutes later.  You'll see it's him who recovers the video.

You will know that it was his intent to make the video of M.C..  He kept it all these years from 2016.  You'll hear about the forensics; that he took that video from the phone and then he put it in the hard drive that's password protected.  It's password protected.  The government had to send that hard drive to Quantico to get into it because no one knew the password.

16

He kept it. Pay attention to where he saved it. He saved the video in a folder with other pornography as his library of materials.

And you'll also see evidence that he watched it with his MacBook under his user profile named Morphus. Morphus. That is a profile associated to him because it is his Apple ID that you'll see, morphus100@gmail.com. And that same phone is listed to him: David's iPhone.

This video alone establishes all three counts. This video alone establishes that he produced the video -- that he produced child pornography, I'm sorry; that he possessed child pornography; and that he transported child pornography. But that's not it. There's more.

So he had videos of teen girls having sex with each other. We'll have to play some of those for you as well. Some of them the video clips are as short as five to ten seconds.

One of those videos depicts, as I mentioned, two girls approximately 11 to 13 years old on a bed totally naked digitally penetrating themselves -- digitally meaning the fingers -- and having sex with each other.

Two other videos of teens are also in his electronics. Some of them depict fully clothed, some of them partially nude. They display their genitals and they display their pubic area in a, what's called, lascivious manner.

You'll also see the modified pictures of child pornography. Of course, adapted or modified pictures of child pornography is still child pornography because it depicts the minors in sexually explicit poses.

So you will see the images that the defendant used. You will see what's called the water stamp at the bottom of the pictures where it says Teen Gallery, which is consistent with what he told the agents. You will see that he did it with his former -- with his ex-girlfriends. These were ex-girlfriends of his that he knew, that he dated when he was in high school. One of them is a picture of this girl at prom with the defendant and he passed this picture through this website and took the prom dress off. That's actually the same picture that the agents and him were talking about when he said "yes, I masturbated to it." The other picture is a group of four girls, all underage, all of them, and he made all four of them nude.

Then you will also see what I mentioned earlier about this list of 1,118 files. For example, I'll read three of those file names for you. The beginning of each of these file starts with pthc. "[PTHC] 6yo girl gets fucked with legs in the air," "[PTHC] 8yo pussy pedo fuck-screwtop style," "[PTHC] Daddy fucks my 4yo cunt for first time." 1,118 of these files, which is going to show you access with intent to view.

18

Let's talk about the witnesses that you will hear in this case -- or you will hear from.

Forensics, computer forensics. What that means is computer experts. That's why the judge was asking you about any experience with computers because we will present the testimony of two experts, computer experts, who together have analyzed thousands of devices. And they will tell you how they analyzed these devices. They will tell you what they found. And the evidence will show beyond a reasonable doubt why these are Dr. Tatum's devices and that the child pornography is his.

For example, let's take the iPhone. The iPhone runs through the whole process of -- the whole case and it's a good example of each one of these links. The iPhone was used to make the video. When a video is made on an iPhone, it's given a number. Every picture, every video is given a number. Number next, number next. If you open a file for all of the pictures saved in a phone, you'll see that list of all the pictures saved. That phone is registered to David. David's iPhone is what it says. The Apple ID is Morphus.

When you look at the phone, the expert will show you the videos for the 15-year-old, his cousin, are missing. They're not in that list. Where are they? They're in the encrypted hard drive that was password protected that law enforcement had to send to Quantico to get into.

And you're going to see that that hard drive was plugged into his MacBook, the MacBook that the FBI got from him when they interviewed him. That was one of the devices they took from him. And the MacBook, what it does is it has a history. It keeps a record of the things you plug into it. So that the next time you plug something into it, it remembers and it says, hey, I know this hard drive, let me help you.

And I'm going to show you these little thumbnails, these little tiles of what each one of the pictures are in the hard drive. That way it makes it easier for you. And you don't see this. It just happens. But the MacBook keeps that record. And this MacBook has the record of the hard drive being plugged into the MacBook and the folder where this video of the 15-year-old cousin was saved. And the user profile for accessing that folder is Morphus, the same email registered to the defendant that you see on the iPhone.

THE COURT: Three minutes, Mr. Cervantes.

MR. CERVANTES: Thank you, Your Honor.

You will also hear from some of his victims. You're going to hear from M.C.. You're going to hear from the prom date that the defendant had. Her name is E.H.. You're going to hear from Jessica who's one of the girls that was in front of the house. They're going to identify themselves in these pictures and you're going to hear from them.

And finally, you're going to hear in just a few

minutes the defendant's own voice when he was answering the FBI's questions and saying what I told you he said.

And when you consider the evidence, you should find that the defendant is guilty of all three counts.  Thank you.

THE COURT:  Mr. Ames.

MR. AMES:  Good afternoon, everybody.  I'm Ryan Ames.  Appreciate, again, your attention.

You're going to hear a lot of evidence from a lot of different people.  Some of it is going to be probably difficult to hear.  Other stuff is going to be more technical.  There's a lot to this case.  But at the end of the day, the government's primary theory and the thing you're going to hear a lot about is basically that Mr. Tatum's a pervert and here's all his devices and here's all the stuff that we found on these devices.  What you're going to find a severe lack of is material that meets the requirements of the statute.  You're also going to see a lack of corroboration for some of the assertions of the government.

For example, the government just stated that David Tatum viewed this shower video on the MacBook.  There will not be evidence of that.  There will be evidence of potentially file paths related to supposed images that the government will not show you because they don't have them.  But the data that the government will present will not show any evidence of him viewing anything.  It will show you evidence of attaching a

device at some point in time to another device and that is all that it will do.

Further, they will not present evidence about who attached that particular device to his MacBook.

Further than that, what you'll find here is that the government will paint a broad picture of Mr. Tatum as a person that has problems with sex addiction and porn addiction. And on that point they're correct. We're not hiding the ball on that. Mr. Tatum has had an ongoing issue dealing with sex addiction and pornography addiction. He's been treated for it.

The government is going to tell you all about his pornography collection that is quite substantial but primarily consisting of adult images with the exception, according to the government, of a handful that they'll present which include images that depict alleged minors' heads on the bodies of adult women that were morphed and made by a computer program.

In some instances they will present videos of alleged pornography where they have not identified anyone in the videos nor confirmed the ages of anyone in the videos. They will not give you evidence that they were able to find any known person through the various clearing houses that the government uses to identify victims. Nothing. No hits came back. Nothing. They sent multiple videos, multiple images to

NCMEC.  None of it came back as flagged in the millions upon millions upon millions upon millions of flagged images that they match with MD5 hash codes.  Zero came back positive for child pornography.  Zero.

The government is going to show you and share with you images that, quite frankly, they're going to allege are child pornography, but they are not.  They are showing images of people literally just standing there.

The Court will give you instructions at the end on what the law is and how you define pornography and, in particular, how you define child pornography.  It's complicated.  You'll need to listen carefully because it's complicated.  It's not as simple as a naked person that might be under 18.  It's no where near that easy.

Listen carefully to the answers that David Tatum gives.  They said first thing up is they're going to show you here shortly an interview they did in a parking lot outside of his job where he admitted to creation of child pornography of minors.  No, he didn't.  He acknowledged he made a couple of images in this website involving a high school girlfriend, a college girlfriend, a couple other people.  There was some other images that he made from the website Teen Gallery whose ages are unclear and he doesn't know how old they are and never stated otherwise.  Clearly stated to them, "I don't know how old they are.  It could be a close call, I don't know.  I

don't know for sure." It was never his purpose or intention specifically to look for that. That's what he tells them.

He also admits straight up, "I'm a voyeur." That's what he's into. That's his thing. It's not children; it's voyeurism. And you'll hear all kinds of stuff about that, about setting up cameras and so on and so forth.

So again, listen carefully to the evidence because what he's on trial for is not being a pervert. That's not a crime in this country or this state. It is not a crime to possess adult pornography so long as it doesn't violate the laws of any jurisdiction. And generally speaking, the government will talk all about adult pornography that he had. But they will not produce copious amounts of child pornography because there wasn't any.

This is someone they are saying is a known sex addict, a known pornography addict, a person that amassed a giant collection of well-organized, well-polished pornography on some hard drive and they're going to produce for you a handful of images that are the most borderline that they could find out of thousands upon thousands as far as whether or not these people -- how old they are.

So listen carefully and look carefully at the evidence the government will present. Listen carefully to the definitions. Listen carefully to how and why the government is presenting certain exhibits from their experts. And listen

carefully to what the evidence actually is of opening or viewing. They're going to say there's a login by someone. They're going to say there's some metadata that says something with a date on it. They're not going to present evidence that David Tatum literally watched the video. I promise they will not show that because simultaneous with that time stamp, there are going to be hundreds of other videos at the same time. So unless he's got a hundred heads and a hundred computers -- again, listen carefully to the evidence and listen carefully to the statute. Your job is to find the facts, make sure they comport with the statute, and keeping in mind that David Tatum is presumed innocent throughout and it's the government's burden to prove all of these things.

So, again, I thank you for your time and your attention. These cases are never easy and I do appreciate it that no matter how uncomfortable things can get in any trial like this, we appreciate your time and David appreciates your service. And I guess we will move on from there and I appreciate it. Thank you.

THE COURT: All right. Members of the jury, we're going to take our lunch break now. Of course, the usual rules. Don't discuss this case among yourselves and certainly don't let anyone else discuss it with you. As I said, if you get approached by anyone, let me know immediately. Don't do any independent research. Don't make up your minds. Leave

your note pads in the jury room.  Never take them outside the building at night or on our breaks.

I'll ask you to be back at 1:30 and so you're free to go until then.

Everyone remain seated until the jury clears the floor.

But Ms. Giambalvo, I'd ask for you to stay just a couple minutes after everyone else leaves.

JUROR NO. 7:  Okay.

THE COURT:  All right.  You're free to go.

(All jurors except Juror Number 7 exited the courtroom.)

THE COURT:  You can sit back down.

JUROR NO. 7:  What?

THE COURT:  You can sit back down.

I was informed during our morning break that you have a work conflict tomorrow.

JUROR NO. 7:  Just from 8:30 to 9:00.

THE COURT:  Okay.  But you're not going to be able to make that work commitment.  We're going to start tomorrow morning at 9:00.  We went over that this morning, which is why I made it clear to all the jurors that our schedule would be 9:00 to 5:00 and asked if that made jury service impossible for anyone and you didn't tell us that it did, so you're not going to be able to make that work commitment tomorrow.  I

wanted to give you as much heads up as possible so you can plan around it. Just wanted you to know.

Mr. Whelan, can you let her out with the rest of the jurors.

And please be back at 1:30. Thank you.

(Juror Number 7 exited the courtroom.)

THE COURT: Will the witnesses be sequestered? There hasn't been a motion, but I'm asking.

MR. AMES: Your Honor, I actually haven't received the list.

THE COURT: It was filed this morning.

MR. CERVANTES: I have an extra copy for defense.

THE COURT: I'm not asking -- take care of that during the lunch break.

Are the witnesses going to be sequestered?

MR. CERVANTES: Yes, Your Honor. Without a motion, that's fine.

THE COURT: All right. Make sure that they are, then.

All right. We'll be in recess until -- yes, sir.

MR. CERVANTES: On this issue in particular, we were going to raise it after the first witness testifies, but we might as well now. Is it okay when -- after Special Agent Marisa Brown testifies -- she's the first witness -- may she remain in the courtroom?

THE COURT: Any witness can remain in the courtroom after they testify, but they won't be allowed to be recalled if they sit through any of the other testimony.

MR. CERVANTES: Understood.

THE COURT: So that's entirely up to you. Once they've testified they can stay.

MR. CERVANTES: Thank you, Your Honor.

THE COURT: All right. We're in recess until 12:30 -- excuse me, 1:30.

(Lunch recess at 12:20 PM.)

TUESDAY AFTERNOON, MAY 2, 2023

(Court back in session at 1:27 PM.)

(Jury not present.)

THE COURT: All right. Counsel, apparently juror number 7 had a bit of a meltdown during the lunch break after being informed that she would not be permitted to make her meeting, her business meeting tomorrow and all of the jurors are present except for her now. Part of her meltdown during the lunch break was to ask the courtroom deputy what happens if she doesn't show up tomorrow.

The Court is concerned that she will not be focused during this trial in addition to her self-admitted ADHD and concerns that she would become bored and unable to pay attention to the evidence. With this work concern and the meltdown that's been described to me, the Court is very

concerned that she will not be a good juror for this case.  I was a little surprised when she was jointly selected, frankly.  But I would entertain a joint motion to exclude -- to excuse that juror.  That leaves us with just one alternate, but it's a short trial.

MR. AMES:  I would be okay with that, Your Honor.  I feel like it could become a worse problem if it's not nipped in the bud, I suppose, and I would have no objection to doing it jointly.

MR. CERVANTES:  No objection, Your Honor.

THE COURT:  All right.  Then if you would inform Letha that Juror Number 7 is not needed.  She may be excused.

THE CLERK:  She did show up, though.

THE COURT:  She can still be excused.

And then bring the rest when they're ready.

(Jury entered the courtroom.)

THE COURT:  All right.  Welcome back, members of the jury.  You'll notice we're without Juror Number 7.  She's been excused.  So we're down to one alternate.  I hope everybody stays healthy and no emergencies come up, but we have at least one backup if necessary.

You may call your first witness.

MR. ODULIO:  Your Honor, the United States calls Marisa Brown.

MARISA BROWN, GOVERNMENT WITNESS, SWORN,

MARISA BROWN - DIRECT

DIRECT EXAMINATION

BY MR. ODULIO:

Q.   Good afternoon, ma'am.

A.   Good afternoon.

Q.   Can you please state your name and spell your last name for the court reporter.

A.   Marisa Brown, B-r-o-w-n.

Q.   Where are you employed?

A.   The Federal Bureau of Investigation.

Q.   What's your position there?

A.   I am a special agent.

Q.   What's your assignment, Agent Brown?

A.   The Crimes Against Children and Human Trafficking Squad.

Q.   Is that in Charlotte, North Carolina?

A.   Yes.

Q.   Tell the jury what the Crimes Against Children and Human Trafficking Squad does.

A.   We investigate child exploitation, child pornography, and human trafficking.

Q.   What's your relationship to the United States versus David Tatum matter?

A.   I am one of the case agents.

Q.   Direct your attention, Agent Brown, to September 21, 2021.  Did you receive a report about an individual named David Tatum?

MARISA BROWN - DIRECT

A.   Yes.

Q.   What was that generally?

A.   The report alleged --

MR. AMES:  I'm going to object to hearsay.

THE COURT:  Overruled.  The testimony is not being offered to show the truth of what she's about to say but to inform the jury as to why she did what she did afterwards.

MR. AMES:  Thank you, Your Honor.

THE COURT:  You may proceed.

THE WITNESS:  The report alleged that David Tatum had child pornography on his computer.

Q.   Based on that did you take certain action?

A.   Yes.

Q.   And was that action prompt?

A.   Yes.

Q.   Can you explain to the jury why that was prompt?

A.   It was reported that David Tatum was a child psychiatrist.

Q.   Directing your attention now to the next day, September 22, 2021.

     Did you have a meeting with an individual named Kimberly Tatum?

A.   Yes.

Q.   And what was that meeting about?

A.   It was to obtain more information related to the report.

MARISA BROWN - DIRECT

Q.    And can you tell the jury who Kimberly Tatum is.

A.    Kimberly Tatum was the wife of David Tatum.

Q.    And at the time of the meeting, where did she live?

A.    She lived at 13021 Pumpkin Way Drive in Mint Hill, North Carolina.

Q.    And who did she live with?

A.    She lived with her husband, David Tatum, and their daughter C.T..

Q.    At the meeting did you receive certain electronic devices from Kimberly Tatum?

A.    Yes, we did.

        MR. ODULIO:  Your Honor, may I approach?

        THE COURT:  You may.

        MR. ODULIO:  Thank you, Your Honor.

Q.    Do you have an item there marked for identification only as Government's Exhibit 1A?

A.    Yes.

Q.    And what is that?

A.    This is a My Passport Ultra external drive.

Q.    And you received that at this meeting?

A.    Yes.

Q.    Do you also have Government's Exhibit 2A there?

A.    Yes.

Q.    And same question, did you receive that at the meeting?

A.    Yes.

MARISA BROWN - DIRECT

Q.   What is that generally?

A.   This is an iPhone and a case.

Q.   Were those items ultimately reviewed as part of this investigation?

A.   Yes, they were.

MR. ODULIO:  Your Honor, we'd move 1A and 2A.

THE COURT:  They're admitted.

(Government's Exhibits Nos. 1A and 2A were received into evidence.)

Q.   Later on that afternoon did you have an opportunity to interview David Tatum?

A.   Yes, we did.

Q.   Do you see him in court today?

A.   I do.

Q.   Could you identify him, please, by where he's seated and an article of clothing.

A.   He's seated at the defense table in a grayish suit.

MR. ODULIO:  Your Honor, if the record could reflect that Agent Brown has identified the defendant.

THE COURT:  The record does so reflect.

Members of the jury, I suspect that at some point during this witness's testimony, you're going to hear that the defendant gave a statement to the FBI.  Whether this statement was voluntarily given and, if so, what weight to give it is entirely up to you.  In other words, these are questions of

MARISA BROWN - DIRECT

fact which are up to a jury to decide.  In determining whether the statement was voluntary and what weight to give it, if any, you should consider what we call the totality of the circumstances.  In making this important determination, you may consider, for example, whether the statement was adduced by a promise or threat.  And you may also consider any other factor which your common sense tells you is relevant to the issue of voluntariness.

You may proceed.

MR. ODULIO:  Thank you, Your Honor.

BY MR. ODULIO:

Q.    So in relation to the meeting with Kimberly Tatum, again, when did you meet with David Tatum?

A.    We met with David Tatum in the early evening around 5:00 or 6:00.

Q.    And where did that take place?

A.    It took place in the parking garage of his employment at Atrium Health in Charlotte, North Carolina.

Q.    Why did it take place in the parking garage?

A.    We met with him after work to not interrupt his day at work.

Q.    And was that at 1000 Blythe Boulevard?

A.    Yes.

Q.    Could you tell the jury who was present for that interaction.

MARISA BROWN - DIRECT

A.   Myself, Special Agent Scott Atwood, Task Force Officer Aleta Dunbar, and David Tatum.

Q.   Okay.  Now, in connection with that interview, were certain devices seized from Dr. Tatum?

A.   Yes.

Q.   I think you have what's marked for identification only as Government's Exhibit 4A.

A.   Yes.

Q.   Tell the jury, please, what that is.

A.   This is a thumb drive with Medical College of Wisconsin on one side.

Q.   And Government's Exhibit 5A?

A.   Yes.

Q.   What is that?

A.   This is a MacBook laptop.

Q.   And those were seized from Dr. Tatum in that interaction?

A.   Yes.

Q.   Have they been in the custody of the FBI since?

A.   Yes.

Q.   And were they also analyzed in connection with this matter?

A.   Yes.

        MR. ODULIO:  Your Honor, we'd move 4A and 5A.

        THE COURT:  They're admitted.

        (Government's Exhibits Nos. 4A and 5A were received

MARISA BROWN - DIRECT

into evidence.)

Q.   Where did the interview take place, Agent Brown?

A.   The interview took place in Agent Scott Atwood's vehicle.

Q.   And where were you seated?

A.   I was seated in the driver seat.

Q.   And where was Dr. Tatum seated?

A.   Dr. Tatum was in the back seat.

Q.   Was there anyone else present -- or where were the other participants in the interview?

A.   Agent Atwood was also in the back seat.  And then when Task Force Officer Aleta Dunbar arrived, she sat in the passenger seat.

Q.   Okay.  Was -- could you describe the vehicle.  Were the doors locked?  Were the windows up?  Could you give us an idea of what was happening here.

A.   Yes.  The windows were down and the doors were unlocked.

Q.   And before you began, was it clear whether -- or did you tell Dr. Tatum whether or not he was free to leave?

A.   Yes.  Before the interview when we were standing outside, we asked Dr. Tatum if he wanted to speak with us and he agreed.  We went into Agent Atwood's vehicle and told him that the windows were down, the doors were unlocked and he was free to go at any time, that he was not under arrest.  And at one point in the interview, Agent Atwood and Dr. Tatum left the vehicle and then returned to the vehicle to finish the

MARISA BROWN - DIRECT

interview.

Q.   Okay.  And at the end of the interview, was -- did the defendant leave?

A.   Yes, he did.  The defendant left at the end of the interview and drove away.

Q.   Okay.  Are you familiar generally with Government's Exhibits 9A through 9I?

A.   Yes.

Q.   Did you examine them and listen to them before you came into court today?

A.   Yes.

Q.   Would you tell the jury what those are generally.

A.   These are excerpts from that interview.

Q.   And are the excerpts a fair and accurate depiction of the interview and the recording?

A.   Yes.

          MR. ODULIO:  Your Honor, we'd offer 9A through 9I.

          THE COURT:  They're admitted.

          (Government's Exhibits Nos. 9A, 9B, 9C, 9D, 9E, 9F, 9G, 9H, and 9I were received into evidence.)

Q.   We'll play those in a second, Agent Brown.  Let me just ask, were you present throughout the entire interview?

A.   Yes, throughout the entire recorded portion.

Q.   Before court today did you also become familiar with Government's Exhibits 10A through 10I?

MARISA BROWN - DIRECT

A.    Yes.

Q.    And what are those generally?

A.    Those are transcripts corresponding to the excerpts from the interview.

Q.    Okay.  And are the transcripts a fair and accurate depiction of what was said during the interview?

A.    Yes.

Q.    Do the trans -- does the transcript identify the speakers in the interview?

A.    Yes.

Q.    And does it do that by initials?

A.    Yes, it does.

Q.    Who is DT?

A.    DT is David Tatum.

Q.    Who is SA?

A.    SA is Scott Atwood.

Q.    Who is MB?

A.    MB is Marisa Brown.

Q.    And tell the jury who AD was.

A.    AD was Aleta Dunbar.

Q.    Okay.  The last set of questions before we go into this is, are you familiar with Government's Exhibits 9A1 through 9I1?

A.    Yes.

Q.    Are those demonstratives of the audio sync with the

MARISA BROWN - DIRECT

transcripts?

A.    Yes.

Q.    And are you familiar with those and have you reviewed those prior to your testimony today?

A.    Yes, I did.

        MR. ODULIO:  Your Honor, we'd like to publish those one at a time now with the Court's permission.

        THE COURT:  All right.  Do these have transcripts attached to them?

        MR. ODULIO:  They have transcripts -- it's the audio with the transcripts attached to them.

        THE COURT:  Members of the jury, the transcripts are provided as an aid to the audios that you will hear.  If you discern any difference between what you heard and what you read in the transcripts, you should go with what you hear as the audio is the better evidence.

        You may proceed.

        MR. ODULIO:  So we'll ask my co-counsel to pull up 9A1.

Q.    As he does that I'll ask Agent Brown:  Agent Brown, were questions asked about Dr. Tatum's interactions with patients?

A.    Yes.

        MR. ODULIO:  We'll publish now 9A1 with the Court's permission.

        THE COURT:  You may.

MARISA BROWN - DIRECT

(Government's Exhibit Number 9A1 was published.)

Q.   I'm going to ask you now, Agent Brown, were questions asked about using a DeepFake website to modify pictures of children to make them nude?

A.   Yes.

MR. ODULIO:   Publishing Government's Exhibit 9B1.

(Government's Exhibit Number 9B1 was published.)

Q.   Agent Brown, were questions asked about whether the defendant searched for images of teens?

A.   Yes.

MR. ODULIO:   I'm going to publish now 9C1.

(Government's Exhibit Number 9C1 was published.)

Q.   Turn now to Government's Exhibit 9D1 and ask you, Agent Brown, whether questions were asked concerning the defendant modifying pictures of an ex-girlfriend?

A.   Yes.

MR. ODULIO:   9D1.

(Government's Exhibit Number 9D1 was published.)

Q.   We'll move on to 9E1 and I'll ask Agent Brown whether questions were asked concerning voyeurism?

A.   Yes.

MR. ODULIO:   This is Government's Exhibit 9E1.

(Government's Exhibit Number 9E1 was published.)

Q.   Agent Brown, I'll ask you before we go to 9F1, were questions also asked about the use of hidden cameras?

MARISA BROWN - DIRECT

A.   Yes.

          MR. ODULIO:  This is Government's Exhibit 9F1.

          (Government's Exhibit Number 9F1 was published.)

Q.   We'll go to 9G1.  Agent Brown, were questions asked about the use of a thumb drive to save pictures that the defendant had put through the DeepFake website?

A.   Yes.

          MR. ODULIO:  This is Government's Exhibit 9G1.

          (Government's Exhibit Number 9G1 was published.)

Q.   Two more.  We'll move now to 9H1.  And I'll ask you, Agent Brown, if questions were asked about searching for images on a website called Teen Gallery?

A.   Yes.

          MR. ODULIO:  Government's 9H1.

          (Government's Exhibit Number 9H1 was published.)

Q.   And finally, Agent Brown, on to 9I1.  Were additional questions asked about whether the defendant used a USB drive to save images?

A.   Yes.

          MR. ODULIO:  This is Government's 9I1.

          (Government's Exhibit Number 9I1 was published.)

Q.   Agent Brown, the devices you have there before you, ultimately in connection with your investigation, was a search warrant obtained to conduct a review and a forensic examination of those devices?

MARISA BROWN - CROSS

A.    Yes.

Q.    And was an individual named Jason Whitt the forensic examiner who analyzed those devices?

A.    Yes, he was.

Q.    And again, 4A and 5A before you there were obtained from the defendant at the interview?

A.    Yes, the thumb drive and the MacBook computer.

Q.    And 1A and 2A were that morning from Kimberly Tatum?

A.    Yes.  The iPhone and the My Passport Ultra external drive.

          MR. ODULIO:  Your Honor, no more questions.

          THE COURT:  You may cross examine.

                    CROSS EXAMINATION

BY MR. AMES:

Q.    Agent Brown, good afternoon.

A.    Good afternoon.

Q.    The interview -- or session you had with Mr. Tatum that afternoon -- or evening, approximately how long did it last?

A.    I don't recall the exact length of the interview. Approximately two hours.

Q.    So it was pretty comprehensive.  It delved into other topics and questions.  Or was it mostly focused on these specific images?

A.    I work child pornography investigations so when I conduct an interview, the questions involve possession and

MARISA BROWN - CROSS

transportation of child pornography.

Q.   So there were additional questions that were asked about searches and things that he looked for and what his general predilection was toward pornography, right?  Just what his interests were.

MR. ODULIO:  Your Honor, I'm going to object to this.  I don't know if it's just the nature of the question, but I'm going to object.

THE COURT:  Under hearsay rules, Mr. Ames, you may ask the witness what she asked, but you may not elicit from her what statements Mr. Tatum made to her.

MR. AMES:  Understood.  Thank you, Your Honor.

Q.   Did you ask David about any additional interests as far as pornography?

A.   In relation to the line of questioning that we do during interviews, we ask questions related to electronic devices: how images are stored and what types of images and media we might find on the devices that we are seizing.

Q.   Did you ask him if he ever purposefully or intentionally sought out pornography of minors?

A.   I don't recall the exact questions that were asked; but to my recollection, the questions, as you can see from the transcripts, were based on possession of child pornography.

Q.   Right.  But my question was, did you ask him if he actively, intentionally searched for child pornography?

MARISA BROWN - CROSS

A.   I don't recall if that exact question was asked; but because of my work as a crimes against children investigator, that's a question that is typically asked during these types of interviews.

Q.   But you don't recall if it was.

A.   I don't recall at this time.

Q.   Okay.

A.   But I did ask questions related to child pornography and the possession of child pornography.

Q.   And the images here that are being discussed, did he ever acknowledge that he knew definitively or knew even with any sort of certainty the ages of these people?

MR. ODULIO:   Same objection, Your Honor.

THE COURT:   Sustained.

Q.   Did you ask him about what -- the ages of anybody in any images that are on this thumb drive you're investigating?

A.   Yes.   In particular, one of the excerpts -- David Tatum told us that one of the images was of his minor ex-girlfriend and that he made that image nude and then masturbated to that image.

Q.   And did you ask him about other images that were put through the DeepFake that were not of minors?

A.   Yes.

Q.   How many cases have you investigated with regard to this type of material in general?

MARISA BROWN - CROSS

A.    I don't know the exact number, but I've been on the Crimes Against Children Squad for about three and a half years.

Q.    And as part of your experience in that, fair to say that you're probably well versed in kind of the world of digital pornography on the internet?

A.    Most of my cases involve some type of electronic component, whether it be the internet, an electronic storage device.

Q.    So -- I mean, what are some examples of popular pornography websites that have come up in cases before that are legal?

MR. ODULIO:  Objection, scope.  Or objection.

THE COURT:  I'll overrule it, but I don't see the need to explore this particularly far.

MR. AMES:  Understood, Your Honor.

THE WITNESS:  I investigate people who have a sexual interest in children and not those interested in legal pornography.

Q.    Okay.  Well, is it the case that teens is a pretty common search term for legal pornography?

A.    I don't know that answer.

Q.    You don't know.  So on a website like Porn Hub, for example, is that a common category on their website, teens, as a category?

MARISA BROWN - CROSS

MR. ODULIO:  Objection, Your Honor.

THE COURT:  Overruled, if you know.

THE WITNESS:  I don't know.

Q.   What about voyeurism, is that a common category?

A.   I'm not very familiar with Porn Hub.

Q.   Is there a website you are familiar with?

A.   Where you download child pornography, yes, which is the cases that I investigate.

Q.   Okay.  So is it -- is it fair to say that you don't know -- do you know any popular search terms on adult legal pornography websites?

A.   No.

MR. ODULIO:  Objection.  Relevance to this, Judge.

THE COURT:  Overruled.  You may answer.  Do you know?

THE WITNESS:  No.

Q.   Okay.

A.   I investigate child pornography.

Q.   So how do you distinguish between whether or not somebody is searching for things -- for example, is -- whether that person is searching for something legal in adults versus something that's not?

A.   Child pornography is of people under the age of 18. That's what we investigate.  And it's -- once you see an image of child pornography, it looks like a child, someone under the

MARISA BROWN - CROSS

age of 18.

Q.   Understood.  But you indicated -- or there was questions about things that he was interested in and -- voyeurism or teens were categories, correct?

A.   Yes.

Q.   And that he looked at pornography in those categories which he stated were common.

MR. ODULIO:  Objection, Your Honor.

THE COURT:  Sustained.

MR. AMES:  Understood, Your Honor.

Q.   Did you ask him any questions about what the images themselves looked like that were morphed?

A.   Yes.  It was a nude image of his minor ex-girlfriend.

Q.   Do you know anything about how that process works?

A.   What process?

Q.   The morphing of an image.

A.   To my understanding, it's a website and you put an image through the website and then it makes the people in the image appear nude.

Q.   So they're not actually nude, just computer-generated nude.

A.   The body of the person in the photo was nude.  Was that the question?

Q.   Yeah.

A.   Okay.

MICHAEL GREGORY - DIRECT

Q.   So --

A.   The body -- the image -- the people in the image appeared nude once you put it through the site.

MR. AMES:  No further questions, Your Honor.

THE COURT:  Any redirect?

MR. ODULIO:  Nothing, Your Honor.  Thank you.

THE COURT:  You may stand down.

(Witness stepped down.)

THE COURT:  You may call your next witness.

MR. ODULIO:  Your Honor, the United States calls Michael Gregory.

MICHAEL GREGORY, GOVERNMENT WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. ODULIO:

Q.   Good afternoon, sir.  Please tell the jury your name and spell your last name for the court reporter.

A.   Michael Gregory.  Last name is G-r-e-g-o-r-y.

Q.   And what do you do for a living?

A.   I'm a special agent with the FBI.

Q.   What's your assignment, Agent Gregory?

A.   I work crimes against children for the Charlotte field office.

Q.   What is crimes against children?  What's that portfolio?

A.   I work matters pertaining to child pornography, human trafficking, and missing children.

MICHAEL GREGORY - DIRECT

Q.   How long have you been in that role?

A.   For about the past eight years.

Q.   I'm going to draw your attention to September 22, 2021. Do you recall that day?

A.   I do.

Q.   Were you assisting in a matter involving the investigation of David Tatum?

A.   I was.

Q.   Where were you that day?

A.   I was providing assistance of a consent search at the residence that Mr. Tatum shared with his wife.

Q.   And is that 13021 Pumpkin Way Drive in Mint Hill, North Carolina?

A.   That's correct.

Q.   And what was the nature of the investigation generally?

A.   Child pornography.

Q.   You said you were assisting in the investigation. What in particular were you doing there at 13021 Pumpkin Way Drive?

A.   I was conducting what we call a consent search of that residence.

Q.   What were you searching for?

A.   We were searching for electronic devices.

Q.   And why generally were you searching for electronic devices?

A.   Investigations involving child pornography currently deal

MICHAEL GREGORY - DIRECT

with digital media, that is, media that can be stored on desktop computers, laptops, iPads, thumb drives; any type of electronic device that digital media can be stored, shared, or transported with.

Q.   I'd like to show you now what's marked for identification only as Government's Exhibit 13A.

Are you familiar with that document?

A.   Yes, sir, I am.

Q.   What is it?

A.   That's the residence that we conducted the search, specifically the residence that was shared by Mr. Tatum.

Q.   And is that a fair and accurate depiction of the residence, a photo of it?

A.   That is.

Q.   I'm going to show you another series of photos and we'll move all of these in.

We'll show you now what's been marked for identification as 13B.

Tell us generally what that is.

A.   So that is a room that is on the ground floor, the first floor of the residence.  As you enter into the house to the right, this was the first room to the right, which would be consistent with, like, a home office.

Q.   Okay.  And then the ensuing photos which are 13C, 13D, and 13E, are you familiar with those and tell us what those

MICHAEL GREGORY - DIRECT

are at a high level.

A.   So again, these are just other pictures or other views of that same room which was consistent with a home office inside that residence that we did the consent search.

Q.   Okay.  And those are fair and accurate depictions of the images -- fair and accurate depictions of the place that you searched there?

A.   They are.

MR. ODULIO:  Your Honor, we'd move in 13A, B, C, D, and E.

THE COURT:  They're admitted.

(Government's Exhibits Nos. 13A, 13B, 13C, 13D, and 13E were received into evidence.)

MR. ODULIO:  Permission to publish, Your Honor.

THE COURT:  You may.  Once admitted, you may publish at your pleasure.

Q.   Let's take a look at 13A and let's orient the jury, please, to what we're looking at here, Agent Gregory.

What is this?

A.   So this is the very front of the house; again, the residence at 13021 Pumpkin Way Drive that we conducted the consent search.  This would be the very front of the house on the sidewalk entering into the front residence -- or front door of the residence.

Q.   Show you now what's been admitted as Government's Exhibit

MICHAEL GREGORY - DIRECT

13B.

Q.    What is 13B?

A.    So this is a view of the, again, room that's consistent with a home office.  This is the view that one would see as they have just entered the residence and turned to their immediate right to enter this room.

Q.    13C, please.

A.    So this is a view of the room facing back into the house to the viewer's left, is where you would have entered into this room.

Q.    13D, please.

A.    So this is a view of the piece of furniture that's consistent with a hutch that's just back behind the desk that contains a desktop computer on the bottom -- on the floor, along with a monitor on the very top.  But again, this is what you're looking at is the hutch which is against the far back window from the most previous picture.

Q.    And did you seize -- you mentioned a computer.  Did you seize that computer in connection with your activity that day?

A.    That's correct.

Q.    And finally 13E.  What is 13E, sir?

A.    So 13E, this is the view between the desk and the hutch, the hutch that you just saw in the previous picture.  You'll see that there are three medicine bottles that are on top of the desktop that contain the name David Tatum on the medicinal

MICHAEL GREGORY - DIRECT

bottles.

Q.   Did you see anything else, other literature or documents, in the office just as you were looking around?

A.   I noted there was some medical literature, various medical types of literature on the -- in the bookshelves.

MR. ODULIO:  Your Honor, permission to approach the witness.

THE COURT:  You may.

Q.   Sir, I think we've got what's marked for identification as Government's Exhibit 3A.

Do you see that?

A.   You talking about the computer in front of me?  I apologize.

Q.   Yes.  Do you see the sticker on top that says 3A?

A.   I do.

Q.   Tell the jury what that is.

A.   This is the desktop computer that was seized from that room, again, consistent with the home office that you just saw pictures of previously.

Q.   And after it was seized was that entered into evidence and maintained by the FBI?

A.   It was.

MR. ODULIO:  Your Honor, we offer 3A.

THE COURT:  It's admitted.

(Government's Exhibit Number 3A was received into

MICHAEL GREGORY - CROSS

evidence.)

Q.   Did you have any other further involvement with that computer after it was seized?

A.   No, sir.

     MR. ODULIO:  No further questions, Your Honor.

     THE COURT:  You may cross examine.

                 CROSS EXAMINATION

BY MR. AMES:

Q.   What's the process of transporting it -- transferring it to government custody?

A.   Once we seized it at the site where it's been located, we do paperwork on scene in which we log what was -- what was seized, when it was seized, where it was seized.  Then it's transported back to our office where it's maintained at our office space until further analysis.

Q.   Who else was present at the search of the home?

A.   Government wise or...

Q.   Everybody.

A.   With the FBI we had two other special agents, another FBI professional, support employee, and there were four people with -- to include Ms. Tatum located also in the residence.

Q.   Approximately what time was this search conducted?

A.   This was approximately at 6:30 PM that night.

Q.   And who was it that had you go over to -- instructed you to go do this search?

MICHAEL GREGORY - CROSS

A.   It was conversations that we had with the case agents that requested assistance in going to search this house.

Q.   Who were those case agents?

A.   Special Agent Marisa Brown and Special Agent Scott Atwood.

Q.   What did they tell you about what they were wanting you to do in this search?

A.   It was already agreed upon to do a consent search at the residence because they were going to be at another site.  So we were divvying up tasks and which I was going to be at the location previously identified.

Q.   Did they tell you what tasks that they were in the process of performing?

A.   I don't recall.

Q.   Was -- approximately what time did you leave?  How long did it take before it was all over?

A.   We were there for approximately an hour and a half, so roughly 8:00 PM that night.

Q.   So around 6:30 to around the 8:00 time frame?

A.   Correct.

Q.   And simultaneously the case agents were doing something else?

A.   Correct.

Q.   And you're not a hundred percent sure what they were doing.

MICHAEL GREGORY - CROSS

A.     Yes, sir.

Q.     Do you know whether or not they were with David Tatum?

        MR. ODULIO:  Objection.

        THE COURT:  Sustained.  He's answered that.

Q.     Was there any particular -- was there any conversation about what time to go over to the residence?

        MR. ODULIO:  Objection.

        THE COURT:  Overruled.

        THE WITNESS:  I don't recall a particular time being discussed, what time we needed to be there, on or about, so I can't really answer that.  I'm not sure.

Q.     Did you reach out to anybody at the residence in advance to let them know you were on the way or anything?

A.     I don't recall.

Q.     During the pendency of the search, did you have any contact with any of the case agents while you were doing -- conducting it?

A.     I don't recall during the search.  Maybe after the search, but I can't say for certain that we discussed anything while the search was occurring.

Q.     What rooms in total did the search consist of?

A.     So because this was a consent search, we could only search areas in which the person allowing us to search had a shared space.  So we searched, I believe, up to four rooms that were shared by Ms. Tatum and Mr. Tatum.

DANIEL JACKSON - DIRECT

MR. AMES:  No further questions at this time, Your Honor.

THE COURT:  Any redirect?

MR. ODULIO:  Nothing, Your Honor.  May he be excused?

THE COURT:  You may.  You may stand down.

THE WITNESS:  Thank you, Your Honor.

(Witness stepped down.)

THE COURT:  Call your next witness.

MR. CERVANTES:  The United States calls Daniel Jackson.

DANIEL W. JACKSON, GOVERNMENT WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. CERVANTES:

Q.   Sir, can you please introduce yourself to the jury and spell your last name.

A.   Yes.  Hello.  I am Daniel W. Jackson, J-a-c-k-s-o-n.

Q.   How are you employed?

A.   I am employed by the FBI Digital Evidence Laboratory in Quantico, Virginia.

Q.   What's your current assignment?

A.   My current assignment is electronics engineer, forensic examiner.

Q.   How long have you been working for the FBI?

A.   For 31 years.

DANIEL JACKSON - DIRECT

Q.   During that time what is the nature of the work that you've done for the FBI?

A.   The first year I examined telephone systems to see if they had been compromised by having listening devices placed in the systems, basically to make sure that phones, when there were classified discussions, were clear.  But after that year -- that program was a joint operation between intelligence agencies, the FBI and CIA and such.

Then I went into the digital evidence laboratory as an electronics technician.  I worked as that, as a forensic technician, for a few years.  I finished my associate degree in electronics and my bachelor's degree in computer science and I became an engineer forensic examiner.  And so for 30 years I've been doing this kind of work, electronic device forensics.

Q.   I'd like to talk to you about your experience in performing forensic examinations of electronic devices.

As part of your job, do you perform forensic examinations of digital evidence?

A.   Yes, I do.  That is my mission.

Q.   What are forensic examinations?

A.   So when I started in the early '90s, it was in electronics.  We were the only forensic electronics engineering lab in the country.  So we would look at anything that any law enforcement agency, department, state, local,

DANIEL JACKSON - DIRECT

federal, wanted an exam on.  So at that time there was not cell phones, which quickly took over the market in the '90s. So I would perform examinations on FM radios that they were using, walkie-talkies to do bank robberies, shocking devices that were being used to torture people that had been kidnapped.

But quickly -- then quickly our main cases started becoming digital diaries, PalmPilots in the '90s.  Young folks might not remember what those are.  In those cases my job was develop and to access the data that was password protected. And that has evolved into phones, pushing out the need for PalmPilots.  So I've done that same work.  And that's been the major part of my career.  The last six years I've specialized in hard drives that are damaged or locked and accessing the data on them.

Q.    Where is your lab located?

A.    It is in Quantico, Virginia, on the FBI campus which is located within the Quantico Marine Corps base.

Q.    Do you also perform data extractions from digital devices?

A.    Yes, I do.  I am -- we are accredited by ANSI, the American National Standards Institute, to do forensic exams of digital evidence.  And for that I use those procedures for extracting and making a forensic one-for-one copy of digital evidence.

DANIEL JACKSON - DIRECT

Q.   What does it mean to do data extraction?

A.   Data extraction.  So if I get a hard drive in that is broken or locked -- if it's broken, I fix it.  There is a circuit board on there that can fail.  There are read/write heads that can fail.  If it's locked, I bypass the password using different methods.  Some are just locked -- some hard drives are just locked and other hard drives are locked and encrypted or just encrypted.  So if I can get by the security, then it's just an open hard drive and I make a forensic copy of it, which is a one-for-one copy.

Q.   So you alluded to this a moment ago, but as part of your job you have experience getting into hard drives that are password protected and encrypted?

A.   Yes.  Yes, that's -- that's a big -- that's a large portion of my work.

Q.   Approximately how many devices have you been able to access that were password protected and encrypted?

A.   Most phones now are encrypted so I would say there's -- not just password protected, but the data.  In the old days I would get by the password which is usually not too complex and then I'd just copy out the data.

Q.   Mr. Jackson, I'm sorry --

A.   I'm sorry.

Q.   I'm sorry to interrupt.  Just roughly in terms of number of devices for the --

DANIEL JACKSON - DIRECT

A.    I'm sorry.  I'm sorry.  I'd say about two thousand. Maybe fifteen hundred, two thousand.

Q.   So you mentioned a one-for-one copy in something that you had said earlier.  So can you explain to the jury what it means when you make a copy of that data.

A.    So in computer forensics it's -- usually the first step of our work is to make a forensic copy.  It's called -- it's called a forensic image in the field.  And that is whether you get a memory stick, like let's say an SD card from a camera, or a hard drive, that is put on an approved tool that is approved and tested, validated.  We have a whole department that tests and validates our tools.  Plus we share with other law enforcement agencies that they've tested and validated through ANSI that I mentioned earlier, the American National Standards Institute.  They have a whole -- so I'm making a forensic -- a one-for-one copy.  Each -- each block of data is checked before it is copied.

     And then after all the data is copied, it is checked again through a mathematical formula and that gets us what we call a digital fingerprint or a hash and that way we know -- we know we have a one-for-one copy.  And when anybody else wants to make a copy to work on it, this is -- what I make is usually called a master copy and other people, if they make a copy of it, they should do the same forensic procedure and check the digital fingerprint because, you know, you're

DANIEL JACKSON - DIRECT

moving -- you're moving, let's say, 2 billion blocks of data. You know, you want to make sure all that data copied correctly.

Q.   Sir, I'd like to just briefly touch on your training.

A.   Sure.

Q.   So do you have specialized training in the field of -- or I guess the skill of making copies of devices?

A.   Yes, I do.  I am -- by the FBI I am -- through our quality assurance program, I have taken the training and completed testing, and I'm tested every year as a follow-up test just to make sure that I get the results that I'm supposed to get on a piece of media.

Q.   Have you testified as an expert in court before?

A.   Yes, I have.  Around ten times.

        MR. CERVANTES:  Your Honor, at this time the government tenders Mr. Jackson as an expert in the extraction and forensic examination of digital evidence.

        THE COURT:  Any objection?

        MR. AMES:  Not to that, Your Honor.

        THE COURT:  All right.  The Court recognizes this witness as an expert in those fields.

        Members of the jury, I don't know if this witness is going to offer any opinions or whether he's just going to tell you what he did for you to judge whether he was qualified to do what he did.  Normally witnesses aren't allowed to render

DANIEL JACKSON - DIRECT

opinions. And like I said, I don't know if he's going to or not. But the rules do allow an expert to render an opinion if scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or determining a relevant fact. However, merely because someone is qualified as an expert and offers an expert opinion does not require you to accept that opinion. Just as with any other witness, it is solely within your responsibility as jurors to decide whether and to what extent an expert opinion is credible.

In assessing the credibility of expert testimony, you should consider whether the witness's training and experience are sufficient to support the testimony in question. And you should also consider whether the expert's opinions were based on adequate information, sound reasoning, and good judgment.

You may proceed.

BY MR. CERVANTES:

Q.   Did you perform a forensic analysis in the case against David Tatum?

A.   Yes.

Q.   Did you apply the steps and techniques that you just described in this case?

A.   Yes.

Q.   How did you get involved?

A.   It is my job to do these kind of cases. They come into

DANIEL JACKSON - DIRECT

our digital evidence laboratory and they get assigned to me. At the time I was the only person doing this work. And that's how I became involved in the case.

Q.   Did you receive a device?

A.   Yes. I received a locked hard drive in this case.

Q.   Do you remember what kind of hard drive it was?

A.   It was a Western Digital hard drive, My Passport.

        MR. CERVANTES: May I approach, Your Honor?

        THE COURT: You may.

Q.   I've handed you what has been admitted as Government's Exhibit 1A. It has that sticker in the bottom.

    Do you recognize it?

A.   Yes. This is an external hard drive and this is what I received as the evidence for this case.

Q.   Did you receive instructions or requests related to that hard drive?

A.   Yes. I received instructions to access all the data on this piece of evidence, this hard drive.

Q.   And why is that? Was it accessible to begin with or not?

A.   It was password locked and I -- even though that comes in in the field saying that this can't be accessed, I -- the first thing I do in a case like this is connect it and verify, yes, it is password locked. I have a tool that will tell me if it is locked that I used on this case.

Q.   And did that tool tell you that it was locked?

DANIEL JACKSON - DIRECT

A.    Yes.  It was locked with a password, a WD password.

Q.    What does it mean to be encrypted?

A.    Encrypted -- a drive -- here we go on one that's open.

Q.    Wait, I'm sorry.  What you're holding in your left hand has not been admitted yet.

A.    May I use this to show -- to explain the part that's locked on a hard drive?

Q.    So let's go through the process of admitting it first. So you're holding something in your left hand.  All right. Now both hands.  What is that?

A.    This is the forensic copy I made of this hard drive. And --

        MR. CERVANTES:  Your Honor, the government moves Exhibit 12 in evidence.

        THE COURT:  It's admitted.

        (Government's Exhibit Number 12 was received into evidence.)

Q.    Go ahead.

A.    So when a hard drive is -- the difference between a hard drive encrypted and a hard drive locked, the controller board on a hard drive can lock where you cannot access the data which is all stored here on magnetic platters that spin like a record, but they're obviously this big.  This is a little bit smaller hard drive.  It's called a laptop size hard drive where this is a desktop one, but they have the same parts.

DANIEL JACKSON - DIRECT

They're just smaller.

So this circuit board can be locked. So you cannot read anything from it unless you send the password to it. It will unlock and you can -- then you can use it like a regular hard drive.

So that was a locked drive.

An encrypted drive -- if a drive is just encrypted, you can see the data here, but it is all scrambled with an encryption key -- encryption algorithm. And then if you enter a password with that, that generates the key and that descrambles the data and then you can see it in the clear.

So encrypted is scrambled with a mathematical algorithm, the data, but it's accessible. And a locked hard drive has a feature in the hard drive, in the controller circuit board, that doesn't let you access the data on the platters. So there are two types of -- two types of cases I work with regularly.

Q.    Drawing your attention to 1A, the other one.

A.    Yes, sir.

Q.    The My Passport hard drive. Was that passport encrypted?

A.    Yes. When -- this is -- this is the WD features for this hard drive for -- for this hard drive. When you set a password in this hard drive, it does lock the controller board, but it also encrypts the data on the drive. So if I were able somehow to look at just the data, it would all be

DANIEL JACKSON - DIRECT

scrambled, which -- anyway, doing research I have gone through that step and looked at data and it's all scrambled.

Q.   Were you able to unlock that My Passport?

A.   I was.  I was able to unlock it.  In this certain drive there is a flag in here that says that it's -- that there's a password.  And when there's a password it's encrypted.  In this particular drive I can access the low level operating system, what we call the -- its modules.  I mean, each one of these are -- each one of these devices are like a minicomputer.  They have a microprocessor and they perform the functions to unlock and decrypt the data.

So on this one -- on this specific drive, you can, if you can access the -- where the modules are stored, which is the operating system -- if you load Windows, it's the actual operating system of the drive.  If you can access that, you can reset the encryption flag which turns off the password. And also, once you reboot it it automatically decrypts the data, which my -- so my tool lets me access -- the tool that I use lets me perform that procedure, turn off that flag and then reboot it.

Q.   Once you unlocked the device and was able to access the unscrambled data, what did you do next?

A.   Then that's the -- then that's usually the challenging part.  Sometimes it's easy; sometimes it's not.  This -- we have a commercially available tool that does this, that

DANIEL JACKSON - DIRECT

unlocks the drive.

So then I have an open drive and it's just -- it's just, okay, I've gone to that. I make a forensic copy of it using an accredited tool. I make that copy. Check that the -- that the tool produces a log that's written to the drive with the data and it passed. And I have completed my work, my mission for this case. Unlock the drive, make a copy of the drive.

Q. In your opinion --

A. Those are my two major tasks.

Q. I'm sorry?

A. Those are my two major tasks that I have for a case like this that I completed.

Q. So drawing your attention now to the other exhibit, 12.

A. It's -- yes. Yes, sir.

Q. In your opinion, is that a one-for-one copy of the My Passport hard drive?

A. It is. And I would argue it's not an opinion; that it is a fact. It passed a known highly used tool in computer forensics and it made a one-for-one copy.

Q. What did you do after you did this work?

A. After I do this work, I send it back to the contributor, which was our FBI office in Charlotte, North Carolina.

Q. Did you have any further involvement in this case?

A. I did not.

MR. CERVANTES: No further questions.

DANIEL JACKSON - CROSS

THE COURT:  You may cross examine.

CROSS EXAMINATION

BY MR. AMES:

Q.  Hi, sir.  The Western Digital drive that you were sent -- I understand you've done a lot of investigations.  Have you done this work with that type of drive specifically before?

A.  Yes.  I've seen this five, ten times.  I see so many hard drives all day, I don't -- but yes, I did.  I have seen it before and performed this procedure in other cases that have not gone to trial.

Q.  Do you know whether or not or recall if -- are there different varieties or versions of this type of device?  Are they more or less similar?

A.  Yes.  Yes.  There are many -- there are -- there are similar drives like this and they -- they evolve.  So the tool that I use won't work on your drives, the method.  So we have to develop a different method or the manufacturer of this commercially available tool has to.  So yes.  Yes, sir.

Q.  I guess how do you -- what's the process of you determining which devices or which tools you need to use based on a specific drive?  How do you determine that?

A.  Well, it's -- that part is fairly easy because there's only one main accepted tool that does this type of work that -- I've worked with forensic labs and data recovery companies across the globe.  I've been to, most recently,

DANIEL JACKSON - CROSS

Tokyo working with their federal police on -- we all use a tool called PC-3000 made by ACE Lab in Europe.  And once -- once you plug this in, it will usually tell you the family, the version of the drive, so you'll know -- you'll know where -- which method to go with.

Q.   Okay.  So the program tells you that.  Do you recall with this drive or be able to tell us what information it gave you about the drive as far as...

A.   It gives me -- I'm sorry, I'd be -- I just always know I can plug in a similar drive into my tool and it gets me -- it gives me the model of the drive, the firmware that the drive is running, and the family of the manufacturer.  The family like in this Western Digital, they give them names like Diablo and, you know, so many different names.  And that's a family of drives.  It's all using the operating -- same operating system.  And then they can -- as each model goes, they can tweak that operating system within that family.

Q.   Do you recall which operating system or family that this particular device was  --

A.   I do not.  I could find that for you back in the lab very quickly, but I -- it's something I don't capture in my notes because I've never been asked it.  I know where I can get it from if somebody had a question.

Q.   You mentioned about newer -- some newer devices might use a different type of testing, I believe.  Correct me if I'm

DANIEL JACKSON - CROSS

wrong about that.  But there are some devices you're saying -- newer types of devices require something slightly different.

A.   When you're getting into locked drives and -- mainly locked drives on my tool, each -- just like with each iPhone, the manufacturer of the commercial tool has to buy it, reverse engineer it, write a program for it and push it out to us.  So the steps and the menu that you have to click through would be different with each new model hard drive.  And the very newest hard drives they don't have a method for yet because they haven't reverse engineered how the drive works.

Q.   Do you have any notion of, like, how old this particular device is based upon your analysis?

A.   I could open it and see if there's a date.  I could crack it open and I could tell you the date code on it, but I don't -- I don't know off the top of my head.  They do put a date code on the drives where -- and we have in the past contacted Western Digital to see -- we've had some specific drives that are broken and we need replacement parts and we have contact with their engineering and their legal department and we've called them up and they've been able -- you know, in high profile terrorism cases, they've even been able to tell us who the drive was sold to, Best Buy, and we can go to Best Buy and see who bought that.

     But I don't have off the top of my head when this drive was made.  It looks like just from me working in the lab, it

DANIEL JACKSON - CROSS

looks like it's several years old:  three, four, five.

Q.   And that information about where -- this isn't a terrorism case, but would that be Western Digital has that or would that be maybe the place where everything was bought would have that, or both?

A.   Western Digital would have who they sold it to, whether it was Best Buy, Dell, their computers, their hard drives. There's only two major manufacturers of hard drives left in the world.  There used to be ten or so.  But just Seagate and Western Digital.

And they -- I had to -- I had to testify on a terrorism case in Mumbai, India, for the government of India and for that we did contact them and they did -- they did track down who they sold it to.  And then it's up to the FBI to go to who they sold it to, or since that was an international case, another international police agency, to see if there was any records from that, you know.

MR. AMES:  No further questions, Your Honor.

THE COURT:  Any redirect?

MR. CERVANTES:  No, Your Honor.

THE COURT:  Thank you, sir.  You may stand down.

THE WITNESS:  Thank you.  Do I leave these specimens here?

MR. CERVANTES:  If you could bring them back to me, that would be good.

72

DANIEL JACKSON - CROSS

(Witness stepped down.)

THE COURT: All right. Members of the jury, let's take our midafternoon break. It's a little early, but my hope is that after this break we can just plow through until about 5:00. But, of course, if you need an additional break in the afternoon, let me know that as well.

I'm sure you have the rules memorized by now, but do not discuss this case among yourselves. Don't start forming any opinions. And don't do any independent research. And we'll be back with you in about 15 minutes.

(Jury exited the courtroom.)

THE COURT: We'll be in recess for 15 minutes.

MR. CERVANTES: Your Honor, just a housekeeping measure for administrative purposes. The next witness is our most lengthy witness. It's the next forensic examiner. I estimate his direct is somewhere around three hours.

THE COURT: So be it.

MR. CERVANTES: Okay.

(Brief recess at 2:52 PM.)

(Court back in session at 3:08 PM.)

(Jury not present.)

THE COURT: Do you have something?

MR. CERVANTES: Yes, Your Honor. So this witness, part of what he's going to testify will be related to the 404(b) slash 412 issues that we discussed.

DANIEL JACKSON - CROSS

THE COURT: Yes.

MR. CERVANTES: So how would the Court like me to flag that?

THE COURT: At what point during his testimony do you anticipate that?

MR. CERVANTES: So just before getting into certain videos, for example, what I could do is I could pause and ask the Court to provide an instruction.

THE COURT: All right. That would be fine.

MR. CERVANTES: Would the Court want me to do that for -- there's basically three sections. So one is a video of the cousin that was also recorded in that same bathroom. So we want to show the jury that video.

Another one is the patient that he recorded under the table. I say he. Obviously that's disputed. The patient that he recorded under the table.

And the third would be the adults pictured in a folder, the folder where he kept his modified victims. During the last hearing defense counsel, I understood, withdrew that objection because that's part of his theory, but I don't know if the Court still wants to instruct.

THE COURT: If there's no objection to that, then the Court wouldn't issue an instruction at that point.

MR. AMES: Your Honor, I think back then it was that the admission of adult images is not inculpatory in our

DANIEL JACKSON - CROSS

belief.

I would -- so it's clear, the evidence thus far has been of devices, with no corroboration whatsoever, being handed to them by purportedly Kimberly Tatum.  And the physical device is what Kimberly Tatum gave them and that's -- one so far has been introduced into evidence.  And what is the foundation even before we get here for the contents of the devices?  If the testimony and the evidence is introduced to say I got this from this person, it is what I got, fine.  The contents of the devices, there's been no groundwork laid whatsoever as far as authenticating that these are devices that supposedly came -- contain pornography.  There's no attribution of any kind whatsoever.

THE COURT:  I think that's what we're about to hear, that these devices contain child pornography.

MR. AMES:  We have not heard a single word about where they came from, whether or not there was actually consent to turn over any of these devices, in particular with respect to the Western Digital drive that was not part of that consent search that was taken out of -- this is all proffered.  I mean, we've heard zero evidence about it, only a proffer that this was taken out of a bag that belonged to David supposedly by his wife.  It's password protected and encrypted.  She doesn't have access to it nor the password to it.  No access to it.  It's not a shared or joint device.

DANIEL JACKSON - CROSS

THE COURT: Well, as I understand it, there's going to be forensic evidence linking the device and its contents to Mr. Tatum; is that correct?

MR. CERVANTES: Yes, Your Honor.

THE COURT: So we're going to let that play out. To the extent you're making an objection, I guess you are, it's overruled and we can take it up again if you think it's necessary.

MR. AMES: If I may, and one other note if I could, Your Honor, that in the discovery process, the indicia of reliability that Kimberly Tatum had -- again, this is perhaps getting into a suppression motion, but what I'm being told now by this forensic analyst is that this is a device or a drive that is a few years old. That the statement from Kimberly Tatum that was proffered -- again, never actually introduced -- was that this device used to belong to her when she was in grad school and no indication of when grad school was. I can proffer it was well more than a few years ago when this supposed device that supposedly she backed her laptop on. She graduated grad school in 2012.

THE COURT: None of this makes any difference, you realize.

First of all, the witness said he didn't know how old the hard drive was. He offered to open up the exhibit and tell you exactly what the hard drive said. You didn't take

DANIEL JACKSON - CROSS

him up on it.  And to the extent that you're making an argument along the same lines that you have, that is overruled and we can take it up again at an appropriate time if there is another appropriate time.

MR. AMES:  So it's my understanding the testimony here from the analyst is of all of the devices and the authentication for them was that they were handed to the government by Kimberly Tatum supposed -- that's the foundation.

THE COURT:  My understanding, Mr. Ames, is that the government is going to solicit testimony from a forensic examiner that will have a digital link to this defendant.

Thank you.

MR. AMES:  Thank you, Your Honor.

THE COURT:  Mr. Cervantes, if this really is going to go roughly three hours, if you would, perhaps in coordination with Mr. Odulio, try to find a time close to 5:00 on either side for a natural break.  I mean, I could try to guess, but if you, not to break up your direct examination overly much, could keep an eye out for some natural break in the testimony.

MR. CERVANTES:  Yes, Your Honor.  I suspect that a natural break would be in between devices.

THE COURT:  All right.  Well, I'll look to you for that.

JASON WHITT - DIRECT

Please bring the jury.

(Jury entered the courtroom.)

THE COURT: All right. Members of the jury, I don't want you to think we just took a second lunch or anything. I try to take advantage of you being out of the courtroom to handle some things that I have to do outside of your presence so I'm not bringing you in and out all the time. So rest assured we were working and got back to you as soon as we could.

All right. Please call your next witness.

MR. CERVANTES: The United States calls Jason Whitt.

JASON WHITT, GOVERNMENT WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. CERVANTES:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Can you please introduce yourself to the jury and spell your last name for the record.

A. My name is Jason Whitt. Last name is W-h-i-t-t.

Q. How are you employed?

A. I am employed with the Federal Bureau of Investigation.

Q. And what's your current assignment?

A. My current assignment is a senior digital forensic examiner.

Q. How long have you been in that role?

JASON WHITT - DIRECT

A.   So I've been a digital forensic examiner since I started with the bureau in August 2010.  I was certified as an examiner in 2012.  And then I received my senior digital forensic examiner certificate in 2017.

Q.   And so you've been a senior forensic examiner since 2017?

A.   Yes, sir.

Q.   What did you do before the FBI?

A.   So before the FBI I was a police officer in Wilmington, North Carolina, where my duties included working patrol.  I also was a detective working crimes against children.  And also worked as a task force officer with the FBI with the Wilmington Police Department working crimes against children matters also.

Q.   In your role as a forensic examiner, are you responsible for reviewing child exploitation cases?

A.   Yes, sir, I am.

Q.   How long have you been doing that?

A.   Reviewing child exploitation matters?

Q.   Yes, please.

A.   I've been doing it since I started with the bureau in 2010.

Q.   So let's talk -- I'm sorry.  Before we get to that, your educational background.  Do you have any degrees?

A.   I do.  I have a degree in management information systems from the University of North Carolina at Wilmington.

JASON WHITT - DIRECT

Q.   Let's talk about some general concepts first.  When we talk about electronics, what are forensics?

A.   So forensics is using policies and procedures to retrieve files off a computer in a way that keeps the files pure so it retains all the information, dates and times.

Q.   What is an artifact?

A.   So a digital artifact, you'll hear me probably say.  A digital artifact is that file whether the file would be a document, a video image.  We refer to them as retrieving the digital artifacts.

Q.   What is metadata?

A.   So metadata is information about data.  So if you have an image or a document, there is metadata associated with that document that tells you who the author might be, when it was created, that type of thing.

Q.   Let's talk about your experience conducting forensic examinations.  Do you have experience in that area?

A.   Yes, sir, I do.

Q.   What does it mean to do a forensic examination?

A.   So a forensic examination, you would take a -- let's talk about a hard drive, a piece of digital media.  You would take that hard drive and you would use policies and procedures to make a forensic image of that hard drive.  Now, what I mean by policies and procedures is you put it behind a write blocker, which is a piece of hardware that will not allow me to change

JASON WHITT - DIRECT

that hard drive.  Once that hard drive is behind a write blocker where I cannot make any changes, we make a forensic image of that hard drive.

And think of a forensic image kind of like if you have a favorite book.  You're making a photocopy of it for a friend. All your notes, all your bent pages, maybe you spilt coffee on it, anything of that nature, when you take a photocopy of it, you're going to capture all those things on that book.

So a forensic image of a digital media or hard drive is exactly that.  It's a bit-for-bit copy of the digital media where at that point we have a hash value assigned to it.  So the hash value, once we create the forensic image, it assigns a hash value which is a mathematical algorithm which tells me that this hard drive, this is a fingerprint of the hard drive. So if I would go into the hard drive and I would change a pixel in one of the images, that hash value would change, like, completely.  So as long as we have the hash value, we can validate our forensic image and tell it is pure and it hasn't changed since the day we took the forensic image of it.

Q.   Do you also perform data extractions from digital evidence?

A.   I do.

Q.   Can you explain to the jury what that means and what that process is like.

A.   Yes, sir.  So once we have the forensic image, we then

JASON WHITT - DIRECT

use forensic software -- there's a bunch of them out there -- to extract the digital artifacts from the hard drive, from the forensic image of the hard drive.  And then we put them into let's call them containers.  We put all the documents in containers, all the images, all the media, all the OS artifacts into a container so that the case agent, or whoever is going to review it, can easily review the information from the forensic image.

Q.   What kinds of digital devices do you work with?

A.   So digital devices, I'll work with hard drives, externals, thumb drives, servers, cell phones.  Anything that's digital we work with.

Q.   And where is it that you work exactly?

A.   So I work in the Charlotte field office here in Charlotte, North Carolina, in the FBI office.

Q.   When you copy a device, what is the point in time that you copy?

A.   So once we copy a device, once we retrieve the device from evidence, that is the time that we create the -- or that's the time we create the forensic image.  So once we create it, there's no writing to it.  Once we have an image, we can always go back and test it or pull more artifacts from it if need be.

Q.   What steps do you take to ensure that the copy you make is not altered as you review the data from the copy?

JASON WHITT - DIRECT

A.   So we take a pre-hash, which I described to you.  It's kind of like the fingerprint of the digital image.  And then we take a post-hash.  So once we do all our forensic examinations, pull the artifacts that we need, review it, we take a post-hash.  So we run a piece of software, forensic software, against the hard drive and take the hash value of it.  We then compare it with the pre-hash so therefore we can say this hard drive has not changed since day one to day whenever we're done with the examination.

Q.   Approximately how many devices do you think -- approximately, do you think you have examined in your career?

A.   Over a thousand devices.

Q.   What percentage of your workload involves processing evidence in child pornography or child exploitation cases?

A.   So child exploitation cases probably take about 80 to 85 percent of my time at the bureau.

Q.   In your career how many child pornography files have you come across?

A.   In the years that I've been doing this, hundreds of thousands of child exploitation images.

Q.   Based on your training and experience, have you come across standard or repetitive name conventions in naming child pornography files?

A.   I have.

Q.   Does that training and experience inform your techniques

JASON WHITT - DIRECT

in how you forensically analyze a device for child pornography?

A.   Yes, sir, it does.

Q.   Can you explain what you mean by that.

A.   So when we start a child exploitation investigation or examination on my end, there are certain terms that we run an index search about.  And what an index search is is the forensic software I was telling you about that reviews that forensic image, it will go through and it will pull all the words out that it sees inside of this hard drive, so there's millions and millions of words; and it indexes them so that way when we search these words, it will pull them up fast and we can see where they're at.

So some of the search terms that I look for is pthc, which means preteen hardcore.  There's other terms that we look for called ray gold, LS models, pedo, pedophilia. There's a bunch of search terms out there.  Those are the some of the ones I start with running an index search.

Q.   Let's talk about the tools you use.  What tools are used?

A.   So we use, like, hardware drive -- hardware hard drive duplicators or -- to create the forensic image of the hard drives.  We also use software to process the forensic image, whether it's AXIOM, whether it's Access Data, Cellebrite.  We also use FTK Imager which helps us create those forensic images also but also allows us to run those hash values again.

JASON WHITT - DIRECT

Q.   Can you describe what is AXIOM?

A.   AXIOM is a forensic software from Magnet.  They make software so that you can load the forensic image into this piece of software and start pulling out those digital artifacts and putting them in those containers that we talked about.

Q.   Is AXIOM a software that you use?

A.   It is.

Q.   Is it commercially available?

A.   Yes, sir, it is.

Q.   Have you attended training that was specifically related to AXIOM?

A.   Yes, sir, I have.

Q.   Are you certified in using AXIOM as an analyst?

A.   Yes, sir, I am.

Q.   Let's talk about your training generally.  What kind of training have you received for forensic examination of devices?

A.   So when you start with the FBI, to get your certification as a digital forensic examiner with them, it takes anywhere from eight months to two years depending on when the classes become available.  During that time I have taken over 200 hours of training with the bureau, whether it's Access Data -- access Data is another piece of forensic software like AXIOM.  So I've taken training in Access Data, internet forensics,

JASON WHITT - DIRECT

Windows forensics.  Got A-Plus certified, Net Plus certified during my training.

Then after that you take a Capstone -- let's go back. Then you must also do five searches and five examinations under a mentor or a coach.  Then after you've completed all that training, after you've completed your searches and your examinations, you then do a Capstone course where they give you like a mock investigation or mock hard drive that you have to image with the policies and procedures you learned and pull out those digital artifacts.

Once that is completed, we have to go to another training called moot court where we are put on the stand and we have to testify to our findings.  After that you're certified as an examiner with the FBI.

And then we are given training throughout the year.  So every year we try to take at least one, maybe two trainings. I have training in X-waves, which is another forensic software, EnCase, another forensic software, SANS training, which I have been trained in advance cellphone forensics, hacking tools, network forensics.  And then also I'm trained in AXIOM Magnet, again, the software that I used for this case, and the tool itself, advance forensics, cell phone forensics with them also.

Q.   Last area on your background.  Certifications, do you hold any?

JASON WHITT - DIRECT

A.    I do.

Q.    What kind?

A.    So I hold certifications from the bureau for my digital forensics.  I also hold two SANS certifications for the advanced forensics, Windows forensics, and the smartphone forensics.  Also hold some certifications from AXIOM or Magnet AXIOM also.

MR. CERVANTES:  Your Honor, the government tenders Mr. Whitt as an expert in the extraction and forensic examination of digital evidence.

THE COURT:  Any objection?

MR. AMES:  I don't object to that, Your Honor.

THE COURT:  All right.  The Court recognizes this witness as an expert in those areas.

And, members of the jury, you'll remember my instructions about judging the opinions of a qualified expert.

You may proceed.

BY MR. CERVANTES:

Q.    Did you perform a forensic analysis in the case against David Tatum?

A.    Yes, sir, I did.

Q.    Did you apply the steps and techniques that you just described in this case?

A.    Yes, sir, I did.

Q.    Can you explain how you first got involved.

JASON WHITT - DIRECT

A.   I got a request from Special Agent Brown to start the forensic examinations of certain digital pieces of evidence.

Q.   Can you -- well, Your Honor, may I approach?

THE COURT:   You may.

Q.   I've placed in front of you Exhibit 1A.  Do you recognize it?  Can you look through that pile there and look at the stickers.

A.   1A, yes, sir.

Q.   Okay.  What is it?

A.   It is a My Passport, Western My Passport external drive.

Q.   All right.  Did you examine that device?

A.   Yes, sir, I did.

Q.   Okay.  Can you look through the rest of the devices and let us know -- they've already been admitted so can you let us know whether you recognize these devices?

A.   Yes, sir, I recognize each one.

Q.   Okay.  What are they?

A.   They are the pieces of digital media that I forensically examined.

Q.   Okay.  So we're going to break these down and let's talk about what you found with respect to each device.

A.   Yes, sir.

Q.   First let's talk about Exhibit 1A.

And if you could put next to it Exhibit 12.

A.   Yes, sir.

JASON WHITT - DIRECT

Q.   So what are these two exhibits?

A.   So Exhibit 1A is the Western Digital My Passport external.

     And Exhibit 12 is a forensic image of the Western Digital encrypted device.

Q.   Could I ask you to lay Exhibit -- the tower, can you lay it on its side so we -- the tower in front of you so that we can see your face and the jury can see you.

     (Witness complied.)

Q.   Thank you.

     And Exhibit 12, what is that?

A.   Exhibit 12 is a hard drive containing the forensic image of the encrypted device.

Q.   Where did you get Exhibit 12 from?

A.   It was shipped to us from headquarters into evidence and I retrieved it from evidence.

Q.   And what happened with that device?

A.   So once we -- Exhibit 12?

A.   Yes.

Q.   So once we had this device, we copied the forensic image over and we end up running -- we didn't end up.  We ran forensic software against the forensic image provided to us.

Q.   Where did you get Exhibit 12 from?  From who?

A.   From evidence.  I retrieved it from evidence.

Q.   Okay.  So Exhibit 1A, was it password protected?

JASON WHITT - DIRECT

A.   Exhibit 1A was not password protected.

Strike that, sorry.  Exhibit 1A was password protected. Sorry.  This is the hard drive we sent to headquarters to be decrypted.

Q.   Okay.  What is Exhibit 12, then?

A.   Exhibit 12 is the forensic image of Exhibit 1A.

Q.   Do you know who created Exhibit 12?

A.   Dan Jackson.

Q.   And so in your scope of work, did you examine Exhibit 12?

A.   I did.

Q.   So before talking about what was on this exhibit, Exhibit 12, are there any indications on the outside of the My Passport hard drive that would inform you on whether the device was shipped or transported in interstate or foreign commerce?

A.   Yes, sir, there is.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 1B.

Do you recognize that?

A.   Yes, sir, I do.

Q.   What is it?

A.   It is the My Passport, Exhibit 1A.

MR. CERVANTES:  Government moves 1B into evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 1B was received into

JASON WHITT - DIRECT

evidence.)

Q.   Is there -- I've zoomed into a portion of the photograph. Can you read what that says at the bottom.

A.   "Product of Malaysia."

Q.   And what does this indicate to you?

A.   That this was made in Malaysia.

Q.   So now let's get into what was in the device.

What steps did you --

MR. AMES:  Your Honor, sorry.  Was item 12 admitted into evidence --

THE COURT:  It was.

MR. AMES:  -- at some point?

THE COURT:  It's been admitted.

MR. AMES:  Item 12?

THE COURT:  Yes, item 12 was admitted.

MR. AMES:  Okay.

THE COURT:  You may proceed.

BY MR. CERVANTES:

Q.   So let's talk about what you found in the My Passport hard drive.

A.   Yes, sir.

Q.   Okay.  What steps did you take to analyze it?

A.   So once I received the forensic image of the My Passport, I copied the image over and I ran it through our AXIOM Magnet software, forensic software.

JASON WHITT - DIRECT

Q.   What did you do next?

A.   I then started extracting the digital artifacts out of it and started examining it and flagging anything that could be potential child pornography.

Q.   Did you flag anything that could be potential child pornography in the My Passport hard drive?

A.   I did.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 1C.

Do you recognize it?

A.   Yes, sir.  It is a video, ls.avi.

Q.   Is this -- one moment.

How do you recognize this video?

A.   Because I flagged it.

Q.   Is this a video that came from the My Passport?

A.   It is.

Q.   You mentioned that you recognize it as a video called ls.avi.

A.   Yes, sir, I do.

Q.   What does that mean?

A.   So LS, as we talked about those common search terms, LS is a common search term for LS models.  I don't know exactly what it means.  A lot of people say it means, like, Lolita series.  But LS models is a common search term or a common term for child pornography.

USCA4 Appeal: 23-4710   Doc: 20   Filed: 05/14/2024   Pg: 112 of 655

JASON WHITT - DIRECT

MR. CERVANTES:  The government moves 1C in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 1C was received into evidence.)

MR. CERVANTES:  Your Honor, permission to publish short portions of this, the first ten seconds, and then another portion of five seconds.

MR. AMES:  Your Honor, I'm still renewing the objection to foundation for --

THE COURT:  Understood.  You have a continuing objection on the foundation.  Overruled.

MR. AMES:  Thank you, Your Honor.

THE COURT:  You may proceed.

(Government's Exhibit Number 1C was published.)

MR. CERVANTES:  For the record, I played from the beginning to the first ten seconds.

I'm moving to minute 1:15 and playing from 1:15 to 1:20.

(Government's Exhibit Number 1C resumed.)

Q.   Did you watch the video until the end?

A.   I did.  Usually with these videos I will skim through them.  I usually try not to watch them, you know, second for second.  The reason that I do skim through them is a lot of times child pornography may be spliced together where they take multiple videos and splice them together.  So I did

JASON WHITT - DIRECT

review this video to the end by skimming through it.

Q.   Do these girls continue to engage in the conduct that we just saw until the end of the video?

A.   Yes, sir, they do.

Q.   How long is the video?

A.   If I could see my notes or a video screenshot, I could tell you.

Q.   Is the video approximately eight minutes?

A.   To the best of my recollection, it is, yes, sir.

Q.   Did you find any videos recording a female in a bathroom?

A.   I did.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 1D.

     Do you recognize that?

A.   Yes, sir, I do.

Q.   Is this video -- did this video come from the My Passport?

A.   Yes, sir, it did.

Q.   How long is this video?

A.   This video is 12 minutes and 4 seconds.

     MR. CERVANTES:  The government moves 1D into evidence.

     THE COURT:  It's admitted.

     (Government's Exhibit Number 1D was received into evidence.)

JASON WHITT - DIRECT

MR. CERVANTES:  For the record, I'm playing the first 41 seconds.

(Government's Exhibit Number 1D was published.)

Q.   I'd like to draw your attention to the right half of this screen.  Can you see what is depicted in the right half of the screen?

A.   It appears to be an orange or red canvas bag with a black border.

MR. CERVANTES:  Okay.  Continuing to play from 41 to 49.

(Government's Exhibit Number 1D resumed.)

Q.   I stopped it at 49 seconds.

Did you hear sounds in the video?

A.   Yes, sir.  You can hear a toilet flushing.

Q.   Did you see him -- this individual use the bathroom?

A.   No, sir, I did not.

MR. CERVANTES:  Continuing at 49 seconds.

(Government's Exhibit Number 1D resumed.)

MR. CERVANTES:  I paused it at 53 seconds.  I'm going to ask you to do some math in a moment.

Continuing to play.

(Government's Exhibit Number 1D resumed.)

Q.   I've paused it at 1 minute and 11 seconds.

Can you -- what's the difference in time there?

A.   Approximately 18 seconds.

JASON WHITT - DIRECT

MR. CERVANTES:  Continuing to play at 1 minute and 11 seconds.

(Government's Exhibit Number 1D resumed.)

MR. CERVANTES:  I paused it at 3:05.  I'm advancing to 8:05.  And I'm going to skip around here until 11:10.

8:21; 8:32; 8:48; 9:03; 9:19; 9:30; 9:41; 9:54; 10:06; 10:19; 10:30; 10:41; 10:56; 11:09.

Paused it at 11:13.

Q.   Can you describe what's happening in the video.

A.   The white female appears to be exiting the bathroom.

MR. CERVANTES:  Continuing at 11:13.

(Government's Exhibit Number 1D resumed.)

Q.   Pausing at 11:52.

How much time was that in between?

A.   What was the first number?

Q.   11:13.

A.   11:13 to 11:52 is 39 seconds.

MR. CERVANTES:  Continuing to play.

(Government's Exhibit Number 1D resumed.)

Q.   What is metadata?

A.   So metadata is data about data, information about a file or information embedded in a file or a video.

Q.   Was there metadata that you reviewed in relation to the video that we just saw?

A.   Yes, sir, there was.

JASON WHITT - DIRECT

Q.   I'm showing you what has been marked for identification as Government's Exhibit 1E.

Do you recognize this?

A.   Yes, sir, I do.

Q.   What is it?

A.   This is a screenshot from the AXIOM forensic software referencing file IMG_3666.MOV.

Q.   Does it fairly and accurately depict the metadata related to the video we just watched?

A.   Yes, sir.

MR. CERVANTES:  Government moves 1E into evidence.

MR. AMES:  Your Honor, again, objection to both hearsay and foundation.  There's been no explanation as to what this even is.

THE COURT:  Overruled.  It's admitted.

(Government's Exhibit Number 1E was received into evidence.)

Q.   So starting from the top, I'm going to zoom in to certain portions as we talk, okay?

A.   Yes, sir.

Q.   So the first portion that I'm going to zoom into is across the very top.

What is that?

A.   So what Magnet AXIOM does, instead of showing you the full video or the first screen of it, still of it, it will

JASON WHITT - DIRECT

actually go through and pull out certain thumbnails at certain times giving you a preview. And this is the preview that it would show for this file.

Q. Okay. So scrolling to then the file name. Can you -- does this tell you what the name of the file is?

A. It does.

Q. What is it?

A. The name of this file is IMG_3666.MOV.

Q. I want to talk about EXIF data. What is that?

A. So EXIF data is stored with the image. It can contain a lot of information from the created date, what camera it was taken from, GPS coordinates. It can even record things like shutter speed and altitude.

Q. And zooming into the bottom of this exhibit where it says EXIF data, can you tell from this data what date the video was created?

A. The created date registered for this file is 7/18/2016.

Q. I've highlighted that for the record.

Can you talk a little bit about the GPS latitude, longitude, altitude information towards the bottom of this EXIF data.

A. The GPS is the global positioning that we use for getting around town, like the GPS in our car, Google Maps, Apple Maps. So when you take a picture with an iPhone, if you have the option turned on, it will actually record your GPS location,

JASON WHITT - DIRECT

where the image was taken.

Q.   In looking at Exhibit 1E, is that the GPS information we're looking at now?

A.   Correct.

Q.   Did you put this information into a website to see what location would come up?

A.   I did.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 1F.

Do you recognize that?

A.   I do.

Q.   What is it?

A.   The screenshot from Google Maps.

Q.   Does it fairly and accurately reflect the screenshot that you took from Google Maps?

A.   It does.

MR. CERVANTES:  Government moves 1F into evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 1F was received into evidence.)

Q.   So a moment ago we were talking about the EXIF data and the GPS coordinates.  So I'm going to bring that back up just a little bit zoomed to the side.

And can you explain to the jury what they're looking at in Government's Exhibit 1F on the right side of the screen.

JASON WHITT - DIRECT

A.   So the right side of the screen is a pond called Songo Pond and around it you'll see some boxes, which those are properties, usually, located around the Songo Pond.

Q.   Did you type in the GPS coordinates into this website to see what would come up?

A.   I did.

Q.   All right.  Is that reflected here in Exhibit 1F?

A.   It is.

Q.   Where?

A.   Up at the top left-hand corner.

Q.   So in comparison to 1E, what are we looking for to compare?

A.   So the GPS longitude and latitude, that is what you enter in, and you enter it in in a way that the latitude comes first and longitude second.

Q.   Did you find another bathroom recording?

A.   I did.

         MR. CERVANTES:  Your Honor...

         THE COURT:  Members of the jury, you're about to see and hear some evidence that the defendant engaged in uncharged bad conduct in the past.  The law allows this kind of evidence for certain limited purposes.  For example, this evidence may properly be considered to prove the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  Keep in mind the limited

JASON WHITT - DIRECT

purpose for which this evidence is admitted.  Most importantly, do not conclude from this evidence that the defendant has bad character in general.  Nor should you conclude that because the defendant may have engaged in bad conduct in the past, that he is more likely to have committed the crimes with which he is now charged.

You may proceed.

BY MR. CERVANTES:

Q.   I'm showing you what has been marked for identification as Government's Exhibit 1G.

Do you recognize that?

A.   I do.

Q.   Is this a video that came from the My Passport hard drive?

A.   It is.

MR. CERVANTES:  Your Honor, the government moves 1G into evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 1G was received into evidence.)

Q.   How long is -- how long is this video?

A.   Eight minutes and one second.

Q.   I'm going to play the first 31 seconds..

(Government's Exhibit Number 1G was published.)

Q.   I've stopped it at 30 seconds.

JASON WHITT - DIRECT

I just want to draw your attention to the bottom half of this screen.  Can you describe what you see.

A.    So you see an orange or red canvas bag with a black border.

Q.    Is that bag consistent with the bag that you previously described --

A.    It is.

Q.    -- in the first bathroom video?

A.    Yes, sir, it is.

Q.    So that we're clear about what we're talking about, when I ask you about this video, is it all right with you if I call it the second bathroom video and then the bathroom video that we just saw with the blond-haired girl, can we call that the first bathroom video?

A.    Yes.

Q.    All right.  I'm going to just play from minute 7:00 to 7:05 and then we'll be done with this video.

        (Government's Exhibit Number 1G resumed.)

Q.    Did you find metadata for this second bathroom video?

A.    I did.

        MR. CERVANTES:  When I switch between video and images, there's a delay, so please excuse the delay.

Q.    I'm showing you what has been marked for identification as 1H.

        Do you recognize that?

JASON WHITT - DIRECT

A.    Yes.   It is a screenshot from the Magnet AXIOM software.

Q.    Does it fairly and accurately represent the metadata associated with the second bathroom video?

A.    It does.

MR. CERVANTES:  Government moves 1H into evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 1H was received into evidence.)

Q.    I'm zooming in on the file name.  Can you read that for the record, please.

A.    The file name is IMG_3696.MOV.

Q.    I'm also pulling up 1E at the same time to compare the two exhibits and ask you a question about it.

So I'm zooming in on the EXIF data for 1E.

So remind us, what is 1E?

A.    1E is the video of the first bathroom video.

Q.    The metadata for the first bathroom video?

A.    The metadata for the first bathroom video.

Q.    Okay.  And 1H is the metadata for the second bathroom video?

A.    Correct.

Q.    What date was the first bathroom video created and what is the date of the second bathroom video?

A.    The first bathroom was 7/18 of 2016 and the second was 7/19/2016.

JASON WHITT - DIRECT

Q.   And with respect to the GPS coordinates for both of these videos, are they the same, not the same, or something else?

A.   They are very close.  They are not the same.

Q.   I want to move on to a set of three other videos.

MR. CERVANTES:  Your Honor...

THE COURT:  Members of the jury, you're going to hear the same sort of evidence that I just talked about and it should be considered by you for the limited purposes that I described earlier.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 1I.

Do you recognize that?

A.   I do.

Q.   What is it?

A.   It is a video of a young female.

Q.   Did this video come from the My Passport hard drive?

A.   It did.

MR. CERVANTES:  The government moves 1I into evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 1I was received into evidence.)

MR. CERVANTES:  For the record, this is a 2 minute and 25 second video.  The government is playing it in its entirety.

JASON WHITT - DIRECT

(Government's Exhibit Number 1I was published.)

Q.   I'm showing you what has been marked for identification as Government's Exhibit 1K.

Do you recognize it?

A.   I do.

Q.   Is this a video that you retrieved from the My Passport hard drive?

A.   It is.

MR. CERVANTES:   Government moves 1K into evidence.

THE COURT:   It's admitted.

(Government's Exhibit Number 1K was received into evidence.)

Q.   How long is this video?

A.   Forty-one seconds.

(Government's Exhibit Number 1K was published.)

Q.   I'm showing you what has been marked for identification as Government's Exhibit 1M.

Do you recognize this video?

A.   I do.

Q.   Is this a video you retrieved from the My Passport?

A.   It is.

MR. CERVANTES:   Government moves 1M into evidence.

THE COURT:   Admitted.

(Government's Exhibit Number 1M was received into evidence.)

JASON WHITT - DIRECT

Q.   How long is this video?

A.   Thirty-one seconds.

(Government's Exhibit Number 1M was published.)

Q.   Did you find metadata related to these videos?

A.   I did.

Q.   Showing you what has been marked for identification as Government's Exhibit 1J.  And if you'll allow me a moment, I'm going to pull up another two so we'll do three at one time, okay?  1L and 1N.

I'm showing you what has been marked for identification as 1J, 1L, and 1N.

Do you recognize these?

A.   I do.

Q.   What are these?

A.   These are the details for the three videos from the AXIOM Magnet forensic software.

MR. CERVANTES:  The government moves these exhibits into evidence.

THE COURT:  They're admitted.

(Government's Exhibits Nos. 1J, 1L, and 1N were received into evidence.)

MR. AMES:  I'm sorry, I didn't -- what are they?

THE WITNESS:  So each screenshot -- if you look at the one at the top, it says Image 1089, then you have IMG_1090, and you have IMG_1091.  Those are the three videos

JASON WHITT - DIRECT

that we just watched.  These are the screenshots of the details of these images or the metadata from the AXIOM forensic software.

THE COURT:  You may proceed.

MR. CERVANTES:  Thank you, Your Honor.

Q.   So let's go through the file names of these.  What is the file name of the first one?

A.   The file name of the first one is IMG_1089.MOV.

Q.   And are these in sequential order to the way that we viewed them a moment ago?

A.   They are

Q.   Okay.  So I zoomed in on the file names for each.  What are the file names for all three?

A.   IMG_1089.MOV, IMG_1090.MOV, and IMG_1091.MOV.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 11.

MR. CERVANTES:  Your Honor, the government moves this exhibit into evidence pursuant to a business record notification certification that was filed on April 9, 2023, at docket entry 35.

THE COURT:  It's admitted.

(Government's Exhibit Number 11 was received into evidence.)

Q.   So I'd like to ask you to read out a couple portions of this document and then we're going to do some comparisons to

JASON WHITT - DIRECT

the exhibit on the left, 1J, okay?

A.   Yes, sir.

Q.   So first, I want to zoom into the -- you had said earlier that the date of videos can be found in the EXIF data?

A.   Correct.

Q.   So what is the date of the first video that we saw, the series which was marked as Exhibit 1I?

A.   The first date for which exhibit?

Q.   I'm sorry.  That was a bad question.

     What is the date of the video that we -- the first video that we looked at in the series of three that was directed up the skirt of a female?

A.   Creation date is 6/17/2015.

Q.   Turning to Government's Exhibit 11, zooming in at the top, what is the date of this record?

A.   6/17/2015.

Q.   What is the name of the patient?

A.   F.L..

Q.   What is the date of birth for Ms. F.L.?

A.   X/XX/1997.

Q.   So on 6/17/2015, the date of the video, how old would F.L. have been?

A.   She would be 18 years old.

Q.   By how many days?

A.   Five.

JASON WHITT - DIRECT

Q.   Can you read -- can you read the portion of the document that I've highlighted and zoomed in.

A.   "Provider Tatum, David."

Q.   And the encounter date next to it?

A.   6/17/2015.

Q.   I'm going to go to page 4.

Can you read the portion I've highlighted.

A.   "F.L. is a pleasant 17YO," or year old, "white female who I saw individually today."

Q.   I'm going to scroll to page 5.

Under school history, can you read the portion that I've highlighted.

A.   "She is in 12th grade at Penfield HS."

Q.   I'm going to keep scrolling to page 7.

Can you read the portion that I've highlighted.  One moment.  Here we go.

A.   "Length of visit:  Duration of face-to-face visit with patient-60 minutes."

Q.   I'd like to move on to a different device.

Can you hold up Exhibit 2A, the iPhone.

(Witness complied.)

Q.   Thank you.

Is there an indication on the outside of the device that would inform you on whether the device was shipped or transported in interstate or foreign commerce?

JASON WHITT - DIRECT

A.   There is.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 2B.

Do you recognize that?

A.   I do.

Q.   What is it?

A.   It is an iPhone 6 that I examined.

Q.   Does it fairly and accurately reflect that iPhone?

A.   It does.

MR. CERVANTES:  The government moves 2B in evidence.

THE WITNESS:  It's admitted.

(Government's Exhibit Number 2B was received into evidence.)

Q.   I'm zooming in to a portion of the picture.  Can you read where it is assembled and designed.

A.   "Assembled in China.  Designed by Apple in California."

MR. AMES:  Your Honor, I'll just note -- I'll renew the objection to hearsay in all of this.

THE COURT:  So noted.  Overruled.

Go ahead.

Q.   So let's talk about how pictures are saved on an iPhone. Can you explain that to the jury.

A.   So any time you use an iPhone or even an Android and use the camera app to take a picture, it saves it into the DCIM folder which stands for digital camera images.

110

JASON WHITT - DIRECT

Q.   The same goes for videos?

A.   The same for videos.

Q.   Is there a particular naming convention that's given to these images and videos?

A.   So they do.  They name them in order starting with, like, 001 up into the thousands.  So you can go into, like, 1,000 to 1,099, 2,000 to 2,999.

Q.   Did you take steps to determine whether the bathroom videos and the up-skirt videos were on the iPhone?

A.   I did.

Q.   What did you do to confirm it?

A.   So I went to -- first I ran an index search.  And then when that came back I didn't find any hits for any movies.  I then went to where it would be stored at on the file system on the phone itself, so I then went to the DCIM folder.  And then I went to the corresponding folders for the videos.

Q.   And you're doing this to see if the bathroom videos and up-skirt videos are still on the phone?

A.   Correct.

Q.   Were they listed?

A.   I did not see them in the folders.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 2C.

     Do you recognize that?

A.   I do.

JASON WHITT - DIRECT

Q.    What is it?

A.    So this is a screenshot from the Magnet AXIOM program. This is actually a screenshot of the file system. So in the phone itself there are files and folders that are stored in certain places. So in this we go through the file system on the phone and I scrolled all the way down to where the DCIM folder is, opened up the DCIM folder, and I viewed where they could be or should have been in the folders represented.

MR. CERVANTES:  Government moves 2C in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 2C was received into evidence.)

Q.    So the jury didn't have this displayed for them until just a moment ago. It's just a formality. But can you -- where should I go to help them understand what you just said?

A.    So as you scroll down where it says -- right above where it's highlighted, above that is the DCIM folder that I was speaking of. Inside a DCIM folder you have different folders as you see:  100 Apple, 101 Apple, 102 Apple. And these are where the files are stored, the images or videos. And each one of those folders represents a naming convention. Like the 100 folder houses 0 to 999, the 101 folder houses 1,000 through 1,999, and so on.

Q.    Do you remember the file names for the two bathroom videos?

JASON WHITT - DIRECT

A.   I do.

Q.   What were they?

A.   IMG_3666 and IMG_3696.

Q.   Zooming in on the list of images, are either of the bathroom videos still in the list of images and videos?

A.   No, sir, they are not.

Q.   How would someone go about transferring a video from the iPhone to the My Passport?

A.   So there's a few ways.  You can upload or -- to the Cloud your videos and then you can access it from a computer where the Passport might be plugged into and downloaded from your iCloud.  You can also copy it -- you can hook your iPhone up to the Mac or any computer.  You can also copy and paste the folders out of the phone into another device.

Q.   If you copied and pasted, what would that do?

A.   So copy and paste is just that.  You make a copy of the file and you paste it into a new storage device whether a computer or an external.  But it would remain there.  You would not delete it if you did a copy and paste.

Q.   So if you did a copy and paste, the videos would still be in this list.

A.   Correct.

Q.   So since the videos are not in this list, was it transferred using a copy and paste?

A.   No.

JASON WHITT - DIRECT

Q.    If you drag and drop, what does that do?

A.    So drag and drop is just like a copy and paste.  It's just a -- instead of highlighting the file and right clicking on it or hitting command C for copy and paste, drag and drop does the same thing as a copy and paste.

Q.    Since the bathroom videos are not listed here, was a drag and drop used?

A.    I do not think so.

Q.    For the bathroom videos not to be in the phone anymore, what would the user have to have done?

A.    So to have the files not in here, you would either have to do a cut and paste so you would actually cut the file out and paste it into a new one which then it would remove it from the list.  Or once you have completed your copy and paste, or however you got the file off, you would have to delete it to remove it.

Q.    In your opinion, is that what would have happened here to remove both of the bathroom videos from the iPhone?

A.    One of those two options.

Q.    Based on this evidence and your review of the videos, in your expert opinion, was this the phone that was used to make the bathroom recordings?

A.    It appears so, yes, sir.

Q.    Did you look to see if the same can be said of the up-skirt videos, the set of three videos?

JASON WHITT - DIRECT

A.    I did.

Q.    I'm showing you what has been marked for identification as Government's Exhibit 2D.

What is that?

A.    It is a screenshot from the file system of the DCIM folder from the AXIOM or Magnet AXIOM forensic software.

MR. CERVANTES:  The government moves 2B in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 2B was received into evidence.)

Q.    Do you remember the file names of the three videos?

A.    I do.

Q.    What are they?

A.    They are IMG_1089, 1090, and 1091.

Q.    Zooming into that particular area of the list of images and videos, do you see those videos listed here?

A.    No, I do not.

Q.    In your expert opinion, was this the iPhone that was used to make the up-skirt recordings?

A.    Yes, sir, it appears so.

Q.    All right.  So let's talk about attribution.  What is that?

A.    So attribution is information about someone that interacts with the computer or the user folder.

Q.    What does it tell you?

JASON WHITT - DIRECT

A.   It tells you who operates the computer or who is using that user account.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 10.  And first I want to talk to you about the My Passport, okay?  Did you find attribution evidence in the My Passport?

A.   I did.

Q.   Okay.  Do you recognize Exhibit 10?

A.   I do.

Q.   What is it?

A.   It's a Jet Blue boarding pass for Tatum, David.

Q.   Did you get this from the My Passport?

A.   I did.

        MR. CERVANTES:  Government moves 10 in evidence.

        THE COURT:  It's admitted.

        (Government's Exhibit Number 10 was received into evidence.)

Q.   Can you read the name on the boarding pass.

A.   Name is Tatum, David.

Q.   Showing you what's been marked for identification as Government's Exhibit 1P.

    Do you recognize this?

A.   I do.

Q.   Is this a document that came from the My Passport?

A.   It is.

JASON WHITT - DIRECT

MR. CERVANTES:  Government moves 1P in evidence.

THE COURT:  Admitted.

(Government's Exhibit Number 1P was received into evidence.)

Q.    Can you explain to the jury what this is.

A.    It is a 2010 Federal Tax Return from TurboTax.

Q.    And what is the name that I've highlighted?

A.    David A. Tatum.

Q.    Let's talk about attribution for the iPhone.  Did you find attribution there?

A.    I did.

Q.    Showing you what's been marked for identification as Government's Exhibit 2E.

      Do you recognize that?

A.    I do.

Q.    Is this a document that came from the iPhone?

A.    Yes, sir, it is.

MR. CERVANTES:  Government moves 2E in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 2E was received into evidence.)

Q.    Can you read the entirety, so from university all the way to June 2016.

A.    "University of Rochester, School of Medicine and Dentistry and Strong Memorial Hospital.  David Arthur Tatum,

JASON WHITT - DIRECT

D.O. has served as a fellow in the Child and Adolescent Psychiatry Program from July 1, 2014 to June 30, 2016 and has faithfully and honorably discharged the duties of the position.  In Witness Whereof, the signatures and the Seal have been affixed below on this 30th of June, 2016."

Q.   I'm showing you what has been marked for identification as Government's Exhibit 2F.

     Do you recognize that?

A.   I do.

Q.   Is this a document that came from the iPhone?

A.   It is.

          MR. CERVANTES:  Government moves 2F in evidence.

          THE COURT:  It's admitted.

          (Government's Exhibit Number 2F was received into evidence.)

Q.   What is this document?

A.   Appears to be some sort of schedule from Carolinas HealthCare System.

Q.   And who is -- can you read the portion that I've highlighted.

A.   "Dr. David Tatum, MD, Carolinas HealthCare System, Department of Psychiatry."

Q.   Showing you what's been marked for identification as 2G.

     Do you recognize this document?

A.   I do.

JASON WHITT - DIRECT

Q.   Did this document also come from the iPhone?

A.   It did.

        MR. CERVANTES:  Government moves 2G in evidence.

        THE COURT:  Admitted.

        (Government's Exhibit Number 2G was received into evidence.)

Q.   Can you please read the top portions that I've highlighted.

A.   "Faculty Candidate Interview Schedule, David Tatum, MD, Senior Instructor (CPEP) Candidate."

Q.   I'm showing you 2H.

     Do you recognize that?

A.   I do.

Q.   Is this a picture that came out of the iPhone?

A.   It is.

        MR. CERVANTES:  Government moves 2H in evidence.

        THE COURT:  Admitted.

        (Government's Exhibit Number 2H was received into evidence.)

Q.   What is this?

A.   A New York state driver's license.

Q.   For whom?

A.   Tatum, David A.

Q.   Did you find owner information in relation to the iPhone?

A.   I did.

JASON WHITT - DIRECT

Q.   Can you explain to the jury, what does owner information mean specifically in relation to an iPhone?

A.   So owner information, when you create an account with an iPhone, you have to put in a name and/or an Apple iCloud account or an email address associated with an Apple iCloud account.

Q.   I'm showing you 2I marked for identification.

     What is it?

A.   This is a screenshot from the Magnet AXIOM program reference to the device or the owner of the iPhone 6.

Q.   Does this fairly and accurately represent the owner information for the iPhone?

A.   It does.

          MR. CERVANTES:  The government moves 2I in evidence.

          THE COURT:  It's admitted.

          (Government's Exhibit Number 2I was received into evidence.)

Q.   I want to talk to you about two specific parts, and I'm going to zoom in.

     Can you please read the device phone name.

A.   The device phone name is David's iPhone.

Q.   And the Apple ID?

A.   The Apple ID is morphus100@gmail.com.

          MR. CERVANTES:  Your Honor, we're moving to the HP, another device.  I think I could do it in half an hour.

120

JASON WHITT - DIRECT

THE COURT:  Okay.  Take what time you need.

MR. CERVANTES:  Thank you.

Q.   Next I'd like to talk to you about the HP computer.  Can you -- I won't ask you to lift it because it seems like the heaviest of all, but can you just point to what I'm talking about.

A.   The HP computer (indicating).

Q.   Okay.  That big tower?

A.   Yes, sir.

Q.   Do you know if there's any indication on the hard drive of this device that would inform you on whether the device was shipped or transported in interstate or foreign commerce?

A.   There is.

Q.   Now, can you see the hard drive from just looking at it right now?

A.   No, sir.

Q.   What would you have to do?

A.   I removed the side of the desktop computer to access the hard drive.

Q.   And have you been able to see the hard drive inside of the computer?

A.   I have.

Q.   Showing you what's been marked for identification as Government's Exhibit 3B.

What is that?

JASON WHITT - DIRECT

A.   That is the hard drive inside of the HP desktop computer.

Q.   It's a picture of the hard drive?

A.   Picture of the hard drive.

MR. CERVANTES:  The government moves 3B in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 3B was received into evidence.)

Q.   Can you read the bottom part of the zoom out.

A.   "Product of Thailand."

Q.   Did you review any videos identified as child pornography in the HP hard drive?

A.   I did.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 3C.

What is it?

A.   It is a video that I saw flagged on the HP desktop.

Q.   Did this video come from the HP computer?

A.   It did.

MR. CERVANTES:  The government moves 3C in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 3C was received into evidence.)

Q.   Actually, one more question before we advance.  How long is -- how long is this video?

A.   The video is 56 minutes and 22 seconds.

JASON WHITT - DIRECT

MR. CERVANTES:  Okay.  I'm going to advance to 11:40, from 11:40 to 11:50.  One moment while I do that.

(Goverment's Exhibit Number 3C was published.)

MR. CERVANTES:  Pausing at 11:50.  I'm advancing to minute 13.

Q.   So in minute 13 I want to ask you whether you can see their faces for the brief seconds that I'm going to play the video, okay?

A.   Yes, sir.

MR. CERVANTES:  Playing from 12:59 to 13:05, 13:06.

(Government's Exhibit Number 3C resumed.)

Q.   Were you able to see their faces?

A.   Yes, sir.

Q.   Have you seen or skimmed through the rest of the video?

A.   I have.

Q.   Does it continue to show these two girls engaging in sexual intercourse?

A.   Sexual activities, yes, sir.

Q.   Okay.  Like what?

A.   Touching each other, that kind of sexual activity.

Q.   Okay.  Was there another video on the HP that you reviewed?

A.   Yes, sir.

Showing you what has been marked for identification as Government's Exhibit 3E.

JASON WHITT - DIRECT

Do you recognize it?

A.   I do.

Q.   Is this a video that came from the HP?

A.   It is.

Q.   How long is this video?

A.   Fifty minutes and 15 seconds.

        MR. CERVANTES:  Publishing.

        THE COURT:  You haven't admitted it.

        MR. CERVANTES:  I'm sorry.  Government moves 3E in evidence, Your Honor.

        THE COURT:  It's admitted.

        MR. CERVANTES:  My apologies.

        (Government's Exhibit Number 3E was received into evidence.)

        MR. CERVANTES:  Publishing.

        (Government's Exhibit Number 3E was published.)

        MR. CERVANTES:  And we'll stop for a moment and advance to 5:30, from 5:30 to 5:45.

        (Government's Exhibit Number 3E resumed.)

        MR. CERVANTES:  Advancing to minute 30:20, from 30:20 to 30:45.  Publishing.

        (Government's Exhibit Number 3E resumed.)

Q.   Were you able to pull metadata for these two videos?

A.   I was.

Q.   Showing you what has been marked for identification as

JASON WHITT - DIRECT

Government's Exhibits 3D and 3F.

Do you recognize them?

A.   Yes, sir.

Q.   What are they?

A.   These are screenshots from the Magnet AXIOM forensic software.

Q.   Do they fairly and accurately represent the metadata for videos?

A.   Yes, sir.

Q.   Which videos?

A.   The videos that we just saw.

MR. CERVANTES:  Government moves 3D and 3F in evidence.

THE COURT:  They're admitted.

(Government's Exhibits Nos. 3D and 3F were received into evidence.)

Q.   So I'd like to ask you about the -- first of all, let's get the file name for a moment on both of these videos.

Can you read the first one that I've called out.

A.   Vidweb_174.avi.

Q.   And the second.

A.   Vidweb_172.avi.

Q.   Now, let's talk about source.  What does that tell you?

A.   The source is going to be the folder path where the file was located.

JASON WHITT - DIRECT

Q.   Can you explain that a little bit more.

A.   Sure.  So the source that we have up on the screen, that's where the 1B1 is the evidence item.  That is the forensic image that we created of the hard drive.  In that we go to the OS, which is where the Windows operating system is stored in that partition.  Then we go to Users, Morphus, folder Desktop, folder New Desktop, folder Board Review, folder RAPID REVIEW.  And inside the folder RAPID REVIEW, the video Vidweb_172.avi is located.

Q.   So the user for this computer, how can you tell what the user is by looking at this file path?

A.   So you can see under the user, the user that is in the file path is Morphus.

Q.   Okay.  Is that for both videos?

A.   That is for both videos, yes, sir.

Q.   Are there other instances where you saw that user name?

A.   Yes.

Q.   Pulling up what's been admitted as Government's Exhibit 2I.

     Do you recall that?

A.   I do.

Q.   Is this another instance of seeing the word Morphus?

A.   Yes, sir, it is.

Q.   Okay.  And what is that from?

A.   This is from the iPhone 6.

JASON WHITT - DIRECT

Q.   Can you explain what an index search is.

A.   So an index search is where the forensic software goes through and pulls out all the words and puts them in an index, whether it's one letter or multiple letters or even letters and numbers.  And that allows us that when we search the computer, that when we pull it up, it can quickly show us where it's at.  So it makes an index of every word, character, inside the computer.

Q.   Did you do an index search for pthc in the HP?

A.   I did.

Q.   Did you get any hits?

A.   I did.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 3G.

     What is that?

A.   This is a screenshot from the Magnet AXIOM program reference to the search or index search I did for pthc.

          MR. CERVANTES:  Government moves 3G in evidence.

          THE COURT:  It's admitted.

          (Government's Exhibit Number 3G was received into evidence.)

Q.   Can you explain -- does this exhibit help you explain the hit that you saw after searching for pthc in the HP?

A.   Yes, sir, it does.

Q.   How so?

JASON WHITT - DIRECT

A.   So in the search of pthc under the user Morphus is an NTUSER.DAT, which an NTUSER.DAT stores user settings, configurations for that user.

So if you move down to the location where I found the hit for the pthc, you will see Software\Microsoft\Windows\Current Version\Explorer\WordWheelQuery\17.  And what the word wheel is is if you open File Explorer in Windows and you go over to the right top corner, there's a search box.  If you search a name there, your word wheel will record what you searched.  And in this instance it was pthc.

Q.   What user was logged into the HP when the search for pthc was conducted?

A.   Morphus

Q.   Did you find attribution evidence in the HP?

A.   I did.

Q.   I'm showing you what has been marked for identification as Government's Exhibits 3H and 3I.

Do you recognize them?

A.   Yes, sir, I do.

Q.   Are these documents that came from the HP?

A.   Yes, sir, it is.

MR. CERVANTES:  Government moves 3H and 3I in evidence.

THE COURT:  They're admitted.

(Government's Exhibits Nos. 3H and 3I were received

JASON WHITT - DIRECT

into evidence.)

Q.   What are these two documents?

A.   They are H&R Block Advantage paperwork for, appears to be, tax information.

Q.   And can you read the highlighted portions that I've made on the document.

A.   "Prepared for David A. Tatum 4/10/2013" and "Prepared for David A. Tatum."

Q.   I'm showing you what has been marked for identification as Government's Exhibit 3J.

Do you recognize that?

A.   I do.

Q.   What is it?

A.   It is a document that was on the HP.

MR. CERVANTES:  Government moves 3J in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 3J was received into evidence.)

Q.   What is this document?

A.   Appears to be a resume.

Q.   For whom?

A.   David Arthur Tatum.

MR. CERVANTES:  Your Honor, this may be a good stopping point.

THE COURT:  All right.  Members of the jury, it's a

little bit early, but I asked the prosecutor to let me know a logical break on either side of 5:00. And I'm led to believe that the next line of questioning would take us further beyond 5:00 than I'm sure you would like to go and even further than I would like to go. So we're going to take our break for the evening.

Tonight's going to be a challenge for you because if you see anybody after you leave here, they're going to want to know what you did today. And here's what you're going to tell them: I was selected to serve on a federal jury, period. You're not going to tell them anything else: what kind of case it is, not civil or criminal. And you can tell them that the judge said I am not allowed to talk to anybody about this or let anyone talk to me about this. Because the amazing thing is if you tell them even just a little bit, they're going to start telling you their opinions. Based on what, I don't know because they don't know anything about this case; but they'll have opinions and they'll be anxious to share them with you. So when the trial is over, you can talk or not talk to whoever you want, but not while it's going on. So just lay all the blame on me if you'd like. That's fine.

Of course, don't discuss this case with anyone. Don't do any independent research. Don't start making up your minds. The trial is just getting started so keep an open mind until all the evidence is closed and you begin your

deliberations.

Leave your jury notes in the jury room and we'll see you tomorrow morning at 9:00. And we can't start until you're all here so out of respect for one another, please be on time.

Everyone remain seated while the jury clears the floor.

(Jury exited the courtroom.)Morphus

THE COURT: You may stand down.

(Witness stepped down.)

THE COURT: Anything we can address this evening, use our time profitably?

MR. CERVANTES: Sure, Your Honor. Given the defense opening, we would propose an additional instruction that may -- the Court may want to instruct us to research more or consider its own research. And the instruction would be along the lines of the issue that defense argued at opening, that the minors were modified on an adult body. And there's case law that says that it doesn't matter whether the modification is to an adult body or a minor's body. The body is -- as long as the minor is identifiable as a minor, you have nudified the minor. And if it meets the definition of sexually explicit conduct or lascivious nature of the picture, that's a separate issue. But it doesn't cease to be child pornography simply because, for example, the image was modified to be on the body of clearly, let's say, a 30-year-old woman. I think there's a

factual issue here. We disagree with the defense. The bodies to us look appropriate for the face and we think that the bodies are minors. But legally the jury should be instructed that that is of no moment.

THE COURT: Yeah, when I was going through the jointly proposed jury instructions, I thought that that was an instruction that would be needed but was missing, but then I thought maybe you all knew more about the case than I did so I was looking for something unnecessary. But the Court would welcome the submission of a proposed instruction. Please get together with Mr. Ames and see if you can jointly propose an instruction. And if Mr. Ames dissents from the government's version of instructions, please note that and file it as you did your other jury instructions.

MR. CERVANTES: Yes, Your Honor.

MR. AMES: That's fine, Your Honor.

THE COURT: Anything else?

MR. CERVANTES: Not from the government.

THE COURT: All right.

THE COURT SECURITY OFFICER: Still waiting, Your Honor. Just a couple of stragglers.

THE COURT: All right. Well, I can go out a different door so the Court is adjourned for the day. Everyone please remain in the courtroom until the court security officer informs you that the jury has cleared the

floor.

All right.  See you tomorrow at 9:00.

(Evening recess at 4:47 PM.)

*****

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

        I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

        Dated this 13th day of September 2023.


                        s/Cheryl A. Nuccio

                        Cheryl A. Nuccio, RMR-CRR
                        Official Court Reporter

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:22-CR-157 |
| | ) | |
| vs. | ) | VOLUME II – REDACTED |
| | ) | |
| DAVID TATUM, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
MAY 3, 2023

APPEARANCES:

On Behalf of the Government:

     DANIEL CERVANTES, ESQ.
     MARK T. ODULIO, ESQ.
     United States Attorney's Office
     227 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

On Behalf of the Defendant:

     RYAN PATRICK AMES, ESQ.
     SeiferFlatow, PLLC
     2319 Crescent Avenue
     Charlotte, North Carolina 28207

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

I N D E X

GOVERNMENT'S WITNESSES                              PAGE

JASON WHITT
    Direct Examination By Mr. Cervantes            140
    Cross Examination By Mr. Ames                  175

M.D.
    Direct Examination By Mr. Odulio               264

E.H.
    Direct Examination By Mr. Odulio               268

M.C.
    Direct Examination By Mr. Cervantes            271

E.S.
    Direct Examination By Mr. Odulio               274
    Cross Examination By Mr. Ames                  280

F.L.
    Direct Examination By Mr. Cervantes            281


DEFENDANT'S WITNESSES                              PAGE

SCOTT ATWOOD
    Direct Examination By Mr. Ames                 307


E X H I B I T S

GOVERNMENT'S EXHIBITS

NUMBER                                          ADMITTED

1D1 ...........................................273
4B ...........................................141
4C ...........................................141
4D ...........................................142
4E1 ...........................................143
4G1 ...........................................147
4G2 ...........................................147
4G3 ...........................................147
4F1 ...........................................150
4H1 ...........................................151
4H2 ...........................................151
4H3 ...........................................151

E X H I B I T S

GOVERNMENT'S EXHIBITS

NUMBER                                                    ADMITTED

4H4  .........................................................151
4H5  .........................................................151
4H6  .........................................................152
4E5  .........................................................157
4F9  .........................................................158
4F13 .........................................................158
4F10 .........................................................266
4F2  .........................................................270
5B  ..........................................................153
5F  ..........................................................155
5G  ..........................................................156
5K  ..........................................................162
5L  ..........................................................163
5H  ..........................................................165
5C  ..........................................................166
5D  ..........................................................169
5E  ..........................................................174
8  ...........................................................145

P R O C E E D I N G S

WEDNESDAY MORNING, MAY 3, 2023

(Court called to order at 8:58 AM.)

(Jury not present.)

THE COURT:  Good morning, all.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  Are the jurors here, Meg?

THE CLERK:  Yes, sir.

THE COURT:  Are we ready for the jury?

MR. ODULIO:  Your Honor, we have one housekeeping matter we would like to bring to the Court's attention.

THE COURT:  All right.

MR. ODULIO:  Your Honor, in the 404 filing that the government submitted and the Court ruled on, with respect to the proposed witness E.S. in our factual description in the filing, we indicated that E.S. was the person who was videotaped in the bathroom.  This is the second bathroom video.

THE COURT:  Right.

MR. ODULIO:  In trial preparation we learned that E.S. was not the person videotaped.  It was another cousin.  I don't think this would operate to affect any other part of the Court's ruling with respect to E.S.'s proposed testimony. It's just going to be what we outlined in our proffer -- or in the motion.  That's unchanged.  But she is going to testify

that "that is my cousin K.C. on that video."

So we just wanted to give that to the Court. Obviously, we alerted counsel to that. I don't -- I can't conceive how that would operate to impact the Court's 404 analysis, but didn't want to presume that so wanted to raise it.

THE COURT: And so her testimony is going to be that she confronted Mr. Tatum about that incident and he made some sort of admission with respect to it.

MR. ODULIO: No, Your Honor. That testimony is going to be the same, but that videotape was relating to Ms. E.S. when she was 15 years old. The part that I'm clarifying is the second bathroom video that was played yesterday in the cabin in Maine was not E.S.. It was her cousin K.C.. So --

THE COURT: Is there any testimony upcoming with respect to that second video?

MR. ODULIO: The second bathroom video?

THE COURT: Yes.

MR. ODULIO: Yes, that will be Ms. E.S.. And she will identify her cousin K.C. and identify the bathroom and identify the defendant. And then the second part of her testimony will be, "Hey, I confronted the defendant about a video he made of me when I was a child." And, again, that will -- is in line with what's reflected in our pleading.

THE COURT: Okay. I see.

Mr. Ames, do you want to be heard on that?

MR. AMES: Your Honor, yeah. I guess it's my understanding the distinction is that when the government was under the impression that this was E.S. in this other video, presumably the testimony would have been that's me and this happened and establish -- corroborating that. And now the testimony, I guess (inaudible).

THE COURT REPORTER: I'm sorry, Mr. Ames, will you pull your microphone a little bit closer.

MR. AMES: Oh, I'm sorry.

Just to make sure I have that correct is that her initial -- originally the testimony presumably would have been related to identifying herself in a video and recounting a prior conversation with Mr. Tatum. Today what will now be presumably the testimony is reviewing this other video that isn't her and recounting a conversation. Is that --

THE COURT: And apparently identifying the person in the video.

MR. AMES: Identifying the person in the video. Okay, yeah. I guess, Your Honor, as far as the 404 is concerned, I guess I would agree it doesn't change in any particular way the analysis there of whether or not that's relevant, her speaking about one video versus another.

THE COURT: The Court agrees and appreciates you

clarifying that for me.

MR. ODULIO: One last thing, Your Honor. We did agree overnight on a proposed jury instruction. That's been filed with the Court and emailed to your clerk.

THE COURT: I pulled it up as I was walking down. I'll try to find time this morning to read it.

MR. AMES: Yes, Your Honor. And if we can address that. I would like to be heard briefly on it just because I don't think that the Fourth Circuit has specifically addressed the issue; but we've cited, I think, all the case law from any circuit we could find, which is a total of four on the issue of the underlying image of the explicit conduct, whether there's a requirement of being minor versus adult, which I believe Mr. Odulio cited all of those as well in the proposal.

THE COURT: Okay. Well, either during the morning break or the lunch break. By then I will have had a chance to read it and we can talk about it some more.

MR. AMES: Thank you, Your Honor.

THE COURT: Bring the jury, please.

MR. ODULIO: Your Honor, can we bring the witness in too?

THE COURT: Yes.

(Witness resumed the witness stand.)

(Jury entered the courtroom.)

THE COURT: Good morning and welcome back. I trust

JASON WHITT - DIRECT

you withstood the inquisitive last night and abided by the Court's instructions.

It may look like we're late, but nobody was late. We were just taking up some things that didn't have anything to do with your deliberations.

You may continue your examination.

MR. CERVANTES:  Thank you, Your Honor.

JASON WHITT, GOVERNMENT WITNESS, PREVIOUSLY SWORN,

DIRECT EXAMINATION (Cont'd.)

BY MR. CERVANTES:

Q.   Good morning, Mr. Whitt.

A.   Good morning.

Q.   When we were last talking yesterday, we were about to get into a new device.

A.   Yes, sir.

Q.   Would you please hold up for the jury Exhibit 4, the thumb drive.

(Witness complied.)

THE COURT:  I believe that's 4A.

MR. CERVANTES:  4A.  Thank you, Your Honor.

Q.   Thank you.

Is there any indication on the outside of the device that would inform you on whether the device was shipped or transported in interstate or foreign commerce?

A.   The only thing on the outside of the device is there is a

JASON WHITT - DIRECT

marking for the "Medical College of Wisconsin."  And on the other side there is a "Department of Psychiatry."  There's no markings as to where it was manufactured.

Q.    I'm showing you what has been marked for identification as Government's Exhibits 4B and 4C.

Do these -- do you recognize these pictures?

A.    I do.

Q.    Do these -- what is it?

A.    It is the thumb drive with the markings of "Medical College of Wisconsin" and the other one is "Department of Psychiatry."

MR. CERVANTES:  The government moves 4B and 4C into evidence.

THE COURT:  They're admitted.

(Government's Exhibits Nos. 4B and 4C were received into evidence.)

Q.    Did you flag images of child pornography on this thumb drive?

A.    I did.

Q.    Were those images organized in any particular way?

A.    The images were in folders, different folders.

Q.    Okay.  And what kind of images of child pornography did you find?

A.    So the images of child pornography that I found on here, they are going to be altered or modified from an original

142

JASON WHITT - DIRECT

image or a source image.  And then you'll see the images where they were modified or altered to appear -- or to be child pornography.

Q.    I'm showing you what has been marked for identification as 4D.

Do you recognize it?

A.    I do.

Q.    What is it?

A.    So this is a screenshot of four folders inside the thumb drive.

MR. CERVANTES:  The government moves 4D in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 4D was received into evidence.)

Q.    So let's talk about what you found.  First of all, if you can just talk a little bit about the folder path.  So if someone were to insert this thumb drive into the MacBook, how is it that they would get to this screen?

A.    So if you inserted this thumb drive into a MacBook, you would see -- it would give it a letter or a volume.  So you would see the letter H or the volume mounted as USB disk depending on which system you plugged it into.

Inside of that you would click on the folder MCW2, and then it would open up more folders.  Then you would find the folder PCS_files.  Then inside that folder you would find

JASON WHITT - DIRECT

Sample.  And inside that folder you would look for MGNweb, w-e-b.  And then inside of that folder you would see these four folders.

Q.   All right.  So we're going to talk about three of these folders.  First we're going to talk about the CPT, then we're going to talk about the SSV, and then we'll talk about the EMOR.  Okay?

A.   Yes, sir.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 4E1.

What is that?

A.   This is a screenshot of the CPT folder.

MR. CERVANTES:  Government moves 4E1 in evidence.

THE COURT:  Admitted.

(Government's Exhibit Number 4E1 was received into evidence.)

Q.   Okay.  Can you describe what we're looking at here.

A.   So inside of here there's 24 images.  There are going to be original images that I will reference to as original or source images.  And then you're going to see images of the original that have been altered to be child pornography.

Q.   So are there -- you're saying that there are pairs?

A.   There are pairs.

Q.   So I'm pulling up a pair of pictures.  Do you agree that this is a set?

JASON WHITT - DIRECT

A.    I do.

Q.    Which one -- you said that they were original and then modified.

A.    Correct.

Q.    The original being the one on the left and the modified on the right?

A.    Correct.

Q.    Pulling up another.  Is this a pair?

A.    Yes, sir.

Q.    Is this a pair?

A.    Yes, sir.

Q.    Is this a pair?

A.    So the image on the right and the image on the far left in the left box are a pair.

Q.    And the image --

A.    The image on -- I'm sorry.

Q.    -- that I've circled in red?

A.    So that image appears to be cropped from the image on the left in the left-hand box.

Q.    Is this a pair?

A.    Yes, sir, it is.

Q.    Is this a pair?

A.    Yes, sir.

Q.    Is this a pair?

A.    Yes, sir.

JASON WHITT - DIRECT

Q.   Is this a pair?

A.   Yes, sir.

Q.   Now, I'd like to draw your attention to the bottom right of this picture.  What do you see there?

A.   So it is a watermark or a banner for Teen Gallery.  At the bottom I believe it's .com.

Q.   Did you find the -- any originals from these three that I've pulled up?

A.   Yes, sir, I did.

Q.   In this folder?

A.   No, sir.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 8.

     Do you recognize that?

A.   I do.

Q.   What is it?

A.   It is a screen shop -- screenshot of the website deepsukebe.io/en.

     MR. CERVANTES:  The government moves Exhibit 8 into evidence.

     THE COURT:  It's admitted.

     (Government's Exhibit Number 8 was received into evidence.)

Q.   Why did you take this screenshot?

A.   So Special Agent Brown advised me that some of these

JASON WHITT - DIRECT

images may be altered by this website.

Q.   Okay.  And did you find evidence that some of the pictures we just looked at had indicia of being modified by this website?

A.   I did.

Q.   I'm going to pull up the last exhibit that we were just looking at and I'm going to zoom in on one of the pictures.

Is there something about this picture that catches your eye?

A.   There is.

Q.   What is it?

A.   So if you look at the top of the picture on the left, you will see the magenta or pink banner on the top and bottom, but also the middle of the picture where you see the white bar to show what is selected on the website appears to be consistent with the website itself.

Q.   Zooming into another picture, is your testimony the same about that picture?

A.   Yes, sir, it is.

Q.   Next I'd like to talk to you about the contents of the SSV folder.

I'm showing you what has been marked for identification as Government 4G1.

Do you recognize it?

A.   I do.

JASON WHITT - DIRECT

Q.   What is it?

A.   It is a screenshot of some of the files in -- or some of the files in the folder SSV.

Q.   I'm going to show you two more and then ask to move these in.  One second.

     Government's Exhibit 4G2, what is that?

A.   It is a screenshot of some of the other files in the folder SSV.

Q.   Third one, 4G3.  Do you recognize that?

A.   Yes, sir.  It's a screenshot of the files -- the remaining files in the folder of SSV.

        MR. CERVANTES:  Government moves 4G1, 4G2, and 4G3 in evidence.

        THE COURT:  They're admitted.

        (Government's Exhibits Nos. 4G1, 4G2, and 4G3 were received into evidence.)

Q.   Starting with 4G1, what are we looking at here?

A.   Some of these are -- these are the first files that are in the folder of SSV.

Q.   Did you identify some of the unmodified pictures that we just looked at in this folder?

A.   I did.

Q.   Is this one?

A.   Yes, sir.

Q.   Is this another one?

JASON WHITT - DIRECT

A.   Yes, sir.

Q.   Are these two more?

A.   Yes, sir.

Q.   The remaining pictures here that I have not called your attention to, did you find that those were modified?

A.   I did not.

Q.   Pulling up 4G2, did you find any of the modified pictures in their unmodified form in this folder?

A.   I did.

Q.   Is this one?

A.   Yes, sir.

Q.   Is this another one?

A.   Yes, sir.

Q.   Is this another one?

A.   Yes, sir.

Q.   How about this one?

A.   Yes, sir.

Q.   And this one?

A.   Yes, sir.

Q.   Showing you 4G3.  Same questions.

     Is this one?

A.   It is.

Q.   At the bottom of this picture, do we see the same water stamp for Teen Gallery?

A.   Yes, sir, we do.

149

JASON WHITT - DIRECT

Q.   Is this another one?

A.   It is.

Q.   Same issue with the watermark?

A.   Yes, sir.

Q.   Is this another one?

A.   Yes, sir.

Q.   How about the watermark?

A.   Same, Teen Gallery.

Q.   And I just want to go back and double check.

4G2, is there a watermark on this picture?

A.   Yes, sir.

Q.   Do you need me to zoom in closer?

A.   There is a watermark.  Appears to be Teen Gallery, yes, sir.

Q.   Next I want to talk about the contents of the EMOR folder.

I'm showing you what has been marked for identification as 4F1.

Do you recognize it?

A.   I do.

Q.   What is it?

A.   It is the contents or the files inside the EMOR file, 4F1.

MR. CERVANTES:  The government moves 4F1 in evidence.

JASON WHITT - DIRECT

THE COURT:  It's admitted.

(Government's Exhibit Number 4F1 was received into evidence.)

Q.   What are we looking at here?

A.   Again, what we're looking at here is source folders or source files and then those files being altered or modified.

Q.   So I'm going to take a couple minutes just to zoom into a few pictures.

So I've zoomed in on several of the pictures in there. Do you recognize these to be similar or sets?

A.   Yes, sir.

Q.   I'm going to zoom in on another set of pictures.

Do you recognize these to be sets?

A.   I do.  Minus the one female on the far left is cut out of the one on the right.

Q.   Yesterday I asked you questions about attribution.

A.   Yes, sir.

Q.   Did you look for attribution in the thumb drive?

A.   I did.

Q.   I'm showing you what has been marked for identification as Government's Exhibits 4H1 through 4H4.

Do you recognize them?

A.   I do.

Q.   Did these pictures come from the thumb drive?

A.   They did.

151

JASON WHITT - DIRECT

MR. CERVANTES:  Government moves 4H1 through 4H4 in evidence.

THE COURT:  They're admitted.

(Government's Exhibits Nos. 4H1, 4H2, 4H3, and 4H4 were received into evidence.)

Q.   I'm going to show you one more that I couldn't fit on the screen.

Do you recognize this one?

A.   I do.

Q.   Did this come from the thumb drive?

A.   It did.

Q.   4H5.

MR. CERVANTES:  Government moves 4H5 in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 4H5 was received into evidence.)

Q.   Showing you what has been marked for identification as Government's Exhibit 4H6.

Do you recognize this?

A.   I do.

Q.   Did this document come from the thumb drive?

A.   Yes, sir.

MR. CERVANTES:  Government moves 4H6 in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 4H6 was received into

152

JASON WHITT - DIRECT

evidence.)

Q.    What does this letter appear to be to you?

A.    It's a letter addressed to a Dr. David Arthur Tatum from Wake Forest University, Department of Psychiatry and Behavioral Medicine.

Q.    Okay.  Last device.  Can you hold up the MacBook, please.

(Witness complied.)

Q.    And that's marked as Government's Exhibit 5A?

A.    Yes, it is.

Q.    Is there any indication on the outside of the device that would inform you on whether the device was shipped or transported in interstate or foreign commerce?

A.    Yes, sir.

Q.    Showing you what has been marked for identification as Government's Exhibit 5B.

Do you recognize it?

A.    I do.

Q.    What is it?

A.    It is the back of the MacBook describing where it's assembled and designed by and also contains the serial number.

Q.    Where is it designed and assembled?

A.    Designed by Apple in California and assembled in China.

MR. CERVANTES:  Government moves 5B in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 5B was received into

JASON WHITT - DIRECT

evidence.)

Q.   All right.  What are user profiles?

A.   So user profiles, when you have a computer, when you first log in or when you open it up, you can create your own user profile.  It just allows you to have multiple users on a computer that you can separate yourself or your information.  But a user profile is a profile you create or somebody creates for you on a computer.

Q.   Did you find multiple user profiles on the MacBook?

A.   I did.

Q.   To what extent did that impact your search?

A.   User profiles do not impact my search.

Q.   Can you explain.

A.   So when we go into a computer, we talked about index searches.  When I first run an index search or I go in and look for videos or images of child pornography, I don't look what user generated them or where it's stored at first.  I run the index search and then I go wherever the evidence leads me.

Q.   And afterwards can you then see what user profile is associated with the piece of evidence that you found?

A.   Yes, sir.  Once they are flagged we'll go through and then once we get the folder path, we will see what user they are stored under.

Q.   Did you find information in the MacBook that it was used to access child pornography?

JASON WHITT - DIRECT

A.    I did.

Q.    What user profiles were associated with that evidence?

A.    So there was two, a David Tatum and a Morphus.

Q.    Is that the same -- spelled in the same way as the Morphus that we discussed yesterday from the iPhone?

A.    Yes, sir, it was.

Q.    Just to be sure, pulling up Government's Exhibit 2I that's already in evidence.  Can you remind the jury what this is.

A.    So this is the details of the owner information for the iPhone 6.

Q.    Okay.  And when you discussed Morphus, is it the same spelling that you see here in the Apple ID?

A.    Yes, sir.

Q.    All right.  Previously we looked at evidence and then we talked about attribution, but for this device we're going to do it backwards.  We're going to talk about attribution first, okay?

A.    Yes, sir.

Q.    Did you find any attribution in the MacBook?

A.    I did.

Q.    Showing you what has been marked for identification as Government's Exhibit 5F.

What is that?

A.    It is a document from the MacBook.

JASON WHITT - DIRECT

MR. CERVANTES:  Government moves 5F in evidence.

THE COURT:  Admitted.

(Government's Exhibit Number 5F was received into evidence.)

Q.   Can you -- can you read the top of the document.

A.   The top of the document.  "David Arthur Tatum, D.O., 13021 Pumpkin Way Drive, Mint Hill, North Carolina 28227."

Q.   Okay.  What does this document purport to be?

A.   Appears to be a resume.

Q.   I'm going to move this over and bring back 2I that we were just looking at.

On this resume, what's the phone number that Dr. Tatum lists on his resume?

A.   The phone number is (315)447-4594.

Q.   And what is the phone number associated with the iPhone that we previously discussed that you said was used to record the two bathroom videos and the up-skirt videos?

A.   The device's phone number recorded is 1(315)447-4594.

Q.   I'm showing you what has been marked for identification as Government's Exhibit 5G.

Do you recognize this?

A.   I do.

Q.   What is it?

A.   This is a screenshot from the AXIOM Magnet forensic software reference to a user on the MacBook.

JASON WHITT - DIRECT

MR. CERVANTES:  Government moves 5G in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 5G was received into evidence.)

Q.   I'm highlighting the top part of the artifact information.  What is the user name associated?

A.   The user name is davidtatum, one word.

Q.   And the full name?

A.   The full name is David Tatum.

Q.   Is there a way to determine whether the thumb drive or the My Passport -- can you hold up both of those.

A.   This is the thumb drive and the My Passport.

Q.   Is there a way to determine whether either of those devices were plugged into the MacBook?

A.   There are.

Q.   Can you describe, what are thumbnails?

A.   So thumbnails -- when you plug in a device into your computer, whether, again, it's a Mac or a Windows, you can -- the computer itself will go out, look at the files and create a thumbnail from it and put it into a thumbnail cache so that whenever you plug the drive back in, it can access these thumbnails faster so it won't slow down your computer.

Q.   So in trying to determine whether one of these devices was plugged into the Mac, what do you do?

A.   So in this we will look for common, like, file paths.  We

JASON WHITT - DIRECT

will also look for folders that we saw on another drive.  We will also do an index search.

Q.   This morning we talked about the folder path, for example, to those folders that have the CPT, the SSV, and the EMOR.  Would you be able to look for that folder path in the Mac?

A.   Yes, through an index search, yes, sir.

Q.   Okay.  So let's -- I'm going to move in some exhibits and then compare them to some exhibits we've already talked about, okay?

A.   Yes.

Q.   So I'm going to show you what's been marked as Government's Exhibit 5 -- I'm sorry, 4E5.

     What is that?

A.   It is a screenshot for the details for the -- or from the MacBook.

Q.   Okay.  For an image?

A.   For a thumbnail, yes, sir.

          MR. CERVANTES:  Government moves 4E5 in evidence.

          THE COURT:  It's admitted.

          (Government's Exhibit Number 4E5 was received into evidence.)

Q.   I'm going to show you two more before publishing to the jury, okay?

     I'm showing you what's been marked for identification as

JASON WHITT - DIRECT

4F9.

Q.    Do you recognize that?

A.    I do.

Q.    What is it?

A.    It is a screenshot from the Magnet AXIOM forensic software for the details of a thumbnail.

MR. CERVANTES:  Government moves 4F9 in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 4F9 was received into evidence.)

Q.    Showing you 4F13.

Q.    What is that?

A.    It is a screenshot from the Magnet AXIOM software for the details of a thumbnail.

MR. CERVANTES:  Government moves 4F13 in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 4F13 was received into evidence.)

Q.    All right.  So I am showing you Government's Exhibit 4D that's been admitted in evidence.  Can you remind us what this is.

A.    So this is the -- how you would get to these folders. When you plug in the thumb drive, you would see the MCW2 folder, the PCS_files folder, the Sample folder, and the MGNweb folder.  And inside that folder you would see the four

JASON WHITT - DIRECT

listed folders.

Q.   All right.  So I'm going to move this over and then we're going to talk about some other exhibits, okay?

4E5.  What is 4E5?

A.   4E5 is the screenshot for the Magnet AXIOM forensic software for the details of that thumbnail.

Q.   Where?  On the MacBook?

A.   From the MacBook.

Q.   Okay.  So the image on the right is from the MacBook. The image on the left is from the thumbnail -- the thumb drive.

A.   Correct.

Q.   Can you tell on Government's Exhibit 4E5, the one on the right, what the folder path is?

A.   I can.

Q.   What is it?

A.   So the folder path that lists thumbnails associated to it is from Volumes, USB disk, MCW2, folder PCS_files, folder Sample, folder MGNweb, w-e-b, folder CPT.

Q.   Is that the same folder path in the thumb drive for the CPT folder?

A.   It is.

Q.   I'm showing you 4F9.

Can you tell us what we're looking at here.

A.   It is the Magnet AXIOM forensic software details for this

JASON WHITT - DIRECT

thumbnail for the MacBook.

Q.   And the thumbnail being depicted at the top?

A.   The thumbnail being depicted at the top, yes, sir.

Q.   So the same -- is your testimony the same about where this is coming from, the MacBook?

A.   Yes, sir.

Q.   What is the folder path for this thumbnail?

A.   The folder path for this thumbnail is Volumes, USB disk, MCW2, which is where the folder would start, PCS_files, folder Sample, folder MGNweb, folder EMOR.

Q.   Is this the same folder path as the thumb drive for the EMOR folder?

A.   Yes, sir.

Q.   Showing you 4F13.

What is this?

A.   This is a screenshot from the Magnet AXIOM forensic program for the thumbnail shown at the top from the MacBook.

Q.   What is the folder path to this thumbnail?

A.   The folder path for this folder is USB disk, MCW2, PCS_files, folder Sample, folder MGNweb, w-e-b, folder EMOR.

Q.   Is that the same folder path as the folder path in the thumb drive for the EMOR folder?

A.   It is.

Q.   So does the -- do the last three metadata exhibits that we were just talking about, 4E5, 4F9, and 4F13, 4F13 being the

JASON WHITT - DIRECT

one that's depicted, do they give you a last access date information?

A.   It does.

Q.   What does that mean?

A.   For the last access date for this is when the thumb drive was plugged in and the MacBook actually saw these files.  So it records the last access date of these thumbnails.

Q.   And what is the last access date for -- that's depicted here for the thumbnail in 4F13?

A.   9/18/2021.

Q.   Based on this information, can you tell the jury the last time that this MacBook was accessed -- this MacBook accessed the folder in the thumbnail.

A.   So the last time that the MacBook accessed the thumbnail would be 9/18/2021.

Q.   And in your opinion, can you tell whether that last access is last accessed into the thumbnail -- the thumb drive that's been admitted as Government's Exhibit 4A?

A.   Yes.  You would have to plug in the thumb drive for the MacBook to actually access it.

Q.   Next let's talk about whether you found any evidence that the My Passport was plugged into the MacBook.

A.   Yes, sir.

Q.   We're going to talk about the bathroom -- the first bathroom video.

JASON WHITT - DIRECT

Did you find evidence that the first bathroom video was plugged into -- that the My Passport was plugged into the MacBook and the folder where the first bathroom video is located was accessed?

A.   I did.

Q.   We're going to break that down in a moment, okay?

A.   Yes, sir.

Q.   Showing you what has been marked for identification as Government's Exhibit 5K.

Do you recognize it?

A.   I do.

Q.   What is it?

A.   This is a screenshot for the -- for a thumbnail located on the MacBook.

MR. CERVANTES:  Government moves 5K in evidence.

THE COURT:  It's admitted.

(Government's Exhibit Number 5K was received into evidence.)

Q.   Can you explain to the jury what we're looking at here.

A.   So what we're looking at here is the thumbnail for a file IMG_3666.MOV and the details that the Magnet AXIOM forensic software pulled for it.

Q.   From this information can you tell whether the My Passport was plugged into the MacBook to access the bathroom video, the first bathroom video?

JASON WHITT - DIRECT

A.   Yes, sir.

Q.   And what is that information?

A.   So if you look at the folder path from where the movie or the file was accessed from.

Q.   What does that tell you?

A.   It tells me from the Volumes/My Passport/User Manuals/KOR/Dartmouth/Downloads/Modules is where the file was accessed from, which is consistent with the My Passport.

Q.   Was the bathroom video saved in the folder marked Modules?

A.   Yes.

Q.   Was the second bathroom video also saved in the Modules folder?

A.   Yes, sir.

Q.   Showing you what has been marked for identification as Government's Exhibit 5L.

     Do you recognize that?

A.   I do.

Q.   What is it?

A.   It is a screenshot of the thumbnail from the Magnet AXIOM forensic software for the details of that thumbnail.

          MR. CERVANTES:  Government moves 5L in evidence.

          THE COURT:  Admitted.

          (Government's Exhibit Number 5L was received into evidence.)

JASON WHITT - DIRECT

Q.   Can you describe what we're looking at here for the jury.

A.   At the top part you are seeing a thumbnail for the file IMG_3696.  And also the folder path is above it which is Volumes/My Passport/User Manuals/KOR/Dartmouth/Downloads, folder Modules.

Q.   Is this the same folder path you just described for the first bathroom video?

A.   Yes, sir.

Q.   From this information can you tell whether the My Passport was plugged into the MacBook to access the second bathroom video?

A.   Yes, sir.

Q.   And was it?

A.   It was.

Q.   What is the last accessed date for this thumbnail?

A.   The thumbnail last accessed date is 9/10/2021.

Q.   Showing you what has been marked for identification as Government's Exhibit 5H.

     Do you recognize this?

A.   I do.

Q.   What is it?

A.   It is a screenshot of the details for a thumbnail located on the MacBook from the Magnet AXIOM forensic software.

          MR. CERVANTES:  Government moves 5H in evidence.

          THE COURT:  Admitted.

JASON WHITT - DIRECT

(Government's Exhibit Number 5H was received into evidence.)

Q.   Can you explain to the jury what this is.

A.   So on the top portion you will see a thumbnail of a video from IMG_1089.MOV, and the folder path is Volumes/My Passport/User Manuals/KOR/Dartmouth/Downloads, folder Modules.

Q.   Is this one of the up-skirt videos we saw yesterday?

A.   It is.

Q.   Is this the same folder path for both of the bathroom videos?

A.   Yes, sir, it is.

Q.   Have you reviewed the folder path for the other two videos -- the other two up-skirt videos?

A.   I have.

Q.   And is the folder path the same for those?

A.   Yes, sir, it is.

Q.   Is there any significance to the fact that the two bathroom videos and the three videos of the patient all have the same folder path?

A.   They were all stored in the same folder so that's where they were saved to or put into.

Q.   We talked about index searches.  You've mentioned that a couple times.  Can you just briefly touch on what that is.

A.   So an index search is when our forensic software sees a forensic image, it goes out and creates, like, a log of all

JASON WHITT - DIRECT

the, like, strings of letters and numbers so that -- and it puts it into a list so that when you run an index search, they can be accessed faster.

Q.   Did you search for pthc in the MacBook?

A.   I did.

Q.   Did you get any hits?

A.   I did.

Q.   Showing you what's been marked for identification as Government's Exhibit 5C.

     What is that?

A.   This is the first page of the hits of pthc that we exported.

Q.   How many hits were exported?

A.   1,118.

          MR. CERVANTES:  Government moves 5C in evidence.

          THE WITNESS:  It's admitted.

          (Government's Exhibit Number 5C was received into evidence.)

          MR. AMES:  Your Honor, I know I have a standing objection, but in particular with this, I just wanted to make it clear that I'm objecting to hearsay, foundation, and otherwise as before.

          THE COURT:  Understood.  Overruled.

Q.   What do each of these rows represent?

A.   So each row is one hit for the term of pthc.

JASON WHITT - DIRECT

Q.   If we looked at any one of the rows in this document that you said a moment ago has 1,118 rows, do they all have the phrase pthc?

A.   Yes, sir.

Q.   Where are these coming from?

A.   These are coming from a QuickLook database to where a volume was plugged in.  And what a QuickLook does is it goes out into -- just like the thumbnail cache, it goes out and sees when you plug it in, it makes a record of each file that is located in the drive; and that's where you get the QuickLook thumbnail cache from.

Q.   So this list, this information is stored in the MacBook?

A.   Correct.

Q.   Do you have any doubt that there was a device that was plugged into the Mac that had files with those names in it?

A.   No, sir.

Q.   If there wasn't a device that had those files in it and was connected to the MacBook, is there any other possible way that these hits could have been found on the MacBook?

A.   No, sir, not to my knowledge.

Q.   I'd like to highlight three of the rows, 18 -- I'm sorry, 8, 13, and 30.  Would you please read each one of these.

A.   8, "[PTHC]6yo girl gets fucked with legs in the air(1).JPG"; 13, "[PTHC]8yo pussy pedo fuck-screwtop style!!.jpg"; and 30, "[PTHC]Daddy fucks my 4yo cunt for first

JASON WHITT - DIRECT

time(1).jpg."

Q.   Based on your training and experience, you said you've reviewed over a hundred thousand files?

A.   Yes.

Q.   Does this naming convention for these files, is it consistent with files you have previously reviewed as child pornography?

A.   Yes.

Q.   What does the y-o after each one of these numbers stand for?

A.   So y-o usually stands for years of age or years old.

Q.   What does pedo stand for?

A.   Pedophilia, pedophile.

Q.   Just to make sure that the document has all the pages that we had discussed, I am going to -- or the rows, I'm going to zoom to the -- or fast forward to the last page.

     Can you confirm that 1,118 is the last row?

A.   Yes, sir.

Q.   PLIST file, what is that?

A.   A PLIST file is a properties list file that records information of the user or information from the application and stores it in the PLIST file.  So whenever you access that application, it has your user settings or data about the application already saved.

Q.   Did you find a PLIST file in the MacBook related to

JASON WHITT - DIRECT

recently played videos?

A.   I did.

Q.   Showing you what has been marked for identification as Government's Exhibit 5D.

What is that?

A.   So this is a screenshot from the Magnet AXIOM forensic software from the VLC PLIST.

MR. CERVANTES:  Government moves 5D in evidence.

THE COURT:  Admitted.

(Government's Exhibit Number 5D was received into evidence.)

Q.   Let's talk about time frame for a moment before we get into the content of this.

Does this PLIST contain any information about when these files were played?

A.   No, it does not.

Q.   Does it have information about when it was first run?

A.   Yes, it does.

Q.   Okay.  And can you describe what that is.  What does that mean?

A.   So inside the PLIST there are fields where it lists certain dates that the programmers of VLC decided to record. In this one you'll see VLCFirstRun, one word, and a date of 8/6/2019.

Q.   What does that tell you, if anything, about these videos?

JASON WHITT - DIRECT

A.   That these videos were either played on or after 8/6/2019.

Q.   So the information doesn't tell you specifically when each video was played, but it does give you at least a range of when they were played.

A.   Yes, sir.

Q.   And that range being what?

A.   The date that it was first run to the date that it was seized.

Q.   Okay.  So between August 6, 2019, to September 22, 2021?

A.   Yes, sir.

Q.   I'm going to focus on a couple rows here.

     Row 19.  Can you describe what we're looking at here and what does this row tell you?

A.   So what you're looking at here is an entry into the recently played media or the VLC PLIST.  This is a row that signifies which file was played.  Where you see file and the colon, and then it lists out the folder path and file name that was accessed by VLC.

Q.   I'm highlighting the word Lolita.  Previously -- yesterday you testified about Lolita?

A.   Lolita is a common search term that I use to find evidence of child pornography.

Q.   Why?

A.   It's always associated with it.  I don't know exactly

JASON WHITT - DIRECT

what it means.  But we always search for Lolita, pthc, pedo, those type of words.

Q.   What does this tell you about where it was played from?

A.   So it was played from the Volumes/My Book/Data --

Q.   Well, what does it tell you about what device it was played from?

A.   So it was played from a My Book, which My Book is a Western Digital external device.

Q.   If row 19 is also listed in that document we just looked at with 1,118 file names that have pthc in it, what would that mean to you?

A.   That this was located on the My Book and also played through the VLC program.

Q.   So let's see if row 19 is on that list that we just looked at.

So I'm going to scroll to page 4 of this document.  I'm going to draw your attention to row 96.

Is the file that was played that's described in row 19, the blowout that's in the top, is it listed in the document with 1,118 file names in it?

A.   Yes, sir.

Q.   So what does that mean to you?

A.   That this device was connected to the MacBook and viewed through the VLC program.

Q.   I'm going to try two more.  Row 7 from Exhibit 5D.  I'm

JASON WHITT - DIRECT

going to go to page 16 in Exhibit 5D, row 450.

Can you read the name of the file in 450.

A.    "Vicky String Bikini Pthc 11Yo Pedofilia.mpg."

Q.    Does Vicky have any significance to you?

A.    So Vicky is a very common name for investigations into child pornography.  It's a very common known victim.  You'll see Vicky's name in a lot of the child exploitation cases that I work.

Q.    And is this particular file, is it also listed in the PLIST?

A.    It is listed in the PLIST, yes, sir.

Q.    So just to be clear, I'm highlighting the back end of that file path.  What does this mean to you, the location of the file?  How can you read that from this folder path?

A.    So the location of the file from My Book through all those folders, Data/COMIC LO - Vol 40/Soul_of_Lolita_complex-Vol.1/ptm5/abemas2, folder A Day In the Life, folder [Lcon] A Day In the Life - Chapter 4, folder rtk, folder yup, folder lveogdstp, and then the file name of Vicky String Bikini Pthc 11Yo Pedofilia.

Q.    So the file name would be the last part after the last forward slash; is that correct?

A.    Yes, sir.

Q.    Everything before that is really a folder that you're clicking through to get to the file.

JASON WHITT - DIRECT

A.   Correct.

MR. CERVANTES:  One moment.

(Pause.)

BY MR. CERVANTES:

Q.   Okay.  The last one we're going to do is row 11 from 5D. We're going to see if this file is also listed in the list of 1,118 file names.  I'm going to go to page 16, row 441.

Can you read the name of the file listed in row 441.

A.   "Childlover - (Pthc) Sally - Medley Of Scenes (4yo to 8yo).mpg."

Q.   Does Sally have any significance to you?

A.   No, sir.

Q.   Is that sometimes common to come across names, what appear to be proper names and not know what it is?

A.   Yes, sir.

Q.   But there are some names that you do come across a lot?

A.   Correct.

Q.   Which is what we discussed before.

A.   Yes, sir.

Q.   Is this -- so is this file listed in the PLIST?

A.   It is.

MR. CERVANTES:  For the record, I'm just highlighting the back end of that folder path.

Q.   You previously mentioned that there were multiple profiles in this MacBook.

JASON WHITT - DIRECT

A.   Yes, sir.

Q.   Which profile is this PLIST associated with?

A.   The profile that the PLIST is associated with is Morphus.

Q.   I'm showing you what has been identified as Government's Exhibit 5E.

Do you recognize this?

A.   I do.

Q.   What is it?

A.   It's a screenshot from the Magnet AXIOM program reference the details for the VLC PLIST.

        MR. CERVANTES:  Government moves 5E in evidence.

        THE COURT:  It's admitted.

        (Government's Exhibit Number 5E was received into evidence.)

Q.   Can you describe to the jury what we're looking at here.

A.   So at the top is the fields inside of the PLIST and on the bottom is the details for the PLIST file itself.

Q.   So if we were to expand this by clicking on this arrow on the left, what would happen?

A.   It would show you files from the recently played media list.

Q.   And we were looking -- previously looking at the breakdown of the recently played list, correct?

A.   Correct.

Q.   So I want to draw your attention to the bottom of this

JASON WHITT - CROSS

document.

What does it tell you?

A.   This tells me the location for the video -- or for the VLC PLIST.

Q.   Does this give you information about who the user was that was logged in when the PLIST was created?

A.   So the PLIST is created under the user Morphus, yes, sir.

MR. CERVANTES:  No further questions, Your Honor.

THE COURT:  You may cross examine.

CROSS EXAMINATION

BY MR. AMES:

Q.   Good morning.

A.   Good morning.

Q.   So obviously you gave us a lot of information.  I'll try to do this is an organized fashion.

So again, with your background, you review a lot of these types of cases, correct?

A.   Yes, sir.

Q.   You said you've gotten thousands -- or at least a thousand devices or thousands?

A.   Thousands of devices, hundreds of examinations.

Q.   Can you briefly just kind of describe investigative wise the process here.  For example, when you're searching devices for evidence and child pornography and working with law enforcement agents, what's that process like?  How does it

JASON WHITT - CROSS

begin?

A.   So after the agent seizes a device, they'll put in a request for us to conduct a forensic examination on the devices.

Q.   And have these devices been looked at before by anybody or does it vary, or what's the...

A.   The devices, to the best of my knowledge, have not been looked at by anybody.  We're the first ones to get them, especially when it's an FBI case.

Q.   So in this particular case with these ones you've described today, when was the first time that you reviewed the contents?

A.   I'd have to review my logs when I reviewed it.

Q.   That's fine.  Do you have an estimate, ballpark?

A.   Around 2021, like after September.

Q.   So if you're doing an initial search, you mentioned -- you discussed flagging.  What is that in regard to?

A.   So flagging or either bookmarking, we'll use those terms interchangeably about finding evidence of potential child pornography that we will flag for further review.

Q.   Okay.  Does anyone else flag -- do any agents flag anything or is that you doing it, or both?

A.   So it's both.

Q.   So there's some circumstances where an agent might have flagged something.  For example, I recall your testimony on

JASON WHITT - CROSS

one of the drives, the Western Digital, I believe, that you noted one of the videos was flagged, correct?

A.   I'm trying to remember on the Western Digital.  I know on the HP some of those were flagged and I reviewed them.

Q.   Sorry, you're right.  You're correct.  It was the HP Pavilion.  So on the HP Pavilion, one of those images was flagged, correct?

A.   Correct.

Q.   What was that in regard to?  Was that an agent flagging it or something else?

A.   It was an agent that flagged it, yes, sir.

Q.   Do you know who the agent was who flagged that?

A.   I believe it was Special Agent Scott Atwood that flagged it.

Q.   Okay.  So I guess in either case, either if you're looking at it for the first time -- being the first person to look at it or looking at it subsequently, your descriptions here were categorizing some images as child pornography specifically, correct?

A.   Correct.

Q.   So are you categorizing them in any other fashion?  Like what are some other categories that you might put into your analysis?

A.   We use potentially known victims, potential child pornography, we use tags of S and M, tags of under 12 just to

JASON WHITT - CROSS

identify the child pornography itself or potential child pornography.

Q.   Some of the images, for example, we just went through on the MacBook that had these morphed images, so to speak.  When you're marking something or categorizing something as child pornography or potential child pornography, is that just because it involves nudity or is there something more to your portion of that analysis?

A.   So mine is just when it involves nudity.  If it is more than just the breast area, we tag it.  So when it shows genitalia.  Or if there is a lot of images, we'll tag them all together so any of the agents can go back and further review them.

Q.   So in other words, do you know if you were the first one to review the MacBook or was there an agent that reviewed that one first, if you recall?

A.   I don't recall.

Q.   Hypothetically, if you were reviewing a device like that first, your system of flagging images would be -- sounds like you're casting a wide net, right?

        MR. CERVANTES:  Objection, relevance.

        THE COURT:  Overruled.  You may answer.

        THE WITNESS:  So can you be more -- like casting a wide net?

Q.   Sure.  You're saying basically if it's any nudity

JASON WHITT - CROSS

involving a potential minor more than just breast area, I suppose, you're flagging those as child pornography or potential child pornography, correct?

A.   Yes, sir, potential child pornography.

Q.   Just in general, are you doing an analysis -- it doesn't sound like it, but correct me if I'm wrong.  It doesn't sound like you're doing an analysis of the actual photo if it is child pornography.  It's just that it needs to be reviewed further.

A.   Yeah.  I mean, being that I review a lot of images, you see a lot of them that are the same whether they are known victims or unknown victims.  So when I do flag them, I am flagging them as potential child pornography for the case agents to review.

Q.   So like on the MacBook, for example, those three folders you were testifying about, there's a number of images that depict nudity, correct?

A.   Correct.

Q.   In circumstances like that, did you flag all images in those folders that involved nudity or was there any delineation between anything you would choose?

A.   I believe in that case any of the images that contained nudity were flagged.

Q.   Okay.  And the flag that you use is child pornography or potential or...

JASON WHITT - CROSS

A.   Correct, yes, sir.

Q.   Okay.  But that -- so when you're stating that you -- I'm flagging it as pornography or child pornography, is that your determination that in fact it is child pornography or just needs to be reviewed further?

A.   So it is not mine.  I review it to be potential child pornography.  I know we use the term flagged as child pornography.  Some of them you can tell whether it's an infant or a young girl.  But, no, I don't make that determination.  I flag them for review.

Q.   Understood.  So, you know, we just went through a series of these morphed images.  Clearly some of those images involved just the waist up, correct?

A.   Correct.

Q.   Or breast area.  No genitals involved in the picture.

A.   Correct.

Q.   Others included people standing and not really doing -- standing up and not really doing anything otherwise.

A.   I'd have to review them, but I know there were some that were waist up, correct.

Q.   Were any of these involving intercourse or of a minor depicted on that MacBook?

        MR. CERVANTES:  Objection, vague.

        THE COURT:  Overruled.  If you understand the question, you can answer it.  If you need clarification, ask

JASON WHITT - CROSS

for that.

THE WITNESS:  So did I see any images involving intercourse of a minor?

Q.   No, on the -- specifically those three folders on the MacBook.  These are the morphed images that we're talking about.

A.   Okay.

Q.   All I'm just trying to ask is these weren't -- there's no -- the images that we're talking about that you're flagging on that particular device, they're not images involving bestiality or intercourse or anything like that, correct?

MR. CERVANTES:  Your Honor, objection to the extent that it calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I did not see any images of intercourse or bestiality in those photos.

Q.   Or anything -- oral sex or anal sex or anything like that either, right?

A.   No, sir.

Q.   So the images are -- the images -- some of them are standing.  Some of them are lying.  Some of them are sitting in various positions.  And if it has nudity you're flagging it for further review, correct?

A.   Correct.

Q.   Without a determination on your end because, again,

JASON WHITT - CROSS

you're just assisting with gathering those images for further review, right?

A.    I am.  But I will also categorize them.  There was one image in there that I did categorize as child pornography.

Q.    Okay.  Sorry, there's one?

A.    There was one in there.

Q.    That you --

A.    That I remember, excuse me.

Q.    Okay.  There's one that you remember that you categorized as child pornography.

A.    Correct.

Q.    What did you categorize the other ones as?

A.    Potential child pornography for the case agents to review.

Q.    Okay.  So the distinction, then, there's these categories.  And from your analysis -- and, again, regardless of whether it was first or second or third or however multiple -- presumably multiple times you might review devices in some cases, right?

A.    Correct.

Q.    The tags or the flags on that particular thing was there was one that you flagged as child pornography, other ones were not flagged as child pornography.

A.    They were flagged as potential child pornography, yes, sir.

183

JASON WHITT - CROSS

Q.    Potential.  Okay.

Now, I'm not a Mac user so this is a little unfamiliar, this quick thumbnail process.

A.    Uh-huh.

Q.    So a lot of the stuff we're talking about, really all -- I think practically all of it on this MacBook, the data you're talking about is related to this QuickLook thumbnail cache folder --

A.    Database.

Q.    -- database, right?

If you could remind me of the process of how that's created.  It's a creation of a thumbnail for a specific Mac operating system.

A.    So we can associate it with Windows too if that will help you.

But what QuickLook is is once you plug in your hard drive, it will go in there and create previews or thumbnails of the files inside of the thumb drive or external.

We can reference it to a Windows machine if you are familiar more with Windows to where when you plug in a thumb drive, when you bring up the window of the files in there, you can select how you view those thumb drives, whether it's in a detailed list or with small thumbnails, medium thumbnails or extra large thumbnails.  That creates this thumbnail database.

Q.    Yeah, actually that does make sense now.

JASON WHITT - CROSS

So the creation of these thumbnails from the -- so you plug in the device, you open a folder. Is it automatically populating thumbnails for everything on a device or is it that a folder has to be open for it to happen?

A.   So with QuickLook it actually creates them just by plugging in a device.

Q.   And saves this ostensibly to the device you're plugging it into.

A.   It saves the thumbnail cache to the device that you're going to view or plug in the thumb -- like the thumb drive into the computer. It saves it to the computer.

Q.   Okay. So automatically will populate these images that are in a cache system so that they can be more quickly accessed later if you're scrolling through a folder.

A.   Correct. If you plug it in again, it will access those thumbnails so it doesn't have to recreate it. The reason they do is because they end up clogging people's machines or overloading the source. So this way they only have to create it once and they can reference the same image or thumbnail.

Q.   And so the images, for example, that we were talking about on the MacBook specifically in those folders and things you referenced, those aren't original actual images on the device, but rather a creation of a thumbnail from a secondary device; is that accurate?

A.   The originals referenced are not on the MacBook. It is a

JASON WHITT - CROSS

creation from the originals of the drive plugged in.

Q.   Okay.  And it's located in this QuickLook folder cache thing, right?

A.   Thumbnail database, yes, sir.

Q.   Sorry, thumbnail database.

And that's a random kind of folder, right?  You said something about it goes and it's under like kind of random letters.

A.   Yes, sir.

Q.   These thumbnail images that are in there, are those accessible just by -- can you open and browse through those folders and pop the images up?

A.   I mean, if you had a program you could; but without a certain program, no.

Q.   What kind of program is that?

A.   Just like you would have to find -- literally it would be a QuickLook thumbnail viewer or any other program that would access those.

Q.   Okay.  Like a specialized type of software to access them if you wanted to browse through or preview those things.

A.   Correct.

Q.   The Magnet program that you use, that's called Magnet AXIOM, correct?

A.   AXIOM, yes, sir.

Q.   Or AXIOM Magnet.  Just AXIOM?

JASON WHITT - CROSS

A.    AXIOM is fine.

Q.    Obviously, if you were presenting them now, you were able to access those thumbnail images?

A.    Correct.

Q.    Is that because your program has that special feature that you can go in and see what the actual image is?

A.    Correct.  It will go into the database and pull the thumbnails out.

Q.    Okay.  Now, there was also a list of file paths that had -- a thousand and some odd file paths were introduced. Where are any images of those?

A.    So there are no images in that QuickLook.  It just retained the file path associated with them.

Q.    Okay.  So there are no images.  There's no date of when this image was -- or this -- actually, it's not even an image. It's a -- it's just a trace of some sort of thumbnail allegedly.  Is that --

A.    No.  What it is is the file path for a thumbnail that was created, but the thumbnail in that database is no longer there.

Q.    Okay.

A.    But the file path is still there.

Q.    All right.  So it's literally just a file path and that's it.

A.    Correct.

JASON WHITT - CROSS

Q.   There's no date.

A.   No, sir.

Q.   There's no image.

A.   No, sir.

Q.   There's no time frame of when it was created.

A.   Not that I could tell.

Q.   You mentioned -- discussing some of this, you talked about last accessed dates, right?  So there's some metadata that you talked about that said we can tell when this was last accessed.

A.   Correct.

Q.   What does last accessed mean?

A.   So last accessed in a QuickLook means that when the QuickLook thumbnail database last accessed those thumbnails.

Q.   Understood.  So when we say accessed or to access, last accessed, what you're referring to is when the computer accessed the cache folder.

A.   So for the computer to access that cache folder, the thumb drive or an external, we'll call it a thumb drive, would have to be plugged in and then it would recognize the folder path or however it recognizes it, and then would access the thumbnail database -- yeah, the thumbnail database for that thumbnail.  So if you were going to pull up that folder, it would already have the thumbnails ready.

Q.   Understood.  And that's, again, to speed up the process,

JASON WHITT - CROSS

more convenient, so that in the event the user wants to open that folder, the thumbnails will populate faster?

A.    Correct.

Q.    So it does this automatically for you as part of the user experience if you decide to click on a specific folder, correct?

A.    Correct.

Q.    So it does not mean that you have to open the folder or access anything within the folder, correct?

A.    To the best of my knowledge, that is correct.

Q.    So in other words, what the -- the last accessed date, for example, you talked about -- and it's in evidence as well -- IMG_3666.MOV, 3696, and then IMG_1089, some of those you discussed had a last accessed date of 9/10/21; is that correct?

A.    I believe so.  Without seeing it I believe so.

Q.    Do you recall the access time for each of those images?

A.    No, sir, I do not.

        MR. AMES:  Is that something you can pull up real quick?

        MR. CERVANTES:  Whatever you need.

        MR. AMES:  Just looking at the metadata on the 3666, 3696.  It was the screenshots of the metadata on these three images.

        I apologize, I should have written down those

JASON WHITT - CROSS

exhibits and I forgot to.

THE COURT:  Why don't we take our midmorning break and let the lawyers get together on pulling up whatever exhibits are needed for cross examination.

MR. AMES:  Thank you, Your Honor.

THE COURT:  I expect you can tell me the rules, but I'm going to tell you anyway.

Do not discuss this case when you're in the jury room.  Don't start making up your mind.  And obviously, don't do any independent research.  And we'll be back within 15 minutes or so.

(Jury exited the courtroom.)

THE COURT:  You can step down.

(Witness stepped down.)

THE COURT:  All right.  We'll be in recess for 15 minutes.

(Brief recess at 10:22 AM.)

(Court back in session at 10:39 AM.)

THE COURT:  Are we squared away?

MR. AMES:  Yes, Your Honor.

THE COURT:  You can bring the jury.

(Jury entered the courtroom.)

THE COURT:  All right.  You may resume.

JASON WHITT

CROSS EXAMINATION (Cont'd.)

190

JASON WHITT - CROSS

BY MR. AMES:

Q.   All right.  So I think where we were, we were talking about the last accessed date from metadata, right?

So previously you had testified about a series of three images that had been last accessed on September 10 of 2021. Do you recall that?

A.   Was it the images or the videos?

Q.   I'm sorry, it was three videos where the last accessed date listed on these quick view thumbnails was 9/10 of 2021.

A.   Correct.

Q.   And I think I had asked you what time those last accessed -- or what time the last accessed data had shown for those, and I wanted to just review those to refresh your memory on it if you couldn't recall.

A.   Okay.

MR. AMES:  5H, I, and J, just the metadata screenshot.

MR. CERVANTES:  There is no 5HI.  5H?

MR. AMES:  Yes, that's it.

Q.   Okay.  So do you recall this?  This is one of the government's exhibits.  Do you recall this one?

A.   I do.

Q.   What is this one?

A.   It is a screenshot for the thumbnail created of the file name IMG_1089.

JASON WHITT - CROSS

Q.   What this data shows is the thumbnail last accessed date and time --

A.   Correct.

Q.   -- is September 10, 2021, at 5:28 AM.

A.   Correct.

Q.   Correct?

So that shows last accessed date.

MR. AMES:  And then there was a couple more, just the next two.

MR. CERVANTES:  Which one?

MR. AMES:  The next one, 5...

MR. CERVANTES:  I need a number.

MR. AMES:  It's listed as 5I.

THE COURT:  It's not been admitted.  5I has not been admitted.

MR. AMES:  5J then.

THE COURT:  J has not been admitted.

MR. AMES:  5K.

THE COURT:  That one has.

MR. AMES:  Okay.  5K.  Sorry, Your Honor.

Q.   Okay.  So this one over on the right, 5K, this is also a screenshot of some metadata from AXIOM, correct?

A.   Correct.

Q.   And this is of a different file, 3666, right?

A.   Correct.

JASON WHITT - CROSS

Q.   And this has an accessed date -- or last accessed date of 9/10/2021, correct?

A.   Correct.

Q.   That's also at 5:28 AM and 29 seconds.

A.   Correct.

Q.   So both of these were last accessed on the same day at the exact same time, correct?

A.   So the folder that they were in or the thumb drive that they were contained on -- the Passport, excuse me, the external drive, was last accessed -- appears to be last accessed at the same time.

Q.   Okay.  So I imagine, then, that with the way this thumbnail procedure works, that when the device is plugged in to the MacBook and it's populating these, as you stated before, the last access means the computer accessing the external device.

A.   To the best of my research, that is what it means.

Q.   And it's automatically kind of populating this stuff.  So likely, then, it would follow that other images that have these thumbnails, like these videos and others or any other images or, you know, whatever the file is that might have a thumbnail, all of these would have a last accessed 9/10/21, 5:28, or thereabouts, right?

A.   Should.

Q.   It would not require opening or viewing the file,

JASON WHITT - CROSS

correct?

A.   To the best of my knowledge.

Q.   And nor does it even require opening the folder that the file is in.

A.   To the best of my knowledge and research.

Q.   So what it perhaps tells us is that one device was plugged into another.

A.   That the My Passport was plugged into the MacBook.

Q.   Okay.  At 9/10/21 at 5:28 AM it was plugged in and that's what we can glean from this.

A.   Potentially.

Q.   Potentially?

A.   So when you look at times, these times, I don't know if they were recorded in UTC time or if they were recorded in Eastern Standard Time.

Q.   Fair point.  Can you describe what UTC time is and what that relates to as far as EST?

A.   Sure.  So UTC time is where time is, like, zero.  Like, think of it -- they call it Zulu, or GMT I believe another term for it is.  So it's literally in the middle of the world. And as you go back -- so think of it as a timeline.  As you move forward towards Europe, it counts up, one, two, three, four, as far as time zones go.  As you count back towards North America, it counts as negative one, negative two, negative three, and so on.  So Eastern Standard Time,

JASON WHITT - CROSS

depending on whether we're in Daylight Savings Time, will be negative four or negative five from UTC time.

Q.    So the benefit of UTC time is kind of -- it's uniformity and organization to some extent as far as forensic analysis.

A.    So UTC time is recorded, yeah, for uniform and then -- because you want the right programs to be in a specific time zone.

Q.    So in AXIOM, for example, there are certain instances where you might see it specifically delineated this is UTC versus EST or other time zones?

A.    Sometimes you can see where it is, yes, sir.

Q.    Is it ambiguous in other times or is it traditionally something specific?

A.    It can be either/or.

Q.    Okay.  Do you know whether or not this is -- this 5:28 AM is UTC versus Eastern?

A.    I do not.

Q.    Okay.  So it could be 5:28 AM or it could be UTC time which means it could be four or five hours later.

A.    Depending, yes, sir.

Q.    Okay.

A.    It could actually -- if this was UTC time, it would be 5:28.  If it was Eastern Standard Time, it would be 1:00 in the morning or midnight.

Q.    Okay.  So the UTC -- for the eastern time zone we're

JASON WHITT - CROSS

going earlier --

A.   We're going back.

Q.   -- four or five hours depending on Daylight Savings as well?

A.   Correct.

Q.   So hypothetically, 5:30 in the morning, roughly, or 12:30, 1:30, give or take, would be presumed if we believed that that's the accurate time a device was accessed.

A.   Say that again, I'm sorry.

Q.   That was a big mouthful, sorry.

If we assume that this is correct, that the device was accessed, it's either eastern time, thereabouts, at 5:30 AM. Or if this is UTC, it means that the device was actually accessed in our time zone at 1:30 AM or perhaps 12:30 AM depending on Daylight Savings.  I don't know at that time of year what it would be.

A.   Correct.

Q.   Does UTC take into account anything for Daylight Savings or that would be on the conversion end depending on the time zone you're in?

A.   The time zone.

Q.   Okay.  So these QuickLook things, it will populate on a variety of devices.  We're talking here about, like, an external hard drive or a thumbnail.  Are there some other devices that it will populate these type of thumbnails for?

JASON WHITT - CROSS

A.   A device that you plug into the MacBook.

Q.   Is it any device that has -- or what kind of files or thumbnails are created?  Is it more than just images or MOVs?

A.   It can be for documents, PDFs, those types of things.

Q.   Any other image types it could do or video types it could possibly do?

A.   Sure.  I mean, any file that you can get a thumbnail from.

Q.   Now, there are multiple devices that have been discussed here.  It includes these thumb drives -- rather, thumb dive, another hard drive, and so on.  Isn't it also the case that encrypted or password protected drives also populate these quick view thumbnails on the device when you plug it in?

A.   I don't know the answer to that.  I would believe that you would have to decrypt it for it to access it, but I'm not sure 100 percent.

Q.   Are you aware that Apple has had some significant issues with privacy concerns based upon plugging in of devices that are encrypted and it saving thumbnails in that data?

A.   No.

Q.   Okay.  And that -- I mean, are -- so you don't know for sure whether or not a password protected or encrypted device automatically will populate these things or what might trigger it to populate these things.

A.   No.

JASON WHITT - CROSS

Q.   Okay.  I guess regardless of that, plugging in is the trigger point to populate them, correct?

A.   To the best of my knowledge, yes, sir.

Q.   So if I were to go to someone's computer with a thumb drive and pop it in and open it up, whatever I've got on that drive is going to create thumbnails.  It's going to create a file path on my -- on the laptop, the computer I'm connecting it to, correct?

A.   If you have access to the user, sure.  If you plug in something, it would populate.

Q.   Okay.  And then, you know, you pop it out and it's there and it remains there and presumably undetectable to a normal user, correct?

A.   Correct.

Q.   Because you can't even look at them unless you have specialized software.

A.   To the best of my knowledge, yes, sir.

Q.   So you'd never be the wiser.  Now, if one day somebody comes in the sights of the federal government and you are tasked with reviewing that device and you see in the cache here a bunch of thumbnails, you're going to flag them and you guys are going to do this process that you've done here, correct?

A.   Correct.

Q.   In addition, it sounds like it includes potentially even

JASON WHITT - CROSS

things that are no longer -- there are no thumbnails for or other indicia of anything, just a file path, just the words, correct?

A.    According to the pthc?

Q.    I'm just saying, yeah, that's an example.  But that -- to be clear, those are in -- those are located in this cache database?

A.    Correct.

Q.    But there's no thumbnail associated with any of them, correct?

A.    No, sir, there's not.

Q.    There's no last accessed date associated with any of them, correct?

A.    No, sir.

Q.    There's no creation date, nothing.  It's literally just a string of words.  That's all that's there.

A.    To the best of my knowledge, in the database it is the folder and path and the title of the file itself.

Q.    So all of those one thousand some odd images that you -- or one thousand some odd file paths, rather, that you referenced and the government produced here, that's the extent of their existence on the devices.  There's no other indicia of it.  There's no thumbnail for any of that stuff, correct?

A.    Correct.  It's just the folder path and the file name.

Q.    Okay.  So you referenced there's multiple users on this

JASON WHITT - CROSS

MacBook laptop, correct?

A.   Correct.

Q.   You named a couple of them.  One was the David Tatum profile.  There was another, Morphus, I believe.

A.   Yes

Q.   Are there any others?

A.   There are three others.  There's a guest account, a Kim Tatum account, and I can't remember the last one.

Q.   Is guest kind of a default thing or does that have to be made or...

A.   To the best of my knowledge, guest is the default one.

Q.   But there's an account for a Kim Tatum?

A.   There's an account for a Kim Tatum.

Q.   Who is Kim Tatum?

A.   I believe the wife of Mr. Tatum, David Tatum.

Q.   Have you ever met with her or spoken with her before?

A.   No, sir.

Q.   Okay.  Are you familiar with her at all just based upon your review of these devices?

A.   Just from the review of the devices.

Q.   Are you familiar with her at all because of anything involving the investigation?

A.   I mean, not outside the investigation.  You did hear talk of, you know, who was --

         MR. CERVANTES:  Objection, hearsay.

JASON WHITT - CROSS

THE COURT:  Sustained.

MR. AMES:  It's not for the truth of what they're saying.

THE COURT:  Ask another question.

MR. AMES:  Understood, Your Honor.

Q.   So she has a login on the MacBook.  Does she have a login or user input or name on any other devices that you've reviewed in this case?

A.   Not that I can recall.

Q.   Does she -- have there been any files that you have reviewed on devices that belong to her?

A.   There have been files that belong -- that I have seen that belong to Mr. David Tatum and Kimberly Tatum.  But I don't remember any of the files that belong just to her.

Q.   Okay.  On the MacBook -- so, for example, you provided some things like a Jet Blue airline receipt and letter from Wake Forest that, I suppose, are indicative of David Tatum being a user of this device.  Is that the purpose, essentially?

A.   Attribution, yes, sir.

Q.   Attribution.  Do you check for attribution of anybody else in that process or are you mainly just looking for him?

A.   So I do not remember any attribution relating to Kimberly, a Kimberly Tatum.

Q.   Did you look for any, though?

201

JASON WHITT - CROSS

A.   When we were looking for it, the ones that popped out were the resumes, the CVs, the boarding passes.  I do not remember any other files with Kimberly Tatum.

Q.   I guess what I'm asking is that in -- what was the purpose of doing that, looking for a file like that or files like that to -- is it to establish use or ownership?  Or what's the purpose?

A.   It is.

Q.   For both or...

A.   The files that we found for attribution were Mr. Tatum's.  There were also, you know, files of tax returns, joint tax returns for a Kimberly Tatum and a David Tatum.

Q.   Okay.

A.   I did not find any files that I can recall that reference a Kimberly Tatum.

Q.   I guess what I'm asking, were those looked for or was your job to find an attribution for David specifically?

A.   We would have looked for them.  I mean, any attribution we would have brought up.  To the best of my recollection, I do not remember any attribution outside of those tax returns.

Q.   I mean, what would be some -- you've provided some already, but what are some other examples of what would be considered an attribution?  Like receipts or what else?

A.   Just receipts, documents, web pages, personal photos.

Q.   So let's say that you're going through, for example, this

JASON WHITT - CROSS

MacBook and you are looking for attribution and you find some stuff like you produced here that involved David Tatum. And you also find some that involve other people, such as his wife. You're saying that that would be -- what do you do at that point with that information?

A.    So when we take the MacBook, we saw that all the files that we flagged were to a user name of David Tatum. So we look for attribution of a David Tatum -- or for who was using that and it came back to David Tatum. Since none of the evidence led me to Kimberly Tatum's user profile, I did not look for any, like, attribution for her or in that -- in her profile because nothing led me there.

Q.    Understood. And I understand, like, the purpose of what you're looking for is not -- what I'm saying is, you're tying the device to David due to his attribution, but there could be other people that use the device, correct?

A.    So we tied it to Mr. Tatum or David Tatum through the user name of David Tatum. And we look for attribution of the user name of David Tatum.

Q.    And one of those attributions was a joint tax return, correct?

A.    I believe there was a joint tax return. I do not remember if it was on the external or the MacBook.

Q.    Do you know if David Tatum's login is password protected?

A.    There is a password. I don't know exactly what it is.

JASON WHITT - CROSS

There is a field for the password in the user information that it hashes the password.  That's just how Mac records the password.  But I do not know what that password would be.

Q.   Do you know that -- is that -- do you have to log in each time you use the device or would it be something that once it's logged in, it just kind of pops up when you open it?

A.   It all depends on the factors of the user settings how that would work.

Q.   And would it be uncommon for a married couple to share a login on the same computer?

        MR. CERVANTES:  Objection, speculation.

        THE COURT:  Overruled.

        MR. AMES:  I'm asking --

        THE COURT:  Go ahead.

        THE WITNESS:  I wouldn't know.  I mean, I think everybody is different so I would not know the answer to that.

Q.   What about this device, do you know whether or not this was a device that Kimberly and David shared?

A.   Outside of the user name, I do not know.

Q.   Okay.  Did you review any files or images at all that indicated that Kimberly Tatum was -- had access to this device?

A.   Outside of the user name, I would not know.

Q.   On any other evidence that the government collected, did you see anything else that might have indicated that she uses

JASON WHITT - CROSS

this device?

MR. CERVANTES:  Objection, vague.

THE COURT:  Overruled.  If you understand the question, you may answer.

THE WITNESS:  Can you repeat it, please.

Q.   Sure.  I can rephrase it if it's easier to hear it.
     You reviewed these devices, correct?

A.   Correct.

Q.   Did you review any other devices?

A.   I did.

Q.   What else did you review?

A.   There was a lot of visual evidence we reviewed.

Q.   How many total devices were collected in this case?

A.   I don't know.

Q.   Is it more than ten?

A.   I don't know.

Q.   Of what you recall, what are some of the devices you recall either that you know were collected or that you specifically reviewed?

A.   There was an iMac, the devices here.  I mean, a few.

Q.   Okay.  Do you recall any that there was an attribution to Kimberly Tatum at all?

A.   I do not.  Outside of the user name on the MacBook because that's where the evidence led us.  Outside the user name I do not know of any.

JASON WHITT - CROSS

Q.   So how would it -- what would it entail if you were trying to look for that -- what are the steps you would take to find an attribution like that or find indications that she was a user of this device?

A.   So again, when we look for the evidence, we go to the evidence where it leads us.  In this instance it led us to the user of David Tatum.  When we go and look for attribution, we look for the documents or history, whatever it might be, that leads to the attribution of that account, user account.  And all that I found outside -- to the best of my recollection, all that I found was a joint tax return that had Kimberly's name on it and also there was a user name on the MacBook for a Kim Tatum.

Q.   Okay.  Did you look into when the last time Kimberly Tatum had logged into the MacBook?

A.   I did not.

Q.   Would that be -- what would it take to find that information in AXIOM?

A.   I would have to go back to my lab and look at it.

Q.   Okay.  Were there any devices that -- I understand the process when you're interacting with agents and such and assisting them either as the first looker or looking after they've flagged things.  Do you know if there's any devices in this case that any agent or other person in the investigation has looked at that you have not?

JASON WHITT - CROSS

A.    I do not know.

MR. CERVANTES:  Objection, speculation and vague.

THE COURT:  Overruled, if you know.

THE WITNESS:  I do not know.

Q.    Outside of the thumb drives that you presented, are there any additional thumb drives that were collected or seized by the government?

A.    I do not know.

Q.    You don't know if there's any other thumb drives?

A.    Honestly, once we found this evidence, I focused on these pieces of evidence and I cannot remember exactly what I examined when it comes to the extra devices.

Q.    I'm sorry, I didn't actually -- if I misspoke, I apologize.  I wasn't asking if you specifically even necessarily reviewed them.  I'm just asking were there other, for example, thumb drives that were collected in this case?

A.    I cannot remember.

Q.    Okay.  Do you remember any other device that was collected in this case?

A.    All I remember is an iMac.

Q.    Did you ever make copies of any of the device data for me?

A.    So I do remember there was the thumb drives from a Kimberly Tatum that copies were made for you.

Q.    Okay.  Were there any other ones?

JASON WHITT - CROSS

A.    There was another one that came from somewhere.

Q.    Okay.  And did you ever -- did you review those devices or did you not review those devices?

A.    So outside of just making an image of them to, you know, keep them pure, I mounted them for the agents and they would go through them.  I have seen files on them.  But as far as, like, reviewing them forensically, I did not.

Q.    Understood.  If you recall from -- I understand you didn't review it thoroughly, you didn't review it in the capacity you would other devices, but do you recall anything that you observed on either of those?

A.    So I do remember some of the folder names, but I do not recall every single thing on there.  Because again, I did not forensically process that.

Q.    What are some examples of things that you may remember?

A.    There was some screenshots of a desktop, there was folders with David's name on it, some emails.  That's basically all I recall.

Q.    Do you recall seeing any -- you said pictures of a desktop computer, I think you said.

A.    So I saw pictures of a screenshot of a computer on there.

Q.    Do you recall seeing any screenshots or pictures of screenshots or anything of -- of the MacBook that's in evidence?

A.    So I don't know exactly what the screenshots were of.  I

JASON WHITT - CROSS

do believe it was of the MacBook, but I do not recall.

Q.   And I understand you didn't -- you weren't doing the analysis to attribute this device to anybody.  But your understanding was that this was a device provided by Kimberly Tatum, correct?

A.   Correct.

Q.   And it included pictures of a MacBook computer screen that you believe is this one that's sitting next to you.

A.   I believe so.

Q.   So you also in your testimony talked about how you do these keywords -- index searches, I think you said, right?

A.   Correct.

Q.   And you indicated that the user profile doesn't impact that search, right?

A.   Not of the index search.

Q.   So you could do an index search that would encompass any and all profiles on a system.

A.   Any file that the computer can access or the software can access, it will look for it in any place.

Q.   And then once you find things that you may want to look into further, you can determine and delineate which user profile that may be associated with, right?

A.   Yes, sir.

Q.   So that may tell you where -- or to whom the computer was logged into at the moment when some data was populated, but

JASON WHITT - CROSS

does it tell you anything about who was actually using the device?

A.   No, sir.  We don't look at who actually uses the device. We look at the user name associated with the evidence.

Q.   And I suppose you can never be certain unless you had a spy camera or something, but are there -- would there be ways to maybe determine that based on the context of the data?

A.   As to what?  Like the context of...

Q.   So let's say, for example, you mentioned 6/29 of 2021 there was a VLC playlist.  Do you recall that part?

A.   Correct.  I don't think I mentioned the 6/29, but I do know that date of 6/29.

Q.   It may have been on a screenshot here, but I believe -- I believe the testimony was it was 6/29 was when this PLIST was created and it was under the account Morphus.  Do you recall that?

A.   So we discussed when it was first played.  But the PLIST creation date does say 6/29.

Q.   Okay.  And there was an initial date.  So it was, like, I can't remember exactly, but sometime in 2019.  And then the PLIST creation date was June 29, 2021, correct?

A.   I think it was June 21.  I don't remember the exact date, but...

Q.   So that's the date of creation and so that's similar, I guess, to the quick view situation.  It's a list that's

JASON WHITT - CROSS

generated because a user does something with the VLC player.

A.   Correct.  I mean, without having to program the VLC program, that's what I believe the recent play media to be and the VLC PLIST.

Q.   So at that point in time -- so, for example, you'd indicated that the user profile that was associated with this was Morphus, I believe?

A.   Correct.

Q.   So that's an example.  Well, the context around that is there's a -- that's one piece of context since there's a user name or account Morphus that's on this device at the time, correct?

A.   Correct.

Q.   And there could be other activity with that account or a specific person that's around the same time frame that might provide context also.

A.   So the evidence led us to Morphus.  We just saw the VLC playlist and we -- that's what we focused on as far as being played on the VLC program.

Q.   Understood.  And so in light of that, you know, you see -- you see that it's what it is.  You see what account or login it's under, and that is sufficient to draw the conclusion that the user was David.

A.   No, the user was Morphus.

Q.   Okay.  And Morphus is who?

JASON WHITT - CROSS

A.   With the associated names of Morphus to David's iPhone, that's where it led us to believe that it was David's account.

Q.   Okay.  Or in other instances where you're doing an index search and it comes back and it's under the David Tatum account, the presumption is that it's David Tatum, correct?

A.   The user of David Tatum.

Q.   I'm sorry?

A.   The user of the account David Tatum.

Q.   Okay.  And -- but then how do you link the user account to a human being?  Is that through that, you know, the Jet Blue record and things -- tax records and such?

A.   We put in attribution, yes, sir.

Q.   So I guess what I'm asking is, is anything else done to determine -- any other context who might be using the device for that period of time other than what you already testified to?

A.   No.  We just focused on the user accounts on the MacBook.

Q.   All right.  So if somebody else that was not David Tatum put anything into this device and it populated a list like it does here automatically --

     MR. CERVANTES:  Objection, vague.

     MR. AMES:  I haven't finished the question.

     THE COURT:  Let's wait for that.

Q.   If anybody -- say I did it.  Just use me for now.  I go to David's house, his computer is on or I know the password or

JASON WHITT - CROSS

I don't require a password because we don't even know if his computer needs one. Let's say that's the case. And I've got a drive or one of his drives, I don't know, one I find, and I pop it into the device. It's going to populate a number of things, including a QuickLook thumbnail update and pop the date and time right now in, correct?

A.   Correct.

Q.   So that if you analyze it the next day, what is it going to look like?

A.   So it would look like what we see.

Q.   Okay.

A.   But in forensics we only look at the user accounts. We do not look at who was using the user account. We go into attributions and see who the user account had access to through passwords and other files that are on there.

Q.   But you don't look for other possible user explanations, is basically what you're saying. So you wouldn't be looking for me or context that might indicate that I did this and put something in.

A.   Forensically, no.

Q.   Okay.

A.   We just focus on the user accounts forensically.

Q.   Now, forensically could it be done? Could there be evidence that is gathered in the data that you guys have that could provide some context to who the user was?

JASON WHITT - CROSS

A.   Like you were talking about earlier, without a spy cam watching you do it, I'm not aware of any.

Q.   But you do it with attribution all the time.  We did it with a 2010 Jet Blue printout of a ticket.  We also did it, apparently, literally with a joint tax return which has two people on it, not one.  So why is it not just as likely that Kim Tatum can be attributed to that document?

A.   I found no evidence of Kim Tatum attribution on those accounts outside of the tax returns.

Q.   But you didn't look for it either.  I understand your position.  You're not -- that's not your purpose.  You're given an instruction to look for things, correct?

          MR. CERVANTES:  Objection, argumentative.

          THE COURT:  Overruled.

          THE WITNESS:  So repeat it one more time, I'm sorry.

Q.   So you're -- again, I understand an investigation evolves in various ways.  Sometimes you're first; sometimes someone else is first.  But you're looking for evidence of attribution.  Are you looking for attribution of David or are you looking just in general, whoever it may be, I'll come to that conclusion after I sift through the data?

A.   Forensically we look for who has files on there.  If there's files on there associated with somebody other than David Tatum, we would have mentioned that.  We do know there was a tax return, joint tax return.  For the files that I

JASON WHITT - CROSS

found on the MacBook, that came back to David Tatum. And I did not see any files that came back to Kimberly Tatum.

Q.   Okay. But again, I want to clarify. I don't want to -- in large part that's because you weren't specifically looking for attribution of anyone else.

MR. CERVANTES: Asked and answered.

THE COURT: Sustained. You've established it.

Q.   So we don't know if somebody else, Kimberly Tatum or otherwise, is a person on any of these dates that may have popped a device into that MacBook.

A.   Forensically we only look at the user accounts.

Q.   Okay. In other words, we don't know. We don't know who the actual human being is that would have put anything into the --

MR. CERVANTES: Objection. Asked and answered.

THE COURT: Sustained.

Q.   So the other device -- some of the other devices, for example, that you looked at, there was an HP Pavilion. Do you recall that device?

A.   I do.

Q.   And do you recall that was given to the government as part of a consent search?

A.   I don't know exactly how it was given over.

Q.   If you don't, that's fine.

A.   I don't know.

JASON WHITT - CROSS

Q.   Are you aware of whether or not anything -- any consent search or any items were consensually given to the government by Kimberly Tatum?

MR. CERVANTES:  Objection, speculation.

THE COURT:  If you know.

THE WITNESS:  I do not.  I do not know.  I know that there were items -- I do know there were items given over.  I do not know anything else other than that.

Q.   Okay.  There was another -- there was a series of thumbnails as well of some of the -- these morphed images, right?  I believe they were government exhibits as well. These were -- you testified that they were accessed on 9/18/2021, all of which were, according to the screenshots, about 4:20 -- 4:21 PM on the 18th of September.  Do you recall that?

A.   If you can bring it up, I can...

MR. AMES:  I have it as 4E4.

MR. CERVANTES:  4E4 is not admitted.

MR. AMES:  Or 4E8.

MR. CERVANTES:  No, not admitted.

MR. AMES:  How about -- I'm sorry.  How about 4F13, that's been admitted?

MR. CERVANTES:  Yes.

Q.   All right.  So here's just another example.  Last accessed date.  There are a number of these that have 9/18,

JASON WHITT - CROSS

4:21 PM as last accessed, correct?

A.    Correct.

Q.    And these are, again, not that -- you don't -- you don't know who accessed -- or rather, sorry.  The access just means that a device was plugged into another device and the computer accessed whatever that thing was, correct?

A.    So, yeah, under the user account, yes, sir.

Q.    And there would similarly be presumably for the Western Digital hard drive because you talked about that as well, and the government was matching up some of these file names from the Mac, again, that don't have any even thumbnail attached to it, to something on the Western Digital drive and such.  So that device as well would, the argument is, create some of these same type of thumbnails if you pop something in, right?

A.    Are you referring to the Passport?

Q.    Yes.

A.    I do know that drive was encrypted.  I don't know how QuickLook works for encrypted drives.  So I would not know without somebody having the password to the encryption on the Western Digital My Passport.

Q.    Okay.  I guess what I'm saying is, is it -- in your investigation and analysis here, there's a claim, for example, IMG_3666.MOV, among others, that have thumbnails or cache stuff on other devices, but others -- why is there not any other thumbnail or -- for some of these pthc things?  Why is

JASON WHITT - CROSS

Q. there no new thumbnail or anything created?

A. I don't know.

Q. Is it because they don't exist on the Western Digital hard drive?

A. They are not there. I don't know why they're not there. They're not there.

Q. So again, computer hard drive, regardless, no images. It's just some words. That's all it is.

A. For the pthc search, yes. It's folder paths and file names.

Q. And the government has presented a lot of stuff over the past day here, images from these devices you're talking about. What is preteen hardcore? What's a preteen?

A. Preteen is anybody under the age of what I would assume to be 13.

Q. And hardcore, you don't have to get too descriptive, but pretty graphic hardcore sexual stuff, not just kind of Cinemax softcore kind of stuff, right?

A. I would assume that hardcore means hardcore, yes, sir.

Q. And so there's been no preteen hardcore put into evidence so far?

A. Outside of the search terms? There have been images of potential child pornography, so I don't know exactly, like...

Q. Something you describe as hardcore -- there's no preteen. There's no hardcore. There's images that have been introduced

JASON WHITT - CROSS

or that you've investigated, but nothing that would --

MR. CERVANTES:  Argumentative, vague, and compound.

THE COURT:  Well, let's wait for him to finish.

MR. AMES:  I'll just withdraw, Your Honor.

Q.    You said you've done lots of reviews of thousands and thousands of devices, correct?

A.    Correct.

Q.    You've seen a lot of bad stuff in your day, fair to say?

A.    Unfortunately, yes, sir.

Q.    You and I have sat down together and watched a lot of bad stuff, correct?

A.    Correct.

Q.    Not in this case.  Others, just to be clear.

But as part of your job, you're seeing a whole lot of things, sometimes multiple times same images, right?

A.    Correct.

Q.    On other -- you might three, four, five years apart see the same series of photos, like you mentioned Vicky or something, or some other ones, right?

A.    Correct.

Q.    Like pornography's general definition, you kind of know it when you see it.  Or that's obscenity, rather.  But you kind of know it when you see it.  With pthc do you kind of know it when you see it?

A.    Preteen hardcore has been associated with images, in my

JASON WHITT - CROSS

experience, with what you're referring to as hardcore images, but also just images of teens standing around nude or doing sexual acts to their self and so on.  So preteen hardcore does not mean every image you see is going to be a hardcore version of pornography with a child.

Q.   Understood.  So it's a search term, but it's not necessarily always exactly descriptive of the underlying file or image, is what you're saying, right?

A.   So preteen hardcore does to me represent child pornography, in my training and experience, but it does not mean that everything you see is going to be hardcore pornography.

Q.   Understood.  Because sometimes it might be people standing -- sometimes it might not even be pornography, correct?

A.   I don't know that.  Every time that I have seen it outside of one time -- or a few times has been children, whether they are standing, whether they are with their legs spread, whether it's hardcore, whether it's sexual acts.

Q.   Well, what's an example of when it wasn't?

A.   So there was one time or a few times -- it's very rare -- that you will see an image that has the term pthc in it, but it is embedded in a lot of other terms.  I don't want to say the terms here in court unless you need me to, but it is -- you'll have terms that associate itself with adult

JASON WHITT - CROSS

pornography. So you'll see, like, five or six terms that are associated with adult pornography and then you'll see pthc. And when you see that, sometimes you'll see pthc, but you know it's going to be adult pornography by the terms that it is with. And that's where I've seen it on just very, very few occasions.

Q. There might be an example of something being mislabeled, right? Like it's labeled this, there's a file name, but the actual file doesn't match the description fully.

A. Can you be more specific?

Q. Well, you just kind of gave an example, right? You said it's got some adult stuff, but it has pthc in there, so that doesn't -- you're saying that there's -- you clicked that at one point in time in another case, you opened it up and it wasn't pthc, it was adult porn, right?

A. So pthc being a term for child pornography. No, it was adult porn on those few occasions.

Q. So all I'm saying is that a file name doesn't designate what the file is. You'd have to look at it to confirm, right?

A. Correct.

Q. Now, there's some other terms and stuff that I think you mentioned either between yesterday and today. There was Loli stuff or --

A. Lolita.

Q. Lolita, yeah. What do you know about any Lolita stuff?

JASON WHITT - CROSS

A.   So Lolita, when you look at, like, LS models, it starts -- when you see LS models we talked about, it can be the Lolita series.  I don't exactly know what Lolita means. But when you see LS models, the series of images usually starts with one or two females, maybe multiple, and it starts off to where they're posing; and then, you know, sometimes -- usually it leads into sexual acts either between the two underage females or with somebody or an adult.

Q.   And are there -- that term, is that -- is that -- is Lolita or some variant of it a term that comes up a lot in other ways in your cases?

A.   Sure, I've seen it.

Q.   What are some examples maybe -- if you remember, what are some other examples where you see that term or something similar come up?

A.   I mean, the amount of images we look at, I do not remember the names of every one of them so I can't answer that question.  I don't know.

Q.   Like L-o-l-i, like Loli something -- hyphen something, is that one that might come up?

A.   I don't know.

Q.   Or like -- are you familiar with, like, Lolicon or anything like that?

A.   No.

Q.   Are you familiar with -- hold on.

JASON WHITT - CROSS

Are you familiar with any, I guess, non -- non-pornography but graphically -- graphically created pornography? Have you ever come across that? Like completely CGI generated, for example.

A.    Like an anime?

Q.    Yes.

A.    Like a cartoon?

Q.    Or something like that, yes.

A.    Yeah, I'm familiar with it.

MR. AMES:  The Court's indulgence real quick, Your Honor.  I'm sorry.

(Pause.)

BY MR. AMES:

Q.    Have you had other cases in the past, I guess, that involved any anime?  What is anime, I guess is the first question.

A.    Anime is just basically a cartoon.  I mean, it can -- it does not have to be pornography.  But it is, like, Japanese animation or cartoons that can be a normal cartoon.  Sometimes it can depict, you know, certain sexual scenes with girls that may appear underage.  Sometimes they are where they are not developed or girls that have a very young face that are very developed.  So anime can literally be all over the place. It's just a cartoon.

Q.    In general, I guess -- you can watch anime on Netflix,

JASON WHITT - CROSS

right, normal anime?

A.   Correct.

Q.   Right?

There's a subculture, a subset, that is a bit deranged, fair to say?

A.   I mean, it is animated, sir.

Q.   So it's, I guess, a specific kind of subgenre that involves images that, as you said, depict young or undeveloped people doing sexual things, for example?

A.   Not all the time.  I mean, there is normal anime that, as you say, you can watch on Netflix that has none of that. There is anime that is just like you're watching a movie, a cartoon movie.  But anime spans all the way down into child pornography, what depicts child pornography.

Q.   But anime -- the implication with anime, though, it is animated, right?  It's not -- when it's anime, it's not live-action images.  It's cartoons.  It's drawings.

A.   Drawings.

Q.   In your cases that you've done, have you in other cases encountered that kind of thing in your searches?

A.   Of course.

Q.   Did those have suggestive names sometimes that are like -- describe what's in the images?

A.   I don't recall at this time.  I honestly do not know.

Q.   That's okay.  I'm asking about prior cases.

JASON WHITT - CROSS

So in total here, you know, there's the MacBook device that, I think by all accounts, doesn't have any original or actual images. The only thing that's on this MacBook that we can glean is that there's some of these thumbnail things in the cache folder, correct?

A.   You're referencing images?

Q.   Yes.

A.   Correct.

Q.   And then the -- there's a thumb drive that has these folders that you mentioned that had the morphed images, right?

A.   The morphed or altered images, yes, sir.

Q.   And what can you tell us about the specific -- any specifics that you're aware of or researched about the morphing process?  How does that site do that?

A.   Honestly, I do not know.  I did go to the site to try to familiarize myself with it.  And I don't know outside of that it is a computer program, an AI program, that, as they claim, nudifies images.

Q.   And ostensibly what it sounds like from my understanding, you can take any image of a clothed person, or so it claims, and put it to this site and it will generate a new image that makes the subject appear to be naked, correct?

A.   So I never tried it.  I don't know what it does with the original.  But it does -- you will give a source -- from the way I understand it, and I have not tried it, is you do give a

JASON WHITT - CROSS

source image and then it will produce an image from the source that is, they call it, nudified.

Q.   And so -- I mean, we've reviewed here today a series. You matched them up side by side:  image one, image two; clothed, unclothed.

The image that's being populated, the best we can tell, is not -- it's AI generated.  It's generated by some sort of code or AI or whatever it may be, right?

MR. CERVANTES:  Objection.  Asked and answered.

THE COURT:  Overruled.  Go ahead, take one more shot.

THE WITNESS:  Yes, sir, a computer program.  So it is a computer program that alters the image.

Q.   So where does -- do you know where the -- this new image that's being created or being -- the nudified part where they're talking about what looks like a naked person now, do you know, are they drawing that from a pool of naked people and adding them on top or do you know in any fashion how it works?

A.   I do not.

Q.   Or if it's literally drawn by a computer just from scratch in some fashion?

A.   I do not know.

Q.   And it seems, at least in the examples, to do a decent job of finding the -- finding the right spots to add the

JASON WHITT - CROSS

nudity, at least in the examples we've seen, correct?

A.   Sure.

Q.   Perhaps with the exception of the one where there's kind of floating heads over here with the prom photo or something.

A.   Correct.

Q.   But -- so do you know if there's any user input on that or is it just the kind of thing, in your review of this, just pop it -- pop it in and click it, set it, forget it kind of thing?

A.   I don't know.

Q.   All right.  Or any -- is there anything else you gleaned at all that I've missed about how it works or looked into what it does otherwise?

A.   I don't believe so.

Q.   All right.  The HP Pavilion device, this was -- I guess this is, fair to say, an older kind of computer, a few years old, the HP Pavilion?

A.   I really didn't look into it.  I don't know the answer to that.  It is a desktop.

Q.   All right.  Did you do -- you did an investigation of those -- the contents, though, looking for potential pornographic materials, though, correct?

A.   On this one I just reviewed the flagged images.

Q.   Okay.  So you reviewed -- so you didn't do a full forensic analysis.  You reviewed flagged images.

JASON WHITT - CROSS

A.   So the full forensic analysis was completed as in making a report for the special agents to review.  They reviewed the report and flagged the images.

Q.   Okay.  So in other words, are you saying that you -- you did an analysis, provided the results.  They flagged a couple of them after they reviewed it?

A.   So I did not flag anything in here.  They flagged it.

Q.   Okay.  So you -- you copied the thing.  You did your normal routine with regard to getting the data.  You went through and did kind of the searches that you do.  And there was nothing that was flagged by you at that time.

A.   So the only thing that was flagged by me on the HP computer was the term of pthc in the word wheel.  I ran a search term for that or an index search for it.

Q.   You're right.  So there was that.  But nothing else other than that was flagged by you at that time, correct.  There was nothing that popped up.

A.   To the best of my knowledge, yes.

Q.   You provided that report -- do you remember roughly when you did that?

A.   I do not.

Q.   Was it recent or was it, like, last year, 2021?

A.   I mean, it depends on your definition of recent.  Within a couple of months maybe.  I don't remember.

Q.   Okay.  But then at some point in time, you know, you

JASON WHITT - CROSS

turned over your preliminary categorizations to the agents and then you got it back later on to do kind of the official work-up once you had some images flagged by them, right?

A.   I don't remember flagging anything in here.  I could have, but I do not remember.  I just reviewed the files that were flagged.

Q.   Okay.  And the files that were flagged, was it the two files that were introduced in court?

A.   The two Vidweb, I think they're named.

Q.   Yeah.  Were those the only files that were flagged to your recollection?

A.   To my recollection.

Q.   So, you know, you did your analysis and produced a report to come to court.  As part of the investigation, is there anything else that's done to try and identify or find who the people might be in any of the images?

A.   You would have to talk to the agents about that, but I do know they submit --

MR. CERVANTES:  Objection, speculation.

THE COURT:  Sustained.

Q.   Did you have specific knowledge in this case of whether or not any agent has sent -- specific knowledge of agents sending off requests for -- to any agency to try and identify anybody?

MR. CERVANTES:  Objection.  Calls for hearsay.

JASON WHITT - CROSS

THE COURT: Overruled. Are you aware of any such requests?

THE WITNESS: I am not.

Q. What's an example of a place that that -- if a request were to be made, where would you send it?

THE COURT: Sustained. He's already said he doesn't know whether any were sent or not.

MR. AMES: I'm sorry, Your Honor. I may have misspoke.

Q. Are you aware of -- what's an example of a place where the government might do --

MR. CERVANTES: Objection.

THE COURT: Sustained, relevance

Q. What is NCMEC?

MR. CERVANTES: Objection.

THE COURT: Sustained.

MR. AMES: I'm sorry?

THE COURT: Sustained, relevance.

MR. AMES: To ask what NCMEC is?

THE COURT: Ask another question, Mr. Ames.

MR. AMES: What's the objection, I'm sorry? It's relevance?

THE COURT: Mr. Ames, there was an objection that was sustained.

MR. AMES: I'm sorry, Your Honor. I understand.

JASON WHITT - CROSS

BY MR. AMES:

Q.   Do you play any role or do -- as part of the investigation, do you do anything or play any role in trying to identify victims?

MR. CERVANTES:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I do not play a role in identifying victims.

Q.   Who does that part?

A.   The case agents.

Q.   In this case who did that part?

A.   I don't know.

Q.   How many agents were involved in this case?

A.   Two.

Q.   Who were they?

A.   Special Agent Marisa Brown and Special Agent Scott Atwood.

Q.   So then presumably one or the other, or both, would be tasked with trying to determine identities of any known or potential victims.

MR. CERVANTES:  Objection.  Calls for speculation.

THE COURT:  Sustained.

Q.   Would it be anybody else other than them?

MR. CERVANTES:  Objection.  Calls for speculation.

THE COURT:  Sustained.

JASON WHITT - CROSS

Q.   As part of your review of devices, other than looking -- you know, some of the stuff you talked about already: searching for certain search terms, looking for indicia of pornographic titles and such.  Is there anything else that you're looking for beyond what we've talked about in general?

A.   To flag potential pornography I look at the index searches and actually look at the images themselves.

Q.   Are there any other searches done or any other kind of investigation done traditionally or is that mostly what it is?

A.   Investigation on my part?  I just focus on the forensics of it.  So outside of running the index searches, flagging what I see as potential child pornography, that is either handed -- or then it is handed over to the case agent for review.

Q.   Is there any other software that you use -- you mentioned AXIOM.  That's a -- I'm confused about this, honestly.  Is Magnet the company and AXIOM the software?

A.   Correct.

Q.   And is that the software that the government uses traditionally in these cases, or some version of it?

A.   There's multiple software out there that the examiner chooses to use.  I choose to use Magnet AXIOM, or we'll call it AXIOM.

Q.   So there's some other options you can use, but that's your preferred one, I guess.

JASON WHITT - CROSS

A.   Correct.

Q.   And are there other things Magnet -- I guess AXIOM itself does or other programs or applications by Magnet that you use and utilize in these investigations even if it's rare, I guess?

A.   I don't think so.

Q.   When you're in AXIOM, other than searching indexes, there's a lot of things you can do, correct?

A.   As far as the index searches?

Q.   No, I'm saying other than the index searches, there's a lot of stuff that you can look at in the AXIOM software when you're analyzing a hard drive, for example.

A.   Correct.

Q.   Does the program, like, categorize and tag things or you can tag things?

A.   So there -- the program will pick out hash values that it will tag that has previously been tagged, and then also I will go through and flag or tag images myself.

Q.   And you can search for types of events and such, right? You can actually -- sorry.  You referred to artifacts earlier yesterday.

A.   Correct.

Q.   And an artifact is just a thing on a computer and it can be a variety of things, right?

A.   Anything on the computer.

JASON WHITT - CROSS

Q.   So it can be an image, it can be a thumbnail, it can be a text document, it could be a record or a log of something, right?

A.   Correct.

Q.   And you can search and categorize all kinds of things, including quick view thumbnails that are no longer viewable by a normal person, right?  As you said earlier.

A.   Correct.

Q.   So in your software you could -- did you do any other investigations outside of, you know, like we talked about, an index search here or looking for attribution and such?  Was there any other -- did you look at anything else on the drives that are outside of that?

          MR. CERVANTES:  Objection.  Asked and answered.

          THE COURT:  Just answer the question.

          THE WITNESS:  Can you repeat it?

Q.   Other than the stuff you've talked about, did you use AXIOM to review at any time or look for anything other -- outside of just specifically looking for images of pornography?

A.   So when we first got the computer and did our forensic analysis of it, my first step is to look for child pornography.  Outside of that there are -- we look for attribution which did lead into the documents, PDFs, and files of that nature.

JASON WHITT - CROSS

Q.   You mentioned too -- you said MD5.  What is that?

A.   It's a hash value.  There are different types of hash values.  There's MD5, SHA-1, SHA-256.  The FBI uses MD5 for their hash value, their hash algorithm.

Q.   And these -- I'm not going to put words in your mouth because you are the expert in this, but that is basically kind of like a fingerprint of an image that stays with the image and you can hypothetically identify an image without even seeing it based on that value, right?

A.   As long as the image has not changed.

Q.   Right.  Even one pixel, I think you said the other day.

A.   Would completely change it.

Q.   Right.  So you can basically have one image here, one image there.  If the hash value is the same, then we know the image is the same, right?

A.   Correct.

Q.   And this is utilized often by the FBI in their investigations, correct?

A.   MD5 values are used to identify images or say that these two images are the same.

Q.   Okay.  And you mentioned in AXIOM, AXIOM will tell you what those hash values are, correct?

A.   They will.

Q.   And you can even do that on your own computer, right?  You can go to the more details or whatever in Windows, or

JASON WHITT - CROSS

something, and it can show you what your MD5, SHA, other values are.  There's a process for that, right?

A.    I don't know that process.

Q.    It's not a secret code, though.  It's attached to the image.  It's populated.

How does that work?  How does the image get that code attached to it?

A.    So it's some algorithm that, you know, I'm not aware of.  But it is a hash value.

Q.    So when you're going through and you're doing your analysis, as part of that analysis, seeing these MD5 hash codes -- or I think you said SHA, is that S-H-A-H?

A.    Just S-H-A.

Q.    S-H-A.  And that's another similar type of code, I guess?

A.    It's a different hash value.  It's a different algorithm

Q.    So that will populate.

Does AXIOM have the option or does it automatically flag for you any hash values that are problematic in any fashion?

A.    So when it compares the hash values from the database, you have to set it to look for the hash values.

Q.    What's the database?

A.    The database is just items that have been flagged prior by other agents.  We can keep a database of them to make review of this faster.

Q.    There's a database.  Is that like a local database here

JASON WHITT - CROSS

like in the Western District or FBI in general or...

A.    It's a database at FBI Charlotte.

Q.    FBI Charlotte.

So, for example, you guys get a case and let's say, for example, you find a bunch of illegal images and someone gets convicted and that all happens.  Then -- and these images you've never seen before.  How do you add those to the database?

A.    So if an image is flagged -- I think this is the question you asked.  If an image is flagged that the database did not recognize, it is flagged as potential child pornography and sometimes it's updated.  You have to click that it's updated.  Or other times it's not.  It's what we choose.  But you would have to update the database with the new hash values to add to it.

Q.    Okay.  And so then from that point on -- so let's say, for example, last year you had a case.  You got an image that you have determined is definitely child pornography.  You've added it to this database.  A year later you get another case and you can see that there's a similar -- exact same hash code in the new case that matches that one from the database.

A.    Sure.

Q.    Is that more or less how it works?

A.    Yeah.  And then you would have to go visually review it.

Q.    Right.  So -- but what it initially indicates to you is

JASON WHITT - CROSS

that, hey, this hash code matches this known image hash code and it's popping up and saying, hey, check this one because this one definitely matches one we already know about.

A.    I wouldn't say know.  I would say potential.

Q.    Okay.  And then you verify by other review.

A.    The case agent would probably verify by other review.

Q.    Understood.  But it's helpful because let's say -- actually, let me back up real quick.  You get a lot of these cases.  Fair to say that the number of images that you uncover and find in these cases often is quite substantial?

A.    They are.

Q.    And so -- and you said before this is a lot of repeat sometimes.

A.    Correct.

Q.    So there's similar -- there's videos you've seen more than once, right?

A.    There are.

Q.    And you don't even need the hash code.  You already know probably before you open it probably what it is because you've seen it eight times.

A.    Potentially.

Q.    Particularly in a large case where there's a ton of images, these MD5 hash codes can really be helpful because rather than you have to go through or an agent go through and review them one by one, it will give you kind of a cheat

sheet, like, check these ones first because these are highly likely to be something that another person has reviewed and indicated already is illegal.

A.   So when they are tagged with AXIOM, the way I do it, is I will go through them at the beginning.  Those are removed.  And then I will go through the images that have not been flagged and we'll flag the other ones.  And then at the end we'll do a review of all the flagged images.

Q.   Okay.  So basically you separate those out first.  Keep the ones that are flagged that have a match value, I guess, to your -- the FBI database in Charlotte.  You look at some of the other stuff that wasn't auto flagged.  And then at the end you kind of put it all together and review the whole list; is that correct?

A.   The hash value is set aside at first.  Then I will flag the rest of them or attempt to.  And then we will go through and review the -- all of them together.

Q.   Okay.  And so this database that Charlotte has, is that shared with any other offices?  Is there any connection?  Like, does another FBI agency on the other side of the country share their information and hash codes with you?

A.   No.  We keep it -- the database that we have we keep here in Charlotte for the Western District.

Q.   Okay.  And AXIOM is only going to make a match or populate with something in your database or is it possible or

**JA256**

JASON WHITT - CROSS

Q. do you in cases connect it to any other databases at all?

A. So there is a database that I brought into ours. I created it with what we call golden hashes. They are hashes that are not -- let's say you did a fresh install of Windows. With a fresh install of Windows, you have all these icons that we know to be pure. So we'll create a hash of that, or the program will, and those hashes are added to our database. So we remove the ones we know are not.

Q. Understood. So like welcome.jpeg, or something, like when Windows pops up.

A. Correct. On a desktop you'll normally get it when you start up.

Q. So that's kind of a filter process that you created to make -- to weed out stuff that you don't really need to be concerned with.

But as far as any, like, contraband or things that have been marked illegal by another person, is there any other database that AXIOM -- when you do your investigation, that AXIOM can connect to to check for matches?

A. Not that I'm aware of.

Q. Okay. And in this case, you reviewed at least these ones. And there's more, right? I don't remember exactly how many. Did you do the MD5 hash match search for all this stuff?

A. AXIOM does it automatically.

JASON WHITT - CROSS

Q.   So it automatically did it.  Did you get any matches for these MD5 hash codes?

A.   I do not recall.  Honestly, I do not.

Q.   Okay.  But I guess in your investigation and preparing your reports, there was never a note that, hey -- you never noted it as happening.

A.   I do not remember if it happened.

Q.   Okay.  But fair to say it wasn't -- you didn't find a hundred matches.

A.   I do not know.

Q.   Are you sure that there were any?

A.   I do not know.

Q.   So you got these -- these devices, they've got all these file paths, all this stuff you guys have been talking about here today, and your system automatically checks it for images of contraband, and there's -- you don't remember if any of them matched up.

A.   So the file paths the system is not going to check for hash values because they are not images.

Q.   So they don't even have a hash value attached to them either, that string of texts.

A.   Not that I'm aware of.

Q.   But the thumbnails, would they have one?

A.   The thumbnails are generated by the OS and they can actually be different.

JASON WHITT - CROSS

Q.   Does it make a new hash value?

A.   It could.

Q.   It could.  Does it sometimes not?

A.   It's going to make a hash value whether it matches a thumbnail that we have seen before or not.  It depends on the OS.

Q.   But if it's a -- you know, if it's the same image, same image, that would populate.  And none here that you recall, right?

A.   I do not recall any of the hash values being marked or flagged.

Q.   Approximately how many images, just in general, not anything supposedly child pornography, but pornography in general, do you have an approximation of how many different images were found in this case?

A.   So during my review for the potential child pornography, I do not note the adult pornography or what the count is, so I do not know how many were images of adult pornography.

Q.   Is it a lot?

A.   I do not know.

Q.   You don't know?

A.   I really don't know.

          THE COURT:  Can we have a brief sidebar, please.

          (Sidebar conference as follows:)

          THE COURT:  Mr. Ames, do you have a guess as to how

JASON WHITT - CROSS

much longer your cross is going to be?

MR. AMES:  Not too much longer.

THE COURT:  Can you quantify that?

MR. AMES:  You know me.  I can't stop talking sometimes.

THE COURT:  To that end, you spent 45 minutes establishing that none of the images that came off these devices were known images.  That could have been done in two questions and 60 seconds.  Okay.  Just a little gratuitous advice.

MR. AMES:  No, I get it.

THE COURT:  What I'm trying to wonder is whether we should -- if you're going to go another hour, I'll take a break sooner than that.  But if -- I want you to finish if you can, but I don't want to starve to death either.

MR. AMES:  Yeah.  I'm trying to think what I --

THE COURT:  I don't want to interrupt your cross if it's almost over.  If it's going to have to be interrupted anyway, then I'll do something different.

MR. AMES:  I think I'm getting close to the end.

THE COURT:  Thank you.

MR. AMES:  I won't make promises, but I'll try.

(End of sidebar conference.)

THE COURT:  Just scheduling issues, folks.  I can look at the clock as easily as you can.

JASON WHITT - CROSS

Go ahead, Mr. Ames.

CROSS EXAMINATION (Cont'd.)

BY MR. AMES:

Q.    The number of images, pornography in general, encompassing all of it, how many you weren't sure.

A.    I do not know.

Q.    Did you review any images that were not child pornography or alleged child pornography?

A.    I did.

Q.    Okay.  Do you recall when or how many, anything like that?

A.    I really cannot put a number to it.  There are images that I reviewed that are not child pornography.

Q.    Okay.  Fair to say that it was the vast majority of images that you reviewed?

A.    So the images that I reviewed are based off the -- the ones I reviewed are based off the index searches, so I took those where it led me.  So those are the ones that I vastly reviewed.  There are images, videos inside of those folders that are not child pornography.  But to give it a count, I do not know.

Q.    Okay.  And in this case -- well, so the index search you're referencing here, what was the index search that you looked for that resulted in you looking at some images?

A.    For which device?

JASON WHITT - CROSS

Q.   Any of them.  Like, for example, the file names, from what I can see, are mostly like IMG_99 whatever.

A.   So when we looked at the devices, the thumb drive, the forward paths, the CPT, of course when we found those images, we decided -- or I decided to see if there was any evidence on other devices so I searched for CPT or EMOR.  That's where I did see some on the devices.

As far as the IMG_3666, those were reviewed based off GPS coordinates to a place up in Maine.  Once I saw that, we started reviewing that because GPS coordinates can lead you to certain images, and that's when I found that video.

Q.   Okay.  And so that was sort of the point here to get -- that's sort of, again, from here to here to here based upon as the investigation flows.

Were there other search terms -- I know pthc is one. Were there any other search terms that were used in that index search on any device that you used here?

A.   I used pthc.  I also searched the image name, like IMG_3666 forward names.  Those are a few that I remember searching.

Q.   I guess -- I'm sorry, I suppose I mean more generic. Other than pthc, is there another term that -- like Lolita. Is there something else you looked for?

A.   No, I did this one just pthc.  I did not search for any other because once I saw the folder path of pthc, a lot of

JASON WHITT - CROSS

those terms that I usually search for were located in the file paths so I knew that they would hit also.

Q.   Understood.  That makes sense.

Is there -- is there any other -- is there any other -- any other device, other than the ones that are put into evidence, that contain any indicia or appear to show any sort of child pornography, or alleged, that you've seen that haven't been put into evidence today?

A.   I believe everything has been put into evidence.

Q.   No other device that you are aware of has any alleged pornographic materials.

A.   Outside of the screenshots of the thumb drive, I do not know of any devices that have any pornographic material on them.

Q.   Okay.

A.   Or potential child pornography material on them.

Q.   Understood.

When you say screenshots, what are you referring to?

A.   So it appeared that either somebody took a picture of the screen or took a snapshot of the screen itself of the images that I saw.

Q.   Are you -- a screenshot of -- can you -- I'm sorry, can you be more -- elaborate a little bit.  Like a picture of a screen --

A.   Like literally taking your camera and taking a picture of

JASON WHITT - CROSS

the screen.

Q.   Okay.  And what was that screen?

A.   It looked like a Mac and it had some images of the images that we have been looking at today.

Q.   Okay.  So like the deepfakes or some other ones potentially --

A.   The ones of the altered or modified images.

Q.   Okay.

A.   That I remember.

Q.   Got it.

So there's someone with a phone that takes a picture of a computer screen like this?

A.   That's what it appears.  I did not analyze it.  I'm just going off what it appeared.

Q.   And do you know -- I'm sorry, you said that.  That was on a thumb drive?

A.   That was on a thumb drive.

Q.   That's not in evidence, correct?

A.   It is in evidence.

Q.   It is?

A.   Yes.  Evidence as in our evidence storage at the FBI.

Q.   Oh, you're right.  I meant in evidence at the trial. It's not been admitted as an exhibit, correct?

A.   It is not in front of me.

Q.   Okay.  Is there any attribution to that thumb drive that

JASON WHITT - CROSS

you're aware of or have done?

MR. CERVANTES:  Objection.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  I did not look for attribution on that thumb drive.  I did not forensically analyze it.

Q.  Okay.  Did you analyze it even if it's not forensic?  Have you looked through some of the documents for images on it?

A.  I don't remember the contents of the documents.  I just remember there's some emails and some screenshots or images from a phone or a camera taking a picture of the screen.

Q.  Did you do any analysis of when those pictures were taken, by whom or anything?

A.  Did not perform any forensic analysis on that thumb drive.

Q.  Do you know where that thumb drive came from?

A.  Stated, I believe -- I believe it was from Kimberly Tatum.

Q.  So when did you learn -- when did you learn that the government had that?

A.  I do not recall.

Q.  Was it before or after you did an attribution of this device and linked it to David Tatum?

A.  I do not recall.  I'm trying to put it together.  I just do not recall.

JASON WHITT - CROSS

Q.   I understand.  It's been a long haul, I understand.

But fair to say, that -- if there's -- if the government is in possession of some pictures of a computer screen showing the evidence we're talking about that was given by Kimberly Tatum, does that imply that she has access to this device?

MR. CERVANTES:  Objection.  Calls for speculation.

THE COURT:  Sustained.

Q.   Are you -- in your analysis did you -- did you observe anything odd or any anomalies on any of these devices out of the norm?

MR. CERVANTES:  Objection, vague.

THE COURT:  Sustained.  Be a little more specific, Mr. Ames.

Q.   Did you find that there was any spyware installed on any of the devices?

A.   I did not.

Q.   Did you look for that?

A.   I did not.

Q.   Are you aware whether or not there was any on any device?

A.   I'm aware that something was installed on a device.

MR. CERVANTES:  Objection.  Calls for hearsay.

THE COURT:  Well, what he's said right now doesn't, so overruled.

Q.   Not repeating anything anyone said because that's hearsay, but what is your understanding or what is your

JASON WHITT - CROSS

knowledge of it?

A.    I have no knowledge.

        MR. CERVANTES:  Objection.  Calls for hearsay.

        THE COURT:  Sustained.

Q.    In AXIOM -- let's say hypothetically there was something like spyware or malware or something on the device.  Is that something AXIOM could search for?

A.    I do not know.  I know that there is an option -- or there is a category to look for certain types of things, but I do not know what is in the database that it might find.  So I don't know if it's antivirus or anything to delete evidence, that kind of thing.

Q.    Are you aware of any sort of programs -- I'm using the term spyware as kind of a blanket term here, but any program spyware like that can do things like remotely access a device or delete stuff or manipulate evidence or data?  Is there anything you're aware of program wise like that?

A.    Personally?

Q.    Yes.

A.    There are --

        MR. CERVANTES:  Objection, relevance.

        THE COURT:  Let's ask the question, did you locate any such software on any of the devices you examined?

        THE WITNESS:  No, sir, I did not.

Q.    Did you look for it?

JASON WHITT - CROSS

A.    No, sir, I did not.

Q.    But you're aware of something, there is an indication of something, but you never looked for it.

MR. CERVANTES:  Objection.

THE COURT:  Asked and answered.

MR. AMES:  Okay.

Q.    I just asked is there -- are there any examples that you've seen or are aware of that can remotely access a device and, for example, as a result, create a QuickLook thumbnail?

MR. CERVANTES:  Objection.  Asked and answered, vague, speculation --

THE COURT:  Sustained.

MR. CERVANTES:  -- relevance.

THE COURT:  Sustained.

Q.    Have you ever heard of TeamViewer?

A.    Have I heard of Team --

MR. CERVANTES:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Have I heard of TeamViewer?

Q.    What's your understanding of what TeamViewer is, your knowledge of it?

A.    So it's -- to my knowledge, TeamViewer is a program that allows somebody to -- you have to give them access to remote into your computer or just to see your screen or to give them access to it.

JASON WHITT - CROSS

Q.   Hypothetical, that would allow -- Google Remote is another example.  You can do that through Chrome, I think. You can access a home computer from another device through your browser.  Have you heard of that one?

A.   I'm familiar --

MR. CERVANTES:  Objection, relevance.

THE COURT:  Sustained.

Q.   If a person is able to remotely access through TeamViewer or other similar software and things are done on -- remotely, can that create new data on the other desktop device?  Like, if I'm accessing my thing at home right now and I'm --

MR. CERVANTES:  Objection, speculation, relevance.

THE COURT:  Sustained.

Q.   Would your investigation in this case indicate to you if there was any remote access or manipulation of any data? Would your -- the way you've researched and done the investigation, would you know or would you not know?

A.   I did not see any evidence of a TeamViewer or any other remote --

Q.   I'm aware.  But you also didn't look for it, so you don't know.

MR. CERVANTES:  Objection, argumentative.  Asked and answered.

THE COURT:  It has been asked and answered.

(Counsel and defendant conferred.)

JASON WHITT - CROSS

BY MR. AMES:

Q.   They talked briefly to you about creation and modified dates.  That's also in some of this metadata.  Talked about how it accesses when maybe the device is creating this quick view thumbnail in that case.

What about the creation date or -- well, what's that, first of all?

A.   The creation date of what?

Q.   A quick view image -- the quick view cache thumbnail that we were talking about earlier.

A.   If you could show it to me, I can probably answer --

MR. CERVANTES:  Objection.  Asked and answered on direct and cross.

THE COURT:  Ask a question that I can guess where you're going --

Q.   So there --

THE COURT:  -- and then I'll be able to better rule on it.

MR. AMES:  That's fair, Your Honor.

Q.   So you talked earlier, I think, about is it like EXIF data or something?

A.   EXIF data of an image, not of the QuickLook thumbnail cache.

Q.   Right.  So EXIF data, is that something -- can you describe if there's a distinction between a creation date in

JASON WHITT - CROSS

the metadata or an EXIF date in the metadata.

A.   I don't quite understand -- I mean, if you could reword it, I will try to answer it.

Q.   So does every image have EXIF data?

A.   A lot of images will retain their EXIF data, but the EXIF data can be stripped out of an image.

Q.   So sometimes it has it; sometimes it doesn't.

Does it always also have -- or presumably always have a creation date as well?

MR. CERVANTES:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  Creation date as when the image was created?

Q.   I'm just saying -- look, there's been a bunch of metadata that popped up on the screen.  I objected to it earlier.  I need to know what it is.

So there's a creation date on every single one of those documents.  There's also EXIF --

MR. CERVANTES:  Objection, argumentative.

THE COURT:  I haven't heard a question in there, Mr. Ames.

Q.   What is the creation date?

MR. CERVANTES:  Objection, vague.

THE COURT:  Can you answer that?  What is a creation date?

JASON WHITT - CROSS

THE WITNESS:  What is a creation date?

Q.   Yes.

A.   A creation date is when the file was created.

Q.   And what's the difference between that and EXIF data?

A.   EXIF data is data about the image to where the EXIF data retains all the creation date, modified date, the model -- or whatever the camera was, GPS coordinates, shutter speed, altitude.  So EXIF data retains all that information of the image.

Q.   So a bit more detailed, fair to say.  EXIF data is more than just a date.  The creation date is just a date, right?

A.   Creation date is a date.  EXIF data is information about the image.

Q.   Does the EXIF data also have, like, a date of creation as well or no?

A.   It does.  There's multiple dates of creation within the EXIF data.

Q.   What are the multiple dates, as an example?

A.   An example is -- I don't know exactly what it's called. There's a content created date.  There's a media created date. Those are the two that I'm familiar with.

Q.   So sometimes you might see an image that has EXIF data that says creation date this date and then you have a creation date above that that's a different date?

A.   So inside the EXIF data, yes, you can see something that

JASON WHITT - CROSS

was created on a date and then the media created date above that could be different.

Q. And then there's an access date also that is different than those, correct?

A. The access date is usually with the file or file system.

Q. And is there any rhyme or reason why -- you said it can be stripped or something. Is there any rhyme or reason as to why that happens, why one image might have this EXIF data and one might not?

A. Some images might not have EXIF data in totality. The reason sometimes it gets stripped is for safety. If you upload a picture to Facebook, I know they strip the GPS coordinates out of it if it is there. So there are reasons why it is stripped out.

Q. Okay. Is that something that someone can manually do or is it kind of --

A. I'm sure if you have the knowledge, you can manually do it.

(Counsel and defendant conferred.)

BY MR. AMES:

Q. The -- and to be clear, that access date that we've talked about with thumbnails and such tells us just when the device was plugged in. Is there a way to determine if other -- is there any other way to determine whether or not an actual video was actually watched based on that data?

JASON WHITT - CROSS

MR. CERVANTES: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Repeat the question.

Q. Sure. So let's say, for example, we see with some of these images we talked about before access date 9/10/2021, and we went over that earlier. There's two, three in a row that have the exact same access date, exact same access time. Is there any way to determine if these images were actually opened and viewed or not?

A. So the only thing we can determine about the QuickLook thumbnail cache is that thumbnails were created from the originals from the external or media plugged into the device.

Q. So for instance, there's -- you're aware and familiar with the video in Maine, the shower video, the first one, the one with the cousin.

A. The blond female.

Q. Yes.

A. Yes.

Q. So it was indicated that that has a thumbnail on the MacBook, you know, with an access date, right?

A. If you could bring it up, I can...

Q. What I'm trying to establish here, you didn't find that video on the MacBook, right?

A. I did not find that video on the MacBook.

Q. So -- nor was there any evidence of it being watched or

JASON WHITT - CROSS

viewed on the MacBook, correct?

A.   So there was a QuickTime Player X PLIST that does reference the folder path for the IMG_3666.MOV, which goes to say that it was played with a QuickTime Player X.

Q.   Okay.  But that's all it says.  It doesn't -- can you tell us when someone supposedly watched any of -- any -- on any of these devices, on the MacBook, when somebody watched any video whatsoever?  Can you tell us a date and time when that occurred?

A.   I did not find any dates associated with when they were played.

Q.   Okay.  So there is nothing to tell us when and there's nothing to tell us whether it ever even happened.  All we know is that --

MR. CERVANTES:  Objection, argumentative.

THE COURT:  Overruled.  Go ahead.

Q.   At one time these devices were plugged in.  That's what the evidence tells us.  That's the only thing we can glean from it specifically is on a certain date and time --

MR. CERVANTES:  Objection, argumentative.  Asked and answered.

THE COURT:  Overruled, but that exact question has been asked enough times.

MR. AMES:  I think it's an important one, Your Honor.

THE COURT:  Well, it may be important, but it doesn't require six repetitions.  So if you have anything else, ask it.

MR. AMES:  That's all for now, Your Honor.  I would ask -- he might be someone I need to recall at some point.

THE COURT:  Members of the jury, this is a good time to take our lunch break.  I'm not going to lecture you again.  Please abide by the Court's orders with respect to recesses.  And I'll ask you to be back here at 1:30.

Everyone remain seated while the jury clears the floor.

And do leave your notes in the jury room.

(Jury exited the courtroom.)

THE COURT:  You may stand down.

(Witness stepped down.)

THE COURT:  Mr. Ames, do you want to discuss this proposed jury instruction?

MR. AMES:  Yes, Your Honor, just briefly.

We -- I believe Your Honor addressed yesterday that you want --

THE COURT:  Keep your microphone in front of you.

MR. AMES:  I'm sorry.  We wanted to discuss the addition of the jury instruction.  I spoke to Mr. Odulio last -- he emailed me last night.  We have a proposed version we sent to you.

I just want -- I guess just noting for the record that it's my understanding the Fourth Circuit does not have a standard on this specifically that I can find. There's some other circuits that do have a standard that we have found, a total of four to my understanding, and we've noted those for Your Honor. Three of them basically track what the proposed instruction is, which was my -- you know, if I'm reading the tea leaves, I imagine that that is -- something that is likely in this case.

I do want to note that there is an Eighth Circuit case that makes a distinction so there is a split among the circuits on this issue. That case in particular, the distinction that they make, Your Honor, is that if the -- in order to come within the child pornography statute, there does have to be an actual image of sexual abuse. Meaning that when we have a situation like here where there's, you know, a head of a person and a body of either an adult or it's a conglomeration, or whatever, or a CGI, whatever it may be, on the Eighth Circuit's version of things, it would not apply because there's no actual abuse that occurred to any person, and that that's where they distinguish it from the other couple of circuits. Because those circuits say even if there's no actual abuse, meaning it's an adult body, for example, on a minor's head and nobody was used, abused, coerced, nothing, it's still pornography because it depicts

something that appears to be abuse.  That's the distinction.

The Fourth Circuit, as I'm aware, has never addressed it.  Wanted to just put that on the radar.  Certainly our argument would be we would argue for the one that does not -- that does require actual sexual abuse.  There was no abuse in the images that are being put forth by the government as far as the morphed stuff.

But understanding the Court's message yesterday about preparing the instruction, that's why I jointly submitted it with Mr. Odulio.  I wanted to note it for the record and the basics of the argument.  I jointly agreed to that language provided the Court wants to adopt that version of the law.  I would object to it just for the record, preserving that in the event that it goes to the Supreme Court some day and this is decided for sure.

THE COURT:  All right.  Well, we'll go with the majority view and I'll accept the instruction as proposed.

Does this adequately address, when combined with the existing instructions, the issues that will be presented to the jury?  For instance, a lot of those morphed images, there's no question that the bodies appear to be minors.  I didn't really catch any that I thought, oh, well, the jury might get hung up on that one.  They might think that one was the body of an adult.  But you may argue that.

MR. AMES:  I realized yesterday when I went home

that I think I was inartful. What I should have said was that the images are not, I mean, I guess, explicit -- they're not explicitly clearly of minor children. I'm doing a binary thing, I suppose. Is it an adult or a child? I think it could be ambiguous. There's a third category of maybe it's a little mishmash of everything, computer-generated. Maybe it's ambiguous. So that's my fault.

THE COURT: And if you want to argue that, that's fine. That's what this instruction is meant to address. I just wanted to make sure that both parties think with the addition of this instruction, it will cover for the jury everything they will be asked to decide. Is that where we stand?

MR. ODULIO: Yes, Your Honor.

MR. AMES: I believe so, Your Honor, yes.

THE COURT: All right. Anything else before we take our lunch break?

Oh, Mr. Ames, you suggested there at the end that you wanted that last witness to remain available.

MR. AMES: Yes.

THE COURT: I assume you're saying to be called during presentation of your evidence if you present any.

MR. AMES: Yes, potentially, Your Honor. Potentially. And I would just respectfully request that be an option. I need to look into a couple of things in case I need

to...

THE COURT:  All right.  Be forewarned, we're not going to replow well-plowed ground.

MR. AMES:  I understand, Your Honor.

THE COURT:  If you have something in particular new and different and relevant, I'll ask the government then to keep that witness sequestered and available in the event that the defense wants to call him during their case in chief.

MR. AMES:  Thank you, Your Honor.

MR. CERVANTES:  Your Honor, we would object to this. I mean, the witness is here.  He's asked his questions.  We don't have any redirect.  And he should be excused like any other witness.

THE COURT:  Well, now, hold on.  As I qualified there, if there's something new -- because he's only allowed -- this is honoring the breach rather than the rule. Cross is only supposed to cover the areas of direct.  As I say, that's honored in the breach.  If there's something new that could not have been brought out during cross examination, I'll listen to it.  We may even have to get a sample of your questions outside the presence of the jury because we're not going to allow his recall just because you have now thought of something you wished you had asked him.

MR. AMES:  I understand.

THE COURT:  So I know he would like to be in here,

but let's protect the record here and make sure he stays sequestered.

MR. AMES:  Thank you, Your Honor.

THE COURT:  Mr. Odulio, did you want to say something?

MR. CERVANTES:  Does that mean we can't confer with this witness?

THE COURT:  No, that does not mean that because there's not been any announcement that he's going to be called.  I'm just trying to keep him sequestered in the event that he is called.

MR. CERVANTES:  Okay.

THE COURT:  Recess until 1:30.

MR. CERVANTES:  Thank you, Your Honor.

(Lunch recess at 12:27 PM.)

WEDNESDAY AFTERNOON, MAY 3, 2023

(Court back in session at 1:28 PM.)

(Jury not present.)

THE COURT:  Mr. Cervantes, did I understand you to say there would be no redirect of that last witness?

MR. CERVANTES:  Yes, Your Honor.

THE COURT:  For everyone's planning purposes, it is highly unlikely that that witness will be allowed to be recalled.  I won't foreclose the issue, but it's highly unlikely.

M.D. - DIRECT

Now, is your next witness a 404(b) witness, Mr. Cervantes? I'm trying to remember from what you said this morning.

MR. ODULIO: Your Honor, the next witness is not a 404(b) witness.

THE COURT: All right. Are we ready for the jury?

(No response.)

THE COURT: Call the jury.

(Jury entered the courtroom.)

THE COURT: Please call your next witness.

MR. ODULIO: Your Honor, the United States calls M.D..

M.D., GOVERNMENT WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. ODULIO:

Q.  Good afternoon, ma'am.

A.  Good afternoon.

Q.  Will you please state your name for the jury and spell your last name for the court reporter.

A.  Yes.  It's M.D., X-X-X-X-X-X-X-X.

Q.  Ms. M.D., where do you reside, city and state?

A.  I live in Detroit, Michigan.

Q.  Do you know an individual named David Tatum?

A.  Yes.

Q.  Do you see him in court today?

M.D. - DIRECT

A.    Yes.

Q.    Can you identify him by where he's seated and an article of clothing.

A.    Yeah.  He's right there in looks like a blue shirt.

        MR. ODULIO:  Your Honor, if the record could reflect the witness has identified the defendant.

        THE COURT:  The record so reflects.

Q.    How do you know Dr. Tatum?

A.    We were in a relationship.

Q.    And approximately when was that relationship or what time period?

A.    Probably 2000 -- started in 2009 or 2010.

Q.    And how long was it, approximately?

A.    A year, maybe a year and a half.

Q.    Okay.

A.    Something.

Q.    I'm just going to show you on your monitor what's been marked for identification only --

A.    Okay.

Q.    -- as Government's Exhibit 4F10.

      I'm going to ask you, Ms. M.D., do you recognize that photo?

A.    Yes.

Q.    How do you recognize it?

A.    That is the first day of school and that's me, my

M.D. - DIRECT

sibling, and my neighbors, and I shared it on Facebook.

MR. ODULIO: Your Honor, the government moves 4F10 into evidence.

THE COURT: It's admitted.

And if you would try and pin down a date for this photo, please.

(Government's Exhibit Number 4F10 was received into evidence.)

Q. Ms. M.D., approximate date if you recall?

A. Yeah, so let's see. I graduated in '01 so it would have been six years before that. So 1996 maybe.

Q. Okay. Approximately '96.

Where was this photo taken?

A. This was taken in Hong Kong.

Q. And you were residing there for school at the time?

A. No, my dad's job. So we all lived there.

Q. Could you identify where you are first in the photo. And I think you can just touch it --

A. That's me.

Q. -- and make a circle.

A. That's me.

Q. Okay. And approximately what grade are you in?

A. Either sixth or seventh grade. I'm sorry, no, either seventh or eighth grade.

Q. And how old would you have been in that -- in either of

M.D. - DIRECT

those two grades?

A.   Well, let's see.  Graduated high school I was 18, right?  Yeah.  So either 12 or 13.

Q.   Okay.  When you were identifying the picture, you identified some of the other individuals.  I think you said a sister.  Could you circle your sister.

(Witness complied.)

Q.   And what is her name and approximately how old is she as depicted here?

A.   Her name is A.D..  She's 18 months younger than I am so she would have been, I guess, 10.  Nine or ten.

Q.    There's another individual with a red shirt with the number 18 on it.

A.    Yes.

Q.   Do you know who that person is?

A.   Yes.  That is our neighbor.

Q.   And do you recall her name and about how old she was here?

A.   She was -- yes.  That is L.B..  She was a grade younger than me.  So she would have been, like, in fifth or sixth grade.  So I think we said I was 12 or 13.  So 11 or 12.

Q.   And then there's a person with a striped shirt right next to you on the other side.

A.   Yes.

Q.   Same questions.

E.H. - DIRECT

A.   So that's S.B.. She was a grade older than me. So she would have been, like, 8th or 9th grade, which would have made her 13 or 14.

Q.   Okay.

A.   Right?

Q.   And then finally the person to the -- with the white -- plain white shirt holding a cup.

A.   Yeah. She was in probably 11th grade at the time, so she would have been 17.

Q.   And do you recall her name, ma'am?

A.   M.B..

        MR. ODULIO:  Your Honor, no further questions.

        THE COURT:  Any cross examination?

        MR. AMES:  No, Your Honor.

        THE COURT:  All right. Thank you. You can stand down.

        (Witness stepped down.)

        MR. ODULIO:  United States calls E.H..

            E.H., GOVERNMENT WITNESS, SWORN,

                DIRECT EXAMINATION

BY MR. ODULIO:

Q.   Good afternoon, ma'am. Could you please state your name and spell your last name for the court reporter.

A.   My name is E.H.. Last name is X-X-X-X-X.

Q.   And tell us where you live, city and state.

E.H. - DIRECT

A.   Fayetteville, New York.

Q.   Do you know an individual named David Tatum?

A.   I did, yes.

Q.   Do you see him in court today?

A.   Yes.

Q.   Could you identify him, please, by where he's seated and an article of clothing.

A.   He's seated on the bench on the right with a blue shirt.

        MR. ODULIO:  Your Honor, if the record could reflect the witness has identified the defendant.

        THE COURT:  The record so reflects.

Q.   You said you knew him.  What time period was that, Ms. E.H.?

A.   We dated in high school.

Q.   Could you give us an approximate time period for when that would have been.

A.   That was my sophomore year of high school and his senior year, so 2001.

Q.   And approximately how old were you in 2001?

A.   I was 15 at the beginning of the school year; 16 at the end of the school year.

Q.   Okay.  I want to show you now what's been marked for identification only as Government's Exhibit 4F2.

    Do you see that on your screen, ma'am?

A.   Yes.

270

E.H. - DIRECT

Q.    What is that generally?

A.    That's me and David at his senior prom -- before his
senior prom.

        MR. ODULIO:  Your Honor, may we publish -- move to
admit 4F2.

        THE COURT:  It's admitted.

        (Government's Exhibit Number 4F2 was received into
evidence.)

        MR. ODULIO:  Publishing.

Q.    You mentioned the prom.  Let me just ask you this.  Do
you know who took that picture?

A.    No, I don't.

Q.    And do you recall when the prom took place,
approximately, Ms. E.H.?

A.    About the end of June.

Q.    And how old are you in this picture?

A.    I'm 16 years old.

Q.    And I think you already mentioned there's another
individual in this photo.  Who is that person?

A.    It's David.

        MR. ODULIO:  Your Honor, no further questions.

        THE COURT:  Any cross examination?

        MR. AMES:  No, Your Honor.

        THE COURT:  All right.  Thank you.  You may stand
down.

M.C. - DIRECT

(Witness stepped down.)

MR. CERVANTES:  The United States calls M.C.

M.C., GOVERNMENT WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. CERVANTES:

Q.   Good afternoon.

A.   Hello.

Q.   Can you please tell the jury your name and spell your last name for the record.

A.   My name is M.C.  XXXXXXX is spelled X-X-X-X-X-X-X.

Q.   And where do you live, city and state?

A.   I live in Seattle, Washington.

Q.   Do you know David Tatum?

A.   I do.

Q.   What's your connection to him?

A.   We're cousins not by blood.  His grandfather married my grandmother.

Q.   Do you see David in the courtroom today?

A.   Yes.

Q.   Can you describe an article of clothing that he's wearing.

A.   Blue shirt, black tie.

MR. CERVANTES:  Your Honor, may the record reflect the witness has identified the defendant.

THE COURT:  The record so reflects.

M.C. - DIRECT

Q.   I'd like to show you something on the screen.  It's already been admitted as Government's Exhibit 1D.  I'm going to play the first two seconds.

(Government's Exhibit Number 1D was published.)

Q.   Do you recognize that video?

A.   Yes.

Q.   How do you recognize it?

A.   It has been brought to my attention by the prosecution.

Q.   Have you seen that video in its entirety?

A.   Yes, I have.

Q.   Do you recognize that person depicted in the video?

A.   Yes.  That's me.

Q.   Okay.  Do you know more or less how old you were in that video?

A.   Yeah, I was approximately -- I was either 14 or 15 in that video.

Q.   How much older is David than you?

A.   He was either 17 or 18 when I was born.

Q.   Okay.  So 17 or 18 years older than you?

A.   Correct.

Q.   Do you recognize the background in that video?

A.   Yes, I do.

Q.   What is that?

A.   That is the bathroom in my family's cabin in Maine.

Q.   Who used that bathroom?

M.C. - DIRECT

A.   Everyone.  There's two bathrooms in the house.  Sometimes there would be 20 people coming to our family reunion, so most people would use that bathroom.

Q.   Did you -- did you know that this recording -- these images were being made of you?

A.   Absolutely not.

Q.   Did you -- when you had these family trips, did you see David there?

A.   Yes.  He was there almost every year.

Q.   I'd like to show you what has been marked for identification as Government's Exhibit 1D1.

     Do you recognize this image?

A.   Yes.

Q.   Is this a screenshot from the video we just saw?

A.   Yes.

     MR. CERVANTES:  Government moves 1D1 into evidence.

     THE COURT:  It's admitted.

     (Government's Exhibit Number 1D1 was received into evidence.)

Q.   Who is that in this screenshot?

A.   That's David Tatum.

Q.   How do you recognize him?

A.   I've known him since I was born so I recognize his face.

Q.   Is there anything about the clothing that you recognize?

A.   Yeah, I recognize the jacket.  It was something he would

E.S. - DIRECT

wear often at the cabin.

MR. CERVANTES:  No further questions, Your Honor.

THE COURT:  Any cross examination?

MR. AMES:  No, Your Honor.

THE COURT:  Thank you.  You may stand down.

THE WITNESS:  Thank you.

(Witness stepped down.)

MR. ODULIO:  The government calls E.S..

Your Honor, a portion of this testimony is 404, the latter part of it.

THE COURT:  All right.  Just let me know when we get to that point.

MR. ODULIO:  Yes, sir.

E.S., GOVERNMENT WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. ODULIO:

Q.   Good afternoon, ma'am.

A.   Good afternoon.

Q.   Could you please state your name and spell your last name for the court reporter.

A.   E.S., X-X-X-X-X.

Q.   Ms. E.S., where do you reside, city and state?

A.   Louisville, Kentucky.

Q.   Do you know an individual named David Tatum?

A.   I do.

E.S. - DIRECT

Q.   How do you know him?

A.   We are cousins.

Q.   Do you see him in court today?

A.   I do.

Q.   Would you please identify -- or could you please say an article of his clothing and identify where he's seated.

A.   Bright blue shirt, black jacket.

MR. ODULIO:  Your Honor, if the record could reflect that the witness has identified the defendant.

THE COURT:  The record so reflects.

Q.   I'm going to show you, Ms. E.S., a portion of Government's Exhibit 1G which is in evidence.  And this is the 7-minute mark of Government's Exhibit 1G.

(Government's Exhibit Number 1G was published.)

Q.   Do you see that on your screen, ma'am?

A.   I do.

Q.   We'll take it off.

I'm going to ask you if you recognize the person in that video.

A.   I do.

Q.   Who is it?

A.   That is my cousin K.C..

Q.   And do you recognize the room this is in?

A.   Yes.  That is the bathroom in our cabin in Maine.

Q.   Have you been there?

E.S. - DIRECT

A.    Yes.

Q.    How many times have you been there?

A.    Oh, probably over 30.  I've been going pretty much every summer since 1993.

Q.    You mentioned that it's in Maine.  Approximately where in Maine is that?

A.    Bethel, Maine.

Q.    When you've gone has the defendant, David Tatum, been there?

A.    Yes.

Q.    I'm going to show you now what's been marked and admitted as Government's Exhibit 1D1.

      Do you see 1D1, ma'am, which has been admitted into evidence, on your screen?

A.    Yes.

Q.    Who is the person on the screen?

A.    David Tatum.

Q.    The room that's in, is that the same room --

A.    It is.

Q.    -- that we saw in Government's Exhibit 1G?

A.    Yes.

Q.    And how do you know that?

A.    That is the upstairs bathroom in the cabin.  The way I can tell is because of the curtains, the way that the shower is set up, and there is a toilet behind him which you can see

E.S. - DIRECT

there is an aerosol can that would be resting on top of the toilet.  That is absolutely the upstairs bathroom at our family cabin in Maine.

MR. ODULIO:  Okay.  We'll take that down.

Your Honor, I'm going to get into it now.

THE COURT:  All right.  Members of the jury, this issue came up yesterday.  You're about to hear some evidence of a prior bad acts allegedly by the defendant, conduct for which he has not been charged.  However, the law allows this kind of evidence for certain limited purposes.  For example, this evidence may be considered by you to prove the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  Keep in mind the limited purpose for which this evidence is admitted.  Most importantly, do not conclude from this evidence that the defendant has bad character in general, nor should you conclude because the defendant may have committed the bad conduct in the past, that he is more likely to have committed the crimes with which he is currently charged.

You may proceed.

MR. ODULIO:  Thank you, Your Honor.

BY MR. ODULIO:

Q.   Ms. E.S., have you ever talked to Dr. Tatum about any surreptitious bathroom recordings of you?

A.   Yes, I have.

E.S. - DIRECT

Q.   When did that conversation take place?

A.   It was around Christmas of 2002.

Q.   Where did that conversation take place?

A.   It was at our -- my great aunt's home in Atlanta, Georgia.  We used to meet there opposite of when we would meet at the cabin.  We'd meet at the cabin in the summer and we'd meet in Georgia in the winter.

Q.   What did you tell Dr. Tatum about the surreptitious video?

A.   I confronted him.  I told him that his sister had found a video of she and I and I wanted more information about it. Wanted to know why he had done it.

Q.   Okay.  So you confronted him about a surreptitious bathroom recording of you and the defendant's sister.

A.   Yes.

Q.   How old were you in these videos?

MR. AMES:  Your Honor -- with respect, Your Honor, I'm going to object to foundation for this.  My understanding it's hearsay.  It's based upon --

THE COURT:  We've been over this.  Overruled.

MR. AMES:  Thank you, Your Honor.

THE COURT:  You may answer.

THE WITNESS:  I'm sorry, can you ask the question again.

Q.   Yes.  Just listen to my question carefully.

E.S. - DIRECT

In this conversation you had with the defendant and referencing this video, how old were you in this video?

A.    Fifteen or 16.

Q.    And you referenced the defendant's sister.

A.    Yes.

Q.    Is the defendant's sister older or younger than you?

A.    She is younger than I am.

Q.    By how much?

A.    By two years.

Q.    As a result of this confrontation, did the defendant say anything to you?

A.    Yes.

Q.    Tell the jury what he said.

A.    He admitted immediately to taking the video.  He told me it was a mistake and he told me he would never do it again.

Q.    Did he show you how he did it?

A.    He did.

Q.    What did he show you?

A.    He showed me in the upstairs bathroom in this home how he was able to take the video.  There is a plastic fan register on the wall that was not bolted in and so you could slide the register to the side exposing a raw edge of drywall and you can see through to a crawl space.  There are crawl spaces all throughout this home in Atlanta.  And from that crawl space you can look through the crack and see the entire bathroom.

F.L. - DIRECT

MR. ODULIO:  Your Honor, nothing further.

THE COURT:  Any cross examination?

MR. AMES:  One moment, Your Honor.

(Counsel and defendant conferred.)

CROSS EXAMINATION

BY MR. AMES:

Q.   I have just one question.  How far apart in age are you and Mr. Tatum, do you know?

A.   He's November '82.  I'm XXXX of '84.

Q.   November '82, and you said...

A.   XXXX of '84.

Q.   XXXX of '84.  Okay.

MR. AMES:  No further questions, Your Honor.

THE COURT:  Redirect?

MR. ODULIO:  Nothing, Your Honor.  May she be excused?

THE COURT:  She may.  Thank you.

(Witness stepped down.)

MR. CERVANTES:  The United States calls F.L..

F.L., GOVERNMENT WITNESS, SWORN,

MR. CERVANTES:  Your Honor, may we have the instruction?

THE COURT:  Yes.

Members of the jury, again, I'm led to believe that this witness will be testifying about uncharged conduct,

F.L. - DIRECT

prior -- or other bad acts.  And so the same considerations apply to this witness's testimony that I just instructed you a few minutes ago.

DIRECT EXAMINATION

BY MR. CERVANTES:

Q.   Good afternoon.

A.   Hello.

Q.   Will you please tell the jury your name and spell your last name, please.

A.   Hello.  My name is F..  My last name is L., X-X-X-X-X.

Q.   Can you tell them where you live, city and state.

A.   Absolutely.  I live at XX XXXXX XXX Webster, New York.

Q.   No, no, I'm sorry.

          MR. CERVANTES:  Your Honor, may the record strike the actual address.

          THE COURT:  Yes, please.

          THE WITNESS:  I'm sorry.

Q.   That's okay.  Just the city.

A.   I live in Rochester, New York.

Q.   Okay.  Great.

     Do you know David Tatum?

A.   I do.

Q.   How do you know him?

A.   I met him through the hospital at inpatient, like inpatient when I was in high school.

F.L. - DIRECT

Q. And do you see him here in the courtroom today?

A. I do.

Q. Okay. Can you describe the color of shirt that he's wearing.

A. It's like a cyan blue.

MR. CERVANTES: Your Honor, may the record reflect the witness has identified the defendant.

THE COURT: The record so reflects.

Q. You said you were in high school when you first met him?

A. Yes.

Q. Do you recall more or less how old you were?

A. I was definitely under 18. I would say junior or senior in high school.

Q. And had you been seeing him as a patient for some time?

A. Correct.

Q. And when is your birthday?

A. My birthday is XXXX XX, 1997.

Q. I'm going to show you a video that has already been admitted in evidence as 1I, and I'm going to play you the first ten seconds and then I'm going to stop and ask you some questions, okay?

A. Sure thing.

(Government's Exhibit Number 1I was published.)

Q. I'm sorry, I'm going to let it play until you can hear the other voice in the video, okay?

F.L. - DIRECT

A.    Okay.

(Government's Exhibit Number 1I resumed.)

Q.    Okay.  Have you seen the entirety of this video?

A.    I have.

Q.    And have you seen another two video recordings of you?

A.    I have.

Q.    And have you heard the audio to these recordings?

A.    Yes, I have.

Q.    Do you recognize who it is -- first let's talk about the female that the image is directed to.  Do you recognize that person?

A.    Yes.  The female in the video I recognize as myself as well as the voice.

Q.    How do you recognize yourself?

A.    Well, I can recall the clothing I was wearing.  I can tell you where each item was from.

Q.    From where?

A.    Well, the dress was from Pac Sun and the pink cardigan was from Old Navy.  The brown and army green flip-flops were also from Pac Sun.  And I still have the silver anklet.

Q.    Okay.  You said you recognized the voice as well.  Who is that?

A.    The female voice in the video was myself.

Q.    And did you -- were you able to recognize the male voice in the video?

F.L. - DIRECT

A.    Yes, I can recall that voice as Mr. -- Dr. Tatum.

Q.    Did you know that these recordings were being made of you?

A.    I did not.

MR. CERVANTES:  No further questions, Your Honor.

THE COURT:  Any cross examination?

MR. AMES:  No, Your Honor.

THE COURT:  All right.  Thank you.  You may stand down.

THE WITNESS:  Thank you.

(Witness stepped down.)

MR. CERVANTES:  May we have a minute to confer, Your Honor?

THE COURT:  You may.

(Counsel conferred.)

MR. CERVANTES:  At this time the government rests its case.

THE COURT:  Members of the jury, at this point in the trial there's several scheduling and legal issues that I have to take up with the attorneys.  So even though we've only been here half an hour, I'm going to ask you to go back to the jury room and give us a few minutes to do that and we'll get back to you as soon as we can.  I'm sure you recall all the rules.

(Jury exited the courtroom.)

THE COURT: Mr. Ames.

MR. AMES: Yes, Your Honor.

THE COURT: I assume you have a motion you want to make.

MR. AMES: Yes, a motion to dismiss at the close of state's evidence, Your Honor.

Just briefly, a general -- a general concern about the foundation as I've had a standing motion throughout the trial, Your Honor. The reliability, chain of custody in particular on some evidence as well.

We have a situation here where there is very little information about the origin, attribution of the devices themselves. The essential evidence that was presented as to their authenticity was that an investigation was conducted and followed up on at a lawyer's office with the defendant's wife and that the device turned over ostensibly by her is the purported device here. That's really seemingly the foundation. As for the documents inside and chain of custody not necessarily with law enforcement but prior to that, where these devices came from, whether they had sufficient authority to seize the devices, and so on and so forth.

And then from there, additional concerns about the chain of custody within the FBI and within the government with respect to certain devices. There are multiple agents in this case. Only one of them testified. There are -- the

testimony, in essence, for many of these devices was it was seized in a meeting with Agent Brown present. She was there. Taken presumably into custody. Copied by Mr. Whitt. But in particular with this hard drive, it was sent off to Quantico; received back from Quantico. Mr. Whitt took it out of evidence when he did his analysis on this copy.

But chain of custody as to the in-between I don't believe has been established. I don't believe that and other devices have had testimony about who logged them in and where and who requested they be sent out. I believe the agent who sent out this device to be copied and that we have the testimony about from Quantico never testified about anything, nor any other of the foundation for any of the images or items. And while we heard from one expert on the copying process, what we don't have is the in-between.

With respect to the evidence itself, there are, I think, certainly images that have been seen that do not, as a matter of law, constitute child pornography. I'm not sure if the government is specifically alleging any -- or arguing any specific one of the shots that we've seen on here. I know certainly the one, my understanding, that constitutes the production charge would be the one with Ms. M.C. in the shower. I believe as far as transport and possession, that one also constitutes the basic premise as well. And the remaining generally for possession, but I'm not entirely sure

about that.  I believe that's generally accurate.  Perhaps the HP Pavilion also transport, I don't know.

But what I will say is that certainly there are images that the Court has seen, the jury has seen that has been acknowledged even here that are just, you know, waist up or do not show genitalia whatsoever that I think -- I would argue as a matter of law are not pornography.  I think that other images fall in that same camp.  As the analyst testified to, he marked -- he marked in his analysis one himself, but not the rest.  And then it was shipped off to the agents to give their take on what would be presented.  We haven't heard from them.  We heard from the first one, Marisa Brown, prior to the evidence being in court.

THE COURT:  Well, we really don't need a witness's opinion as to whether something is child pornography.  That's a question for the jury.

MR. AMES:  Understood, Your Honor.  I'm just saying if -- I guess sort of what I'm getting at in part is I understand that these are fact finding questions for the jury with respect to the shower video and some of the other images.  I do understand.  There are other images that very clearly are not.

So one thing I do, in addition to the motion to dismiss, if there's any -- when the time comes for instructing the jury, avoiding any potential confusion with respect to

what image constitutes what just because there's a -- this morphed image sort of production -- producing making an image sounds similar to the producing statute, which it's not.  It's a different -- the only production charge is with Ms. M.C. in the shower.  That's the only one.  The rest of them are something else.  And I just want to make sure that it can be clarified, whether it has to be done in argument or the Court, that that's -- that count in particular, that's the production charge.  The other ones are not.  Because I don't want a situation where the jury is reviewing morphed images and mistakenly come to the conclusion that those are production images.

THE COURT:  That might have been something that you would have proposed in the jointly submitted jury instructions.

MR. AMES:  Your Honor, we did speak about it prior to trial and the -- we came to a meeting of the minds that it generally lays it out, but I suppose what I'm -- I suppose what I'm currently wondering is that are there any restrictions on it in terms of -- because I understand -- I'm not going to argue about length of sentence or anything like that, but how to address that with the jury so as to not run afoul of anything there, but needing to make it abundantly clear that there's only one image -- or one video, rather, that is considered production.

THE COURT: That's correct, right, Mr. Cervantes, that the one, the bathroom number one is the --

MR. CERVANTES: Is the production charge.

THE COURT: -- only evidence supporting count one, production, correct?

MR. CERVANTES: Count two.

THE COURT: Count two, I'm sorry.

And I'm wide open to yet more changes to the previously agreed to jury instructions. We're going to need to get it in writing because I send those back with the jury. I don't mind telling them that the allegation with respect to count two is the bathroom number one production and no other. I'm willing to say that. We'll just have to get that in writing to Mr. Whelan somehow.

But with respect to the rest of your motions, I think the chain of custody is sufficient from which the jury could find that the items are reliable and relevant. And, you know, to a certain extent I'm not sure you and I understand the evidence the same way. These devices could have been found on the sidewalk for all that matters. The evidence tying it to the defendant is the forensic evidence. And so there's been much ado over something that I think doesn't matter particularly much, which is how the FBI came into possession of it and its custody afterwards.

So all that to say that there is sufficient evidence

from which a reasonable jury could find beyond a reasonable doubt the defendant's guilt as to each of the three counts.

Now, will there be defense evidence, Mr. Ames?

MR. AMES:  Your Honor, that's some -- we're having that conversation because we weren't anticipating that. However, the way the testimony has played out and the evidence has played out, without the lead analyst -- lead detective or investigator in the case testifying, nor another agent testifying prior to the evidence coming in, cross examination of Mr. Whitt who did not investigate the devices, anything deeper than looking for images themselves that were flagged or requested in a report of him, we're in a position where the government's evidence has certainly at a minimum implied certain things.

The reason, Your Honor, why I spent so much time hemming and hawing over the idea of what constitutes access is because prior to me doing so, the jury may very well have come to the conclusion that access means literal access.  That he accessed these on these dates and times.  And it's -- he's looking at certain videos like this one of Ms. M.C. who has an access date of September 10, 2021, 12 days before the FBI meets with him.  When in reality there is no idea whatsoever when or if this thing was ever accessed on a MacBook for sure. Unclear as well on any other device.  So those issues are why I was asking those questions.  And there's further --

THE COURT: My question was, is there going to be defense evidence?

MR. AMES: Yes, there is, Your Honor. I believe we have to. And I think we would call Agent Atwood.

THE COURT: To what effect?

MR. AMES: Under Rule 611(c) to ask questions about the custody and chain of custody of devices. To ask about what, if any, investigation he did in his review of the evidence. We're talking here about a trial in which there was one person put on the stand to talk about the review of the evidence and the only review of the evidence that was instructed to apparently and flagged by agents who didn't talk about it.

THE COURT: That happens all the time. I don't understand what the grave concern is here.

MR. AMES: Because, Your Honor, these --

THE COURT: Because it is common, it is ordinary, it is the norm that not every case agent testifies in every trial to everything they know.

MR. AMES: And, Your Honor, I can -- in that case -- the alternative -- our -- who's been a consulting expert but now may have to graduate because the devices that were seized here have copious adult pornography on them that was glossed over. And I asked those questions, but there was no -- there were no answers to them because the people that actually

reviewed it -- so the context here is important.

THE COURT: So you want to put one of the case agents up on the stand to ask them whether there was adult pornography on some of these devices?

MR. AMES: In addition -- there's other -- there's other aspects, Your Honor. But in general, the problem I'm facing here is that a lot of the people that were very integral into this process are not here to answer and clear up very simple issues.

For example, you found and the government is alleging a total of -- the morphed stuff aside, there's four videos total of which no one is identified in any of them but the Ms. M.C. video. Most of the other -- I mean, very little identification of anybody. No identification of any known victim --

THE COURT: There were three videos --

MR. AMES: -- other than --

THE COURT: There were three videos and at least one witness identified the person in each of those videos.

MR. AMES: Your Honor, I'm talking about the ones that are pornography, not 404. I'm talking about -- videos that would be alleging pornographic material are going to be Ms. C███████ video and I presume -- I don't know for sure. Maybe they're not arguing that. But there are two or three other videos that involved more sexualized activity whose

identity -- there's no identity of those people.

THE COURT: So you're saying that there's some sort of deficiency. Are you talking about, like, the two young girls that were in the bed together that no one has identified who they are?

MR. AMES: No, nobody has identified who --

THE COURT: Who cares?

MR. AMES: Because, Your Honor, there's a process by which they check these. And these videos in particular, Your Honor, were found on an older device. It's a device from years ago.

THE COURT: No, wait, wait, wait. The jury can look at that video and decide from what they see whether that fits the definition of child pornography.

MR. AMES: Sure.

THE COURT: It doesn't matter whether that video can be found in any database as a known example of child pornography. It doesn't make any difference.

MR. AMES: With respect, I would submit it does, Your Honor, because if it is found and flagged in a -- if it's flagged I'm assuming it's inculpatory. If it's not, I'm arguing that's exculpatory.

THE COURT: How so? That somebody hasn't already seen that picture and deemed it to be child pornography and therefore the jury cannot deem it to be child pornography or

shouldn't consider child pornography because someone else already hasn't?

MR. AMES:  Your Honor, part of the reason is I -- we're talking about a case here where 20-plus devices were seized and searched.  A number of images.  Pawed through.  Sent to NCMEC; came back with zero.

THE COURT:  It doesn't make any difference.  It doesn't make any difference whether we are seeing a child porn video for the first time or not.  The question for the jury is, is it child porn and is it attributable to this defendant?  Oversimplification, of course.  It doesn't matter whether any other trial anywhere has ever seen that video.  It doesn't make any difference.  It's not exculpatory if it hasn't shown up somewhere else.

One way to have elicited it would have taken less than 30 minutes.  From the agent you had up here is to ask: Are there databases to which the FBI has access of known hash tag child porn?  Yes.  Did you run the seized videos through that database?  Yes.  Did it hit on any of those?  No.

That's about 60 seconds, not 30 minutes, and you could have elicited the testimony that you now say is just so desperately relevant and I'm telling you it's not relevant.

MR. AMES:  Your Honor, I did -- I asked specifically about whether or not it was sent to any -- I asked specifically the database that the government used in this

case and I was not allowed to ask about it.

THE COURT: All right. Mr. Ames, we're talking past each other. I'm telling you it is not relevant. The Court finds it is not relevant and there is no admissible evidence with respect to whether or not the videos in question here are in known -- in databases of known child pornography. It makes no difference. It either is or is not child pornography, as the jury will tell us.

MR. AMES: Understood, Your Honor. And in a future case, if there is government evidence of not just NCMEC -- I imagine I will be certainly filing matters to make sure that that's not disclosed. But there certainly is, in addition, Your Honor, forensic information that is being -- that is -- you know, he has the right to confront accusers. He has the right to give the jury a fuller picture and full story. I've already instructed and told --

THE COURT: I keep asking you what that story is you're trying to tell.

MR. AMES: Your Honor, because the government's evidence as presented was that there are images and videos that were accessed by him and playlists and PLISTS and things accessed by him -- and we're talking largely about 404 evidence, not even substantive evidence. We're talking about the extraneous stuff. They supposedly investigated -- or supposedly accessed and viewed and seen by him and on things

and so on, and there's zero mention of the fact that there's literally another person in the house that literally uses that device as well and literally was spying on him and gathering information, and she was giving that information directly to Agent Atwood on multiple occasions --

THE COURT:  You can't get that in through Agent Atwood.

MR. AMES:  I understand, Your Honor, but that's --

THE COURT:  Do you want to call his ex-wife as a witness?  Is that what you're saying?

MR. AMES:  That's not what I want to do, Your Honor. I want it to be at least established here that the devices in question, particularly the MacBook, was a thing that they shared together and she accessed on a routine basis which --

THE COURT:  The agent doesn't know that except from having been told that.

MR. AMES:  The agent knows it because there were pictures that she took of the screen of the device on multiple occasions and they know she accessed it on multiple occasions and took copies of all of those things.

THE COURT:  How does he know that other than hearsay?

MR. AMES:  He's seen the images himself of the computer screen.

THE COURT:  And what does he know of those images?

MR. AMES:  Your Honor, then I'd like to renew my --

THE COURT:  He knows what the ex-wife told him about --

MR. AMES:  Your Honor, then I'll -- in that light I'll renew my motion to suppress from earlier, then, because if he --

THE COURT:  That's denied too.

Let me address Mr. Tatum about whether or not you wish to testify.  If you would stand up, please, sir.

Mr. Tatum, you have a constitutional right not to testify.  The burden of proof is on the government to prove the elements of the offense beyond a reasonable doubt and you are presumed innocent.

Do you understand that you have a constitutional right not to testify?

THE DEFENDANT:  Yes, Your Honor, I understand.

THE COURT:  You also have a right to testify if you would like to.  Do you understand that?

THE DEFENDANT:  Yes, I also understand that, Your Honor.

THE COURT:  And if you choose to testify, you'll be subject to cross examination by the assistant United States attorney.  Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And do you understand that it is your

decision and your decision alone whether or not to testify?

THE DEFENDANT:  Yes, I understand.

THE COURT:  And I don't want to know what you and your attorney said to each other on the subject, but have you discussed with your attorney whether or not you will testify?

THE DEFENDANT:  We have discussed it.  We have not come to a decision.

THE COURT:  All right.  And the -- are you satisfied with your attorney's advice with respect to this, whatever it is?  I don't want to know what it is, but are you satisfied with his advice?

THE DEFENDANT:  Under current circumstances, yes.

THE COURT:  Is there anything that you don't understand about your right to testify or not testify?

THE DEFENDANT:  No, Your Honor, I understand my rights.

THE COURT:  And you said you haven't made a decision, but it's decision time.  It's now time for defense evidence if there's going to be any, so the Court needs a decision as to whether or not you're going to testify.

THE DEFENDANT:  Yes, I'd like to discuss this further with my attorney.

THE COURT:  All right.  Is one of the attorney rooms available?  I don't want to drag this out.  I know you need some time, but we've got a jury sitting out there wondering

what we're going to do.

MR. AMES:  I understand.  Your Honor, we spoke about it last evening as well and --

THE COURT:  Well, retire to your conference room for further discussion.

(Counsel and defendant exited the courtroom.)

(Pause.)

THE COURT:  Officer, would you ask Mr. Ames to come give me an update.

(Counsel and defendant entered the courtroom.)

THE COURT:  Mr. Tatum, have you made a decision whether or not to testify?

THE DEFENDANT:  I'd like the Court to consider something else before I answer.

THE COURT:  What would that be?

MR. AMES:  Your Honor, the defense has been consulting with a forensic team, as the Court knows.  We did not anticipate calling him for trial.  Did not ever think that that would be something we were needing.  They were consulting with us throughout the process.  We spoke over the lunch break briefly with one of the analysts and I gave him an update on some things.  Texted with him.

And in light of some of the things that I think the Court needs to -- that the jury needs to hear about with regard to some of the forensic evidence that's not been able

to be established here, we would like to see if our expert witness can come testify about those things in the case in chief. He is unfortunately farther away but could be here tomorrow morning. That's the issue that we're facing. I can elaborate further if the Court wishes.

THE COURT: What reciprocal discovery have you provided to the government with respect to this witness?

MR. AMES: Your Honor, there hasn't been any reciprocal discovery in terms of any reports or notes or anything of that nature. They have been on a consulting fashion. I can tell the Court that the only evidence that the analyst has looked at are copies of data provided by the government. That's the extent of it. It's literally the raw data, the same stuff that Mr. Whitt looked through with Magnet AXIOM. And it would largely be testimony about some of the dates, time frames, accesses, and so on and so forth, on the device that we were not -- that some of those issues have not largely been clarified and established. And that is the primary driving point for me.

And my position is that there are some important timelines that need to be addressed that have not been that give an impression of the evidence that I don't think is fair to Mr. Tatum. So it's largely in that vein. I don't know if that counts as a rebuttal of sorts. I don't know, Your Honor, but there --

THE COURT: Mr. Cervantes, what do you say?

MR. CERVANTES: We would object to that, Your Honor. The jury is here. We've been moving forward as scheduled on this trial. We have received zero information from them. The fact that they went with their expert, we don't sit there with their expert to look at what they're looking at. That's why there's a request for reciprocal discovery, which we made and we filed. And we told defense counsel numerous times in emails that -- we reminded him, hey, we haven't received anything from you. Do you have any discovery for us? Do you have any expert reports for us? And the answer was either no answer or no.

THE COURT: And did the government provide an expert report from its expert forensic witness?

MR. CERVANTES: Yes, Your Honor. Detailed.

MR. AMES: Your Honor --

MR. CERVANTES: And filed expert notices as required by the rules.

MR. AMES: Your Honor, I spoke with the U.S. Attorney's Office -- and, again, he's right -- on multiple occasions both in person and by email. We had those discussions. I informed them throughout the pendency of this, and I guess it's been since -- I guess since January or so, that the intention here was -- the problem in this case, there's a significant amount of devices and a significant

amount of data and a lot of it -- again, part of the reason why I'm objecting to the foundation and hearsay, Your Honor, is there are significant and important elements of these crimes that are related to times and dates. And the evidence that the jury is considering is produced by a computer sitting on a screenshot that was taken at some point in the past by, I guess, Mr. Whitt and that is being claimed as a basis to establish when and where things were made from -- created, accessed, viewed, and so on. And there's evidence to the contrary that is sitting on the devices that Agent -- I understand he didn't look through it, that's okay, but it's out there now.

THE COURT: You clearly anticipated that that's evidence you wanted to put before the jury.

MR. AMES: It is -- no, Your Honor, it is not. I did not anticipate, Your Honor -- first of all, the government's estimate was a 3-day trial. That's it. So that's -- the expectation here was not that we would be at this juncture today.

Number two, it's not something I anticipated. I did not anticipate that we're going to call the lead agent in the case nor the other agent in the case and have them say nothing about any of the evidence itself. Zero testimony about it. The entirety of it is with Mr. Whitt which -- his contribution is great. But it also includes him reviewing evidence that

was flagged by them, vice versa. There's a lot that wasn't discussed and there's a lot that I would say needs to be clarified and we can't clarify. How am I supposed to clarify that multiple people use this computer because that's what the --

THE COURT: You know exactly who the witnesses are who could have provided that information. Specifically, even if your client doesn't want to testify, his ex-wife. You could have subpoenaed her. She could prove exactly what you're trying to prove. You've chosen not to do that.

I'm not sure how your technical expert is going to be able to say anything more than I see these other user names on these things. He doesn't know as a fact who else had access to those computers, right?

MR. AMES: I'm not going to say yes or no to that, Your Honor. I don't want to -- I don't know for sure whether it's a fact.

THE COURT: All right. We're going to do this. First of all, with respect to Agent Atwood, I'm not telling you you can't call Agent Atwood. I am saying you're not going to be allowed to have him answer hearsay questions.

MR. AMES: I understand.

THE COURT: And I didn't hear a forecast of much by way of hope for examination that wasn't hearsay. But if you want to call him and ask him questions, I'm not going to stop

you from doing that.  But he's not going to answer any hearsay question.

MR. AMES:  Your Honor, the main thrust of this is that the government has presented evidence to suggest, yeah, this is a case that has a limited number of images and videos. It's got a lot of 404 evidence.  It's got a lot of conjecture about -- it's got file paths and strings about pthc.  And how much pthc was found?  Goose egg.  Zero.  So it's to inflame the jury.  It's to suggest certain things to them with zero evidence, zero things to -- nothing to back it up.

THE COURT:  Save your closing argument for the appropriate time.

MR. AMES:  And, Your Honor --

THE COURT:  All right.  I'm going to take a 20-minute recess and I'm going to think about this request.

MR. AMES:  Thank you, Your Honor.

THE COURT:  Ms. Kirk, if you would tell the jury that we've been delayed and I expect to have them out here at about 3:00.

By that time you will make a decision to call Agent Atwood and I will have made a decision whether to allow this undisclosed expert witness.

We'll be in recess until 3:00.

(Brief recess at 2:42 PM.)

(Court back in session at 2:58 PM.)

(Jury not present.)

THE COURT:  The Court in the exercise of its discretion will not allow the defense to call an undisclosed expert, particularly with the lack of reciprocal discovery. It would be an ambush and unfair to the government.  I certainly wouldn't allow the government to call an undisclosed expert with no report provided.

It's been clear from at least the pretrial conference that there are a great many things that you were hoping to be able to put in front of the jury and you were hoping to do that through government witnesses, but the government witnesses that were called were unable to provide the information that you wanted the jury to hear about.  The government is under no obligation to call your preferred list of witnesses so that you can get in what you hope to get in. You could have easily, and I expect did, anticipate that there could be a need to supply yourself the evidence that you wanted the jury to hear.  You made a tactical decision not to prepare for that defense and the Court will not allow this late, undisclosed expert witness to provide that information.

Now, have you decided whether to call Agent Atwood?

(Counsel and defendant conferred.)

MR. AMES:  Yes, Your Honor, we'd like to call Agent Atwood.

THE COURT:  All right.  And, Mr. Tatum, have you

decided whether or not to testify?

(Pause.)

THE DEFENDANT:  I'm leaning towards yes, Your Honor, but I'd like to hear the testimony of the agent.

THE COURT:  All right.  Then we'll need an answer immediately thereafter.

All right.  Call the jury.

MR. AMES:  I'm very sorry, Your Honor, very briefly. I referenced a few minutes ago Rule 611(c), treating him, I guess, as a hostile witness in the case in chief.  My understanding is I'm allowed to ask somewhat leading questions in that circumstance.  Hostile, but I'll be as nice -- cheerful as I always am.

THE COURT:  If by hostile you mean leading questions, you may do that.

MR. AMES:  Yes, hostile in that sense, but I will try not to be too bad about it.

THE COURT:  Just remember that it's the witness's testimony that matters and you're not a witness.

MR. AMES:  Yes, Your Honor.

THE COURT:  All right.

(Jury entered the courtroom.)

THE COURT:  Members of the jury, I apologize for that long delay.  Things went a lot longer than I anticipated earlier.

SCOTT ATWOOD - DIRECT

Is there evidence for the defense?

MR. AMES:  Yes, Your Honor.  We'd like to call Agent Scott Atwood.

SCOTT ATWOOD, DEFENSE WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. AMES:

Q.   Could you state your name for the jury.

A.   Hi.  My name is Scott Atwood.

Q.   And, Mr. Atwood, where do you work?

A.   I work with the FBI here in Charlotte as a special agent.

Q.   How long have you been doing that job?

A.   Almost 16 years.

Q.   Are you in any specific department or work on any specific type of cases?

A.   I work on the Crimes Against Children Task Force here in Charlotte.

Q.   Tell us a little bit about your background in that regard.  A little bit.

A.   Not to bore the Court, but I've worked a number of violations with the FBI and I've been working on a Crimes Against Children Task Force for about the past two years here in Charlotte.

Q.   And I'm sorry, do you recall approximately when you started on that task force?

A.   I'm going to guess just about June of '21, 2021.

SCOTT ATWOOD - DIRECT

Q.   Were you on any other task force or team prior to that, immediately prior?

A.   Yes, I was here in Charlotte.

Q.   Doing any particular type of cases immediately prior?

A.   I was on the Surveillance Operations Group.

Q.   What did you do there?

A.   Surveillance.

Q.   What kind of training or experience do you have in surveillance in particular?

A.   They teach you at the FBI academy.  We do it throughout the course of our duties routinely.  Attend surveillance courses, driving courses back at the FBI academy.

Q.   So with respect to your -- what's your involvement with this case?

A.   I was one of the case agents.

Q.   What does that mean?

A.   That means you handle most aspects of the investigation. Handle it from start to finish.

Q.   And could you describe, I guess, what are some of those duties?  What are some of the things you've done in this case?

A.   I started the case.  I got information from my supervisor about the information that was referred to our office.  I interviewed people.  I conducted review of digital evidence. Made arrests.  Worked with the U.S. Attorney's Office.

     Is that what you're talking about?

SCOTT ATWOOD - DIRECT

Q.   Yeah.  So you had a pretty significant role in the prosecution of Mr. Tatum.

A.   Not the prosecution, but the investigation, yes, sir.

Q.   The investigation leading to the prosecution.  Gathering the evidence and such.

A.   Yes, sir.

Q.   You said you initially got a report from your supervisor?

A.   Correct.

Q.   Who was the supervisor?

A.   Kevin Swanson.

Q.   Where does he work out of?

A.   Out of the Charlotte office.

Q.   And what was that report?

        MR. ODULIO:  Objection.  Calls for hearsay.

        THE COURT:  Sustained.

Q.   When you received the report, what did you do next?

A.   I read the information, the referral of information, and it contained -- the referral was that someone else had firsthand knowledge of Mr. Tatum --

        MR. ODULIO:  Objection to this, Your Honor.

        THE COURT:  No, that's fine.  Finish that sentence.

        THE WITNESS:  The referral of information was that Mr. Tatum -- the referral of the information was from a person who had firsthand knowledge of Mr. Tatum possessing images of young girls clothed and unclothed on his computer.

SCOTT ATWOOD - DIRECT

Q.   And what did you do after that when you received information?

A.   The referral also indicated that Mr. Tatum was a doctor at Atrium Health and that he worked with children.  And so being that that's what we do on the Crimes Against Children Task Force, our utmost important responsibility is protecting children who are being victimized.  Being we knew or suspected he had access to children on a routine basis, we sought to prove or disprove the information that was referred to our office.  So we sought out the person who reportedly had the firsthand information and that was Kimberly Tatum, Mr. Tatum's wife.

Q.   And at that point in time did you go and meet with Ms. Tatum?

A.   We did.  The referral said that Ms. Tatum wanted to meet with her attorney present.  So I contacted her attorney listed in the referral and they agreed to set up a meeting between myself, Agent Brown, and Ms. Tatum at her attorney's office.

Q.   Who else was present at that meeting, if you recall?

A.   Her attorney?

Q.   No.  Was there any other people from the government or FBI involved?

A.   Not that I recall.  I think it was just Agent Brown and myself.

Q.   During that meeting did you -- were you provided any

311

SCOTT ATWOOD - DIRECT

evidence or given anything?

A.   Yes.  Ms. Tatum provided us with a number of electronic devices that she said Mr. Tatum used --

MR. ODULIO:  Objection, hearsay, Your Honor.

THE COURT:  Don't tell us what she said.

THE WITNESS:  Sorry.

Q.   I'm sorry.  Go ahead.

A.   Ms. Tatum provided us a number of electronic devices.

Q.   What were those devices?

A.   External hard drives, cell phones.  That's what I remember.

Q.   How many devices were there?

A.   I don't recall exactly.

Q.   So you said hard drives -- I'm sorry.  You said hard drives, cell phones.  Anything else?

A.   Not that I recall.

Q.   Were there any thumb drives?

A.   Yes, there were thumb drives.

Q.   How many thumb drives?

A.   One.

Q.   Did -- did you review any of these items at the lawyer's office?

A.   No, not at the lawyer's office.

Q.   Did she bring any items that you did not seize or take from her?

SCOTT ATWOOD - DIRECT

A.   Did I bring any items?

Q.   No, I'm sorry.  Did Ms. Tatum bring any other items with her that she brought that you didn't take at that point in time?

A.   In regards to the information, the referral of information, no.

Q.   At that meeting I mean.

So she brought a number of devices.  Were there any that you didn't take that she offered to you?

A.   No.

Q.   Okay.  Was this a -- what were the circumstances of the seizure?  Was it based upon a search warrant?  Was it based upon consent?  What was it?

A.   She gave it to us.

Q.   Okay.  So it was consensual?

A.   The giving of the devices?

Q.   Yes.

A.   Yes.

Q.   Those devices you mentioned, there was a hard drive?

A.   Yes.

Q.   And cell phones.

And what did you do with those devices?

A.   I took them back to the FBI, logged them in as evidence, and obtained a search warrant from the federal courts to examine those devices.

SCOTT ATWOOD - DIRECT

Q.   When did you obtain that warrant?

A.   I can't say specifically.

Q.   Was it that day or was it sometime later?

A.   I'm going to guess sometime later.  I cannot prepare a federal warrant in a day.

Q.   Understood.

Was it roughly a week later, two weeks, something in that ballpark?

A.   Honestly, I have no idea.  I'd have to review my case log.

Q.   In the interim, did you look through any of the devices?

A.   Yes, I did.

Q.   And any other general investigation done in that time frame to your recollection, I guess, beyond the meeting and looking through a device?

A.   So one of the pieces of evidence that was given to us was a thumb drive.  We took that back to the FBI office.  We plugged it into a write blocking hardware that you guys have been told about.  I'm not a techie so I don't understand all that.  But we reviewed the thumb drive that was provided and we observed on the thumb drive child pornography that was consistent with the referral of information.

Q.   And so when you reviewed that, was it -- what were the pictures depicting?  Was it the same things that have been put into evidence or was it in some other format?

SCOTT ATWOOD - DIRECT

A.   Correct, it was the same thing that's put into evidence.

Q.   Were there any pictures of a computer screen within that thumb drive?

A.   Yes, there were.

Q.   And you reviewed those images.  In your estimation or opinion, were the images that you were seeing pictures of the laptop that's in evidence?

        MR. ODULIO:  Objection, opinion.

        THE COURT:  Right, as to opinion.  Does it look consistent to you?

        THE WITNESS:  Yes, Your Honor, it looks consistent.

Q.   You said child pornography.  Are you referring to the images that we've been discussing in court regarding the morphing?  Is that what was on this drive?

A.   They appeared to have been altered, correct.

Q.   So morphed images and they're on a computer screen taken as a picture with another device.

A.   That's what it appeared to be, yes.

Q.   And there's video of a computer screen as well.

A.   That's correct.

Q.   Do you recall approximately what point in time these images, videos were initially created?

A.   I do remember there being -- in part -- in opening the video, that there was a timestamp on the screen and so that's what we tried to reference, obviously.

SCOTT ATWOOD - DIRECT

Q.   What was the general time frame?

A.   I have no idea.

Q.   Was it the day before that this was reported?

A.   I honestly -- there's been a lot of stuff and a long time in this case.  I cannot recall.

Q.   Was it over a month after?

MR. ODULIO:  Objection.  Asked and answered.

THE COURT:  That's the last one.  You can answer that.

THE WITNESS:  I honestly do not know.

Q.   You went and secured a warrant at that point, correct?

MR. ODULIO:  Objection, Your Honor.  He's asked this.

THE COURT:  Overruled.

THE WITNESS:  No.

Q.   I'm sorry, I'm just trying to set the table for you.

You went and got a warrant sometime after that, right?

A.   No.  First we -- we sought to speak to Dr. Tatum being the urgency of the issue and we obtained statements from him also.

Q.   Understood.  You're right.  You went and approached him in the parking lot of where he worked, I believe.

A.   Correct.  It's not our job to prove or disprove.  So we're not in the business of ruining people's lives.  We weren't going to go in there.  We knew him to be a

SCOTT ATWOOD - DIRECT

professional.  It's not how we conduct business normally.  So we waited for him in an obscure area in an attempt to speak to him.

Q.   And when he came outside after work, you had a conversation with him.  It was in a -- I believe one of your cars initially or something like that.

A.   So first we encountered Mr. Tatum outside the vehicle as he was walking towards his vehicle.  Prior to that we had already observed in plain view a bag that was consistent with a laptop or a computer bag.  And so as he approached his vehicle, we approached him and identified ourselves.  Asked if he would voluntarily speak to us, which he agreed to do so.  And that exchange is where we initially obtained the laptop bag from Mr. Tatum.

Q.   At what point in time did you receive the laptop bag from him?  Was it, do you recall, beginning, middle, end of the conversation?

A.   So it was in the initial encounter.  We -- Mr. Tatum actually wanted to leave and go to a different area, which being that we had already observed evidence of the crime -- in our line of work, it's digital evidence so it can be easily erased, obviously.  And so one of our other objectives is to try and secure that evidence as best we can and then we seek authority from the courts to examine those devices.

     Being that we had reason to believe that the laptop was

SCOTT ATWOOD - DIRECT

in the vehicle, he wanted to leave, that was -- we didn't feel that that could happen. So we asked for a voluntary consent search of his vehicle, which he did. He walked us through that, which we saw and observed a pillowcase with multiple women's undergarments in there and other things. And then once we got to the passenger side of the vehicle, Mr. Tatum opened up the door, reached in and grabbed the laptop bag and secured it on his person, and then said we can search the rest of the vehicle.

And so during that exchange we asked him what was in the bag -- sorry, let me back up. Prior to that we asked him if he had a laptop, which he informed us was at his house and that's another reason that he wanted to leave. However, when he consented to the search of his vehicle, he reached in and grabbed the bag. And when we asked him what was in the bag, he said his laptop computer he remembered was in the bag. And so at that time I don't remember if it was Agent Brown or myself informed him that that's the reason that we were there and we wanted to talk to him, and that's when we took the bag from him.

From there asked if he would voluntarily agree to speak to us, which he agreed to. We went and sat in my vehicle, Agent Brown in the front, which you've already heard, Mr. Tatum and myself in the back seat, and we had a discussion, which you've also heard the audio.

SCOTT ATWOOD - DIRECT

Q.   So the devices were seized and that was the laptop and the thumb drive as well, correct, I believe?

A.   So during that conversation Mr. Tatum agreed to creating images of child pornography and masturbating to them --

Q.   I'm sorry, Agent, the question was what you seized.  That was all.

A.   I was trying to lead up to how we actually obtained -- we didn't take everything in the bag.  We just took the computer and the external devices that he said he stored child pornography on that he didn't say were in the bag.

Q.   I understand.  I was just asking what were the things that were seized.  What were they?  It was a laptop and a thumb drive, right?

A.   That's the best of my recollection.  I can't -- I, again, would have to review my notes.  That's my best recollection.  It was a flash drive.

Q.   And to be clear, he did not indicate he saved child pornography.  He indicated he used the DeepFake website, correct?

A.   At that point in time, he said he created images of his high school girlfriend that he masturbated to and he saved those images on external devices.

Q.   And you had seen those images already, correct?

A.   I had seen images that matched the description of the questions that led us to the encounter with Mr. Tatum and the

SCOTT ATWOOD - DIRECT

questions that we were asking him about.

Q.    But specifically, you talked about the one that he said about his ex-girlfriend, right?

A.    Correct.

Q.    And you had seen that one?

A.    At that point in time I didn't know who the images were or what they depicted.  I believed them to be under the age of 18.  I believed them to be nude, appearing nude.  I believed it to be child pornography.  And those were the images that I was trying to ask Mr. Tatum about.  It's not something that we come out and ask -- most people don't answer right off the bat, yes, it's child pornography, so we have a discussion about it.  That's why it took two or three hours.

Q.    And so you sat with him probably from what time?  I understand you were waiting for him to get out of work. Approximately what time did you initially engage with Mr. Tatum?

A.    I have no idea.  It was after work.

Q.    So shortly after normal work hours.  It wasn't anything crazy late at night or early afternoon, right?

A.    I'm a night person.  I don't really -- I can't answer that honestly.

Q.    During that period of time, had you made any arrangements with Kimberly Tatum to go and search the residence?

A.    During our initial encounter with Ms. Tatum...

SCOTT ATWOOD - DIRECT

Q.   What was that arrangement?

A.   No, that was not the answer, I apologize.  I didn't complete that statement because it was hearsay and something that Ms. Tatum told me.

Q.   It's not self objection.  I'm asking --

MR. ODULIO:  I'll do it, Your Honor.  Objection, hearsay.

Thank you, Agent Atwood.

THE WITNESS:  Sorry.

MR. AMES:  That was convenient, I suppose.

Q.   So was there an arrangement or discussion -- did you tell her anything or was there a discussion about going to the house to get any items later that day or evening?

MR. ODULIO:  Same objection, Your Honor.

THE COURT:  Overruled.  You can answer that.

THE WITNESS:  Your Honor, respectfully I'm not -- I don't know how to answer the question without --

THE COURT:  All right.  Let me ask the question, then.  See if I can help.

During the course of this initial meeting and based upon that meeting, did you and other agents make a plan to visit the home and take possession of certain items?

THE WITNESS:  Being that our first priority was speaking to Mr. Tatum, Agent Brown and myself decided that we would go to his place of employment to attempt to speak to

SCOTT ATWOOD - DIRECT

him.

As I already explained about the preservation of digital evidence, we believed there to be other devices at Mr. Tatum's home that he had access to to store information and so, yes, I -- we sent a team over there to attempt to gain -- to attempt to gather those pieces of evidence.

THE COURT:  Thank you.

BY MR. AMES:

Q.   And the -- and the gathering of those pieces of evidence was not done with a search warrant, correct?

A.   No, it was done by consent from Ms. Tatum.

Q.   And the time frame in which that consensual search of the home occurred was when, to your knowledge?

A.   The time frame area, you're asking was it simultaneously to us speaking to Mr. Tatum?

Q.   Yes.

A.   That is correct.

Q.   Did you call Kimberly Tatum or anybody else in the household in advance to tell them what time to expect agents to arrive?

MR. ODULIO:  Objection, Your Honor.

THE COURT:  Overruled.  Did you do that?

THE WITNESS:  I'm not sure.  I'm not sure.

Q.   Did you call another agent to -- did you call another agent to inform him about what time to arrive?

SCOTT ATWOOD - DIRECT

A.   Again, two years ago.  This is a lengthy investigation. We carry 15 investigations routinely.  The best of my recollection would have been probably -- in these sorts of cases, the offenders are sometimes violent.  I would not have sent my own colleagues in blindly.  If there was a consent search set up, it would have been speak to this person at this address.  It's possible that that could have occurred.

I did not know -- we did not know if Mr. Tatum -- where he would go after we spoke to him.  We were not interested in arresting him.  That's why the consent conversation with him was voluntary.  We suspected that he was going to go back to his house and have access to all of those devices.

So that was the plan was to obtain those devices that we thought were in question.

Q.   And you in that -- so you seized them, you said before, from Mr. Tatum from the vehicle, correct?  That was not -- the search of the inside of the car, I guess, was maybe consensual.  But the seizure of the backpack devices was not, right?

A.   So the way we actually obtained the laptop, which is what I was trying to get to, was when we informed Mr. Tatum -- or when Mr. Tatum decided he was free to leave and he wanted to leave the interview with Agent Brown and myself, he wanted his car keys and identification and reached for the laptop bag at that point in time.  Being that we had already established

SCOTT ATWOOD - DIRECT

that the laptop was in there and contained images of child pornography, we had to do an inventory of that bag being that there was potential evidence in there.

And so at that time we did an inventory search of the bag. We took items that we thought were pertinent to our investigation. We informed him of that. We gave him a receipt for it. This is what we're taking. We didn't examine those devices then. We just took physical possession of the items that Agent Brown presented to you. And then that's when we obtained the search warrant to examine them.

Q.   All right. But in other words, he didn't voluntarily hand those things over, correct?

A.   No. We had already established they contained child pornography.

Q.   Understood. But the question I asked was he didn't voluntarily hand you those two devices, did he?

A.   No, sir, he did not.

Q.   Those were seized from him, correct?

A.   That is correct.

Q.   Without his consent.

A.   Sure.

Q.   And simultaneously while that's happening, meanwhile at his home there are agents meeting with Kimberly Tatum to seize more items with her consent, correct?

A.   That is correct. I think the jury has already heard that

SCOTT ATWOOD - DIRECT

they only searched items that were used jointly between Kimberly and Mr. Tatum.

Q. I want to just pose a hypothetical to you if I can.

Had David Tatum been at his home that night when the officers arrived, would he have consented to the seizure of these items?

MR. ODULIO: Judge --

THE COURT: Sustained.

Q. Okay. Bad question, then.

What time do you -- I mean, you met with him for a period of time. Do you know how long the other agents were at the home that were seizing the items with the wife's consent?

A. I have no idea.

Q. Do you know what items they seized?

A. I don't honestly. I can't remember.

Q. You stated that the only things coming into evidence were things that the family -- or Mr. Tatum and Kimberly jointly used; is that correct?

A. Yes.

Q. And those devices are the things that were sitting up there earlier. The MacBook that was jointly used.

A. To my best recollection --

MR. ODULIO: Objection, hearsay, Your Honor.

THE COURT: No, go ahead and answer that.

THE WITNESS: I believe the MacBook to be jointly

SCOTT ATWOOD - DIRECT

used.

Q.   And as well as, I guess, there was -- well, cell phone probably not, but the -- what else was there?

Oh, the hard drive.  Where did that one come from?

A.   I believe there were two hard drives potentially that Ms. Tatum gave to us.  One that she took from the laptop bag in question when we encountered Mr. Tatum, either the -- I can't remember.

Q.   So she took that out of the bag.  He didn't have that with him on his person, correct?

A.   No, because she said --

MR. ODULIO:  Objection, Your Honor.

THE COURT:  Sustained.

Q.   Okay.  She had it with her at that initial meeting?

A.   She did.

Q.   And that device was given to you at that initial meeting along with the thumb drive and such, correct?

A.   Yes, it was.

Q.   And this -- you said there were two.  Was one of those devices the one that's in evidence right now?

A.   Yes, it is.  It's the Western Digital My Passport.

Q.   And was that device password protected?

A.   To the best of my recollection, it was.

Q.   And did Kimberly Tatum provide you with any password or access to that device?

SCOTT ATWOOD - DIRECT

A.    She said --

        THE COURT:  Sustained.

Q.    The question wasn't what she said.  The question was did she provide you, give you a way to get into it?

A.    No.  She...

Q.    Did she know how to get into it?

        MR. ODULIO:  Objection, Your Honor.

        THE COURT:  His answer was complete.  He said no.

Q.    Was there any way to get into it even with her assistance?

        MR. ODULIO:  Objection, Your Honor.

        THE WITNESS:  I don't know how to answer that.

        THE COURT:  Sustained.

Q.    Did you have -- did you have to send the device to Quantico, Virginia, in order to get into the device?

A.    Yes, we did.

Q.    So it required that -- it was taken out of Mr. Tatum's bag supposedly and provided to you by the wife as a jointly used item?

A.    I didn't say that the Western Digital was jointly used.

Q.    Is it your opinion that it wasn't?

A.    I don't have an opinion on that.

      The MacBook was jointly used.

Q.    Okay.  You sat in this meeting.  Obviously, you were gathering information and evidence.  Did Mr. Tatum, to your

SCOTT ATWOOD - DIRECT

recollection, talk at all about any devices?

MR. ODULIO:  Objection, Your Honor.

THE COURT:  Sustained.

Q.   Or did you question him about any other devices?

A.   I remember we had a discussion about where Mr. Tatum liked to store the images that we were asking him about, the child pornography images, and he said that he stored them on thumb drives that he kept in his desk at the home.

Q.   Is that what he stated or did -- when you asked about the location of a thumb drive, he said he thought it was in his office or a desk at home, something to that effect?

A.   Yes, that's correct.

Q.   Okay.  During the time period where you were interviewing him, you said that's a couple of hours, roughly.

A.   I believe so.

Q.   And was he trying to -- was he doing anything other than speaking with you?

A.   Are you referring to was he making telephone calls?

Q.   Was he making telephone calls?

A.   He made a number of telephone calls.

MR. ODULIO:  Objection, Your Honor.

THE COURT:  Overruled.

Q.   How many telephone calls approximately?

A.   I couldn't even tell you.

Q.   Were you able to learn who he was calling or trying to

SCOTT ATWOOD - DIRECT

call?

A.    Yes.

Q.    Who was he trying to call?

A.    He was trying to call his father-in-law, Kimberly Tatum's father.

Q.    Do you know who Kimberly Tatum's father-in-law is?

A.    His name is -- I'm drawing a blank right now.  Is it Mr. Martin?

Q.    Do you know whether or not Mr. Martin was at the home at that moment in time when these calls were being made?

A.    I'm not -- I can't say for sure.  I think -- I think he was.  I don't know if he was there during or after.

Q.    Have you spoken with Mr. Martin as part of this investigation?

A.    Yes, we have.  We spoke to him one time when we spoke to Ms. Tatum at her home at -- or during the investigation.  Mr. and Mrs. Martin were there and we spoke to them.

Q.    And so it was clearly -- to your recollection, did David ever get through to anybody he was trying to call?

A.    No.  To the best of my recollection, he -- the calls went unanswered.

Q.    Are you aware of or did you -- were you aware of anybody having a conversation with Mr. Martin or any -- Mr. Martin prior to this consensual search of the residence?

        MR. ODULIO:  Objection, hearsay.

SCOTT ATWOOD - DIRECT

THE COURT: Just as to whether you know of any such conversations, not what they were.

THE WITNESS: At this point in the investigation, not well into the investigation, did we -- Agent Brown -- well, I'm not going to speak for Agent Brown, but well into the investigation did I even know who Mr. Martin was. I did not know him.

Q. I guess more or less what I'm driving at here is that you're doing -- you're over here speaking with Mr. Tatum. There's other people and other agents and other things going on at the residence. And I'm just asking if you're aware did anybody have any conversations with Ms. Tatum, her father, anyone else in the residence about what to do if Mr. Tatum calls someone over there?

THE COURT: Sustained. The only way he would know the answer to that is by hearsay.

Q. Did you ever give instructions to Ms. Tatum or her family not to answer his phone calls if he tried to call over there?

MR. ODULIO: Objection. Same objection, Judge.

THE COURT: No, you can tell us what instructions, if any, you gave anyone else.

THE WITNESS: I did not give any instructions to not answer the phone call. I'm not sure where that's coming from.

Q. Did you call anyone in advance of the consent search at the residence or otherwise?

SCOTT ATWOOD - DIRECT

A.   I do not recall.  That's not normally how I would conduct business.  I would have informed my colleagues about who and what to do once they got there.

Q.   Is there a particular -- I think you elaborated perhaps, but was the particular reason that you did these simultaneously because you wanted to gather the evidence while -- from the home while Mr. Tatum was not there?

A.   So prior to attempting to speak to Mr. Tatum and conducting the search at the home, we had obtained referral information there was child pornography potentially on Mr. Tatum's devices.  We had observed information that backed up the referral of information.  And so our job at that time is to attempt to validate and preserve the evidence.

So, yes, there was a simultaneous agreement to attempt to seize any potential evidence that's at the home.  Obviously, I think that's understandable, in conducting investigations over 16 years, that if the person who resides in the home is conducting crimes linked to digital evidence, that it's going to be secreted.  Thumb drives are stashed wherever and we've missed some throughout the years.  So that was part of the plan is to conduct a simultaneous search in addition to the interview.

Q.   And was Mr. Tatum made aware that while he was in your custody in the parking lot, that his home was being searched by other agents?

SCOTT ATWOOD - DIRECT

A.   I'm not sure about -- I'm not sure of that.  I'm not sure that I -- he was aware of that.

Q.   Did you ever tell him or give him any information that we're simultaneously right now going and looking through your home and seizing other devices and electronics?

MR. ODULIO:  Objection to the relevance of this.

THE COURT:  Sustained.

Q.   Did you ever give him an opportunity to object to the seizure of any items in his home?

MR. ODULIO:  Objection, Judge.

THE COURT:  Sustained.

Mr. Ames, to the extent your questions are addressed to legal issues and the legality of the seizures, those are issues for the Court that have already been decided by the Court --

MR. AMES:  Understood, Your Honor.

THE COURT:  -- and need not be further explored for those purposes.

BY MR. AMES:

Q.   After you -- after you disembarked with Mr. Tatum, after that you went and obtained a search warrant, correct?

A.   Correct, after we obtained all the devices and had a chance to breathe.  It was a lengthy 24 hours.

Q.   And so what was the basis for that -- was the basis for the search warrant anything in addition to the investigation

SCOTT ATWOOD - DIRECT

or is it the thumb drive that you had looked at on the 22nd?

MR. ODULIO: Objection, relevance. Calls for a legal conclusion.

THE COURT: Sustained.

Q. Did you do an investigation into whether or not Dr. Tatum ever harmed any patient or abused any patient?

MR. ODULIO: Objection, relevance.

THE COURT: Sustained.

Q. Did you do any investigation into his job at Atrium Health?

MR. ODULIO: Objection, relevance.

Q. You already testified --

THE COURT: You can answer that. Did you do any such investigation?

THE WITNESS: We verified that he was employed as a psychiatrist at Atrium Health.

Q. Did you do any investigation as to whether or not there had been any improper behavior or inappropriate --

MR. ODULIO: Objection, Your Honor.

THE COURT: Sustained.

MR. AMES: I understand, Your Honor, but his initial testimony is the whole --

THE COURT: Sustained. Don't -- don't need an explanation.

MR. AMES: I understand.

SCOTT ATWOOD - DIRECT

THE COURT:  The reason for your asking the question was disallowed.  Just ask another question.

Q.    Where did you go from there in your investigation?

A.    Once we obtained the search warrant, we sought to examine the devices to see if they contained any child pornography.

Q.    Did you -- when did you search the -- when did you start looking through those devices, approximately what time frame?

A.    I can't say specifically.  Probably a week or two later.

Q.    And one of the devices -- you said that one was sent to Quantico for -- to try to get into that device, correct?

A.    Correct.

Q.    And that's a device that -- withdrawn, Your Honor.

Have you had subsequent contact with Ms. Tatum or anybody else in her family as part of the investigation?

A.    As -- throughout the investigation we -- Ms. Tatum provided information periodically.  But we did our best to limit our exposure to Ms. Tatum, so much so that as we met with her in preparation --

MR. ODULIO:  Objection, Your Honor.  Relevance as to this answer.

THE COURT:  Sustained.

Q.    I understand.  But she provided a lot of information to you, correct?

MR. ODULIO:  Objection.  Same objection, Your Honor.  This is hearsay as well.

SCOTT ATWOOD - DIRECT

THE COURT:  Sustained.

Q.  When you're reviewing -- I imagine you were here for Mr. Whitt and his testimony about the process of reviewing these devices; is that correct?  You were present for that part?

A.  Did I hear the testimony?

Q.  Yes.

A.  Yes.

Q.  And part of that, as he testified, there are circumstances -- sometimes he's looking through devices and flagging things, sometimes vice versa.  Do you recall flagging any items in an HP Pavilion desktop?

A.  I do, yes.

Q.  And do you recall doing so in any -- in any of the other devices, just flagging anything and reviewing it?

A.  There were a number of devices seized in this case.  I reviewed most of them and flagged multiple items.

Q.  How many total devices have been seized at this point, approximately?

A.  I think there's probably 20ish.

Q.  And the forensic searches that have been conducted, does that include -- I mean, includes broad, broad strokes, correct?  There's a lot of images that are gone through both by the analyst and by the agents, correct?

A.  Yes.

Q.   And was -- is it fair to say there's a significant amount of pornography that was found on the devices seized from David Tatum?

A.   There was a good bit.

Q.   In terms of images and videos, thousands and thousands; is that fair to say?

A.   I can't say.  I wouldn't want to speculate on that.  I didn't --

Q.   It's a lot.  We can put it that way.

A.   It's a good bit.

Q.   And the vast majority of that was adult pornography and was not submitted here in court today, correct?

A.   There was a good bit of adult pornography.

Q.   And I imagine -- or I guess are you familiar with the term pthc?

A.   I am.

Q.   And how -- you've worked with cases before in the last couple years that involve material of that variety.

A.   Correct.

Q.   What, in your experience, does that generally entail when you -- that kind of material?

          MR. ODULIO:  Objection, Your Honor.

          THE COURT:  Sustained.

Q.   The images that you reviewed that are entered into evidence, there's other adult images that were not entered; is

SCOTT ATWOOD - DIRECT

that correct?

MR. ODULIO:  Objection, relevance.  Your Honor, he's not charged with adult --

THE COURT:  Right, of course he's not.  Of course he's not.  And I don't think it's particularly relevant, but you can answer that question.

Were there images of adult pornography that were not offered into evidence?

THE WITNESS:  Yes.

Q.   And did that include some of the morphed images?  Were there adults and people that were also morphed and put into evidence -- or not put into evidence?

MR. ODULIO:  Objection, Your Honor.

THE COURT:  Sustained.

Mr. Ames, the Court wouldn't have allowed adult pornography into evidence.  It wouldn't be relevant or admissible.

MR. AMES:  I'm sorry, that adult pornography would not be relevant?

THE COURT:  Your question has been ruled irrelevant.

MR. AMES:  Understood, Your Honor.

Q.   From there, Agent Atwood, there was a device that was sent to Quantico.  It comes back.  Eventually later on in the investigation some charges came.  What -- did you arrest Dr. Tatum at one point in time after there were charges?

SCOTT ATWOOD - DIRECT

A.   Yes, we did.

Q.   Subsequent to that did you conduct a review of any other -- or more devices at any point?

A.   Yes, we did.

Q.   Did you do any -- did you conduct any review of the MacBook laptop in particular?

A.   I did review the MacBook on multiple occasions.

Q.   Did you -- when you're doing your analysis or investigation, did you look to determine if there was any spyware on the device?

A.   I can't say that I did specifically.

Q.   Okay.  Did anybody to your knowledge?

A.   Not to my knowledge.  I wouldn't know.

Q.   Was the FBI informed at any point in time that there may have been spyware on the device?

     MR. ODULIO:  Objection.  Calls for hearsay.

     THE COURT:  Sustained.

Q.   Have you had conversations with anybody else -- or did you have -- did your investigation involve anybody else in Ms. Tatum's family?

A.   No, our investigation did not involve anyone else or focus on anyone else but Mr. Tatum.

Q.   The -- did you have any more recent conversations with anybody in Ms. Tatum's family?

     MR. ODULIO:  Objection, Your Honor.

SCOTT ATWOOD - DIRECT

THE COURT:  Sustained.

Q.   Have you learned anything about the evidence in the FBI's custody that turned out to not be the original copy?

THE COURT:  Sustained.

MR. ODULIO:  Objection.

Q.   Have you learned anything recently that involves additional copies of evidence?

MR. ODULIO:  Objection.  Sidebar, Your Honor.

THE COURT:  Yes.

(Sidebar conference as follows:)

MR. ODULIO:  We object to this whole line of questioning.  We think it's irrelevant.  The Court's already ruled on aspects of this line of questioning.  As such, I think it's clear that it's got no relevance here in the case.

MR. AMES:  I don't think I've crossed the line. There's a motion in limine with regard to talking about criminal charges involving family.  Again, I've told the Court I don't intend to do that.  I think it's relevant that a device that was purported to be an original turned out not to be.

THE COURT:  First of all, that's a gross overstatement of that particular device.  It hasn't been offered into evidence.  And it was a predicate to initiate the investigation.  So that line of questioning is irrelevant for our purposes today.  So let's get away from your suppression

SCOTT ATWOOD - DIRECT

theory of there were these flash drives that were handed over to the FBI at the beginning of the investigation and there's something wrong with them.  We're not going there anymore.

MR. ODULIO:  Your Honor, we'd also ask if there's more questions like this, if the Court can consider some kind of limiting instruction to the jury concerning the legal process here because I don't like the implication.

THE COURT:  Yeah.

MR. ODULIO:  It's not fair.

THE COURT:  We'll take that up at jury instructions, but you are inviting the Court to give an instruction that essentially says you're wrong.  Okay.  So --

MR. AMES:  No, I --

THE COURT:  -- tread carefully.

MR. AMES:  I understand, Your Honor.  And I'll speak with Mr. Tatum about the circumstance and let him know that as well.

THE COURT:  All right.

(End of sidebar conference.)

DIRECT EXAMINATION (Cont'd.)

BY MR. AMES:

Q.   How many investigations in general have you done for pornography-type cases?

A.   Quite a bit.

Q.   And the style or type of images that you would typically

SCOTT ATWOOD - DIRECT

see in a file called pthc, could you give an overview -- what does that generally in your experience entail if you open an image that says pthc on it?

MR. ODULIO:  Objection, Your Honor.

THE COURT:  Sustained.  We're not here about generalities.  Ask another question.

(Counsel and defendant conferred.)

BY MR. AMES:

Q.   Would you categorize or characterize the images submitted into evidence to be hardcore in this case?

MR. ODULIO:  Same objection, Your Honor.

THE COURT:  Sustained.  That's not an element of the offense.

MR. AMES:  Agreed, Your Honor.

Q.   So are some of the images that you have reviewed inconsistent with pornography in light of the fact there's not lasciviousness?

MR. ODULIO:  Objection, Your Honor.

THE COURT:  Sustained.

MR. ODULIO:  It's the same question.

THE COURT:  Sustained.  The evidence will be submitted to the jury, the jury will receive the Court's instructions, and the jury will find the facts that you are now exploring.

Q.   What are the criteria that you use when you flag an image

SCOTT ATWOOD - DIRECT

as potential child pornography in your investigations?

A.   Whether they look like a child and they're naked.

Q.   So that's the entirety.  Are you making any determinations otherwise?  Just nudity and age?

A.   I'm not making the determination.  I'm flagging it for my review.  I ask my colleagues to review who also have similar experiences.  I look for characteristics, hip width, breast size, prepubescent, facial features.

Q.   Understood.  And when you have -- when you have images that you've located, are there any processes that you use to verify whether they have been previously indicated as pornographic or --

MR. ODULIO:  Objection, Your Honor.

THE COURT:  You can answer that.

THE WITNESS:  Can you restate the question, please.

Q.   Is there a database you might send images to to confirm whether or not they may be pornographic or previously identified as child pornography?

A.   Are you asking about NCMEC?

Q.   Yes.

A.   Yes.  That's one of the criteria that we would do normally in our investigations.  If we see images that we think are child pornography that fit the criteria, we have a way to submit those images to NCMEC based off the hash ID. You've been given information already about the hash ID and

SCOTT ATWOOD - DIRECT

how it changes.  A cache image is different -- it's my understanding that a hash ID for cache images is different than a regular image itself.  So the hash ID sometimes can be --

            MR. ODULIO:  Objection to the narrative.

            THE COURT:  No, that's fine.  Probably be helpful to the jury.

            THE WITNESS:  The hash ID can be invalid a lot of times as far as submission.

Q.    Did you submit any in this case?

A.    Yes, we did.

Q.    Did you get any matches for child pornography?

A.    To the best of my -- so NCMEC will not -- NCMEC only advises that it's child pornography if the victim has been identified.  So that's two separate things.  We submit the submission to NCMEC --

            MR. ODULIO:  Objection.  This is all hearsay, I think, Your Honor.

            THE COURT:  It's fine.  This will be helpful to the jury.

            THE WITNESS:  We submit the hash ID to NCMEC of suspected child pornography or just if NCMEC knows of the image.  That's really the submission.  Because NCMEC is the houser of child pornography submitted by law enforcement.  If we suspect it being child pornography, we'll submit the hash

SCOTT ATWOOD - DIRECT

ID.  NCMEC will tell us, yes, that hash ID has been submitted before, meaning other law enforcement has encountered that image or, yes, this hash ID matches this victim.

And so we've done both of those in this case.  We submitted the hash IDs to see if NCMEC knows of any potential victims and we've submitted victim notifications to where the in-person victims that you've heard from today now have notifications in NCMEC.

Q.   So with respect to images that were otherwise on devices that were not morphed pornography or whatnot, at any point in time in the investigation, was there ever an indication or a match to NCMEC or any other database that confirmed identified child pornography?

MR. ODULIO:  Objection, Your Honor.

THE COURT:  Sustained.  It's irrelevant and a wrongly worded question at that.

Q.   Was there ever a hash tag match at any point in time with anything you found in the 20 devices that confirmed or identified that it was --

MR. ODULIO:  Objection, Your Honor.  It's the same question.

THE COURT:  Sustained.  That match doesn't make it or not make it child pornography.  As the witness just testified, that match only identifies whether that image has been previously identified by another law enforcement agency.

SCOTT ATWOOD - DIRECT

The ultimate question for the jury is whether the images that have been presented to it are in and of themselves child pornography, not whether NCMEC has copies of them.

MR. AMES:  I understand.

THE COURT:  So that line of questioning is irrelevant.  Please move on.

MR. AMES:  One moment, Your Honor.

(Counsel and defendant conferred.)

THE COURT:  Any additional questions, Mr. Ames?

BY MR. AMES:

Q.   Agent Atwood, did you ever, later on in the investigation, seize any other items from Mr. Tatum at any point as well?

A.   Yes, we did.

Q.   Those were not -- those did not contain any contraband, correct?

MR. ODULIO:  Objection, relevance.

Q.   To your knowledge.

THE COURT:  You can answer that.

THE WITNESS:  I would have to look at the list -- I don't believe so -- of when they were seized.

(Counsel and defendant conferred.)

MR. AMES:  No further questions, Your Honor.

THE COURT:  Any cross examination?

MR. ODULIO:  Your Honor, no.

SCOTT ATWOOD - DIRECT

THE COURT:  All right.  Thank you.  You may stand down, Agent.

THE WITNESS:  Thank you, Your Honor.

(Witness stepped down.)

THE COURT:  Further evidence for the defense?

(Counsel and defendant conferred.)

THE COURT:  Mute your microphone, please.

MR. AMES:  Yes, Your Honor.

(Counsel and defendant conferred.)

THE COURT:  Further evidence for the defense, Mr. Ames?

(Counsel and defendant conferred.)

MR. AMES:  I'm sorry, Your Honor, I'm trying to...

THE COURT:  I understand.

THE DEFENDANT:  Your Honor, I was not --

THE COURT:  Wait, wait.  No, no, don't speak in open court.

Members of the jury, let me ask you to retire to the jury room for just a few minutes.

JUROR NO. 4:  We know the rule.

JUROR NO. 13:  Just getting our steps in.

(Jury exited the courtroom.)

THE COURT:  What did you want to say, Mr. Tatum?

THE DEFENDANT:  So I wasn't expecting to have to testify today.  I am not -- my lawyer has advised me not to

testify.

THE COURT:  I don't -- really, really don't want to know what you and he said to one another.

THE DEFENDANT:  Okay.  You know, I think that -- should I testify I'd like to be able to tell my story.  I'd like to be able to explain what happened in a narrative fashion.

THE COURT:  No, sir.  No.  Examinations go as you've seen, question and answer, because some of what witnesses might otherwise say would be inadmissible and the only way for the Court to police that is to hear the question and make a determination whether the answer to that question would be admissible.  So you won't be able to testify in a narrative fashion.

THE DEFENDANT:  And I wouldn't be allowed to testify about anything regarding hearsay.

THE COURT:  Correct.

MR. AMES:  Unless there's an exception to it.

THE COURT:  Right.  There are some exceptions, but I -- I'm trying to guess what of those might apply here, but none of them are obvious to me.

So I need your decision, Mr. Tatum.

(Pause.)

THE DEFENDANT:  Would I be allowed to testify tomorrow?

THE COURT: No, sir. We're not going to waste an hour of trial time. The testimony will begin today. I don't know if it will conclude today. We'll just have to see how it goes, but it will certainly begin today.

THE DEFENDANT: Will I have additional time to confer with my attorney before testifying?

THE COURT: You mean before making the decision? We have an hour left in the day roughly and the jury has already lost a good bit of it because of some of these issues which were easily anticipated, I'm sure were anticipated, and much discussed between you and your attorney. I'm not going to continue to waste the jury's time while you continue to wonder whether to testify. It's just time to decide.

MR. AMES: I advise against it.

THE DEFENDANT: I choose not to testify.

THE COURT: Thank you, sir.

I think that -- the Court is satisfied that the defendant is fully aware of his right both to testify and not testify. I'm also well persuaded that he has had lengthy discussions with his attorney on that issue and has made a considered and thoughtful decision not to testify.

Would there be any other evidence, then, Mr. Ames?

(Counsel and defendant conferred.)

MR. AMES: I think the defense would rest, Your Honor.

THE COURT:  All right.  I'll ask you to make that announcement once the jury comes back just to let them hear it.  I'll ask if there's additional evidence, at which point you can rest your case.

Will there be rebuttal evidence?

MR. ODULIO:  No rebuttal, Your Honor.

THE COURT:  All right.  Well, then, the Court's plan is that, you know, I have just a very few minutes of general instructions; and since we have some time on our hands, I'll give those.  But I won't ask counsel to begin closing arguments tonight.  There's no way we'll get through that.  So you can be prepared for that at 9:00 tomorrow morning.

MR. AMES:  Your Honor, is there another jury instruction to deal with?

THE COURT:  Well, there was one.  I've been thinking about that since.  You wanted the Court to explain to the jury that the evidence with respect to count two consists only of bathroom video one and, you know, I may be able to just say that rather than putting it into the written instructions.

MR. ODULIO:  That's fine, Your Honor.  If the Court wants something in writing, we'll work with Mr. Ames to give that to you, but I think doing it verbally is fine.

THE COURT:  All right.  Let's bring the jury.

(Jury entered the courtroom.)

THE COURT:  Is there further evidence for the

defense?

MR. AMES:  No, Your Honor.

THE COURT:  Any rebuttal evidence?

MR. ODULIO:  No, Your Honor.

THE COURT:  All right.  Members of the jury, that's the close of all of the evidence that either party wishes to offer.  We have three things left to do.  One, I have a set of instructions that I give every jury in every criminal case because these things apply to every criminal case.  Then in the morning we will have closing arguments from counsel and then my concluding instructions which are specific for this case and these offenses.  And so all we're going to do yet this afternoon, and it won't take me very long, is to go through these instructions that apply in every criminal case. And then I'll release you for the evening.

As I told you in the preliminary instructions, it is your duty and your responsibility in this trial to find the facts.  You may find those facts only from the evidence which has been presented during this trial.  The evidence consists of the testimony of the various witnesses, the exhibits which have been admitted into evidence by the Court, and any stipulation between the parties.  Although I don't believe the parties did stipulate to any facts.

In reaching your decision as to the facts, it is your sworn duty to follow the law as the Court instructs you.

You will apply this law to the facts that you find from the evidence and render your verdict.

If during their closing arguments the attorneys refer to concepts of the law or what the law is, and if you detect any difference between what they say the law is and what I say the law is, you go with what I say. And same with the facts. If the lawyers recite the evidence to you and it doesn't agree with your memory, you're to be guided by your memory and not what the attorneys say.

I'm confident that none of the attorneys would intentionally misstate the law or the facts, but mistakes can be made with respect to the law and people's memories differ on what the evidence is. But you always go with what I say about the law and what you remember about the facts.

You are required to perform these duties without bias, prejudice, or sympathy for either party. The law does not permit jurors to decide cases on the basis of bias, prejudice, or sympathy, or any other basis than on the facts and the law.

This case involves charges brought against the defendant by a bill of indictment. You are reminded that an indictment is but a formal method of accusing the defendant of a crime. Its purpose is to inform the defendant of the charges against him and bring him to trial. It is not evidence of any kind against the defendant, nor does it permit

351

any presumption or inference of guilt.  In other words, an indictment is not consistent either with guilt or lack of guilt.  It simply puts that question at issue for your decision.  It is up to you to decide whether the government has proved each element of the crimes alleged in the bill of indictment beyond a reasonable doubt.

You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged.  The defendant is not on trial for any act, conduct, or offense not alleged in the indictment.  Neither are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

Every defendant in a criminal case is presumed to be innocent and this presumption continues throughout the course of the trial.  This presumption will end only if you reach the jury room and arrive unanimously at the conclusion, if you do, that the government has shown to your satisfaction that the defendant is guilty beyond a reasonable doubt.

This burden on the government does not change at any time during the course of the trial.  The presumption of innocence in favor of a defendant is not a mere formality to be disregarded by the jury at its pleasure.  It is a substantive part of our criminal law.  Accordingly, the government must prove each of the elements of the crimes charged in this indictment beyond a reasonable doubt before

**JA369**

there can be a conviction.

The term "reasonable doubt" means just what it says. It is a doubt based upon reason and common sense. Its meaning is no doubt self-evident and understood by you and the Court will not attempt to define it any further.

As I told you earlier in the trial, there are two types of evidence from which a jury may properly assess in determining whether the government has met its burden of proof as to any offense. One is direct evidence, such as the testimony of an eyewitness. The other is circumstantial evidence. Circumstantial evidence is evidence of facts or circumstances from which the existence or nonexistence of other facts in controversy may be inferred. The law makes no distinction between direct and circumstantial evidence but simply requires that before convicting a defendant, the jury must be satisfied of the guilt of the defendant beyond a reasonable doubt from all of the evidence in the case.

While you should only consider evidence presented during the trial of the case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.

Certain of the government's exhibits included transcripts. You'll recall the audio that also had transcripts with it. You're instructed and reminded that whether the transcripts correctly or incorrectly reflect the content of the conversation or the identity of the speakers is entirely for you to determine. You should make this determination based on the testimony regarding the preparation of the transcripts, your own comparison of the transcripts to what you have heard on the recordings, and any other relevant evidence or testimony. Should you determine that the transcripts are incorrect or inaccurate in any respect, you should disregard them to that extent.

You also heard evidence that the defendant made a statement outside of court to two FBI agents. In determining whether any statements claimed to have been made by the defendant outside of court was knowingly or voluntarily made, you should consider the evidence concerning such a statement with caution and great care and should give such weight to the statement as you feel it deserves under all of the circumstances. You may consider in that regard such factors as the age, training, education, occupation, and physical and mental condition of the defendant, his treatment while under questioning, and all the other circumstances in evidence surrounding the making of the statement.

You are not required to accept testimony even though

the testimony is uncontradicted and the witness is not impeached.  You may decide because of the witness's bearing and demeanor, or because of the inherent improbability of his or her testimony, or for other reasons sufficient to you that such testimony is not worthy of belief.

The testimony of a witness may be discredited or impeached by showing that he or she previously made oral or written statements which are inconsistent with his or her present testimony.  The earlier contradictory statements are admissible only to impeach the credibility of the witness and not to establish the truth of these statements.  It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has been impeached.  I don't recall impeachment testimony, but if you recall some, that is the instruction to apply to it.

You also heard during the trial testimony of witnesses who were recognized by the Court as experts in particular fields.  I will remind you that a person's training and experience may give him specialized knowledge in a technical field.  The law allows that person to state an opinion about matters in that particular field.  Merely because the witness has expressed an opinion does not mean, however, that you must accept this opinion.  The same as with any other witness, it is up to you to decide whether you believe his testimony and choose to rely upon it.  Part of

355

that decision will depend on your judgment about whether the witness's background, training, and experience is sufficient to give the opinion that you heard. You must also decide whether the opinions were based on sound reasons, judgment, and information.

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against either party. You should consider all of the facts and circumstances in evidence to determine which of the witnesses you choose to believe and not believe.

The law does not require either the defendant or the government to cross examine any witness. You may not draw any inferences from the fact that the government or the defendant did not cross examine a witness.

The defendant has elected not to testify in this case. The Court instructs you that he has a constitutional right not to take the stand and testify and not to speak at all or offer any evidence, the burden of proof being entirely upon the government. You must draw no adverse inferences of any kind from his exercise of his privilege not to testify. This right is a fundamental one in American criminal law and one which cannot be disregarded by the jury at its pleasure.

The lawyers for both sides objected to some of the things that were said or done during the trial. You may recall that. This simply means that the lawyers were

requesting that I make a decision on a particular rule of law. Do not hold that against either side. The lawyers have a duty to object whenever they think that something is not permitted by the rules of evidence. Those rules are designed to make sure that both sides receive a fair trial. Do not draw any conclusion from such objections. These relate only to the legal questions that I must determine and should not influence your thinking. If I sustain an objection, the witness was not allowed to answer it. If I overruled the objection, the witness was allowed to answer the question and you should consider that answer as you would any other.

Let me emphasize that a lawyer's question is not evidence. At times a lawyer may have incorporated into a question a statement that assumes certain facts to be true and asked the witness if the statement was true. If the witness does not answer or denies the truth of the statement and if there is no other evidence in the record proving that the assumed fact is true, then you may not consider the fact to be true simply because it was contained in the lawyer's question.

On the other hand, if the witness adopts or agrees to the assumed facts in his or her answer, then the witness may be considered to have testified to the facts assumed in the question and his or her testimony is evidence of those facts.

You may use your notes, if any, taken by you during

the trial. You are instructed that your notes are only a tool to aid your own individual memory and should not be substituted for your memory. If you chose not to take notes, remember it was your individual responsibility to listen carefully to the evidence. You cannot give this responsibility to someone who did take notes. We depend on the judgment of all members of the jury and you must all remember the evidence in this case.

I will remind you that the punishment provided by law for the offenses charged in the indictment, should there be a verdict of guilt, is a matter exclusively within the province of the Court and should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or lack of guilt of the accused.

All right. So -- and I know it's only 4:30, but the closing arguments will take a little while and I don't like to split them up, and we'll have time tomorrow to deal with all of this. So I'm going to release you tonight. Should be the last night where you'll have to put people off from wondering how your day went. But, you know, we're getting close. So please don't talk to anybody about this case. Don't let anybody talk to you about it.

Don't start forming your opinions. The trial is close to being over but it's not over. You need to hear the closing arguments of the lawyers and you need to get what we

call the substantive instructions from the Court, the law that applies specifically to these charges. And then when that's over, you can retire to the jury room and begin forming your opinions during your deliberations together.

So as always, leave your notes in the jury room and we will see you tomorrow morning at 9:00.

Everyone remain seated while the jury clears the floor.

JUROR NO. 13: What time do we come back tomorrow?

THE COURT: 9:00. Sorry if I didn't say that.

(Jury exited the courtroom.)

THE COURT: Just to be double clear, count two applies to what has been referenced as the bathroom one video, correct?

MR. ODULIO: Yes, Your Honor.

MR. CERVANTES: Would Your Honor like an exhibit number reference?

THE COURT: Sure.

MR. ODULIO: Your Honor, Exhibit 1D.

THE COURT: All right. How long would counsel like for closing arguments?

MR. ODULIO: Your Honor, we'd like one hour, please.

THE COURT: Mr. Ames?

MR. AMES: At least one hour, Your Honor.

THE COURT: Let me say this. My experience in the

four years since I've been on the bench is attorneys grossly underestimate how long their arguments are going to take, but I hold them to it every time.  So I want to give you enough time, but I am going to hold you to whatever we agree on.  An hour seems sufficient to me.

Mr. Ames, do you --

MR. AMES:  I think that should generally be sufficient.  There's a lot of variables and different types of things going on in the evidence here, but I think that should be sufficient, Your Honor.

THE COURT:  All right.  I'll hold both sides to it.  Of course, the hour for the government includes their rebuttal argument, which, again, in my experience gets short shrift from the U.S. Attorney's Office in lots of trials.  They leave themselves about all of three minutes to do a rebuttal, which I always think should be balanced the other way.  But I'll give each side an hour.  I think that's plenty.  You'll lose the jury if you talk to them more than an hour.  Now, I say that even though I once gave a 5-1/2 hour closing, but there was 72 counts and it was a 3-week trial.  But an hour it is and we'll start up with the government at that time.

Anything else we need to address tonight?

MR. ODULIO:  Your Honor, there is, I think, the issue of forfeiture, jury trial for forfeiture.

THE COURT:  Yes.  Thank you --

MR. ODULIO:  And I think the inquiry is whether or not the defendant wants a jury forfeiture should there be a guilty verdict.

THE COURT:  Yes.  Thank you for reminding me of that.

Mr. Ames.

(Counsel and defendant conferred.)

THE COURT:  If you want to have the evening to talk with him about it -- I mean, I don't know if he wants to make a snap decision or not.

Mr. Tatum, the issue is if there is a guilty verdict, then the forfeiture count in the indictment comes into play and you're entitled to have the jury decide that issue.  It is often left to the Court to decide or there's even a consent to forfeiture following a guilty verdict if there is one.  That's the issue we're talking about here. I'll give you the evening to talk to Mr. Ames about --

MR. AMES:  Thank you, Your Honor.

THE COURT:  -- if there is a guilty verdict, what you want to do with the forfeiture count.

MR. ODULIO:  Nothing else from the government, Your Honor.

THE COURT:  Mr. Ames, anything else to do today?

MR. AMES:  I don't think so, Your Honor, no.

THE COURT:  The Court will be in recess until 9:00

tomorrow morning.  Please remain here until the CSO let's everyone know that the jury has cleared the floor, which I hope there's still a CSO to tell us that.  One of the counsel can step out if you'd like to get confirmation you're not going to get otherwise.

All right.  We're in recess.

(Evening recess at 4:31 PM.)

*****

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER


        I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

        Dated this 13th day of September 2023.



                        s/Cheryl A. Nuccio
                        _____
                        Cheryl A. Nuccio, RMR-CRR
                        Official Court Reporter

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:22-CR-157 |
| | ) | |
| vs. | ) | VOLUME III - REDACTED |
| | ) | |
| DAVID TATUM, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
MAY 4, 2023

APPEARANCES:

On Behalf of the Government:

    DANIEL CERVANTES, ESQ.
    MARK T. ODULIO, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    RYAN PATRICK AMES, ESQ.
    SeiferFlatow, PLLC
    2319 Crescent Avenue
    Charlotte, North Carolina 28207

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

JA381

P R O C E E D I N G S

THURSDAY MORNING, MAY 4, 2023

(Court called to order at 8:57 AM.)

THE COURT:  Good morning.

ALL COUNSEL:  Good morning.

THE COURT:  Juror number 11 was in a minor vehicle accident this morning.  She's fine, but she's shaken up and she's not going to be here.  So we've got our 12, thank goodness.

Are we ready for the jury?

MR. CERVANTES:  Yes, Your Honor.

(Jury entered the courtroom.)

THE COURT:  Good morning, members of the jury.

Juror number 11 was in a minor car accident this morning and she's fine, but she's shaken up a little bit and is not going to be joining us.  So we have the 12 we need to proceed.

I expect that you'll begin your deliberations not later than 11:30 and I don't intend to take a break between now and then; but if anybody needs one, please let me know.

As I told you yesterday, what we'll have this morning are closing arguments of the attorneys and then the final instructions from the Court.  Of course, I remind you that the arguments of the attorneys are not evidence and that the law, of course, comes from the Court.  For instance,

questions about the legality of the seizure of certain evidence or the admissibility of evidence under the rules of evidence are for the Court to decide.  The Court has decided those issues and they're not for your consideration.

Now, the arguments will begin with the government's opening argument and then the defense will present its argument.  And then because the government has the burden of proof, it is allowed a rebuttal argument after the defense argument.

The jury is with the government.

MR. ODULIO:  May it please the Court, Dr. Tatum, counsel, ladies and gentlemen of the jury:

This is the defendant setting up this phone to use his 15-year-old cousin to produce and make child pornography as she got undressed, used the toilet, and took a shower in her family vacation home in Maine.  He saved that child pornography from this phone.  After he deleted it from this phone, he saved it on to that hard drive and transported it here to North Carolina.  He possessed it and other child pornography like it on that hard drive and used that MacBook to access it and to view it.  He's guilty of all the counts in the indictment alone for this conduct.

Count two charges production of that child pornography video of M.C..  She came in here yesterday and testified in front of you that she was 15 years old at the

time this was taken.  She identified the defendant in that image of him gazing into this phone.  Setting it up to capture her pubic region, her vagina, strategically on that floor. Flushing the toilet after he left.  That's count two.

Count three is when he saved it onto that hard drive and transported it into the Western District of North Carolina.

And of course, you see there in count one the possession and access with intent to view.

And the forensic examination of that MacBook and all of these devices show that he did it.  He saved it for over seven years along with his other child pornography.  And what does that tell you?  Was this an accident?  Was this a big mix up?  Was this planted by somebody else?  Of course not.  This evidence that we've shown you proves that the defendant did it.  That this was no accident or mistake.  It was deliberate. It was intentional.  It was well planned with multiple steps.

And this picture of the defendant gazing into this phone along with all the other evidence we presented proves that he committed the three types of crimes charged in the indictment.  And the M.C. video alone, that first bathroom video alone, is sufficient to convict him of all these counts. Let me say that again.  The video of M.C. that he produced is sufficient to convict him of possession and access with intent to view, production and attempted production as charged in

count two, and transportation of child pornography.

And make no mistake, ladies and gentlemen, one video is enough. One still from one video of child pornography is enough. You're not going to hear anything in the jury instructions that say that there's got to be a quantity of child pornography to convict. One is enough. And when it comes to child pornography, one image is too many.

But we've given you much more evidence than the single video that he produced in Maine. We've shown you pictures and other videos of child pornography. We've shown you forensics. We've even shown you and played for you the defendant's own statements he gave to the FBI when asked about these images. And all of those lead to the conclusion, the only conclusion, that he's guilty.

Now, I'm going to take you through that evidence, show you some of the elements, highlight some of the things for you to consider. But before we do that, let's knock out some low hanging fruit, get it out of the way so you can focus on other matters.

The first thing is this issue of child pornography that you've heard about. The Court is going to instruct you and give you some instructions and I'm going to highlight some of those briefly for you.

Child pornography involves the use of a minor engaging in sexually explicit conduct.

It also involves images that have been created, adapted, or modified to appear that an identifiable minor, that is, it means that you can tell it's a kid, is engaging in sexually explicit conduct.

Now, we've shown you both types during this trial. Mr. Cervantes in his opening highlighted that for you, right?

The second category or bucket that we showed you, those are the adapted, modified, you've heard it referred to as morphed images. Okay. If they're sexually explicit, if those adapted images are sexually explicit, they meet the definition. And they were, right?

All of the other images fall into that first category involving a minor engaging in sexually explicit conduct.

And look, there's a couple of other related concepts here and I'm going to go through them, but it's not complicated. It either is or isn't child pornography, okay. It's kind of like being pregnant. You can't be half pregnant. It can't be half child pornography. And there is no ambiguity with these images that we had to display for you. And that was not for the faint of heart, right? It's our duty to display those to you. It's your duty to look at them. And we did it because when you go back into that room, you've got to make that determination. But in this case it's not even a close call.

So that first category we'll talk about in a second. There is a little bit of a nuance on that second category, right? If it's adapted or modified. You'll hear the Court tell you that as long as the face of the person depicted in that image is a child, it's not relevant whether the adapted or modified body that was put on that child is that of a minor or an adult. Set that aside. The issue of concern is whether or not it's sexually explicit, okay.

And what is sexually explicit? Well, you don't need to be any kind of learned person to know what that is, right? It's sexual intercourse between a person of the same or opposite sex. It is masturbation. It is a lascivious exhibition of the pubic area, genitalia. And all of the images and the images that you have seen have fallen into some or all of those categories.

Recall the first video we had to play for you of those two girls on that bed having sex. That's sexually explicit conduct. Recall the other images from the HP. Of those two videos, those were over 50 minutes long, we played 10 seconds for you. Sufficient to establish what those were. And they were child pornography, right?

What's lascivious exhibition? Well, you're going to hear from the Court it's when the image, the focal point of the image is on the genitals or the pubic area; whether the setting of the image makes it sexually suggestive; whether the

child is fully or partially nude; and whether the visual depiction is intended to elicit a sexual response from the viewer. And that's important. That's very important.

But again, those videos that I mentioned, we also have the M.C. video, right? Is she fully nude? Yes, of course she is, right? We've got the prom picture. A prom picture. Who does that? A first day of school picture of 10-, 11-, 12-, 13-year-olds posted on Facebook adapted into child pornography. Who does that? They were fully nude, right?

What else? Look at the setting, look at the focal point. They all meet the definition.

And what else can you take from this? Well, they were designed to elicit or intended to elicit a sexual response. How do we know? FBI asked him about it, right? And what did he say? What did he use the images for? Those are his words. You heard them. We played them for you. He was clear. There's no ambiguity about it. They asked him again, right? What did he say? Answered the question already, right? What does that -- how and to what extent does that inform you with respect to these images? It shows and demonstrates, ladies and gentlemen, that this is child pornography. There's no ambiguity. There's no argument here.

And again, one is enough. One still is enough to convict him. It ain't complicated. Common sense, good

judgment, and life experience. That's why you're here. And that's what you're going to use in there to get through this issue.

Okay. What else? Interstate commerce. You heard Mr. Cervantes ask forensic examiner Whitt these questions about where this stuff was manufactured. That's because, as I'm going to go through with you with respect to each of the counts, the law requires that some -- in some manner these devices had to be manufactured outside of North Carolina or the United States or had to move in interstate commerce, right?

So in any permutation of what you're going to hear, this child pornography was made with an item made outside of the United States, right? It was saved on an item made and manufactured outside of the United States. It was transported from Maine to North Carolina on that item which is manufactured outside of the United States. And it was, of course, actually transported across state lines. So interstate commerce, as you're going to hear, nothing burger. We met it. Check it off the box. All of the interstate commerce elements are going to be met and have been met.

Okay. That's child pornography. That's interstate commerce. What else? Let's look at each of the counts.

Count one charges possession and access with intent to view, right? And here are the elements that the Court will

instruct you on.  And you'll have these instructions in the back.

The first is the defendant knowingly possessed, or accessed with intent to view, the child pornography.

That the material had been mailed or shipped in interstate or foreign commerce.  That's the interstate commerce element I talked about.

And then the last is when he possessed it, the defendant knew the material contained child pornography.

All right.  Let's break that down.

Was it child pornography?  Is that even a legit question?  Of course it is.  In all of its horror it is.

Okay.  The interstate commerce element is satisfied.

So how did we prove knowing possession?  Well, let's look at the devices.  Two of these were taken right from him by the FBI, right?  And I'll go through each of the devices in this presentation, but what did they contain?  They contained pictures of him.  They contained a picture of him, a video of him producing child pornography, right?  Two of those devices came from his wife who he lived with at the time.  The HP, right, came from this home in Mint Hill.  Where did it come from?  A home office, right?  Nice office.

What else was in that office?  Medication.  Whose name was on it?  The defendant's.  Is there any ambiguity about whose devices these were?  No, of course not.

When you consider the flash drive, what was on the flash drive?  Images of minors he knew, prom date pictures, pictures that he got off Facebook, right?  What does that tell you about the knowing possession?

And during the interview with the FBI, the defendant himself foreshadowed this idea of forensics, right?  The idea that a forensic analysis of these devices are going to find evidence, traces of what he did with them, right?

And Jason Whitt was on the stand a lot and it had to do with forensic evidence, which is the kind of evidence that the judge already talked about on the first day: circumstantial evidence or indirect evidence.  Do you remember that?  Remember the analogy Judge Bell used?  If you go to bed at night and your driveway is dry and in the morning you wake up and it's wet, it probably rained, right?  And he said the law makes no distinction between direct and indirect evidence. You can make your observation and develop an inference that of course it rained.

But during this trial we got some suggestions, right?  Hey, it rained in the driveway -- it rained overnight. My driveway is wet.  It must have rained overnight.  Oh, no, no, no, your sprinkler must have been on.  Well, my neighbor's driveway is wet.  Oh, your sprinkler must have sprayed on him. Well, my across-the-street neighbor's driveway is wet.  He doesn't have a sprinkler system.  Well, the town well must

have leaked on it, right?  If no one saw the storm, it couldn't have been.  Well, that's just not true.  And you know that from life experience and common sense.  The law makes no distinction.  The forensic evidence showed you what?  It showed you the picture of his face right there that you see on the screen.  It showed you what was saved on what devices and what was plugged in and accessed.  And it was foreshadowed by the defendant's own statement.

So don't get bamboozled by that.  Indirect evidence which we've offered you which has been corroborated through other evidence demonstrates that he possessed these devices knowingly.

How did we do that?  We showed you the 1,118 file names of pthc.  One thousand one hundred and eighteen.  And I'm not going to read the names to you because you can see them.  And they're disgusting.  They're abhorrent.  And the other take away is these file names reference specifically 6-year-olds, 10-year-olds, 7-year-olds.  And there was a lot of questions during the trial, hey, pthc could represent adults, right?  I guess.  What do these files say?  Six-year-old, 7-year-old, 4-year-old.

Focus on the evidence in front of you, not on hypotheticals or what ifs or could haves or might coulds, right?  This is what is in front of you in this trial and it shows that these terms, which were accessed with that MacBook,

were oriented towards children, child pornography.

We showed you the PLIST. Very similar evidence, right? Recently accessed videos, recently played videos on the VLC. Jason Whitt explained that to us so that a lay person could understand. What is the take-away? That MacBook which was in his possession had evidence that those videos were played. No one saw him do it. Use your good judgment and common sense when evaluating that argument, okay? I know you will.

These are his devices. I'm going to talk about attribution but before I do that, recall that the My Passport on the top left was encrypted. It had to be sent to Quantico. Consider that fact when evaluating the evidence. No one in Charlotte was able to give the FBI that password. It had to be sent off. And what did the evidence show with respect to that hard drive? It was plugged in and accessed to what? That MacBook. Who had the MacBook? The defendant. More than that. The user path, the folder path. I saw you paying attention. The take-away there is what is a user path? Who is the user path?

Two things. Number one, it matched the file path on the hard drive where the child pornography was kept. And the second thing, the user path was this fella. This fella, David Tatum, Morphus.

Did it rain? Did anybody see it? Come on. Come

on.

Attribution.  We presented evidence of attribution on each of these devices.  Again, you recall Agent Whitt's testimony.  He starts with a search for the child pornography and he follows that evidence.  And when he followed the evidence, he found that it was in the user profiles and folders associated with the defendant and he found these other documents in these devices.  And what do these documents show?  We showed you.  It's in evidence.  Mostly unchallenged.  What are these?  His driver's license, his certificate of completion for his fellowship in child psychiatry -- child psychiatry -- tax returns, photos of ex-girlfriends, interview schedule for his job here in Charlotte, and, importantly, a resume.

What's highlighted there?  A phone number.  Why is that highlighted?  What is that phone number tied back to?  This thing.  What is this?  This is his phone.  The user ID on the phone says David's iPhone.  The resume has this phone number on it.

Did it rain?  I think there might could have been a hurricane after this trial.

So the conclusion is, of course, the only conclusion, he knowingly possessed child pornography.

All right.  And we know that again because, look, when they asked him about this stuff, this is what he said

376

that he used it for.  Recall the topic of the conversations when this interview happened.  Those adapted or modified images, which included -- one of those images was an image that he downloaded from Teen Gallery of a clothed girl at a pool holding a phone and it was adapted to display and make the focal point her vagina in a lascivious manner.  That meets the definition.  It's child pornography.  So keep that in mind as you evaluate that admission.

Okay.  Count two, production.  These are the elements of production.  And I started my talk with this because, quite frankly, again, the video of M.C. totally establishes -- that first bathroom video, as the Court will instruct, establishes that.

Was the defendant -- was the minor under the age of 18?  Of course she was.

The defendant used or employed or persuaded or induced the minor.  Used is what's in play here.

And again, whether or not the visual depiction was mailed or actually transported, we've proven it was actually transported in and affecting interstate commerce.

So what is used?  What is used?  We know the defendant used M.C. to make child pornography.  She wasn't aware that she was being used.  And that doesn't matter.  According to the instructions you're going to receive from Judge Bell, it's really a non-issue.  Think about it this way.

You can use a shovel to dig a hole. The shovel isn't aware that it's being used to dig a hole but that hole exists. Same concept. He used his cousin to make child pornography.

It was actually transported in interstate commerce. It was produced using materials that affected interstate commerce.

There's also a nuance to this count, ladies and gentlemen, a distinction I ask you to keep in mind. This is also charged as an attempt. And what that means is you can convict the defendant if you determine that the defendant intended to commit this crime of producing it and he took a substantial step toward the commission of that crime. And what that means is you wouldn't even have to reach or resolve the question of whether that image, that video met the definition of child pornography if you concluded that he intended, intended to use M.C. to produce that video and he took a substantial step. I'm not suggesting it doesn't meet the definition. Of course it does. I'm pointing out a nuance you're going to hear about from Judge Bell. There's two paths to liability there. Either one he's guilty.

And what he did with M.C. wasn't an accident. He made other surreptitious videos too using the same phone, saving it in the same location on the hard drive, and accessing it to view it in the same way using that MacBook. We showed you that. And that evidence came in to demonstrate

378

to you that as charged in count two, he had the intent to produce the video involving M.C.. And how can we discern that? How can you fathom what's in a person's mind? Well, you look at what else he does. And that's why this evidence is relevant and that's why it was shown to you.

You recall, importantly, Jason Whitt established that those files involving those other videos and the M.C. video too were missing from this phone in the DCM folder, right? Sequentially all the files were there, all the other files were there except the child pornography files. What does that tell you? Was this an accident? Did he delete those out of the goodness of his heart? No, of course not. It was not an accident.

One of the hardest things we showed you was that patient video of F.L., the young lady who came in here, identified herself in the video and identified the defendant's voice. A patient, right? Someone who was purportedly being treated and given care by the defendant. What is he doing? What is he doing with his phone? What does that show you with respect to his intent? Where was it pointed? In her pubic region. What does that show you about his intent? Was it an accident? Was it a mistake or was it deliberate? Was it well-intentioned? Was it planned? If it was an accident, why was it saved on that hard drive for all these years? If it was an accident, why was it methodically deleted from his

phone? It wasn't an accident, right? And you can take that evidence in deciding with respect to count two if he had the intent to do it with M.C..

We showed you again these forensics. It reflects that where that file was saved was plugged into that computer. Simple as that. It's not anything more complicated. It rained. It rained. That's what we showed you. 9/10/2021, last accessed date on that folder.

And here's what's even more telling. The agents, you heard in the interview, asked him I think on two occasions, "Did you ever do anything with your patients? You're a child psychiatrist." What did he say? "No, never did anything. Search my office. Never did anything." That was a lie, right? And you can consider that again when determining whether this was a big mix-up. If it was a big mix-up, why lie? He lied.

What else? The video -- the second bathroom video of K.C.. We had Ms. E.S. come in here and identify her cousin, right? It was the family cabin in Maine. You recall the EXIF data. Again, why was this presented? Because it's the same modus operandi. Same camera angle designed to what? Capture the pubic region of the person taking a shower, right? Saved in what? The same place. Deleted in the same way. Consider that when determining whether the evidence and the burden has been met with count two. It has. And these other

videos show it.  Again, the same access date.  And, of course, the M.C. video as well.

So you recall as well the testimony from E.S. who testified about a conversation she had with the defendant 20 years ago when she confronted him about a video that he made of her when she was a minor, 15, and of his own sister, right?  His own sister L.T. who was a year and a half younger than E.S..  That makes her a minor too in that video.  And what did he do?  Did he deny it?  No.  He admitted it.  He admitted it.  He even showed her how he did it in the crawl space in Grandma's attic.  Moved the vent, right?  That's evidence probative, relevant that you can use to discern whether that intent element of count two, whether we've met our burden.  We have.

And again, we end the segment with the defendant's own words.  These agents asked him, "What are you into?"  And he says, "I'm a voyeur."  What does that mean?  People being videotaped without their knowledge, right?  That's what this is.  That's what count two is.  That's what this other evidence is.  And it's corroborated by the defendant's own statement, right?

He's guilty of count two on either theory, production or attempt.  Convict him.  Convict him.  He's guilty.

Finally, the elements of count three,

transportation, quite frankly, is the easiest one.

The first is whether the defendant knowingly transported child pornography in interstate commerce. All right. We already did child pornography. We already did interstate commerce, right?

Did he do it knowingly? All the evidence relating to counts one and two establish that knowledge. They all do.

Again, the EXIF data shows these videos were produced in Maine. The forensic data, frankly your common sense, demonstrates that this was transported to North Carolina on that device. Accessed with intent to view on that MacBook. He's guilty of that. We've proven it. Convict him.

Now, as I demonstrated, all these elements are met and in just a few minutes it's going to be up to you. You're going to go back there and consider all the evidence. Some of the evidence that I'm going to ask you to consider are the defendant's own words. We played it for you at the start of this trial. His own words that he gave to the FBI.

He said, "I've searched for teens. I've used Teen Gallery. I went to a DeepFake website to adapt and modify these pictures. I got off on it."

"What does that mean? Did you masturbate to it?"

"Yes."

He admitted he's into voyeuristic videos, right? Which he explained as, quote, "people being videotaped without

their knowledge."  He even said he deleted child pornography and kind of foretold this issue with the forensics.  You can take that into consideration.  It's powerful.  His own words are powerful because, as some people say, words matter.  And we've proven that here, right?

We've shown you a lot of forensics and that's important too because it's circumstantial evidence of rain.  We've shown that.  We've shown a hurricane to show you the defendant's guilt.  And the Court's going to again, has instructed, direct is equal to circumstantial evidence.  There is no distinction under the law.

And importantly, right, what did we end the trial with, the government's case in chief?  We presented you those victims.  They took that stand.  You heard from them.  They told their story.

And remember the testimony of E.S. most of all, his cousin.  She identified K.C. in that video, right?  Told us that she confronted him about the video that he made of her and his own sister.  He admitted to it.  He even showed her how, right?  Do you remember the other aspect of her testimony?  She said, hey, the defendant promised me, promised me, I'm never going to do it again, right?  But we know that was a lie.  We proved it.  Because he did it again and again and again and again using these devices.  He won't listen to his own cousin.

383

Think about the oath he took when he was a doctor and what he did using this phone, right? Wouldn't listen to his cousin, wouldn't listen to his oath. But guess what. He's got to listen to you, right? He's got to listen to your verdict. He's got to.

So when you go back into that room, with your verdict, with your verdict you can put an end to the defendant's sexual exploitation of children once and for all. Okay. He's guilty. We proved it. Convict him.

THE COURT: Mr. Ames.

MR. AMES: Thank you, Your Honor.

All right. Good morning, everybody. Once again, I wanted to say appreciate your time, appreciate your attention. I know how difficult these types of cases are. So I really thank you for your service.

We talked the other day when we first came out here on Tuesday. You recall I told you a few things during the opening argument. I told you we were not going to hide the ball on anything with regard to Mr. Tatum's prior conduct with other people. I said to you that he's an admitted porn addict, admitted sex addict. Has sought counseling for it. I told you that the government's case is going to include a lot of evidence not just of what they're alleging in their charges, but it was going to include a bunch of other evidence as well. And that their general gist of the information you

will receive would be that David Tatum is a pervert.

And we're not denying that he had prior acts that were bad. We're not denying that there aren't victims. There are. And there are a few of them sitting over there right now.

David Tatum betrayed his family. David Tatum betrayed the people that he trusted and who love him very much and I'm sure he loves very much as well. But he did terrible things to them.

But that is not what you're weighing today. What you're weighing today is whether or not the government has proven beyond a reasonable doubt that he committed the acts specifically that they are alleging. That's your role and that's your job. It is not to take an assessment of his entire life and his entire history and punish him for everything you've heard. Your specific job is to weigh the evidence for its relevant purposes and determine whether the government has specifically met the burden for the charges alleged.

I'm going old school with paper here. I'm going to run through that because I think there are a few points that we need to address here. Now, the U.S. attorney went over a few of these. I just want to quickly, while they're fresh here in everyone's mind, go over them real quick.

The child pornography definition. This is one that

you are going to have instructions on when you go in the back and the judge will give you these instructions in detail. But what it entails is production of a visual depiction of a minor. That part is pretty straightforward. Some of the rest of it isn't. There's an additional definition number two that you probably don't have to worry about, but this is specifically the instruction you're going to get later.

Now, keep in mind this is extremely important because unlike what many people may think, a nude image of a minor is not by itself child pornography. It just isn't. That's why you don't -- when you go home today, you're not going to have to throw out the pictures of your kid taking a bubble bath or running through sprinklers. There can be art, there can be pictures and photographs, a variety of those involving nudity of minors. It is not pornography by definition.

The law states and gives you the definition, and these are the categories. There's a few extra ones that were not just displayed so I'll give you all of them. They need to fit one of these five categories: sexual intercourse, bestiality, masturbation, sadistic or masochistic abuse, and then finally, lascivious exhibition of anus, genitals, pubic area of a person.

So you can pretty much eliminate one through four as a general matter in the information and images that you have

seen.

The lascivious exhibition of anus, genitals, pubic area is the definition that by and large we're dealing with here. But keep in mind the context of these other things that you're looking at.

The requirement for something to be child pornography is not just some nudity. It's much more than that. It requires sexually exploitive -- sexually explicit, rather, conduct. And it's not enough that they're not just nude. It's not enough that the pubic region is visible. That's not even enough under the statutory definition. It requires the lascivious exhibition specifically. And not just exhibition, lascivious.

Now, what does that word mean? Well, Congress being Congress, they didn't give us a definition. There's none in the statute. But it is a fact for you to decide. And the judge is going to give you some guidance. I'm going to show you those factors -- some of them anyway.

You're going to have this list back there, but essentially -- there's actually a total of six of these factors. They're not exhaustive nor all inclusive. They are not dispositive. They are for your consideration, okay? So you don't have to -- there's no checking of a box on each. There's no if I don't have one, then it's not or -- you just have to look at these as -- taking these in advisement in

helping you determine when you're looking at or thinking about a particular image, whether or not it constitutes lascivious exhibition.

But in particular, what's the exhibition part?  It means a depiction that displays or brings to view to attract notice to the genitals or pubic area of children to excite lustfulness or sexual stimulation of the viewer.  Again, it's not just someone standing there.  It requires specific focus, exhibition.  And not just exhibition, lascivious exhibition.

And those factors can include the focal point.  Was it the focal point, the main focus of the image?

Was the setting made to appear sexually suggestive?  Was there something within the image itself other than potentially just the focal point, but was it -- where was it?  What was going on?  Those can be factors.

Whether the person is displayed in an unnatural, inappropriate attire, inappropriate pose.

Whether they were fully clothed or nude.

And the final two:

Whether the depiction suggests coyness or willingness to engage in sexual activity.

And whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

And as the judge will note below, it doesn't have to involve all of them to be lascivious.  It's for you to decide

the weight.

And again, just because genitals, anus, anything is visible is not enough.  It has more to it.  It requires more.

I just want to lay that all out so that -- my sincere hope is this is not a circumstance where you go and check a box and take things for granted.  This is important.  You have facts and things to weigh.  You're the fact finders here.  You're the ones that make these decisions and it's important that you do so carefully and with consideration.

I want to address a few of the main points, but one thing I want to make clear.  There are three different types of counts in this case.  They're similar in a lot of ways, but they also have some distinct differences.  Count one is possession, which is possessing it.  Count two is the production, which means making or producing.  And count three is the transport.  And the judge will lay those out as well and the differences and distinctions, but throughout them the definition of child pornography is going to be the same.  The definitions and the factors you consider will be the same.  So that analysis is going to carry out throughout this.  But some of the other factors you're going to have to consider will be slightly different.

What I want to note to you is that of all the evidence, of every single piece of evidence that the government has presented to you, I want to be clear, only one

of them, and one only, even can meet the definition of count two which is the production count. The only video or image that meets that requirement is the video of his cousin M.C. taken with a camera in the bathroom getting in and out of a shower. That is the only one. It is not production to morph an image. That is not alleged. That one video is the only count that qualifies for count two.

So speaking on that video, what we observed and what the evidence provided was that this was at a cabin that the family goes to in Maine on a routine basis. Cousin E.S. said that she's gone, like, 20 times, I believe. Or many years. Thirty, I don't know. Very many times.

So in this bathroom you saw a video of what appeared to be David Tatum setting up a phone on a shelf somewhere in a bathroom. He leaves the room. Sometime later his cousin does come in, takes a shower and leaves. And he comes back in to retrieve the camera.

So what the government is arguing and what they want you to glean from that is that that was meeting all of the elements, not just for count two, but for the rest, but specifically for the second count for production, that this was meeting this definition that it was child pornography, number one. And number two, that it was done with intent to film her. And number three, that it was, in fact, saved, transported later for the other counts.

So the analysis specifically, was it child pornography? Again, no one here is contending it's not -- it's good. And frankly, I'm not contending it's noncriminal. There are other laws that David Tatum has assuredly broken, state laws, federal laws in other jurisdictions and elsewhere with the conduct that you have seen. But that is not for you to decide. You have three charges to decide and three only.

So whether or not he committed a crime in Maine in some fashion under their laws, or in New York under their laws, or even in North Carolina under the state laws here, that's not for your consideration. Whether or not he violated a voyeurism statute, whether or not he violated someone's privacy and that has a criminal implication. You have literally three charges to consider.

Here you would have to, in order to find him guilty, determine that this was in fact child pornography. Meaning it meets those definitions that we just talked about. That it's either bestiality or intercourse or sadomasochistic or exhibition of the pubic or genital region that is lascivious, meaning sparking desire or whatnot in the viewer. That's the only definition that would even come close to qualifying because there's clearly no intercourse. There's clearly no bestiality. So you would have to find that this occurred with an intention to do so, number one. Not just an intention to film, but an intention to use or coerce or cajole her in some

fashion to engage in explicitly sexual conduct. That he had to somehow intend that, have that happen, film it, and intend to film it. All of these things need to be met.

So you can review and -- was there any lascivious conduct? Was she doing anything sexual while she was there? I submit she was not. She didn't know the camera was present. She took a shower. She cleaned herself off and that's all she did. There was nothing sexual about it.

The government would like you to believe that somehow it is sufficient that if a person looks at or views an image and is aroused by it, that in and of itself is sufficient. It is not. For instance, there is some of these morphed images that the government has provided. He had an ex-girlfriend, the prom photo, for example. Now, you'll have to do an analysis if you're looking at that photo. Is that pornography? Again, it's not good. We're not condoning it. But is it pornography? Does it have the definitional meaning? Lascivious. Is it lascivious? Is it focused on the genital region? I know this sucks to talk about, but that's what your analysis is. It doesn't. It just doesn't. It's literally a person standing.

There are many other images just like that: People standing and that is all. Nothing sexual at all with the nature of the photo. And the fact that he masturbated to it or liked it does not change by magic what's in the photograph.

No more than if someone masturbates to a Sears catalog, it doesn't make the Sears catalog pornography. So you need to look and analyze and evaluate the image. That is your purpose here.

So please don't skip over the important parts here to determine whether in fact this is pornography and what his role was, particularly in count two. He placed a camera in a bathroom, but they also have to prove that he intended to create child pornography. That he intended to use or coerce M.C. to engage in sexually explicit sexual activity for the purpose of creating child pornography. That's the definition.

We have the video and that's essentially all that we have to establish what happened and what the circumstances were. That's the entirety of it. That's why they have brought in a lot of this other evidence that isn't charged today to try to show that he's consistent in his behavior and he does this a lot and he's done it before, right? That was the purpose. He's not charged with it, but that's why it's relevant.

They told you to listen to E.S. right at the end there, right? Again, E.S. was another one of David's victims. You heard about her story where back when she was 15 or so, high school age, there was a video taken of her taking a shower. It also included David's own sister. And she heard about this from David's sister and confronted him about it.

Now at that time, bear in mind, they were of similar age. They were about a year or so apart. So he -- both around 15, 16. Like the age frames, it wasn't exactly clear. So at that point in time, he was also high school age. This is not somebody who is 30 or 40 years old. They're the same age.

Additionally, it would seem to be the case that he certainly would not have wanted to film his sister. The cousins are not blood related as testified to. They are step cousins. So he's got this video apparently that his sister was in. I imagine that -- and you can decide based on what you've heard whether that was an intentional act; that he was intending to create that of his sister. I would suggest probably not, but you can decide that.

But you also heard that this cabin -- sounds like they've got a pretty big family and they've got a lot of people there and they're telling you how prolific he is at this voyeurism stuff and placing cameras in bathrooms. We don't know how many times it's been done. We don't know how often it happens at the cabin. We don't know if it was done 8 or 10 or 12 times that day with multiple people. We do not know because the evidence hasn't been presented.

So did he intend specifically for the camera to film M.C. or did he intend for the camera to film whoever happened to walk in? We don't know. They haven't given any evidence

or any surrounding circumstances. They haven't called anybody that was there to corroborate who might have been there at that particular date and time. They didn't give you any pictures of what the shelf would have looked like and where he placed it. They didn't give you anything. They just showed you the video. And then they showed you a bunch of stuff that happened at various other times to various other people and want you to presume things based on that.

But I will tell you as far as the voyeurism evidence is concerned, what you have seen -- while you didn't see this video purported to have happened many years ago in high school, you saw another video, same cabin, with another family member who, again, I submit, is another victim. There's no denying it. But that was of an adult. And again, probably a violation of other laws but not these laws.

So who knows how many times, how often this may have occurred, and if it was just something he was doing at a very high clip with multiple people and happened to have one, maybe other people, that he didn't intend to, we don't know. We have nothing in regard to the intent in that specific moment. We just have conjecture about it based upon past behavior.

But note too that of all the voyeurism videos that you've been given, all the rest are adults. Again, they're not good, but they're of adults.

The patient that he had, of course, is horrifying.

Taking an up-skirt photo of a person that's in your office and putting their faith and trust in you to talk about what are assuredly sensitive issues for somebody young and in high school is horrific to do that, but it's not pornography and it's not child pornography because the patient was over the age of 18. The government has argued and I think will argue that, well, it was very close, by a few days. Well, would that not show that his intent here in his perverted behavior was to avoid filming somebody under 18? If he's had a long-time patient week after week that he's meeting with and he knows how old she is and he waits until the appointment five days after she turns 18 and that's the video that he takes, wrong as it is, it doesn't show an intent to film a minor. It shows literally the opposite: the intent to film an adult.

The government may go and show this exhibit now that indicates the report says 17 years old on it. She's not. She was 18. It also doesn't describe the same clothes she had on that day. So they can pull that up. Probably will. But note that she was literally 18. He did know it. It was another part of the report where he notes that she's 18. That's what happened. They didn't tell you a whole lot about it. They just introduced a document, but you can review the document yourself and you can note what that document says that she was wearing that day. It was not a skirt, right? So some of this

stuff is just left over from prior appointments presumably, but you make that call.

Now, with respect to some of the other, again, evidence that he's not charged with, there's this file list of very suggestive names. Horrifying stuff, no doubt. Again, no images. Nothing. It's literally just text. I said that, I think, in the opening. I said it during trial. The reason that's critical is because we really don't know what it is. No matter how suggestive it sounds or how horrible it is, there's no evidence of what it is at all or where it came from or anything.

And how does it get there? This is important. The reason why I spent so long blabbering about the whole idea of these cache files and the thumb drive, why I care so much and why we're putting that forward so much is the government's getting up here and arguing that access means something different than access really means. The suggestion is that when you see this metadata and access, it means that the person opened it or viewed it or did some tangible thing with the item. That's not what it means. It just means one device was plugged into another and that is all. Mr. Whitt told you about that. We went over that very carefully and that's important.

If you recall, I pulled up multiple instances of screenshots and thumb shots and such on this MacBook that were

accessed allegedly on September 10, 2021.  They all had the same access date.  Not only that, they had the same access time.  Not only that, the same access second.  So unless he was watching 85-some-odd videos simultaneously, I would submit that, no, that access date is not a date that it was opened or viewed.  It was only a date that somebody put some drive into a computer and that's what creates it.  That's the point.

So look carefully.  You'll have the exhibits.  You can look for yourself.  Recall I was asking what does this even mean?  What is this stuff, the metadata?  Read through it.  Look how the dates match up.  Look for other dates.  The video of M.C., for example, there's a creation date and a modified date from six or seven years ago.  There is no other indicia of ever viewing or watching it in any recent term whatsoever.  That is false.

I told you in the opening statements -- if you recall, the government submitted to you that in their case they were going to show you that the video of M.C. was played, opened on the MacBook.  And I told you, no, they won't, if you remember that.  Money back guarantee.  No, they will not prove that because it didn't happen and they don't have evidence of it.  Lo and behold, there is literally no video of it on the MacBook.  What is there?  The quick view thumbnail.  That is what's on it and that is all.  That's why we spent so much time with that.  And how does the QuickLook thumbnail get on

there?  Putting the drive in populates it, just the thumbnail. That's it.  You can't even access the thumbnail without special software.  There's no video on the computer.  It's just a thing that's on there that you can't even see.  So no, all of this stuff that they're saying is accessed and viewed on the MacBook, there is no evidence of.

Let's talk about this playlist again.  It's the same concept.  Look at the playlist.  The entire list is populated at the same time, June 29th.  They're going to tell you it's a Morphus login.  They didn't look anywhere else that day, but they're going to just assume because it says that, it was him. You heard from at least a couple witnesses, but certainly from the main investigator on the case, Mr. Atwood, Agent Atwood, that we called, who had interactions with his wife and knows that it was a jointly used device.  Knows that multiple people did have access, did use it.

Again, I'm not suggesting that stuff was planted. Don't get me wrong.  I'm not suggesting that someone got framed here.  What I'm suggesting is just because there's some image or something pops up, it's not -- the only conclusion anyone could ever draw here is that it's David Tatum who's responsible for this image.  That's not the case.  They want to suggest that he's carrying around some images and watching them constantly on a MacBook computer and deleting them, or whatever the case may be.  No, that's not the case.  The only

remnants of it are because a drive gets plugged into a device. That is it. That is all. The government's own witness told you that.

That's the evidence on the MacBook. And we don't know when or who was on the computer and who might have plugged the device in. So to suggest that he was watching a video on September 10th or something when there's multiple instances of the exact same time having the exact same access date, you can use your common sense on this. It's just thumbnails. That's all it is.

So look carefully at the metadata. Trust or not trust it at your discretion. That is your prerogative as the jury. But listen carefully to the instructions. Think carefully about the evidence and things you've heard, particularly with regard to the analyst who gave you a lot of detail, a lot of good information. He provided a lot because this is a digital case with digital evidence. That's really basically all of it as far as the tangible evidence other than testimony. So Mr. Whitt gave you a ton of information to consider about how this process works.

I asked a lot of questions about -- we delved into what is pthc, and such, in part because -- again, I guess you can use a common sense assessment of it because there's no specific definition that was given. But preteen hardcore, again, the evidence that is here for Mr. Tatum is (A) that he

doesn't know what that is, is not familiar with it, but (B) no particular evidence to speak of that even implicates that there was anything preteen or hardcore anywhere. The only implication are supposedly these file paths generally that have some pretty horrific names. But keep in mind this is a person, as I said before, a prolific collector of pornography in general, including a lot of adult pornography, including a lot of anime. We had a conversation about that too. That's the Japanese cartoons. You can see some on Netflix, the normal ones. I've watched them. They're fine. There's a subsection, subgenre that is some pretty nasty crap. It includes depictions of minors. It includes them doing sexual stuff in comic books and in videos and stuff. We talked about that.

And we talked with Mr. Whitt about common things he might see in terms of names. We talked about the Lolita or Loli or Lolicon and stuff like that. He wasn't a hundred percent familiar with exactly what it is, but he gave you a couple of examples like, yeah, younger looking, even like really, really young looking people in Japanese cartoons and such. Again, not child pornography because it doesn't meet the definition of having, you know, a person in it that you guys are tasked with doing today. But it was on there. There's a lot of it. And note some of the file paths. They talked about the file paths. That list they gave you has got

the name of a file that does not have -- they showed you a file, but the list you have does not have the rest of the file path.  So that file path is related to a comic book that says the Loli part in there, Chapter 4, whatever it is.  Again, we don't know what it is.  They didn't produce that.  But that is one of thousands upon thousands.  I think they mentioned the Loli search was like 10,000 files.  Again, we're talking about a lot here, a lot of adult pornography too.

And so what the government has presented is a handful of images and photos that are, other than the family members that you've heard from, largely people we don't know, don't know the age of, don't know the identity of, don't know really where they came from, and don't know otherwise if they are in fact child pornography because even if you see sexual behavior that does meet the definition quite clearly, like a sexual video that's obviously pornographic, you still have to determine they're a minor beyond a reasonable doubt.  You may think maybe, probably.  That's not good enough.  It is beyond a reasonable doubt.

If you're a sports fan or something, if you've ever seen where there's a play and they make a call, someone challenges the call and they say, well, it's presumed that the call on the field stands unless there's clear and convincing evidence to overrule it.  Okay.  That's kind of how this works.  He's presumed innocent and can only be convicted if

the government proves by clear and convincing evidence that he's guilty. But not even that. It's a higher burden. It's a beyond a reasonable doubt burden, the highest one we have. Clear and convincing evidence is a standard that they take your kids away. Beyond a reasonable doubt is harder. So keep in mind that that's the standard that you have to weigh all of these decisions.

How old a person is beyond a reasonable doubt. Not based on assumption. Based on the evidence that you have heard and that only.

What about whether it's pornography? Again, beyond a reasonable doubt.

Whether or not they had the jurisdictional requirements, all that word salad that the judge will tell you about. Beyond a reasonable doubt.

Whether or not they've properly attributed things and all of that.

Take everything carefully, sincerely into consideration because these are the easiest cases in the world to gloss over. These are the easiest cases to check those boxes. They absolutely are. But you have a duty and I ask sincerely that you think carefully about all of these issues. You listen carefully to the judge's instructions and you consider this for what it is, which is a series of conduct that they're alleging that is specific and not related to some

of the other folks that came in.

Consider when you're looking at an image is this pornography? Is the focal point on genitals? Is it intercourse? Is it that or not? Is that present? Is it nude or not? Is it all of those factors? Consider each and every one of them. Consider them in the context broader of the statute and what this is supposed to prevent. The production charge in particular is supposed to prevent the filming of sexual abuse. Look at the statute. Read through it yourself. Look at what the examples are of things that the government would have to prove. Look how severe they are. And consider the definition very carefully and ask yourself whether or not that occurred here.

No matter what you think, no matter how horrible you think the behavior was, the guilty verdict only comes, only comes if you believe beyond a reasonable doubt that he committed the specific acts specifically delineated in that statute. For count two it's only one video and only one video applies.

You can also take into account to some extent things you didn't hear about. You can't speculate on evidence you wish you knew, stuff you wish you knew, wish you heard about, wish you saw. You have to go with the evidence presented and any reasonable inferences therefrom.

You're going to have those documents back there as

well to work from.  I would ask you to go through them carefully.  Some of them may not be pleasant.  But in particular, some of the metadata, some of the more technical information.  And consider carefully whether or not some of the allegations here are what they appear to be.  Again, we're not saying anyone got framed or anything.  The question is were they or were they not accessed on certain dates and times?  Were they even on certain devices?  Is there any evidence of any of these things?

Be careful in going through that and be careful with being overcome with emotion, which is pretty inevitable, obviously, in a case like this.  It's hard not to be that way.  Okay.  I get it.  I understand.  But we've got a system here that works for a reason.  We all have a part in that and you have that today.

And I really, really appreciate your time and I appreciate your patience with me and all my blabbering all the time.  I appreciate the people that came out to participate in this trial.  I know that's hard.  You guys know it's hard too.  And I hope that you can do what is fair and what is right in your serious consideration of all of the evidence.  And it's not checking boxes and it's not just assuming things and it's not easy whatsoever.  This should not be easy.  It's not easy for anyone.  It should not be easy for you.  You have an important, important job.  I know I keep saying it over and

over again like a broken record. It's for a reason. When I'm repeating something and I can't stop talking, it's because I think it's pretty damn important. So please consider all of those matters that I spoke about. Think long and hard. Think carefully. Ask questions if you have them. Talk to each other.

I appreciate your time. Thank you.

THE COURT: You have 23 minutes, Mr. Cervantes.

MR. CERVANTES: Thank you, Your Honor.

Let's talk about what we agree with and what we don't agree with because apparently there is some common ground here.

Number one, defense agrees that Dr. Tatum is the one who recorded, who made that recording of M.C.. That's beyond dispute. And the evidence proved it anyway. His family members identified him. He's in the video. That's not an issue. They've conceded it.

They also agreed this is criminal. This is criminal, ladies and gentlemen. But they want a technicality. Criminal, but not the criminality here. We submit to you it is the criminality here. We're going to go through that. We've gone through that. Mr. Odulio explained that to you. But they want you to find through some technicality that isn't actually applicable and doesn't work with the facts of this case to find him not guilty.

We also agree that we don't know how many recordings he's made. Who knows how many recordings the defendant has made of other victims, of other minors, other adults. How many? Only the defendant knows. We found some. We presented those to you. We found four: The first bathroom video of M.C.; the second bathroom video of K.C.; E.S. testified to one of her and the defendant's sister when they were both minors; and F.L.. She also testified he did those three sets of recordings, which is another point of agreement. He agrees to that. He agrees that he made that recording. He agrees that it was wrong.

We're not here, though, to say, hey, convict him because of the F.L. recording. To be clear, he's not charged with that. But that recording informs your decision of what his intent is in making the recording of M.C., the first bathroom video. Where did he point it? Where did he point the camera? What kind of voyeur is he?

A voyeur is someone who records other people. Okay. But he's a sexual voyeur. He's not interested in recording people without their knowledge going about their business in everyday life. He's interested in recording them in the bathroom, the most intimate of places. What happens in the bathroom? You take your clothes off. Why didn't he do a recording somewhere else? Even a bedroom. Lesser chance that you're going to take your clothes off. Maybe. I don't know.

But a bathroom you're surely going to take a shower. And he knew exactly what was going to happen because he set it up 20 seconds before M.C. went in to go shower. Then he comes in right after, retrieves the camera and keeps it all these years. Where does he keep it? Where does he save it? He didn't look at it and say, oh, boy, my 15-year-old cousin. They're family. There's no doubt -- although it wasn't admitted to by defense here, but there's no doubt that he knew how old she was. They're family. She was 15 at the time.

He didn't look at that and say, hey, I probably shouldn't have done that. No, he deleted it from his phone. He put it in the hard drive. He saved it for all these years. Since 2016 that video has been saved. And where is it saved? In his library of pornography. It's not saved in a folder that says mistakes of my life, things I regret. It's saved together with his material that he uses to get off.

We don't agree on a lot more than we do agree on. This isn't art. None of these images are art. None of these videos are art. He didn't ask M.C. on the stand: Don't you think this is an artistic view of you naked in the shower? Is that art?

He also misstated the law. As the judge said, you need to follow the judge's instructions. But I'm going to do my best to restate them correctly.

So the defense suggested to you that somehow M.C.

needs to do something in the video. It's on M.C.. Let's shift the burden, ladies and gentlemen. Let's shift it to the victim to make sure that this video can only qualify as child pornography if the child is the one who does something sexual. Let's switch the burden to the victim. He'd like that. The law is not like that.

So the law -- this is the document that the defense showed you. Definition of sexually explicit conduct.

Number 1, sexual intercourse.

So in terms of -- the pornography here, as I told you in the opening, there's several portions, there's several types, right? Let's go for low hanging fruit, as Mr. Odulio told you. The first video we showed you of the two girls that were approximately 11 to 13 years old. There's no doubt about that. This doctor is a child psychiatrist. Most of his patients, 75 percent of his patients were children. He knows what children look like. And even if he didn't, just look at the video.

Sexual intercourse. They were engaged in that.

The last category is the category that would apply to the M.C. video because she did not engage in sexual intercourse. So I guess we can agree on that.

So what does sexually explicit conduct mean when we're talking about the lascivious exhibition of the genitals or pubic area of a person? We're not here trying to prosecute

parents who are taking pictures of their kids and they happen to be in the bathroom. That's not what the law says. It is the lascivious exhibition. And there's guidance that you're going to get to what the lascivious exhibition of the genitals means. That's what makes it criminal, right? And there are factors. These are factors, okay? Some of the factors are applicable here.

The first one, what is the focal point? The focal point, the angle of the video in the bathroom is directed towards M██████ crotch.

Look at the setting. It's in the bathroom. As I said, this isn't a voyeuristic video of them on their family vacation and M.C. out on the lake or something like that. This was designed to record her in her most intimate moment, in the shower, to capture her naked. Not just naked, but he set it up from the ground up to capture her groin area.

Number four, she's nude. Totally nude.

Number six -- this one, I think, is the most debated between the two sides, right? What is the -- what is the intent or design of this video? Does it elicit a sexual response in the viewer? The defendant has already told you what he does with his material. The defendant took the actions of taking that video and preserving it. What is it designed to do? It is designed to satisfy his urge to create these videos, to satisfy his sexual urge.

410

What if -- what if M.C. in that video actually had started doing something to herself, masturbating? We wouldn't be having this conversation, right? The defendant doesn't get a free pass just because the victim didn't do what he hoped the victim would do. Here what he tried to do was record her in the bathroom so that he could use that video for himself.

He says that he's only interested in recordings of adults, but that's not true. His child pornography material you've seen involves minors. That can't be in dispute. The modified images, some of those girls were at least under 10 years old. That's up to you to decide by looking at the images. I mean, you've seen them here. You can tell. Some of you even told us during jury selection that you have children. You know what children look like even if you don't have them.

But the facts contradict his contention that he's only interested in adults. Let's talk about F.L., for example. The defense was right, I was going to show you that document.

This is the medical record of the defendant's visit -- or F██████ visit with the defendant. You can see that he is the listed provider. No doubt about that. He agrees that he treated her and even agrees that he made the video.

What I want to highlight is that the defendant

believed that she was under 18, right?  The defense has highlighted the fact that five days before this meeting she had turned 18.  But what I'm asking you to do is look at what the facts suggest to you was the defendant's belief of what he was doing.  The facts show you that he believed she was 17.  He didn't know she had just turned 18 five days before, and he tells you that in his notes.

He says, "F.L. is a pleasant 17-year-old white female."  I'm showing you Government's Exhibit 11.  "She is in 12th grade at Penfield High School.

"F.L. is a 17-year-old girl who has a chaotic childhood with a dysfunctional mother and is now being raised by her father who is a single parent and works many hours a week typically."

This is who he took advantage of.  He didn't believe -- he didn't know she had turned 18.  So in his mind -- in fact, what he tried to do was even make another production video.  He's not being charged for the F.L. conduct, I'll say it again.

But this is instructive of what he was trying to do when he made the video of M.C..  It's hugely important because, as we've talked about, you can never really know.  Unless you have some way to look into his mind, you look at conduct.  And that's just using your common sense.  We do that all the time.  What someone intended to do, you look at the

circumstances and you decide what it's consistent with. And here he thought he was recording a 17-year-old girl.

Now, the defense also says that there's no evidence that the defendant accessed the M.C. video. First of all, we don't have to prove that, right? The elements for production don't require us to show you that the defendant was sitting there watching the video. We could stop short at the moment that he recorded that video because the crime is complete. We could show you that he completed the crime as soon as the video was complete and everything we've shown you after that is really just corroborating evidence, right? Our job is to prove this to you beyond a reasonable doubt, so we're going beyond just proving the elements of the offense. All of these other facts, they don't go to establish the elements. You'll see that when you're breaking down the elements and what facts support them. It's not -- there isn't some requirement there that the defendant viewed the image, right? We're showing that because it shows what he did with it.

And there's proof that he accessed it. So contrary to the defendant's statement, Exhibit 5K shows you -- this is the metadata from the MacBook that has the same thumbnail as the M.C. video, right? It is a thumbnail created of the M.C. video, excuse me. It has -- the file name is the same file name. Thumbnail last accessed date/time: September 10, 2021. What does that tell you? That tells you that the hard drive

was plugged into the MacBook.

What else did we show you about that hard drive? That's the My Passport hard drive.  It was encrypted.  No one knew the password to get into the hard drive.  We had to send it to Quantico.  There's another important fact there.  The only way that the Mac is going to be able to generate this information about that file when the hard drive is plugged in is because the hard drive is unlocked when it's plugged into the Mac.  That is how the Mac can retrieve that data and store it in its hard drive.

And how is it that the Mac could have accessed the thumbnails of the image -- of the video?  How is it that the Mac could have accessed all of this metadata about the M.C. video?  That's because the user knew the password.  And the only person in this courtroom who knows the password is the defendant.  And it's not Kim because when she gave us the hard drive, we obviously had to send it to Quantico.

But even if all of that fails, even if all of that fails, which it doesn't, what is -- what was the defendant's intent?  What was he trying to do?

So Mr. Odulio has explained to you that count two, the production, has attempt.  It also includes attempt.  What was the defendant trying to do with this video?  Because again, the law is not going to give him a free pass just because he was inept in committing his crime or because he was

fortunate enough that M.C. didn't do something to herself in that video to make it clear that it's child pornography. The law does not forgive him as such. Accordingly, when you're charged with an attempt, you can be convicted of the substantive offense if you have the intent to commit the offense and you take a substantial step toward that offense. Those are the first and second elements that you see on the screen. Intent to commit the offense and substantial step toward it. Everything we've talked about applies to that.

THE COURT: Three minutes, Mr. Cervantes.

MR. CERVANTES: Thank you, Your Honor.

Finally -- well, two more points that I'll try to get into three minutes.

The -- we don't agree that the defendant doesn't know what pthc is or that he didn't have -- that there was no access. So let me just go back to this really quick, this list, right? I'm not going to read these file names again. This is 5C.

What is the evidence? So this is just a list, data that's pulled out of the MacBook. It's a list of all these horrible sounding files. So that's evidence, right?

Mr. Whitt testified that in his experience, pthc is consistent with child pornography. And that in the rare, rare situations, he has seen a few files with pthc that involve adult pornography; but in those files, the file names, there's

usually some indication as well in the file name that there's something related to adult.

So go ahead and look through all of these 1,118 rows and try to find one of those rows that indicates adult and take that out. You're going to be left with probably another thousand, if that, just to be generous and to give him the benefit of the doubt. And it was rare.

But there's more because Exhibit 5D, right? This is the one that shows you what was played. This is the history of what was played on the MacBook, 5D. It shows you that this VLC was first run August 6, 2019. I asked Mr. Whitt so what does that mean? He said basically it means that these videos here were all played sometime after that date to the date that the MacBook was recovered. All right. So these videos. And these videos we linked back to three of them that were on this list showing that they were played. Those three -- I just took three examples -- were played sometime, because they're on this list, sometime after August 2019.

Finally, the defense wants you to believe that it's only child pornography if you can identify who the minor is. He's made some -- if you know the identity. And that's just simply not true. First of all, it's irrelevant when it comes to M.C. because obviously she's family. So I think he's suggesting that some of the other minors depicted in the other videos, it can't be child pornography unless you know the

identity. And that simply isn't true, right? It is use of a minor. We know that he used a minor. We know he used M.C.. We know she's real. You saw her.

And then identifiable minor, right? What we're talking about is the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct. You can use your judgment and common sense. When you walked in here the other day, we never said, hey, leave your experience at the door and just make decisions in a vacuum as if you have no real world experience. This is the point of having a jury because people like you --

THE COURT: I'm sorry, Mr. Cervantes, please conclude.

MR. CERVANTES: Use your common sense. They're minors.

Thank you.

THE COURT: All right. Members of the jury, I don't like reading to you. You probably don't like being read to. But the instructions that I'm about to give you will be with you in the jury room. I don't expect you to memorize these. In the sense they will be with you in the jury room, I need to make sure that I say exactly the same thing out here, that you will have virtually my words ringing in your ears in the jury room. So you can continue to take notes if you'd like, but

you will have these instructions.

I will now read count one in the bill of indictment, to which I will refer to as the bill of indictment or just the indictment.  I will then read the statute that the defendant is charged with violating.  Finally, I will tell you the essential elements of this offense.  You should keep in mind as I review this charge that you will have a copy of the bill of indictment with you when you go into the jury room to decide this case so it will not be necessary for you to try to memorize the charge.  I remind you that the indictment is not evidence.

Count one reads:

From in or about July 16 through on or about September 22, 2021, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, David Tatum did, and did attempt to, knowingly possess, and access with intent to view, any material that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8), and that has been mailed and shipped and transported using any means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that have been mailed and shipped and transported in and affecting interstate and foreign commerce by any means, including by computer.  All in violation of

Title 18, United States Code, Section 2252A(a)(5)(B)6.

You will note that the bill of indictment charges that the offense was committed on or about a certain date or dates. The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense in question was committed on a date reasonably near the date or dates alleged in the indictment.

Where a statute specifies several alternative ways in which an offense can be committed in the disjunctive, or using the word "or," the bill of indictment may allege the several ways in the conjunctive, or using the word "and." You may find the defendant guilty of the offense if you find beyond a reasonable doubt that he committed one or more of the means of violating the statute. Thus, where the indictment uses the term "and," you may consider it as "or" unless I specifically instruct you differently.

Title 18, United States Code, Section 2252A(a)(5)(B) provides, in pertinent part, as follows:

Any person who knowingly possesses, or knowingly accesses with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate

or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer, shall be guilty of an offense against the United States.

For you to find the defendant guilty of possession of child pornography as charged in count one of the superseding bill of indictment, the government must prove the following essential elements beyond a reasonable doubt:

First, that the defendant knowingly possessed, or accessed with the intent to view, any material that contained an image of child pornography, as alleged in the superseding bill of indictment;

Second, that the material had been mailed or shipped or transported using any means of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer, or was produced using materials that had been mailed, shipped, transported in, or affecting interstate or foreign commerce by any means, including by computer; and

Third, that when the defendant possessed or accessed with the intent to view the material, the defendant knew the material contained an image of child pornography.

I will now define certain terms used in the definition of this offense. You are to apply these

420

definitions as well as those I have given you previously as you consider the evidence as to these offenses. If I do not define certain words, you will assign to them their ordinary, everyday meanings.

The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

Ordinarily, there is no way that a defendant's state of mind can be proved directly because no one can read another person's mind and tell what that person is thinking. But a defendant's state of mind can be proved indirectly from the surrounding circumstances. This includes things like what the defendant said, did, how the defendant acted, and any other facts or circumstances in evidence that show what was in the defendant's mind. You may also consider the natural and probable results of any acts that the defendant knowingly did, and whether it is reasonable to conclude that the defendant intended those results.

The government must prove beyond a reasonable doubt that the defendant possessed a visual depiction. To "possess" something means to have it within a person's control. This does not necessarily mean that the person must hold it physically, that is, have actual possession of it. As long as the visual depiction is within the defendant's control, he

possesses it. If you find that the defendant either had actual possession of the depiction, or that he had the power and intention to exercise control over it, even though it was not in his physical possession, you may find that the government has proven possession.

The law recognizes that possession may be sole or joint. If one person alone possesses it, that is sole possession. However, it is possible that more than one person may have the power and intention to exercise control over the visual depiction. This is called joint possession. If you find that the defendant had such power and intention, then he possessed the depiction even if he possessed it jointly with another person.

"Child pornography" means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct where:

One, the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

Such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or

Three, such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

Additionally, you are instructed that as long as the face of the person depicted in the image is an identifiable minor, it is irrelevant whether the adapted or modified body is that of an adult or a minor. If such imagery reflects sexually explicit conduct, it is child pornography.

The term "minor" means any person under the age of 18 years. When you consider whether a person is under the age of 18, you may use your life experience in observing children. The government does not have to prove that the defendant knew that the victim was less than 18 years old.

The term "sexually explicit conduct" means actual or simulated:

One, sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; or

Two, bestiality; or

Three, masturbation; or

Four, sadistic or masochistic abuse; or

Five, the lascivious exhibition of the anus, genitals, or pubic area of any person.

The term "lascivious exhibition" means a depiction that displays or brings to view to attract notice to the

genitals or pubic area of children in order to excite lustfulness or sexual stimulation in the viewer. Not every exposure of the genitals or pubic area constitutes a lascivious exhibition. In deciding whether the government has proved that a particular visual depiction constitutes a lascivious exhibition, you should consider the following factors:

One, whether the focal point of the visual depiction is on the minor's genitals or pubic area;

Two, whether the setting of the visual depiction makes it appear to be sexually suggestive, for example, in a place or pose generally associated with sexual activity;

Three, whether the minor is displayed in an unnatural pose, or in inappropriate attire considering the age of the minor;

Four, whether the child is fully or partially clothed, or nude;

Five, whether the visual depiction suggests coyness or a willingness to engage in sexual activity; and

Six, whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

A picture or image need not involve all of these factors to be a lascivious exhibition of the genitals or pubic area. It is for you to decide the weight or lack of weight to be given to any of these factors. Ultimately, you must

determine whether the visual depiction is lascivious based on its overall content.

"Visual depiction" includes undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

The term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter, or a typesetter, or a portable handheld calculator, or other similar device.

The government must prove beyond a reasonable doubt that the material had been mailed or shipped or transported using any means of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer, or was produced using materials that had been mailed, shipped, transported in, or affecting interstate or foreign commerce by any means, including by computer.

A visual depiction was transported in or affecting

interstate or foreign commerce if it crossed between one state and another or between the United States and a foreign country.  Transmission of photographs or video by means of the internet constitutes transportation in or affecting interstate commerce.  However, you must find beyond a reasonable doubt that the specific depiction in question was actually transmitted by means of the internet, if we were dealing with the internet which is not really the facts before you here.

A visual depiction was produced using materials that had been transported in or affecting interstate or foreign commerce if the materials used to be -- used to produce the visual depiction had previously moved from one state to another or between the United States and another country.

Here, the government alleges the computers used to possess the videos and images in question were manufactured in another state or country.  I instruct you that if you find that the computers used to possess the videos and images were manufactured outside North Carolina, that is sufficient to satisfy this element.  The government does not have to prove that the defendant personally transported the computers across a state line or that the defendant knew that the computers had previously crossed a state line.

I will now read count two in the bill of indictment. With respect to this count, it only applies to what has been referenced as bathroom one video or the M.C. video, which is

Government's Exhibit 1D.

Count two reads:

From in or about July 2016 through on or about September 22, 2021, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, David Tatum attempted to and did employ, use, persuade, induce, entice, and coerce Child Victim 1 to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct using materials that had been mailed, shipped, or transported in and affecting interstate and foreign commerce by any means, including by computer, and the visual depiction was transported using any means and facility of interstate and foreign commerce.  All in violation of Title 18, United States Code, Section 2251(a) and (e).

Title 18, United States Code, Section 2251(a) provides, in pertinent part, as follows:

Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, or attempts to, shall be guilty of an offense against the United States if that visual depiction was produced or transmitted using materials that have been mailed, shipped or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or

transmitted using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, or mailed.

For you to find the defendant guilty of using a minor to produce a visual depiction of a minor engaging in sexually explicit conduct as charged in count two of the superseding bill of indictment, the government must prove the following elements beyond a reasonable doubt:

First, that the minor was under the age of 18;

Second, that the defendant used or employed or persuaded or induced or enticed or coerced the minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and

Third, that the visual depiction was mailed or actually transported or transmitted in or affecting interstate or foreign commerce; or

That the visual depiction was produced using materials that had been mailed, shipped, or transported in and affecting interstate or foreign commerce by any means, including by computer.

I have previously defined several of these terms, including "minor," "sexually explicit conduct," "visual depiction," and "computer."  You should apply those definitions in deciding count two as well.

It is a crime for anyone to attempt to commit a

violation of certain specific laws of the United States even if the attempt fails.  In this case the defendant is charged in count two with committing the offense of employing, using, persuading, inducing, enticing, or coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct, or attempting to do so.

For you to find the defendant guilty of attempting to commit the offense of employing, using, persuading, inducing, enticing, or coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First, that the defendant intended to commit the offense of employing, using, persuading, inducing, enticing, or coercing a minor to engage in sexually explicit conduct for the purposes of producing a visual depiction of the conduct; and

Second, that the defendant did an act that constitutes a substantial step towards the commission of that crime and that strongly corroborates the defendant's criminal intent and amounts to more than mere preparation.

A minor is "used" if they are photographed or videotaped.

The term "producing" means producing, directing,

manufacturing, issuing, publishing, or advertising.

The government does not have to prove that the defendant's sole purpose or the primary purpose of engaging in such conduct was to produce a visual depiction, but the government must prove that producing a visual depiction of the sexually explicit conduct was one of the defendant's purposes for using, employing, persuading, enticing, or coercing the victim to engage in sexually explicit conduct. And that it was a significant or motivating purpose and was not merely incidental to the sexually explicit conduct.

In determining -- in deciding whether the government has proven that the defendant acted for the purpose of producing a visual depiction of the sexually explicit conduct, you may consider all of the evidence concerning the defendant's conduct.

The term "interstate commerce" includes commerce between one state, territory, possession, or the District of Columbia, and another state, territory, possession, or the District of Columbia. Interstate commerce simply means the movement of goods, services, money, and individuals between any two or more states or between one state and the District of Columbia.

"Foreign commerce" includes movement of goods, services, money, and individuals from one country to another.

To satisfy this element, the government must prove

that the defendant's conduct affected interstate or foreign commerce in any way, no matter how minimal.  The government is not required to prove that the defendant knew his conduct was in or affecting interstate or foreign commerce.  In determining whether the defendant's conduct "affected interstate commerce," you may consider whether the defendant used means, instrumentalities, or facilities of interstate commerce.  A facility of interstate commerce is some thing, tool, or device that is involved in interstate commerce.  Cell phones and the internet are both means, facilities, and instrumentalities of interstate commerce.

The local or intrastate production of visual depictions of a minor engaged in sexually explicit conduct with a computer, a cell phone, or a camera that traveled in interstate or foreign commerce is part of an economic class of activities that substantially affect interstate or foreign commerce.

The indictment alleges that the visual depiction was actually transported or transmitted in or affecting interstate or foreign commerce.  This means that the government must prove that the visual depiction crossed between one state and another or between the United States and a foreign country.

A visual depiction of a minor engaging in sexually explicit conduct is "produced" using materials made -- excuse me, materials mailed, shipped, or transported in or affecting

interstate or foreign commerce if the visual depiction is stored, created, or recorded on a device containing materials mailed, shipped, or transported in or affecting interstate or foreign commerce.

Simply stated, the phrase "transported in interstate or foreign commerce" means that the materials used to produce the visual depiction had previously moved from one state to another or between the United States and another country.

Here, the government alleges that the camera and film used to make the video in question were manufactured in another state. I instruct you that if you find that the camera and film were manufactured outside of North Carolina, that is sufficient to satisfy this element. The government does not have to prove that the defendant personally transported the camera and film across a state line, or that the defendant knew that the camera and film had previously crossed a state line.

I will now -- excuse me. I instruct you that a minor cannot legally consent to participating in illegal sexual conduct. A person under the age of 18 lacks the capacity to consent to illegal sexual conduct. Accordingly, any argument regarding a minor's consent must not be considered by you in reaching a verdict.

I will now read count three in the bill of indictment.

Count three reads:

From in or about 2016 through in or about September 22, 2021, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant, David Tatum, knowingly transported and shipped any child pornography, as defined in Title 18, United States Code, Section 2256(8), using any means and facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce by any means, including by computer. All in violation of Title 18, United States Code, Section 2252A(a)(1).

Title 18, United States Code, Section 2252A(a)(1) provides, in pertinent part, as follows:

Any person who knowingly mails or transports or ships using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography shall be guilty of an offense against the United States.

For you to find the defendant guilty of transportation of child pornography charged in count three of the superseding bill of indictment, the government must prove the following essential elements beyond a reasonable doubt:

First, the defendant knowingly transported, shipped, or mailed any item or items of child pornography using any means of interstate or foreign commerce, or in or affecting

interstate or foreign commerce, including by computer; and

Second, when the defendant transported, shipped, or mailed the items, the defendant knew the items were child pornography.

I have previously defined several of these terms, including "knowingly," "child pornography," and "computer." I also defined "interstate or foreign commerce" with respect to count two. You should apply those definitions in deciding count three as well.

Therefore, members of the jury, considering counts one, two, and three, I charge you that if you find from the evidence that each of the essential elements of a count has been proven beyond a reasonable doubt as to the defendant, then you must find the defendant guilty of the crime charged under that count.

However, if you do not so find, or if you have a reasonable doubt as to one or more of the essential elements of the crimes charged, it would be your duty to return a verdict of not guilty.

Does either party request a sidebar with respect to these instructions?

MR. CERVANTES:  No, Your Honor.

MR. AMES:  No, Your Honor.

THE COURT:  All right.  Members of the jury, that's as unpleasant for me as it probably was for you.  I just hate

reading to people. I haven't done that since the Harry Potter books to my son. And I read them all, every word of every one.

So you have now heard the evidence and the arguments of counsel for the government and for the defendant. It is your duty to remember the evidence whether it has been called to your attention or not. And if your recollection of the evidence differs from that of the attorneys, you are to rely solely upon your recollection of the evidence in your deliberations, the same as I have said many times before with respect to the law. The law comes from the Court, not from the lawyers.

As jurors, you must decide this case based solely on the evidence presented here within the four walls of the courtroom. This means that during your deliberations, you must not conduct any independent research about this case, the matters in the case, the individuals or groups involved in the case, or any legal concepts. Your duty to follow this instruction is a serious responsibility and the failure to follow it may result in being found in contempt of court.

During your deliberations you must not communicate with or provide any information to anyone by any means about this case.

I have not reviewed the contentions of the parties, but it is your duty not only to consider all of the evidence,

but also to consider all of the arguments, the contentions and positions urged by the attorneys, and any other contention that arises from the evidence and to weigh them all in the light of your common sense and as best you can determine the truth of this matter.

The law, as indeed it should, requires the presiding judge to be impartial. Therefore, do not assume from anything I may have done or said during the trial that I have any opinion as to what your verdict should be. I do not.

I instruct you that a verdict is not a verdict until all 12 jurors agree unanimously as to what your decision should be. You may not render a verdict by a majority vote or by any other voting mechanism other than a unanimous verdict of 12.

The Court suggests that as soon as you reach the jury room before beginning your deliberations you select one of your members to preside as foreperson. The foreperson has the same vote as everybody else but just serves to lead the discussion.

If you need to communicate with me once you have begun deliberating, the foreperson will send a note to me by -- I think there's a buzzer in there that will ring through into here that will let us know you need to communicate with us. Just push that button and write down a note and tell me what you need to ask or any other reason you need to reach out

to me. But if you do send me a note, do not tell me how you stand in your vote. If you're 6-6, 11-1, I don't care and I don't want to know. If you have a question, just ask me the question.

As soon as you have reached a verdict as to the count alleged in the indictment, you will return to the courtroom and your foreperson will, upon my request, hand the verdict sheet to the clerk of court. There are places on the verdict sheet for the foreperson to enter the verdict, sign it, and date it.

During the trial, of course, there were many items put into evidence. If you need to see any of those items, let me know that. That's all electronically available. Well, for the most part except for electronic devices. And Ms. Kirk will show you how to use the electronic evidence system to access any of the exhibits you need to see. So if you need that, let me know and we'll set that up for you.

If you need a break during deliberations, you may do so in the jury room. Or if you need a break outside the jury room, if you have -- someone needs to smoke, for instance, you'll be escorted out of the jury room by a court security officer. But if you are not together, that is, if someone is in the restroom, for instance, do not deliberate. Have no deliberations unless all 12 of you are present at all times.

All right. So, members of the jury, please now take

this case and, as best you can, tell us the truth of the matter.

Once deliberations start I don't want you leaving the courthouse facility so we're going to have lunch brought in for you. I don't know if you already knew that. I hope we chose correctly, or you did.

All right. The case is now with the jury.

(Jury exited the courtroom at 11:10 AM.)

THE COURT: Mr. Ames, have you and your client come to a decision about what you want to do with the forfeiture count in the event of a guilty verdict?

MR. AMES: Yes, Your Honor. Your Honor, yes, we spoke about it last evening and confirmed just now again that he's fine with not having the jury consider that and that Your Honor can do so.

THE COURT: All right. Thank you.

Anything else we need to address while the jury is out?

MR. CERVANTES: No, Your Honor.

MR. AMES: Your Honor, I didn't want to interrupt during closing arguments because I think that's rude. I do want to note there was a position stated that the encrypted hard drive being attached to the MacBook would not populate this metadata with regard to the QuickLook thumbnails and such that was made during closing argument. I didn't object at the

time.  Again, I didn't want to interrupt.  But I certainly do object to that statement being submitted.  It was not in evidence, number one.  Number two, it was something that was asked about to which the analyst, Mr. Whitt, said he wasn't sure.  He doesn't know and wasn't sure.

You know, I specifically -- I think my question -- it was a leading question, but it was:  Have you heard about anything with encrypted drives and such with Apple products in particular about them bypassing that encryption stuff despite having a password?  There was an exchange about it, to which my best recollection, Your Honor, and I'm not a thousand percent sure but pretty sure that Mr. Whitt said he wasn't sure about encrypted drives being inserted and therefore populating these thumbnail -- this thumbnail evidence is what the government is relying on as a time frame of when things were accessed.

THE COURT:  Well, with respect to any potential misstatements of the evidence, we'll have to rely on the jury's recollection of the evidence, as I have instructed them more times than not.  And even with respect to your both opening and closing arguments, you injected supposed facts that were not in evidence, particularly that Mr. Tatum is a sex addict and has sought treatment for such.  There was no evidence to that effect.  You said it both during opening and closing.  We'll hope the jury abides by the Court's

instructions to consider only evidence that was admitted and not the arguments of counsel.

Now, I'm going to ask everyone to stay within finding distance. The jury will probably send a note out fairly quickly asking for the exhibits, but I didn't want to just necessarily put that on them.

Obviously with respect to the alleged child pornography, we'd have to bring them back out here. That's not on the JERS system. We'd have to bring them back out and put them in the jury box and let them see anything they want to see again. So please stay close and available in the event that we get a question from the jury because I don't want to delay answering their question because I can't find any of you.

All right. We'll be in recess pending word of the jury.

(Recess pending a verdict at 11:14 AM.)

*****

THURSDAY AFTERNOON, MAY 4, 2023

(Court back in session at 1:45 PM.)

(Jury not present.)

THE COURT: All right. We have a question from the jury which I'll read to you.

It says, "Do we consider the defendant's motivation and point of view of what he thought would be 'lascivious

exhibition' when he took the 'M████' video, or do we view the video in a vacuum to determine if the video is 'lascivious exhibition?'  Do we consider his parking lot interview where he admits to being a voyeur and 'getting off' if we consider the video not as a stand-alone but from the defendant's point of view and his motivation for taking it?"

I think the correct legal answer is:  "It is for the jury to determine whether an image or video is lascivious as the Court has defined it for you.  In considering this question, the jury may consider all of the evidence and draw reasonable inferences from the evidence.  The defendant's motivation or opinion regarding lasciviousness is not controlling."

MR. CERVANTES:  May we confer?

THE COURT:  You may confer, yes, of course.

(Counsel conferred.)

MR. CERVANTES:  Your Honor, the instruction seems fine to us except the last sentence.  We would ask that the last sentence either be struck or more specific reference to number 6, the last bullet for the definition of lascivious exhibition because that last sentence seems to be inconsistent with that last bullet point.

THE COURT:  Yeah, what I'm wondering there is -- and I get your point.  When it says "whether the visual depiction is intended or designed to elicit a sexual response in the

viewer," who's the relevant viewer there?  Is it the person in this case who produced it or in this case is the juror the viewer?

MR. CERVANTES:  We would argue that it's the defendant, Your Honor.

MR. AMES:  I would argue at a minimum it's vague, Your Honor.  It could be -- it could be the juror or it could be the royal we.  It could be a potential viewer.

I think this is one of the more difficult aspects of the analysis for the jury in general.  There's actually a decent amount of case law because so many of these cases, when we're in a situation where there's not this just clear and utterly overt sexual nature to a video, this is often -- we're often in category 5 and we're often in the *Dost* factor number 6 as one of the sticking points.

You know, I've just kind of browsed through recently.  There's some cases very similar.  *McCoy* out of the Eighth Circuit from last year.  There's one I was looking at just yesterday actually, *U.S. versus Hillie* out of DC.  And this is actually -- this case has gone up and down and up and down a little bit where there's been a rehearing.

But the most recent, United *States v. Hillie*, number 19-3027, a decision from 6/28/2022.  It involves -- just pulling up the facts here, Your Honor.  The jury convicted Hillie of producing and possessing child pornography.  The

panel reversed the conviction based on -- it held that a child does not engage in a lascivious exhibition under 2256(2)(A)(v) -- (5), I guess, unless she displays her private parts "in a manner that connotes the commission of one of the other four sexual acts in the list."

And then that was the initial part -- the initial definition. And then upon rehearing and reconsidering it, the Court then said that -- and clarified it's commonly defined as lustful, tending to arouse sexual desire. And the phrase lascivious exhibition of the private parts -- sorry -- basically, just that the -- the summary is that it objectively needs to be sexually suggestive in this opinion in *Hillie.*

There's also an Eighth Circuit case that I read a little -- just actually about an hour ago. It involved a shower in defendant's master bathroom. The district court sentenced defendant. The Eighth Circuit reversed finding the evidence presented was insufficient. The Court explained that the underlying indictment prevents a person from using a minor to engage in sexually explicit conduct, which I think is the same theory here. Congress in turn defined sexually explicit conduct as lascivious exhibition, not mere nudity, applying the statute. The Court concluded no reasonable jury could have found -- sorry, Your Honor, I'm looking right here. But I can give you a citation for that as well. *United States versus McCoy*, M-c-C-o-y, number 21-3895. That's also from

last year, 2022.  And there's a few others.

I think that in many that I've read, the -- with this particular *Dost* factor and this particular situation of potentially a use argument and this viewer issue, I have seen at least a few of the circuits talking about a more objective standard within kind of the four corners of the video.

Also, the Third Circuit said similar back in 2021 -- no, actually, December of last year.

So I think it's a hard question, long story short. But I think recent decisions from other circuits have put it as a more objective test, not subjective from the person who's producing or creating.

And moreover, Your Honor, as was argued previously, the statute doesn't require the producer to view it.  I mean, that was an argument made to the jury in closing.  And so whether or not the viewer needs to even view the thing in the first play, if that's true, then their subjective belief about what is lascivious or what counts as lascivious doesn't seem to carry a significant amount of weight versus the objective image on the screen itself.

THE COURT:  Mr. Cervantes, what do you say?

MR. CERVANTES:  I say that the issue that defense counsel is raising in citing to *Hillie* is not -- first of all, not binding Fourth Circuit precedent.  I do agree that *Hillie* would suggest that you need to look at the viewer.  But

there's also other decisions talking about the objective characteristics of the video and also the conduct that the defendant did with the video, including to look at it.

I think that the most appropriate instruction here would be to instruct them along the lines of what the Court said in the first part, which is to consider all of the evidence and then apply those -- the evidence to the factors listed on page, I have it as 13 of my version, but the page with the *Dost* factors.  That would be the most appropriate thing, I think.

MR. AMES:  Your Honor, there's another one, *United States versus Heinrich*, 21 -- *Heinrich*, H-e-i-n-r-i-c-h, number 21-2723.  That's the Third Circuit.  That's from this year.  That was a case where defendant had a conviction and wanted to introduce a report -- a psychological type report to show that his production was supposed to be something showing beauty, or whatever, and wanted to introduce it.  And the Court said no, you can't because, and I quote, the report is inadmissible because under the statute his reason for taking the pictures is irrelevant.  It punishes those who orchestrate objectively sexually explicit conduct involving a minor in order to take pictures of the conduct.

So in other words, what he wanted it to be or what his intention was in that case, again, it's an objective standard of what was it.  Was there a sexual act or explicit

act or not, period?

The *Hillie* case, in fact, if I remember right in the factual basis, I think it involves a shower as well. Almost -- and very similar, and a person cleaning themselves and doing regular bathroom things, if I'm recalling correctly. So factually, it's also very, very similar.

MR. CERVANTES: Your Honor, if I may actually cite some Fourth Circuit precedent.

I would direct the Court's attention to *US v. Courtade*, 929 F.3d 186. It's from 2019. Also involving a surreptitious recording in the bathroom shower. In *Courtade* the video did not depict the minor engaging in sexual conduct or activity connoting a sex act. Yet the Fourth Circuit concluded the video was lascivious because, quote, "far from depicting merely a girl showering, drying off, and getting dressed, the video contained extensive nudity -- including shots of her breasts and genitals -- that was entirely the product of an adult man's deceit, manipulation, and direction."

And so in that case the Court upheld the application of the *Dost* factors and a shower video just like this was found to be lascivious merely because of the defendant's actions.

And so I don't think it's fair to just say the viewer in the objective sense. I do think that the *Dost*

factors consider and look into what it is that the defendant did to obtain this video. And in this decision the Court looked at the defendant's conduct. So I do think it has an element of what the defendant thinks and is doing.

MR. AMES: Your Honor, just briefly.

In the *Courtade* case the victim is a young girl who the defendant plies with ice cream and tells her that the camera is off and goes and puts his hands into a shower and takes very affirmative acts to further the use or coercion, or whatever the theory is, I don't know for sure, but I would imagine more than just use. We're talking about someone that is actually taking active steps to put a camera in his hand, tell her certain things about it.

THE COURT: I don't think those factual distinctions inform the issue particularly. The two things I'm trying to weigh here is obviously it would never be enough if it's purely subjective because then a defendant could subjectively find something to be -- find something that would elicit a sexual response that wouldn't, by any measure, be lascivious. They can be attracted to elbows and that wouldn't make it lascivious even if they were -- even if that elicited a sexual response from them.

But on the other hand, the -- I think that there's some element to -- and I'm not sure the right word is intention as you quoted the Fourth Circuit case. It seems to

me that we can craft an instruction based upon some of what you just read to further explain sub-portion 6 to say among the things the jury can consider are, and then list the things the Fourth Circuit said were reasonable considerations in the determination of lasciviousness.

MR. CERVANTES: It was extensive nudity, including shots -- so extensive nudity and the product of the adult man's deceit, manipulation, and direction.

MR. AMES: Your Honor, I just -- can I please point out in the -- literally in the decision it's distinguishing from a case -- this is quoting from this Fourth Circuit case. "Here, the video's objective characteristics -- the images and audio contained within its four corners, irrespective of Courtade's private subjective intentions -- reveal the video's purpose of exciting lust or arousing sexual desire."

The next paragraph: "Far from depicting merely a girl showering, drying off, and getting dressed, the video contains extensive nudity -- including shots of the breasts," and so on.

The point being, Your Honor, it's making its ruling and decision distinguishing it from a case that would be barely similar to David Tatum's case and the video at play here.

THE COURT: I'm not sure that distinction is as broad or extensive as you're suggesting.

Mr. Whelan, do you have that case pulled up?

MR. WHELAN:  Yes.

THE COURT:  Can you just email it to me.

MR. WHELAN:  Yes.

MR. ODULIO:  Your Honor, if I may on *Courtade*?

THE COURT:  Yes.

MR. ODULIO:  I think the point counsel is making is actually reinforcing the government's view, which is the Fourth Circuit has said that in considering this issue, the Court can look beyond just the mere four corners of the image. You look at the actions and the intent of the person producing the video.

So I think the Court is right factually.  It's actually of no moment.  What's of moment is the Fourth Circuit saying, hey, you ought to look at that.  And that, Your Honor, that reasoning, is at odds with and cannot be countenance with *Hillie*.  That's why *Hillie* is not the law of the Fourth Circuit and is wrongly decided in the department's perspective and is not controlling here.

THE COURT:  I think the Fourth Circuit itself -- I'm not real clear on this -- is perhaps not taking a directly contrary position to *Hillie*, but I think they've been critical of *Hillie*, if my memory serves on this issue.

MR. AMES:  I'm not positive either, Your Honor. I --

THE COURT: Hold on just a second, everybody. Let me read the case and then we can discuss it further.

(Court peruses document.)

THE COURT: Well, the circuit -- I remember this case now from prior cases. Of course, the circuit described the problem of trying to decide whether subjective intent comes into play and says we don't have to in this case, so this can be done on an objective basis. So it doesn't express an opinion on whether there is any subjective element to this part of the analysis.

It does seem like when they go on to describe the things that make it objectively reasonable, some of them sound kind of objective to me, frankly. The producer was actively engaged in positioning and directing and filming, which sounds to me kind of subjective rather than objective, but that's not how the Court of Appeals saw it.

They do have some helpful language in here when they're concluding that the video there was objectively lascivious and says simply "because the images and audio -- revealing deceit, manipulation, and the careful directing and filming of a young girl resulting in footage of her breasts and genitals -- makes clear that the video's purpose was to excite lust or arouse sexual desire in the viewer." Which, again, sounds to me like it has an element of subjectivity in there. The circuit said, no, not so, but that's just how it

strikes me.

So I think to best be faithful to the Fourth Circuit on this, I'm going to have to craft some manner of incorporation of the language I just read into this answer to the jury's question and make it descriptive of what is being discussed in point 6 that we've all been talking about, the things the jury can consider. Thoughts?

MR. CERVANTES: We agree, Your Honor.

MR. AMES: I want to make sure that I understand, Your Honor. The instruction would involve descriptions from -- of certain behavior?

THE COURT: No, I'm going to have to -- and I'm not going to do this sitting in front of you, and I hate to delay the jury any further. I'm going to go out and try -- and I'll come back, of course, and bounce it off of everybody. But I want to describe for the jury some of what the Fourth Circuit has told us in answer to their question. I think that you're right, it's not as -- the answer that I crafted before would not be of particular help to the jury, I don't think. And perhaps not even accurately describes the state of the law.

MR. CERVANTES: Well, Your Honor, on that point, the first part of what you described in considering all of the evidence, I took it to mean what the Fourth Circuit was saying in this opinion, which is consider all of the factors, all of the things that happened to make the video to begin with and

not just look at the video itself, which is what the Court in *Courtade* is saying. That they not only look at the video, but they look at what the defendant did to make the video, the angle, selecting the angle.

So in that paragraph that the Court read where it starts "on its face, then, the video depicts," and it goes on to cite *United States versus Ward* and they quote specifically, "When a photographer selects and positions his subjects, it is quite a different matter from the peeking of a voyeur upon an unaware subject pursuing activities unrelated to sex." And here we have that. And I think what the Fourth Circuit is saying is, we can -- without getting into the mind, because they didn't decide that issue here, we can at least dispose of the issue by looking at the conduct that led to the creation of the video, which we argued the angle of the camera being on the floor.

MR. AMES: But the description he just gave is backwards. They were, again -- they were -- the position was the *Ward* case is -- if you read it again, he's talking about this is -- this *Ward* case is different than a situation where it's literally just a peeping Tom type of situation where there's not a person actively directing, manipulating, having someone move anywhere in particular, which is what this case is. It's literally no contact whatsoever. It's just sitting on a shelf.

And I'll note, Your Honor --

THE COURT: Well, wait a minute. There's certainly deception involved in hiding, so that's a common element in these.

MR. AMES: Yes, which --

THE COURT: There's also a question of positioning given where the camera was hidden. So this is not as distinct as you suggest.

All right. I think I've heard all the argument I need to. I'm going to try to craft something here. Tell you what it is. Perhaps hear some additional brief discussion about it. And then we're going to give the jury the Court's best opinion. I'll be back with you as soon as I can.

MR. CERVANTES: Thank you, Your Honor.

(Brief recess at 2:18 PM.)

(Court back in session at 2:38 PM.)

(Jury not present.)

THE COURT: All right. So during the break we've also looked at what's essentially a circuit split on this. Some say that point number 6 contains subjective elements, some say it does not. The Fourth Circuit says, yes, there's a disagreement among the circuits and we're not going to take a position yet.

So in working through this, I think the Court is going to have to take a position from among the circuits

because otherwise I'm not fairly answering the jury's question.  I tried to structure some language that might give them some guidance without really answering their question, but that doesn't strike the Court as being fair to the jury.

So the Court's proposed instruction to be sent back is:  "It is for the jury to determine whether an image or a video is lascivious as the Court has defined it for you.  In considering this question, the jury may consider all of the evidence and draw reasonable inferences from the evidence.  Among the circumstances the jury may consider are the selection and positioning of the subject; whether the video contains extensive nudity, including video of her breasts and genitals; and the entirety of the context in which the video was made, including the defendant's motivation and intent."

I'm siding with the circuits that have said that there's an element of that in it.  I understand you object, Mr. Ames.

MR. AMES:  Yes, Your Honor.  And in particular because I think some of the language just mirrors some of the factors that are already present.  For instance, the amount of nudity.  Nudity is already a factor.  The --

THE COURT:  I understand the argument.  But I'm reading Chief Judge Gregory's opinion where he said that one of the reasons that the video in that case was objectively lascivious was because of those kind of facts.  And I'm trying

to track the circuit to the extent the circuit is giving me any guidance. I understand your argument that it's redundant, repetitive, and unnecessary. Is that the argument?

MR. AMES: Your Honor, the language it's tracking, is it from -- which case is it? Is it the *Courtade*, or whatever it is called?

THE COURT: Yes.

MR. AMES: So if you don't mind, Your Honor, can you read the instruction again.

THE COURT: Sure. "It is for the jury to determine whether an image or video is lascivious as the Court has defined it for you. In considering this question, the jury may consider all of the evidence and draw reasonable inferences from the evidence. Among the circumstances the jury may consider are the selection and positioning of the subject; whether the video contains extensive nudity, including video of her breasts and genitals; and the entirety of the context in which the video was made, including the defendant's motivation and intent."

The first two-thirds of that sentence are essentially paraphrases or near quotations from the *Courtade* case.

Emmett, can you hand that up to me so I can sign it.

MR. AMES: Sorry, I apologize. I'm looking for the language.

THE COURT: No, I understand. Look, that's the instruction I'm going to give. I know that you object to it and I'm confident in the event of a conviction you'll appeal it and perhaps this time the circuit will answer the question for us. But that's my best judgment of what the law should be and what my best guess the Fourth Circuit and/or the Supreme Court will find it to be.

MR. AMES: So I --

THE COURT: That's it. Discussion over. I mean, I hear your objection. I understand your objection. And I'm taking my best shot at giving them what I believe is the correct statement of the law.

(The Court's response was tendered to the jury.)

MR. AMES: Would you mind -- would you mind reading the question for me one more time so I can just jot it down, Your Honor?

THE COURT: Sure. I'll let you come up and just copy it verbatim.

MR. AMES: That would be perfect. Thank you.

THE COURT: Sure. Both sides, of course, are invited.

We'll wait for Ms. Kirk to get back to do that. And we can make additional copies.

Emmett, if you would print what went back to the jury.

We'll be in recess pending further word from the jury.

(Recess pending a verdict at 2:45 PM.)

*****

(Court back in session at 3:02 PM.)

THE COURT:  All right.  I'm told we have a verdict.  Please bring in the jury.

(Jury entered the courtroom.)

THE COURT:  Has the jury reached a verdict?

JUROR NO. 12:  Yes, Your Honor.

THE COURT:  And are you the foreperson?

JUROR NO. 12:  Yes, Your Honor.

THE COURT:  If you would please hand the verdict form to Ms. Kirk.

(Verdict form tendered to the Court.)

THE COURT:  In the matter of the United States versus David Tatum, we, the jury, find:

As to count one, the defendant guilty.

As to count two, the defendant guilty.

As to count three, the defendant guilty.

Is this your verdict, so say you all?

(Affirmative response.)

THE COURT:  Do you wish to poll -- the jury to be polled, Mr. Ames?

MR. AMES:  Yes, Your Honor.

THE CLERK: Ladies and gentlemen of the jury, in the case of the United States of America versus David Tatum, you have returned a verdict of guilty as to the three counts in the superseding indictment.

Junior number 1, was this your verdict and is this still your verdict?

JUROR NO. 1: Yes.

THE CLERK: Juror number 2, was this your verdict and is this still your verdict?

JUROR NO. 2: Yes.

THE CLERK: Juror number 3, was this your verdict and is this still your verdict?

JUROR NO. 3: Yes.

THE CLERK: Juror number 4, was this your verdict and is this still your verdict?

JUROR NO. 4: Yes.

THE CLERK: Juror number 5, was this your verdict and is this still your verdict?

JUROR NO. 5: Yes.

THE CLERK: Juror number 6, was this your verdict and is this still your verdict?

JUROR NO. 6: Yes.

THE CLERK: Juror number 8, was this your verdict and is this still your verdict?

JUROR NO. 8: Yes.

THE CLERK: Juror number 9, was this your verdict and is this still your verdict?

JUROR NO. 9: Yes.

THE CLERK: Juror number 10, was this your verdict and is this still your verdict?

JUROR NO. 10: Yes.

THE CLERK: Juror number 12, was this your verdict and is this still your verdict?

JUROR NO. 12: Yes.

THE CLERK: Juror number 13, was this your verdict and is this still your verdict?

JUROR NO. 13: Yes.

THE CLERK: Juror number 14, was this your verdict and is this still your verdict?

JUROR NO. 14: Yes.

THE COURT: All right. Members of the jury, I think I said this during jury selection, that I'm always impressed with every juror and how seriously you take your duty, and it's particularly true in this case in some ways. You ought to be lawyers. I hate to criticize you like that, but you ought to be lawyers in some ways. The question you asked and the reason it took some time to give you an answer is because when you were asking about lasciviousness and essentially whether that's a totally objective standard or is there a subjective element to it, well, we have 12 circuit courts of

appeal in this country. Some of them say it's all objective. Some of them say, no, there's a subjective element to that. We sit in the Fourth Circuit Court of Appeals and they have said, yes, there's a circuit split and we're not saying yet which side we're on. Of course, I'm bound by Fourth Circuit precedent.

So having read the cases, I was more persuaded by those courts that think that there is a subjective component to that point that you were asking about; that it's not purely objective. But I expect we'll get an answer from the Court of Appeals at some point on that.

But I say that just, again, to thank you and congratulate you for how seriously you took this. Obviously, you dove into the case and gave it significant thought.

If any of you would like to remain in the jury room, I'd be glad to come meet with you and talk about federal procedure, the rules of evidence, anything that you're kind of curious about. It is not a command performance. You have done your duty.

And you will not be instructed as to what to do after this. You may talk to whomever you want or you can refuse to talk with whomever you want. But I very much thank you, as I'm sure all the participants in this trial do, for your seriousness and your consideration.

But if you do want to stay, just stay in the jury

room.  Let Ms. Kirk know that you want to meet with me.  I have a few minutes worth of things I have to do.  Then I'll come find you, if you want to.  You are free to leave.  But do leave your badges and your notepads behind.  Thank you very much.

(Jury exited the courtroom.)

THE COURT:  Now, as to the forfeiture count, since that's been left to the Court, let me ask whether the parties would be amenable to the two of you getting together and see if there's a consensus with respect to that.  You might be able to come up with a proposed joint order.  If need be, if we need a hearing, let me know that as well and we'll schedule one since we're not under a particular gun for that.

Now, with respect to Mr. Tatum's release status, what is the government's position?

MR. ODULIO:  Your Honor, our position is that under 3143, by operation of law, he ought to be detained.

THE COURT:  Mr. Ames, I'll be glad to hear from you, but let me preface it by saying Section 3143(a)(2) tells this Court that the defendant shall be detained, except under a couple of exceptions that don't apply here, because under 3142(f)(1)(A) this is considered a crime of violence pursuant to 3156(a)(4)(C) and the word "shall" does not seem to give the Court any discretion in this matter.

So, Mr. Tatum, you will be confined pending

sentencing. The U.S. Probation Office is going to prepare a presentence report. It is a pretty lengthy document from which the Court gets to know more about you, more about the circumstances of this case perhaps. And that takes about 60 to sometimes 90 days. And then the Court schedules sentencings just as soon as they're ready and the Court's schedule allows, so we'll try to keep this thing moving forward.

Yes, Mr. Ames.

MR. AMES: Nothing, Your Honor. I appreciate it.

THE COURT: All right. Mr. Tatum is in the custody of the marshals.

All right. The Court is in recess until next Wednesday at 9:30.

(End of proceedings at 3:11 PM.)

*****

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

            I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

            Dated this 13th day of September 2023.


                        s/Cheryl A. Nuccio

                        Cheryl A. Nuccio, RMR-CRR
                        Official Court Reporter

**University of Rochester Medical Center**

SCIPK BH CHILD/ADOLESC L████ F████
315 Science Pkwy        MRN: E679800, DOB: ████1997, Sex: F
Rochester NY 14620       Visit date: 6/17/2015
Amb Encounter Report

## Encounter Information

| | Provider | Department | Encounter # |
|---|---|---|---|
| 6/17/2015 | Tatum, David | SCIPK BH CHILD/ADOLESC | 48146021 |

## Level of Service

Level of Service
**PR OFFICE/OUTPT VISIT,EST,LEVL III [99213]**

## Referring Provider

**Bogdan Mscichowski, MD**

## Reason for Visit

**Anxiety**

## Diagnoses

| | Comments |
|---|---|
| **Mood disorder** - Primary | |

Reviewed: **6/17/2015  1:39 PM by Tatum, David, DO**

## Problem List as of 6/17/2015

| | Priority | Class | Noted - Resolved | Hosp From | Hosp To |
|---|---|---|---|---|---|
| Non-Hospital | | | | | |
| **Hashimoto's thyroiditis** | | | 12/5/2012 - Present | | |
| | | | Entered by Jospe, Nicholas, MD | | |
| **Panic disorder** | | | 3/9/2015 - Present | | |
| | | | Entered by Fotiou, Alexandra, MD | | |
| **Mood disorder** | | | 3/17/2015 - Present | | |
| | | | Entered by Bissada, Amy, DO | | |
| **Marijuana dependence** | | | 3/17/2015 - Present | | |
| | | | Entered by Bissada, Amy, DO | | |

## History as of Encounter

### Medical as of 6/17/2015

**Medical last reviewed by Tatum, David, DO on 6/17/2015**

Past Medical History

| Diagnosis | Date | Comments | Source |
|---|---|---|---|
| Thyroid disease | — | — | Provider |

### Surgical as of 6/17/2015

**Surgical never marked as reviewed**
None

### Family as of 6/17/2015

**Family last reviewed by Tatum, David, DO on 6/17/2015**

Printed by 56969 at 3/20/23  7:54 AM

GOVERNMENT EXHIBIT 11

**JA482**

**University of Rochester Medical Center**

SCIPK BH CHILD/ADOLESC L█████, F█████
315 Science Pkwy      MRN: E679800, DOB: █████997, Sex: F
Rochester NY 14620    Visit date: 6/17/2015
Amb Encounter Report

## Family as of 6/17/2015 (continued)

| Problem | Relation | Name | Age of Onset | Comments | Source |
|---------|----------|------|--------------|----------|--------|
| Crohns Disease | Other | — | — | paternal cousin. No other autoimmune disease. | Provider |
| Mental illness | Mother | — | — | — | Provider |

## Family Status as of 6/17/2015

**Family Status last reviewed by Tatum, David, DO on 6/17/2015**
None

## Tobacco Use as of 6/17/2015

**Tobacco Use last reviewed by Tatum, David, DO on 6/17/2015**

| Smoking Status | Smoking Start Date | Quit Date | Smoking Frequency |
|----------------|--------------------|-----------| ------------------|
| Never | — | — | |
| Smokeless Status | Smokeless Type | Smokeless Quit Date | |
| Unknown | — | — | |
| Source | | | |
| Provider | | | |

## Alcohol Use as of 6/17/2015

**Alcohol Use last reviewed by Tatum, David, DO on 6/17/2015**

| Alcohol Use | Drinks/Week | Alcohol/Week | Comments | Source |
|-------------|-------------|--------------|----------|--------|
| No | | — | — | Provider |

## Drug Use as of 6/17/2015

**Drug Use last reviewed by Tatum, David, DO on 6/17/2015**

| Drug Use | Types | Frequency | Comments | Source |
|----------|-------|-----------|----------|--------|
| Not Asked | — | — | THC-daily | Provider |

## Sexual Activity as of 6/17/2015

**Sexual Activity last reviewed by Tatum, David, DO on 6/17/2015**

| Sexually Active | Birth Control | Partners | Comments | Source |
|-----------------|---------------|----------|----------|--------|
| Not Asked | — | — | — | Provider |

## Activities of Daily Living as of 6/17/2015

**Activities of Daily Living never marked as reviewed**
None

## Social Documentation as of 6/17/2015

**Social Documentation never marked as reviewed**
None

## Occupational as of 6/17/2015

**Occupational never marked as reviewed**
None

## Socioeconomic as of 6/17/2015

**Socioeconomic never marked as reviewed**

Printed by 56969 at 3/20/23  7:54 AM

**JA483**

## University of Rochester Medical Center

SCIPK BH CHILD/ADOLESC L[███], F[███]
315 Science Pkwy
Rochester NY 14620
Amb Encounter Report

MRN: E679800, DOB: [███]/1997, Sex: F
Visit date: 6/17/2015

### Socioeconomic as of 6/17/2015 (continued)

| Marital Status | Spouse Name | Number of Children | Years Education | Education Level | Preferred Language | Ethnicity | Race | Source |
|---|---|---|---|---|---|---|---|---|
| Single | — | — | — | — | English | Not Hispanic or Latino | White or Caucasian | — |

### Birth as of 6/17/2015

**Birth never marked as reviewed**
None

### OB History as of 6/17/2015

**OB History never marked as reviewed**
No obstetric history on file.

### Allergies

Review status set to Up to Date by Tatum, David, DO on 6/17/2015

| | Updated | Reaction Type | Reactions | Comments |
|---|---|---|---|---|
| **Risperidone** | 03/26/2015 6:29 PM | Intolerance | Other (See Comments) | Caused Galactorrhea |

### Immunizations

| Name | Date |
|---|---|
| **Tdap** | 01/12/20 (22 y.o.) |
| Comment: | |

### Vitals

Most recent update: 6/17/2015 8:41 PM

| BP | Ht | Wt |
|---|---|---|
| 93/65 | 1.473 m (4' 10") | 45.4 kg (100 lb) |

### Medications

#### Medications at Start of Encounter

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| **ARIPiprazole (ABILIFY) 10 MG tablet** | 15 tablet | 0 | 5/20/2015 | 7/10/2015 |
| Sig - Route: Take 0.5 tablets (5 mg total) by mouth daily - Oral | | | | |

### All Orders

No orders found for this encounter

### Progress Notes - All Notes

#### Progress Notes by Tatum, David, DO at 6/17/2015 1:39 PM

| | | |
|---|---|---|
| Author: Tatum, David, DO | Service: Psychiatry | Author Type: FELLOW |
| Filed: 6/17/2015 8:49 PM | Encounter Date: 6/17/2015 | Status: Attested |
| Editor: Tatum, David, DO (FELLOW) | | Cosigner: Mancuso, Darren, DO at 6/18/2015 7:20 AM |

**\*\*Sensitive Note\*\***

Attestation signed by Mancuso, Darren, DO at 6/18/2015 7:20 AM

I have reviewed the resident's note and agree with the assessment and plan of care based on the resident's findings as documented above.

Darren Mancuso, DO 6/18/2015

Printed by 56969 at 3/20/23 7:54 AM

**JA484**

**University of Rochester Medical Center**

SCIPK BH CHILD/ADOLESC L▮▮, F▮▮
315 Science Pkwy
Rochester NY 14620
Amb Encounter Report

MRN: E679800, DOB: ▮▮/1997, Sex: F
Visit date: 6/17/2015

---

**Progress Notes - All Notes (continued)**

**Progress Notes by Tatum, David, DO at 6/17/2015  1:39 PM (continued)**

---

**STRONG BEHAVIORAL HEALTH PSYCHIATRIC EVALUATION AND MANAGEMENT**

**HISTORY**

**Chief Complaint/Reason for Encounter: "It feels like this last week was very emotional."**

**History of Presenting Illness:**
F▮▮ is a pleasant 17 y/o white female who I saw individually today. She said that she was particularly tired today, saying that she took a nap in the car and was very tired at school. She started taking the Abilify I prescribed though has taken it somewhat sporadically. She didn't start taking it until Monday, where she took in the morning but then also took it at night some days. She said she took it both last night and this morning, which could very likely explain why she was sedated today. She did not feel like the Abilify was overly sedating like the seroquel, but did feel like she could fall asleep after taking it.

She described some drama amongst a number of her male friends, and they have all been upset with her lately because she wronged one of their friends. She described a number of trivial encounters between her and some of these friends and that this was emotionally draining for her. She has gotten behind in her school work as a consequence and now has a fairly large English project due on Friday yet she's still scheduled to work at Wendy's Thursday night before it is due. We discussed how she might need to adjust her priorities since her graduation may be on the line if she can't complete these last few assignments.

She did enroll for FLCC next year and is excited about going. She also took her 5 hour driving course and hopes to get her license before she goes to school.

Seems less depressed than previously, does not appear manic. Her sleep continues to be dysregulated but not by Seroquel at this point since she's not taking it. Her appetite is slightly increased but no significant weight gain at this point, she denies SI/HI/AVH.

**Past, Family, Social History:**
**Substance use history and treatment:**
Alcohol Use: Has drank in the past but strongly dislikes it because of her mom's alcoholism.
Tobacco Use: Denied
Illicit Drug Use: Was smoking marijuana daily, though she remained abstinent after discharge from the hospital for 3 months. Recently she has used intermittantly. She had been smoking "dabs" prior to her hospitalization which has a very high THC content. She has not used dabs since then. First use of THC in middle school, but it became more frequent in high school and almost daily since the summer of 2014.

**FAMILY HISTORY:**
**Psychiatric Illness in Family:** Mother has been diagnosed with Bipolar disorder, borderline personality disorder, and alcohol dependence. Mom is currently in jail after violating probation after getting 2 DWI's.
**Suicides in Family:** Her father has two cousins who committed suicide, though she was not close to them.

---

Printed by 56969 at 3/20/23  7:54 AM

**JA485**

**University of Rochester**
**Medical Center**

SCIPK BH CHILD/ADOLESC  L█████  F█████
315 Science Pkwy
Rochester NY 14620
Amb Encounter Report

MRN: E679800, DOB: ███/1997, Sex: F
Visit date: 6/17/2015

---

### Progress Notes - All Notes (continued)

Progress Notes by Tatum, David, DO at 6/17/2015  1:39 PM (continued)

**Social/Developmental History:**
**Living Situation:**
She lives with her father and younger sister. Her mother was recently released from jail after violating her probation after multiple DWI's.

**Developmental and Abuse Hx:**
Normal Developmental Milestones
F███ has witnessed a significant amount of domestic abuse of her mother as a child.
Her mother was highly dysfunctional when she was a child and was in abusive relationships and F███ witnessed this abuse. Mom was often drunk and CPS took custody from her and she has lived with dad since. F███ said her mom once told her "I hate that I love alcohol more than I love you."

**School History:**
She is in 12th grade at Penfield HS, though she currently is going to individual tutoring after she assaulted a peer at school and was facing a long term suspension if she didn't agree to the tutoring option. She has not gotten the best grades this year or in general in the past. She was in the East Rochester school district many years ago, but then dad moved them to Penfield after their mom went to jail.

Her school counselor is Nathan Miller
25 High School Dr.
Penfield, NY 14526
Phone: (585) 249-6700
Fax: (585) 248-2810
Attendance Office: (585) 249-6707
Nurse's Office (585) 249-6721

**Review of Systems & Active Medical Problems:**
**(1 system = Problem Pertinent; 2-9 systems = Extended; 10 or more systems _or_ some systems noted as "all others negative"= _Complete_)**

Pertinent items are noted in HPI., A comprehensive review of systems was negative.

| PSYCHIATRIC  EXAMINATION |
|---|

**(1-5 bullets = Problem Focused; 6-8 bullets = Expanded Problem Focused; At least 9 bullets = Detailed; Completion of _All_ bulleted items - Comprehensive). Note: Vital Signs are weighted as one system area)**

**Filed Vitals:**

|  | 06/17/15 2041 |
|---|---|
| BP: | 93/65 |
| Height: | 1.473 m (4' 10") |
| Weight: | 45.36 kg (100 lb) |

**Mental Status Exam**
APPEARANCE: Appears stated age, Well-groomed, in t-shirt and jeans
ATTITUDE TOWARD INTERVIEWER: Cooperative and pleasant
MOTOR ACTIVITY: WNL (within normal limits)
EYE CONTACT: Direct
SPEECH: Age appropriate and Pressured

---

Printed by 56969 at 3/20/23  7:54 AM

**JA486**

**University of Rochester Medical Center**

SCIPK BH CHILD/ADOLESC L███ F███
315 Science Pkwy
Rochester NY 14620
Amb Encounter Report

MRN: E679800, DOB: ███1997, Sex: F
Visit date: 6/17/2015

## Progress Notes - All Notes (continued)

### Progress Notes by Tatum, David, DO at 6/17/2015 1:39 PM (continued)

AFFECT: Full Range, Appropriate and Pleasant
MOOD: Sad
THOUGHT PROCESS: Normal
THOUGHT CONTENT: Negative Rumination
PERCEPTION: Within normal limits
CURRENT SUICIDAL IDEATION: patient denies
CURRENT HOMICIDAL IDEATION: Patient denies
ORIENTATION: Alert and Oriented X 3.
CONCENTRATION: Fair
MEMORY:
    Recent: intact
    Remote: intact
COGNITIVE FUNCTION: Average intelligence
JUDGMENT: Intact
IMPULSE CONTROL: Fair
INSIGHT: Good

### MEDICAL DECISION MAKING

**Diagnoses:**
Ambulatory Behavioral Health Multi-Axial Diagnoses:

| R PSY 1ST AXIS I | 4/2/2015 |
| --- | --- |
| **AXIS I** | Mood Disorder NOS, 296.9 |

| R PSY 2ND AXIS I | 4/2/2015 |
| --- | --- |
| **AXIS I** | Cannabis Dependence, 304.3 |

No flowsheet data found.

| R PSY AXIS II | 4/2/2015 |
| --- | --- |
| **AXIS II - Multi Select** | Deferred and none |

| R PSY AXIS III | 4/2/2015 |
| --- | --- |
| **AXIS III** | Hashimoto's thyroiditis |

No flowsheet data found.

| R PSY AXIS IV - FREE TEXT | 4/2/2015 |
| --- | --- |
| **AXIS IV - Free Text** | Dysfunctional relationships with her parents, poor school performance |

| R PSY AXIS V | 4/2/2015 |
| --- | --- |
| **AXIS V** | 40 |

No flowsheet data found.

**Formulation:** F███ is a 17 y/o girl who has had a chaotic childhood with a dysfunctional mother and is now being raised by her father who is a single parent and works many hours a week typically. She was smoking significant amounts of marijuana, including concentrated hash oil "dabs" multiple times per day to self medicate her anxiety and panic attacks.

Multiple psychosocial stressors recently include mom being released from jail and going in and out of rehab. F███ also lost her relationship with her boyfriend of 1 year and continues to grieve this loss though she appears to have accepted that their relationship was not healthy. Provided al-anon group times for her to

**University of Rochester Medical Center**

SCIPK BH CHILD/ADOLESC L█████ F█████
315 Science Pkwy
Rochester NY 14620
Amb Encounter Report

MRN: E679800, DOB:████/1997, Sex: F
Visit date: 6/17/2015

## Progress Notes - All Notes (continued)

### Progress Notes by Tatum, David, DO at 6/17/2015 1:39 PM (continued)

engage with people who are going through similar struggles.

Seroquel 50 mg qhs while effective in promoting adequate sleep is causing excessive morning sedation because she is taking it late in the evening. This side effect is limiting it's benefit so we will transition to Abilify 5 mg daily. Risperdal caused lactation and was discontinued for that reason.

While she is high risk for having bipolar considering her mom's diagnosis, this is complicated by her heavy THC use. She had classic symptoms of a panic disorder but also was disorganized and paranoid in the hospital. Still having mood lability concerning for bipolar, though will continue to measure these against her current psychosocial stressors to determine whether she has a unipolar or bipolar depression.

**Medications/Medical Records/Labs/Diagnostic Tests Reviewed:**
Current Medications:
Current Outpatient Prescriptions

| Medication | Sig |
|---|---|
| • ARIPiprazole (ABILIFY) 10 MG tablet | Take 0.5 tablets (5 mg total) by mouth daily |

. Tolerability: None

**Plan:**
1. Continue abilify 5 mg qhs though will continue to monitor for side effects.
2. Continue to monitor marijuana use and possible consequences.
3. Continue psychotherapy with a focus on improving her alliance with her father and helping them develop healthier communication styles.
4. Will help her explore her future college decisions.

**Length of Visit:**
Duration of face to face visit with patient: 60 minutes., Greater than 50% of face to face time was spent providing counseling and/or coordination of care.

| PSYCHOTHERAPY |
|---|

Psychotherapy:
Length of session: 60 minutes

Participants: Patient

Focus of Session/Interventions:
Focused on helping her develop insight into how she wants to have a relationship with her mother, and build her alliance through improved communication with her father. Psychodynamic therapy modality.

Plan: Continue therapy weekly or every other week depending on scheduling.

David Tatum, DO

Printed by 56969 at 3/20/23 7:54 AM

**JA488**

# University of Rochester Medical Center

SCIPK BH CHILD/ADOLESC L████, F████
315 Science Pkwy
Rochester NY 14620
Amb Encounter Report

MRN: E679800, DOB: ██/1997, Sex: F
Visit date: 6/17/2015

## Progress Notes - All Notes (continued)

### Progress Notes by Tatum, David, DO at 6/17/2015  1:39 PM (continued)

Signed by Mancuso, Darren, DO on 6/18/2015  7:20 AM
Attribution Key
    Attribution information is not available for this note.

## Questionnaires
No completed forms available for this encounter.

## Care Coordination

### Flowsheet (all recorded)

Encounter Vitals - Wed June 17, 2015

| Row Name | 2041 |
| --- | --- |
| Enc Vitals | |
| BP | 93/65  -DT |
| Weight | 45.4 kg (100 lb) -DT |
| Height | 1.473 m (4' 10") -DT |
| Pain Score | 0 - No pain  -DT |
| Excl. in GC? | No  -DT |
| Recorded by | [DT] Tatum, David, DO 06/17/15 2041 |

User Key       (r) = Recorded By, (t) = Taken By, (c) = Cosigned By

| Initials | Name | Effective Dates | Provider Type | Discipline |
| --- | --- | --- | --- | --- |
| DT | Tatum, David, DO | 03/25/15 - 07/31/15 | FELLOW | Fellow |

## Infusion Orders
No relevant orders to display.

**JA489**

**University of Rochester Medical Center**

SCIPK BH CHILD/ADOLESC L█████ F█████
315 Science Pkwy          MRN: E679800, DOB: ███/1997, Sex: F
Rochester NY 14620        Visit date: 6/17/2015
Amb Encounter Report

## AVS Snapshots

Most Recent After Visit Summary



F█████ L█████
**6/17/2015 4:00 PM**  **Office Visit**
MRN: **1685835**

Department: **Strong Behavioral Health Child and Adolescent Clinic**
Dept Phone: **585-279-7800**

Description: **18 year old female**
Provider: **David Tatum, DO**

### Basic Information

| Date Of Birth | Sex | Race | Ethnicity | Preferred Language |
|---|---|---|---|---|
| ███1997 | Female | White or Caucasian | Not Hispanic or Latino | English |

| MRN | Type |
|---|---|
| E679800 | ENTERPRISE ID NUMBER |
| 1685835 | SMH MRN |

| Future Appointments | Provider | Department | Dept Phone |
|---|---|---|---|
| 6/24/2015 4:00 PM | Tatum, David, DO | Strong Behavioral Health Child and Adolescent Clinic | 585-279-7800 |

If you were referred to another provider/specialty during this visit —please provide him/her with this AVS information

### Medication List

These changes are accurate as of: 6/17/15  8:49 PM.  If you have any questions, ask your nurse or doctor.

#### CONTINUE taking these medications

| | Prescription Info | Instructions |
|---|---|---|
| **ARIPiprazole 10 MG tablet** Commonly known as: ABILIFY  Next Dose Due: | Quantity: 15 tablet Refills: 0 For diagnoses: Mood Disorder | Take 0.5 tablets (5 mg total) by mouth daily |

### Reason for Visit

**Anxiety**

### Visit Diagnoses

**Mood disorder**   -  Primary
Printed by 56969 at 3/20/23  7:54 AM

**JA490**

**University of Rochester Medical Center**

SCIPK BH CHILD/ADOLESC L█████, F█████
315 Science Pkwy
Rochester NY 14620

MRN: E679800, DOB: ████1997, Sex: F
Visit date: 6/17/2015

## Care Coordination (continued)

## AVS Snapshots (continued)

### Allergies as of 6/17/2015

| | |
|---|---|
| Risperidone<br>Caused Galactorrhea | Other (See Comments) |

### Medications Administered During Today's Visit

None

### Your Vital Signs Were

| BP | Ht | Wt | BMI | Smoking Status |
|---|---|---|---|---|
| 93/65 | 1.473 m (4' 10") | 45.36 kg (100 lb) | 20.91 kg/m2 | Never Smoker |

### Problem List as of 6/17/2015

| | Noted - Resolved |
|---|---|
| Hashimoto's thyroiditis | 12/5/2012 - Present |
| Marijuana dependence | 3/17/2015 - Present |
| Mood disorder | 3/17/2015 - Present |
| Panic disorder | 3/9/2015 - Present |

**All Patients:**
An up-to-date medication list is very important to your safe care. Bring your list to all healthcare appointments. Carry it with you at all times in case of emergency. Update your list whenever you start a new medication, change the dose of a current medication, or stop a prior medication. Remember to include over-the-counter medications and supplements such as vitamins and herbs.

### Instructions

None

**Ambulatory Entire Encounter Report - Table of Contents**

I.    Contact Information
II.   Visit Information
      1. Reason for Visit
      2. Diagnosis
      3. Problem List
      4. Medical History
      5. Vitals
III.  Medications
IV.   Orders and Results
V.    Encounter Notes and Letters
VI.   Treatment and Coordination Plans
VII.  Flowsheet Data
VIII. Scans (Encounter and Order Level)
IX.   Nuclear Orders in Encounters

**Please note: the encounter may not contain all of the above information**

Printed by 56969 at 3/20/23  7:54 AM

**JA491**

**University of Rochester Medical Center**

SCIPK BH CHILD/ADOLESC L█████, Fa███
315 Science Pkwy
Rochester NY 14620
Amb Encounter Report

MRN: E679800, DOB: ███/1997, Sex: F
Visit date: 6/24/2015

**Ambulatory Entire Encounter Report - Table of Contents (continued)**

**JA492**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID TATUM,<br><br>Defendant. | Docket No. 3:22-cr-157-KDB<br><br>MOTION FOR A<br>JUDGMENT OF ACQUITTAL |

MOTION FOR A JUDGMENT OF ACQUITTAL

The Defendant, David Tatum, by and through his counsel of record, Ryan Ames, respectfully moves pursuant to Rule 29 of the Federal Rules of Criminal Procedure for a Judgment of Acquittal on all counts. Alternatively, the Defendant moves for a new trial under Rule 33.

## I.    STATEMENT OF CASE

Trial in this matter commenced on May 2nd, 2023 on charges that from in or about July 2016 through September 22nd, 2021 the Defendant:

(1) Possessed Child Pornography in violation of 18 USC § 2252A(a)(5)(B);

(2) Produced Child Pornography in violation of 18 USC § 2251(a) and (e); and

(3) Transported Child Pornography in violation of 18 USC § 2252(a)(1)

The jury returned a verdict of Guilty for all counts on May 4th, 2023. The Court denied the Defendant's oral Rule 29(a) motions for a Judgment of Acquittal prior to submission of the case to the jury. The Defendant renews these motions, and supplements them pursuant to Rule 29(c).

1

**JA493**

## II.  BACKGROUND

The alleged depictions of child pornography submitted to the jury, as defined

in 18 USC § 2256(8), can be summarized as follows:

(1) LS Video (Exhibit 1c)
Allegedly recovered from Western Digital external hard drive. Two
unknown females engaging in sexual intercourse.

(2) Bathroom Video of Victim 1 (Exhibit 1d)
Allegedly recovered from Western Digital external hard drive. A hidden
camera depicts Victim 1 undressing, using bathroom, and getting in and
out of shower.

(3) Webcam Video "vidweb_172.avi (Exhibit 3c)
Allegedly recovered from HP Pavilion Desktop. Apparent webcam video
depicting three unknown females. At approximately 30:25 mark, one
female is observed exposing and touch pubic area.

(4) Webcam Video "vidweb_174.avi" (Exhibit 3e)
Allegedly recovered from HP Pavilion Desktop. Apparent webcam video
depicting two unknown females. At approximately 26:22 and 36:40 marks,
females are observed engaging in digital penetration.

(5) Morphed Images (Exhibits 4d, 4e, 4f, 4g)
Allegedly recovered from Medical College of Wisconsin Thumb Drive and
from Metadata/Thumbnails on MacBook Pro. Includes approximately a
dozen nude images of both known and unknown females. The images were
allegedly created by Defendant using a "nudifier" website.

The Government has acknowledged that the only depiction that allegedly

violates 18 USC § 2251 (as it pertains to David Tatum) is the Bathroom Video of

Victim 1 (Exhibit 1d). The jury was likewise given an instruction to this effect with

respect to Count 2. The Government further argued that the Bathroom Video of

Victim 1 could support convictions for Counts 1 and 3.

Victim 1 testified at trial that she would have been 15 years old in July of

2016, the time of the alleged recording. She further testified that she had no

2

knowledge that she was being filmed.

It is conceded by the Government that the Defendant did not "employ, persuade, induce, entice, or coerce" Victim 1 in the creation of the video. It is the Government's contention that requirements of 18 USC § 2251(a) are met in that the Defendant "used" Victim 1 by virtue of filming her.

The Defense argued at trial that the video of Victim 1 could not support a conviction for any count because it simply isn't child pornography.

### III.    JURY INSTRUCTIONS FOR "LASCIVIOUS EXHIBITION"

The jury received instructions that in order for an image to constitute child pornography under federal law, it must include a depiction of sexually explicit conduct as defined in 18 USC § 2256(2). The Government concedes that the video does not depict intercourse, bestiality, masturbation, or sadistic or masochistic abuse, the criteria laid out in 18 USC § 2256(2)(A)(i) through (iv). The sole allegation is that the video meets the definition of "sexually explicit conduct" by purportedly depicting a "lascivious exhibition of the anus, genitals, or pubic area" under 18 USC § 2256(2)(A)(v).

The term "lascivious exhibition" is not defined by statute, nor is any authoritative precedential definition provided in the body 4th Circuit case law. The Jury received an instruction defining the term "lascivious exhibition" as "a depiction that displays or brings to view to attract notice to the genitals or pubic area of children in order to excite lustfulness or sexual stimulation in the viewer". The

3

**JA495**

instruction further noted that "not every exposure of the genitals or pubic area constitutes a lascivious exhibition." *See Instruction No. 12*

The Court also instructed that in determining whether a particular visual depiction constitutes a lascivious exhibition, the Jury should consider a series of six factors derived from *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986):

(1) Whether the focal point of the visual depiction is on the minor's genitals or pubic area;

(2) Whether the setting of the visual depiction makes it appear to be sexually suggestive, for example, in a place or pose generally associated with sexual activity;

(3) Whether the minor is displayed in an unnatural pose, or in inappropriate attire, considering the age of the minor;

(4) Whether the child is fully or partially clothed, or nude;

(5) Whether the visual depiction suggests coyness or a willingness to engage in sexual activity; and

(6) Whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

## IV.    JURY QUESTION

After a few hours of deliberation, the Jury submitted the following question to the Court (underlined emphasis is verbatim from the handwritten question; the Victim's name is redacted):

> *Do we consider the defendant's motivation and point of view of what <u>he</u> thought would be "lascivious exhibition" when he took the "[VICTIM 1]" video, or do we view the video in a vacuum to determine if the video is "lascivious exhibition?" Do we consider his parking lot interview where he admits to being a voyeur and "getting off" if we consider the video <u>not</u> as a stand-alone but from the defendant's point of view and his motivation for taking it?*

4

**JA496**

This strikes directly at the core of the Defendant's argument. As an aside – Defense Counsel (and no doubt the Government as well) concurs in the Court's acknowledgment to the Jury that this question was remarkably thoughtful and well-reasoned.

The question in essence asks whether the Jury should conduct a "four corners" style of analysis and consider the video objectively ("in a vacuum") to determine lasciviousness, or whether subjective factors related to this particular Defendant should be considered.

From there, if subjective factors are to be weighed, the Jury asks to what extent should they consider the type of material that Jury believes would "excite lustfulness or sexual stimulation" in this particular Defendant? And even further, does an admission to the FBI five years later by the Defendant to being a "voyeur" impact whether or not the depiction is lascivious?

After consulting with and hearing argument from the Government and the Defense, the Court issued the following response to the Jury's question:

> It is for the jury to determine whether an image or video is "lascivious" as the Court has defined it for you. In considering this question the jury may consider all of the evidence and draw reasonable inferences from the evidence.
>
> Among the circumstances the jury may consider are the selection and positioning of the subject, whether the video contains extensive nudity, including video of her breasts and genitals, and the entirety of the context in which the video was made, including the Defendant's motivation and intent.

The jury returned with its verdicts of Guilty a few minutes later.

5

**JA497**

V.    ARGUMENT

The Defendant contends that the evidence to support conviction on all three counts is insufficient as a matter of law, and that the Court should issue a Judgment of Acquittal. In the alternative, the Defendant contends that the response to the Jury instruction rested upon improper factors and principles, or outside the range of permissible decisions.

Because the Fourth Circuit does not appear to have notable precedent defining "lascivious exhibition" under 18 USC § 2256(2)(A)(v), the Court's response to the Jury question invoked a series of factual matters considered in *US v. Courtade*, 929 F.3d 186 (4th Cir. 2019).

While the Defendant's case and *Courtade* involve depictions of a minor in the process of showering, that is where the similarities end:

> Far from depicting merely a girl showering, drying off, and getting dressed, the video contains extensive nudity—including shots of her breasts and genitals—that is entirely the product of an adult man's deceit, manipulation, and direction as captured in the video. As the district court found, Courtade tricks Jane Doe into undressing by lying to her about wanting to "test" whether the camera is waterproof—a test he could have conducted himself by (for example) holding the camera under a running tap. . . Courtade lies to Jane Doe again by reassuring her—before she begins showering—that the camera is off and cannot record her. . .
>
> Once Jane Doe takes the camera in the shower, Courtade directs her on how to hold and position it, ensuring that the camera records her nude body. . . . Courtade himself also takes an active role in filming Jane Doe's nude body, at one point holding the wide-angle camera above the shower rod—long after he has "tested" the waterproof quality of the camera—and deliberately angling the camera lens down in such a way as to capture even more footage of Jane Doe's breasts and genitals. . .
>
> And while Jane Doe is showering, moreover, Courtade can be heard promising her ice cream as a reward for testing the camera. On its face, then,

6

**JA498**

the video depicts not simply a young girl nude in the shower. Its images and audio reveal a young girl deceived and manipulated by an adult man into filming herself nude in the shower, and methodically directed to do so in a way that ensures she records her breasts and genitals. . .

The video also reveals an adult man himself filming a teenage girl's breasts and genitals as she showers. Under these circumstances, we are satisfied that the video objectively depicts a "lascivious exhibition" because the images and audio—revealing deceit, manipulation, and the careful directing and filming of a young girl resulting in footage of her breasts and genitals—make clear that the video's purpose was to excite lust or arouse sexual desire in the viewer.

*Courtade*, 929 F.3d at 192-93 (citations omitted).

While perhaps the closest thing to precedent that exists in the Fourth Circuit, *Courtade* states explicitly in its text that it does not address the core issue of David Tatum's case and the Jury's specific question. Quoting *Courtade* at length:

> "Many courts, recognizing that applying the term 'lascivious exhibition' is not always easy, have looked to the six factors articulated in *United States v. Dost* as guideposts in determining whether conduct meets the statutory definition…As Courtade points out, however, the *Dost* factors have been subject to criticism over the years. *See, e.g., United States v. Frabizio*, 459 F.3d 80, 88 (1st Cir. 2006) (observing that the factors "have fostered myriad disputes that have led courts far afield from the statutory language").
>
> Particularly divisive has been the sixth factor, which potentially implicates subjective intent and asks whether the depiction is intended or designed to elicit a sexual response in the viewer. *See United States v. Brown*, 579 F.3d 672, 682-83 (6th Cir. 2009) (explaining that "[s]ome courts have accepted arguments that lasciviousness should be determined from the image alone" and "[o]ther courts have explicitly avoided the question").
>
> Courtade indeed argues at length that his subjective intent or motive in creating the video is irrelevant to our analysis, and that considering his intent would be at odds with the statutory language and would raise concerns under the Due Process Clause and the First Amendment.
>
> In this case, we need not venture into the thicket surrounding the *Dost* factors or define the parameters of any subjective-intent inquiry, because we can dispose of this case based on the objective characteristics of

7

**JA499**

the video alone. The plain meaning of "lascivious exhibition" requires that we ask whether the video depicts Jane Doe's genitals or pubic area "in order to excite lustfulness or sexual stimulation in the viewer." *Knox,* 32 F.3d at 745. Here, the video's objective characteristics—the images and audio contained within its four corners, irrespective of Courtade's private subjective intentions—reveal the video's purpose of exciting lust or arousing sexual desire within the plain meaning of "lascivious exhibition."

*Courtade*, 929 F.3d at 193

A number of other circuits *have* addressed the issue that *Courtade* did not.

For instance:

*United States v. HILLIE*, 38 F.4th 235, 237 (D.C. Cir. 2022):

"A child who uncovers her private parts to change clothes, use the toilet, clean herself, or bathe does not *lasciviously* exhibit them. To be sure, a voyeur who secretly films a child engaged in such tasks may do so for his own sexual gratification, or for the gratification of others who will see the depiction. But the definition turns on whether the exhibition itself is lascivious, not whether the photographer has a lustful motive in visually depicting the exhibition or whether other viewers have a lustful motive in watching the depiction."

*United States v. McCoy*, No. 21-3895 (8th Cir. Dec. 15, 2022).

"Finally, the videos were not intended or designed to elicit a sexual response in the viewer. The government disagrees, arguing "M.B.'s innocent acts of undressing and taking a shower on the videos are lascivious because of McCoy's intent for them to be sexual." In support, the government points to other images and videos presented at trial rather than the content of the two videos of M.B. Even if McCoy intended for the two videos of M.B. to be sexual in nature, the statute does not ask whether the videos were intended to appeal to the defendant's particular sexual interest. Instead, the inquiry is whether the videos, on their face, are of a sexual character. *Petroske,* 928 F.3d at 772; *Wallenfang,* 568 F.3d at 658; *Kemmerling,* 285 F.3d at 646. As our discussion of the other factors demonstrates, the videos are not."

*United States v. Heinrich*, No. 21-2723 (3d Cir. Jan. 4, 2023).

"All these questions are objective. It does not matter whether the defendant subjectively intended the conduct or depiction to be "sexually explicit" or

8

**JA500**

"lascivious." True, the sixth factor asks how the pictures were "intended or designed" to affect viewers. But that phrase just tells us to ignore how a particular viewer reacted…."[T]he sixth *Dost* factor, rather than being a separate substantive inquiry about the photographs, is useful as another way of inquiring into whether any of the other five *Dost* factors are met." *Id.* In short, the sixth factor reminds us to look at the picture as a whole—an objective inquiry."

RESPECTFULLY SUBMITTED, this the 18th day of May, 2023.

s/ Ryan P. Ames
Ryan P. Ames
North Carolina Bar # 49651
SeiferFlatow, PLLC
2319 Crescent Ave.
Charlotte, NC 28207
Telephone: 704-512-0606
Fax: 704-314-0677
Email: ryan@seiferflatow.com

## CERTIFICATE OF SERVICE

I hereby certify that that on this 18th day of May, 2023, the foregoing document was served electronically on the United States through ECF filing.

s/ Ryan P. Ames
Ryan P. Ames

9

**JA501**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )    DOCKET NO. 3:22-cr-00157-KDB
                            )
                            )
v.                          )
                            )
DAVID TATUM                 )
                            )

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL

The United States of America files this response in opposition to Defendant's "Motion for a Judgment of Acquittal." Defendant moves for Judgement of Acquittal pursuant to Federal Rules of Criminal Procedure Rules 29 and 33. A motion for judgment of acquittal pursuant to Rule 29 is appropriate when a defendant challenges the sufficiency of the evidence, which defendant does not do. His motion is more appropriately characterized as a motion for new trial pursuant to Rule 33 because his only argument is that the Court erred in instructing the jury on the law regarding the definition of "lascivious exhibition of the anus, genitals, or pubic area of any person" under Title 18, United States Code, Section 22556(2)(A)(v). As explained below, the Court properly instructed the jury. Accordingly, Defendant's motion should be denied.

### I.    Motion for Judgement of Acquittal Pursuant to Rule 29

Rule 29(c)(2) provides that, "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." "The test for deciding a motion for a judgment of acquittal is whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). "When bringing such a challenge, a defendant 'faces a heavy burden'—this Court must give full play to

1

**JA502**

the jury to resolve testimonial conflicts, weigh the evidence, and 'draw reasonable inferences from basic facts to ultimate facts.'" *United States v. Dennis*, 19 F.4th 656, 665 (4th Cir. 2021) (citations omitted). "And while [the Fourth Circuit] review[s] the district court's conclusions de novo, [the Fourth Circuit] can reverse a conviction only where no reasonable juror 'could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 665-66.

Although Defendant purports to raise a claim that the evidence was insufficient, he dedicates one conclusory sentence to that proposition in his argument. *See* ECF No. 56 at 6. He fails to reference a single fact that was insufficient for any element of any of the three Counts of conviction. Nor could he.

Having failed to articulate any argument or refer to any facts on this issue, the government relies on the trial evidence and the Court's ruling in denying his motion for judgement of acquittal at the close of all the evidence. Such trial evidence included, inter alia, that Defendant possessed and accessed with intent to view child pornography across multiple devices, that he masturbated to child pornography he generated through a "deep fake" website, and that he produced and transported child pornography across state lines from Maine to North Carolina. Accordingly, Defendant's motion for acquittal pursuant to Rule 29 should be denied.

## II.    Motion for a New Trial Pursuant to Rule 33

Fed. R. Crim. P. 33(a) provides, in pertinent part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." *See also United States v. Fenn*, 584 F. App'x 114, 115 (4th Cir. 2014) (citing Federal Rules of Criminal Procedure Rule 33(a)). A district court "should exercise its discretion to grant a new trial sparingly," and "should do so only when the evidence weighs heavily against the verdict," *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (citation omitted), or when substantial prejudice

2

**JA503**

has occurred, *United States v. Jones*, 542 F.2d 186, 211 (4th Cir. 1976) (citations omitted). As explained below, Defendant has not met his burden.

### a. Background

Defendant's focus in this motion is with respect to Count 2, which charged him with substantive and attempted production of child pornography. ECF No.19. This charge related to the surreptitious recording that Defendant made of his 15-year-old cousin (M.C.) as she got naked in a bathroom to shower at the family vacation home in Maine.

The trial evidence showed that Defendant made the video of M.C. He captured himself setting up the camera at an angle from the floor that ensured that M.C.'s naked pubic area would be captured. M.C. and another relative identified Defendant in the video. Defendant flushed the toilet after he set up the camera and just prior to exiting to deceive any listeners into believing that he had used the bathroom, when in fact, the video showed that he had not. Defendant also took steps to conceal his unlawful conduct, deleting the video from his iPhone, and then moving the file onto an external hard drive and concealing it within a series of sub folders contained in the user manual of the external hard drive.

The evidence further showed Defendant's motive and intent, among other applicable 404(b) purposes, to capture a lascivious exhibition of M.C.'s genitals and pubic area. Defendant possessed videos of minors engaging in sexual intercourse. He utilized pictures of former girlfriends and a website called teen gallery to obtain images of minors that he then adapted and modified to make them depict a lascivious exhibition of the minors' genitals or pubic area. He accessed with intent to view over 1,000 files with titles indicative of child pornography, all of which contained the phrase, "PTHC," which stands for pre-teen hard core. He surreptitiously recorded other family members, including more minors, naked and showering in the bathroom.

3

**JA504**

And he recorded his former patient by directing a camera up her skirt as she sat at a table with Defendant during one of her therapy sessions with him. He also filmed up her skirt as he weighed the patient on a scale. His patient had turned 18 years old 5 days before the recording, and Defendant wrote in his notes that his patient was "17," thus indicating Defendant's mistake of fact that she was a minor.

The initial set of jury instructions submitted to the jury were agreed to by both parties. *See* ECF No. 42. Those instructions provide that "Child Pornography" involves the depiction of a minor "engaging in sexually explicit conduct." *Id.* at 10 (Inst. No. 9). The phrase, "engaging in sexually explicit conduct," includes "the lascivious exhibition of the anus, genitals, or pubic area of any person." *Id.* at 12 (Inst. No. 11). Lascivious exhibition "means a depiction that displays or brings to view to attract notice to the genitals or pubic area of children in order to excite lustfulness or sexual stimulation in the viewer." *Id.* at 13 (Inst. No. 12). "In deciding whether the government has proved that a particular visual depiction constitutes a lascivious exhibition," the parties agreed, and the Court instructed, the jury to consider several factors, including "Whether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Id.* at 13.

Given that Defendant was charged with attempt to produce child pornography, the parties further agreed on instructions related to attempt. *Id.* at 20. The relevant portion instructed the jury to determine whether the evidence proved beyond a reasonable doubt that "the defendant intended to commit the offense of employing, using, persuading, inducing, enticing, or coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct."

During deliberations, the jury had one question:

> Do we consider the defendant's motivation and point of view of what he thought would be "lascivious exhibition" when he took the "[M.C.]" video, or do we view the video in a vacuum to determine if the video is "lascivious exhibition"? Do we consider his parking lot interview where he admits to being a voyeur and

4

"getting off" if we consider the video not as a stand-alone but from the defendant's point of view and his motivation for taking it?

After hearing argument from both sides, the Court instructed the jury:

> It is for the jury to determine whether an image or video is "lascivious" as the Court has defined it for you. In considering this question the jury may consider all of the evidence and draw reasonable inferences from the evidence.
>
> Among the circumstances the jury may consider are the selection and positioning of the subject, whether the video contains extensive nudity, including video of her breasts and genitals, and the entirety of the context in which the video was made, including the Defendant's motivation and intent.

ECF No. 53.

### b.  The Court Properly Instructed the Jury

Defendant agreed to instruct the jury that lascivious exhibition "means a depiction that displays or brings to view to attract notice to the genitals or pubic area of children in order to excite lustfulness or sexual stimulation in the viewer." *Id.* at 13 (Inst. No. 12). "In deciding whether the government has proved that a particular visual depiction constitutes a lascivious exhibition," the parties agreed, and the Court instructed, the jury to consider several factors, including "Whether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Id.* at 13.

The Fourth Circuit has not decided whether the jury can consider the producer's subjective intent or motive in creating the video when deciding "[w]hether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Id.*  It has, however, given us some guidance. In *United States v. Courtade*, 929 F.3d 186, 192 (4th Cir. 2019), the Fourth Circuit decided not to "define the parameters of any subjective-intent inquiry, because we can dispose of this case based on the objective characteristics of the video alone." But its "objective" characteristics alluded to factors that reflected defendant's subjective intent and motive in creating the video. *Courtade* involved a surreptitious bathroom video. The Court looked to defendant's deceit, manipulation,

5

**JA506**

and direction in the video to conclude that it depicted more than "merely a girl showering, drying off, and getting dressed." *Id.* at 193. The Court also looked to defendant's efforts to position the camera in a way that ensured that the video captured the victim's breasts and genitals. *Id.*

Importantly, the Court focused on the objective characteristics of the video that reflected the "video's purpose." *Id.* ("[W]e are satisfied that the video objectively depicts a 'lascivious exhibition' because the images and audio—revealing deceit, manipulation, and the careful directing and filming of a young girl resulting in footage of her breasts and genitals—make clear that the *video's purpose* was to excite lust or arouse sexual desire in the viewer.") (emphasis added).

Other Circuits agree that the defendant's motives and intentions in creating a surreptitious video are relevant for the jury's consideration. *See United States v. Wells*, 843 F.3d 1251, 1255 (10th Cir. 2016) (explaining that "lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or like-minded pedophiles") (citation omitted); *United States v. Holmes*, 814 F.3d 1246, 1251–52 (11th Cir. 2016) ("depictions of otherwise innocent conduct may in fact constitute a 'lascivious exhibition of the genitals or pubic area' of a minor based on the actions of the individual creating the depiction"); *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir. 1987) ("The picture of a child 'engaged in sexually explicit conduct' within the meaning of 18 U.S.C. §§ 2251 and 2252 as defined by § 2255(2)(E) is a picture of a child's sex organs displayed lasciviously—that is, so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur.").

As the Court acknowledged prior to instructing the jury in this case, the Circuits are split, however, on whether to consider a defendant's motive and intent in producing a video. The leading decision in support of Defendant's position, which he cites, is *United States v. Hillie*, 38 F.4th 235

6

**JA507**

(D.C. Cir. 2022). The *Hillie* Court defined "lascivious exhibition of the anus, genitals, or pubic area of any person" as meaning, "the minor displayed his or her anus, genitalia, or pubic area in a manner connoting that the minor, or any person or thing appearing with the minor in the image, exhibits sexual desire or an inclination to engage in any type of sexual activity." *Id.* at 236. This definition is problematic for a number of reasons, but most importantly, it improperly focuses on the *minor's* sexual desire or inclination to engage in sexual activity. No one would credibly disagree that infants and toddlers, as well as unconscious or drugged children, are unable to "exhibit[ ] sexual desire or an inclination to engage in any type of sexual activity." And yet, *Hillie* eliminates the ability to prosecute the offenders who produce, possess, and distribute the lascivious exhibition of genitals of victims too young or incapacitated to demonstrate a desire to engage in sexual activity.

This also reads out important parts of the production statute, which emphasizes that the heart of the offense is the offender who "*employs, uses, persuades, induces, entices, or coerces any minor to engage in . . .* [the lascivious exhibition of the genitals]." 18 U.S.C. § 2251(a) (emphasis added). Those verbs play an important role, which the *Hillie* definition ignores by focusing on the minor's actions. As the dissent in the decision denying en banc review indicates, "None of our sister circuits have adopted an interpretation focusing on the minor's 'sexual desire' or 'inclination to engage in sexual activity.'" *Hillie*, 38 F.4th at 243 (Rao, J., dissenting). The D.C. Circuit's definition uniquely threatens cases of the youngest and most vulnerable victims, including infants and toddlers, sleeping or drugged children, and those unwittingly used or compelled to act a certain way, all of whom are incapable of "exhibit[ing] sexual desire or an inclination to engage in any type of sexual activity." *Hillie*, 38 F.4th at 236. This is neither an abstract nor hypothetical concern, as Defendant argued in closing that the production video was

**JA508**

not child pornography because *M.C.* did not engage in sexually explicit conduct.

Additionally, by starting with "the minor displayed his or her anus, genitals, or pubic area," the *Hillie* definition ignores that the lascivious exhibition of the genitals can be *of any person.* 18 U.S.C. § 2256(2)(A)(v) ("'sexually explicit conduct' means actual or simulated lascivious exhibition of the anus, genitals, or pubic area of *any person*") (emphasis added). Instead, *Hillie* restricts the lascivious exhibition to the minor's genitals and eliminates the criminalization of an adult's genitals pictured with a clothed minor. *See, e.g., United States v. Lohse*, 797 F.3d 515, 518 (8th Cir. 2015) (upholding defendant's conviction for production when defendant filmed himself naked with his penis on or near his three year old victim's face while she was sleeping and clothed).

Apart from all this, Defendant foreclosed his ability to rely on *Hillie* and its progeny because he agreed to the *Dost* factors in Jury Instruction 12, ECF No. 42 at 13, and *Hillie* rejected the *Dost* factors, 14 F.4th 677, 691 (D.C. Cir. 2021) ("[W]e decline to adopt the *Dost* factors, and thus we find unpersuasive those decisions of our sister circuits that follow the *Dost* factors, or that use *Dost* as the foundation for construing 'lascivious exhibition of the anus, genitals, or pubic area' . . .").

Tatum also block-quotes *McCoy* and *Heinrich* without articulating their connection to his position. Nevertheless, these decisions are not helpful because they suffer from the same fatal infirmities that plague *Hillie*: they suggest a focus on the minor's conduct depicted in the image instead of the defendant's conduct in creating the content. *See United States v. McCoy*, 55 F.4th 658, 661 (8th Cir. 2022) ("the videos do not suggest sexual coyness or a willingness to engage in sexual activity"); *United States v. Heinrich*, 57 F.4th 154, 161 (3d Cir. 2023) ("In sum, § 2251(a)'s actus reus requires proof beyond a reasonable doubt that the defendant engineered conduct involving a child that the jury, considering all the facts and context, finds sexually explicit.").

8

**JA509**

Moreover, the value of *McCoy* is questionable since a rehearing was granted and the opinion was vacated. *See United States v. McCoy*, No. 21-3895, 2023 WL 2440852, at *1 (8th Cir. Mar. 10, 2023) ("The opinion and judgment dated December 15, 2022 are hereby vacated. This case will be placed on the calendar for oral argument in St. Louis, Missouri during the week of April 10-14, 2023.").

Finally, Defendant was charged with the completed *and attempted* production of child pornography. Attempt requires the specific intent to commit the crime, which squarely places Defendant's motives and intent at issue in attempting to produce child pornography. Instead of *McCoy,* the more applicable Eighth Circuit case is *United States v. Johnson*, which involved charges against Johnson for completed and attempted production of child pornography. 639 F.3d 433. The *Johnson* Court explained that "even images of children acting innocently can be considered lascivious if they are intended to be sexual." 639 F.3d at 440. The *McCoy* Court distinguished its case from *Johnson* on the grounds that McCoy was only charged with substantive production, not attempt. *See McCoy*, 55 F.4th at 662 ("Here, by contrast, the jury was instructed on a completed offense under 18 U.S.C. § 2251(a) rather than attempt under 18 U.S.C. § 2251(e)"). Indeed, even Judge Kastas, who concurred in the denial of rehearing en banc in *Hillie*, noted that evidence that Hillie "surreptitiously recorded girls 'by hiding a video camera in the bathroom ceiling vent and in a bedroom dresser'" could be relied upon by the jury in *attempted* production to "readily infer that his interest in the girls was sexual, not sartorial or urological" and "[g]iven that, the jury could further infer that Hillie hoped to capture sexually explicit conduct, not merely things like changing clothes or using the toilet." *Hillie*, 38 F.4th at 241, n.1, (Kastas, J., concurring) (noting that the government did not seek en banc review of the panel's vacatur of the attempt convictions).

9

**JA510**

Accordingly, the interest of justice do not require a new trial because the Court properly instructed the jury on Defendant's motive and intent in creating the video. The Court's instruction coheres with the Fourth Circuit's guidance in *Courtade*, 929 F.3d at 193, which focused on the evidence that demonstrated the offender's "purpose" in creating the video: "the video's purpose was to excite lust or arouse sexual desire in the viewer."

## CONCLUSION

For the reasons explained above, Defendant's "Motion for Judgment of Acquittal" should be denied.

**RESPECTFULLY SUBMITTED**, May 25, 2023.

<div style="margin-left:auto;">

DENA J. KING
UNITED STATES ATTORNEY

By:      s/ *Daniel Cervantes*_____
Assistant United States Attorney
FL Bar Number: 40836
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 338-3115
daniel.cervantes@usdoj.gov

s/  Mark T. Odulio_____
Mark T. Odulio
Assistant United States Attorney
North Carolina Bar Number: 50011
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina 28202
Telephone: 704.338.3108
Fax: 704.344.6629
E-mail: Mark.Odulio@usdoj.gov

</div>

10

**JA511**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CRIMINAL ACTION NO. 3:22-CR-00157-KDB-DCK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) | |
| v. | ) ) | **ORDER** |
| DAVID TATUM, | ) ) | |
| Defendant. | ) ) ) | |

      **THIS MATTER IS BEFORE THE COURT** on the Defendant's Motion for a Judgment of Acquittal under Rule 29 of the Federal Rules of Criminal Procedure. (Doc. No. 56). The Defendant also seeks, in the alternative, a new trial under Rule 33. *Id*. The Court has reviewed the Motion, the parties' briefs and exhibits, and other relevant pleadings of record. For the reasons discussed below, the Court will deny the Motion.

## I.    BACKGROUND

      The Defendant, a former child psychiatrist, was initially indicted for one count of Possession of Child Pornography under Title 18 U.S.C. Section 2252(A)(5)(B). *See* Doc. No. 3. A superseding indictment was filed that alleged one count of Possession of Child Pornography, one count of Production of Sexually Explicit Content under Title 18 U.S.C. Section 2251(a), and one count of Transporting Child Pornography under Title 18 U.S.C. Section 2252A(a)(1). *See* Doc. No. 19.

      Trial began on May 2, 2023. The United States presented evidence that the Defendant made a surreptitious recording of his 15-year-old cousin (M.C.) while she undressed to take a shower at a family vacation home. The Defendant was identified as the individual who set up the video by

1

another relative. The United States presented evidence that the Defendant sought to conceal this conduct by deleting the video from his iPhone and moving the file onto an external hard drive. Evidence was also introduced that the Defendant: (1) possessed videos of minors engaging in sexual intercourse, some of which contained the phrase "PTHC" ("pre-teen hardcore"); (2) used modified pictures of former girlfriends to depict a lascivious exhibition of a minor's genitals or pubic area; and (3) recorded a former patient by directing a camera up her skirt as she sat at a table during one of her therapy sessions.

The parties agreed on the initial set of substantive instructions submitted to the jury. *See* Doc. No. 42. These instructions provided that "Child Pornography" involves the depiction of a minor "engaging in sexually explicit conduct." *Id.* at 10 (Inst. No. 9). "Engaging in sexually explicit conduct" was defined to include "the lascivious exhibition of the anus, genitals, or pubic area of any person." *Id.* at 12 (Inst. No. 11). On the agreement of the parties, the jury was further instructed that in deciding whether a particular visual depiction constituted a lascivious exhibition to consider several factors, including "[w]hether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Id.* at 13.

> During deliberations, the jury asked the Court one question:

> Do we consider the defendant's motivation and point of view of what he thought would be "lascivious exhibition" when he took the "[M.C.]" video, or do we view the video in a vacuum to determine if the video is "lascivious exhibition"? Do we consider his parking lot interview where he admits to being a voyeur and "getting off" if we consider the video not as a stand-alone but from the defendant's point of view and his motivation for taking it?

After hearing extensive argument from both parties, the Court instructed the jury:

> It is for the jury to determine whether an image or video is "lascivious" as the Court has defined it for you. In considering this question the jury may consider all of the evidence and draw reasonable inferences from the evidence. Among the circumstances the jury may consider are the selection and positioning of the subject, whether the video contains extensive nudity, including video of her breasts and

2

genitals, and the entirety of the context in which the video was made, including the Defendant's motivation and intent.

*See* Doc. No. 53. Shortly after receiving this instruction, the jury returned a guilty verdict on all counts.

The Defendant has now moved for a judgment of acquittal or a new trial arguing that the evidence to support conviction on all three counts was insufficient as a matter of law and that the response to the jury question rested on "improper factors and principles, or outside the range of permissible decisions." This matter is now ripe for the Court's consideration.

## II.    LEGAL STANDARD

Rule 29 of the Federal Rules of Criminal Procedure states that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A defendant may move for a judgment of acquittal . . . within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." *Id*. "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." *Id*.

"A judgment of acquittal based on the insufficiency of evidence is a ruling by the court that as a matter of law the government's evidence is insufficient 'to establish factual guilt' on the charges in the indictment." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003) (quoting *Smalis v. Pennsylvania*, 476 U.S. 140, 144, 106 S. Ct. 1745, 90 L. Ed. 2d 116 (1986)). "The test for deciding a motion for a judgment of acquittal is whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). "[I]n the context of a criminal action, substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a

3

**JA514**

conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996). Moreover, the jury, not the reviewing court, assesses the credibility of the witnesses and resolves any conflicts in the evidence presented. *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997). Consequently, a court must deny a defendant's Rule 29 motion and accept the jury's verdict if, "after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

Rule 33 of the Federal Rules of Criminal Procedure provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a); *United States v. Moore*, 843 F. App'x 498, 505 (4th Cir. 2021) (Bell, J.). A district court "should exercise its discretion to grant a new trial sparingly," and "should do so only when the evidence weighs heavily against the verdict," *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (citation omitted), or when substantial prejudice has occurred, *United States v. Jones*, 542 F.2d 186, 211 (4th Cir. 1976).

## III.  DISCUSSION

To begin with, although captioned as a motion for a "judgment of acquittal," the Defendant's Motion is more properly characterized as a motion for a new trial.  The Defendant's sole assignment of error is the Court's response to the jury's question about "lascivious exhibition." *See* Doc. No. 56. The Defendant makes no argument that the evidence is insufficient. Accordingly, Defendant has abandoned any contention concerning the sufficiency of the evidence and the Court will consider the Motion under Rule 33 rather than Rule 29.

Turning to the Court's challenged response to the jury's question, the Court finds that it fairly and accurately answered the jury's question without creating prejudice. The Defendant agreed to instruct the jury that lascivious exhibition "means a depiction that displays or brings to view to attract notice to the genitals or pubic area of children in order to excite lustfulness or sexual stimulation in the viewer." *Id.* at 13 (Inst. No. 12). Recognizing that applying this definition is not always easy, the parties jointly proposed the six factors articulated in *United States v. Dost* as guidelines for the jury in determining whether a depiction met this definition. *Id.* These factors are: (1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; (2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity; (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; (4) whether the child is fully or partially clothed, or nude; (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer. *United States v. Eychaner*, 326 F. Supp. 3d 76, 91 (E.D. Va. 2018). The jury perceptively pinpointed the apparent incongruity of the sixth and final factor. The first five factors seem to be objective, while the sixth factor could be either objective or subjective. The jury therefore asked whether they could consider the Defendant's subjective intent in determining whether the surreptitious recording of M.C. constituted a "lascivious exhibition."

As the parties acknowledged during their trial arguments, the circuits are split on this issue. *See United States v. Wells*, 843 F.3d 1251, 1255 (10th Cir. 2016) (explaining that "lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or like-minded pedophiles") (citation omitted); *United States v. Holmes*, 814 F.3d 1246, 1251–52 (11th Cir. 2016) ("depictions of otherwise innocent

5

**JA516**

conduct may in fact constitute a 'lascivious exhibition of the genitals or pubic area' of a minor based on the actions of the individual creating the depiction"); *but see United States v. Hillie*, 38 F.4th 235 (D.C. Cir. 2022) ( defining "lascivious exhibition" as "the minor displayed his or her anus, genitalia, or pubic area in a manner connoting that the minor, or any person or thing appearing with the minor in the image, exhibits sexual desire or an inclination to engage in any type of sexual activity."); *United States v. Heinrich*, 57 F.4th 154, 161 (3d Cir. 2023) (finding that the *Dost* factors are "objective" and that "[i]t does not matter whether the defendant subjectively intended the conduct or depiction to be 'sexually explicit' or 'lascivious.'"). The Fourth Circuit has yet to weigh in on this divisive issue. *See United States v. Courtade*, 929 F.3d 186, 192 (4th Cir. 2019) (declining to "define the parameters of any subjective-intent inquiry").

That said, the Fourth Circuit has provided some guidance to district courts. In *United States v. Courtade*, 929 F.3d 186, 192 (4th Cir. 2019), while deciding not to take sides in the subjective-objective quarrel, the Fourth Circuit noted several "objective" factors that could be taken into account with respect to  the defendant's intent in creating a surreptitious bathroom video. The *Courtade* Court looked to the defendant's deceit, manipulation, and careful directing and filming of the victim's breasts and genitals in finding that the video's purpose was to excite lust or arouse sexual desire in the viewer. *Id*. at 193. The Court also looked to the defendant's efforts to position the camera in a way that ensured that the video captured the victim's breasts and genitals. *Id*. While the *Courtade* Court decided that case on the "objective" aspects of the video, its reasoning also no doubt went to the defendant's motivation and intent.

This Court's instruction closely tracked the Court's reasoning in *Courtade*.  The Court instructed the jury to consider "the selection and positioning of the subject, whether the video contains extensive nudity, including video of her breasts and genitals, and the entirety of the

6

context in which the video was made including the Defendant's motivation and intent." Thus, the Court's response adheres to the Fourth Circuit's decision in *Courtade*. Moreover, the Court's duty in responding to a jury question is to clarify the source of confusion fairly and accurately. *See United States v. Alvarado*, 816 F.3d 242, 248 (4th Cir. 2016). If the Court had failed to address the issue of the Defendant's intent (e.g., by simply leaving the jury to decide the issue based on the earlier instruction they found ambiguous), the Court would not have addressed the source of the jury's confusion.

The Court is persuaded that a defendant's intent is a relevant consideration. Child pornography often consists of conduct that, but for the intent of the producer, is innocent (such as perfectly appropriate home movies of young children bathing). The "lascivious exhibition" is not the work of the child, whose innocence is not in question, but of the producer or editor of the video. *See United States v. Horn*, 187 F.3d 781 (8th Cir. 1999). Put another way, lasciviousness is not a characteristic of the child photographed but of the "exhibition which the photographer sets up for an audience that consists of himself or like-minded pedophiles." *See United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir.), *cert. denied*, 484 U.S. 856, 108 S. Ct. 164, 98 L. Ed. 2d 118 (1987). To find otherwise would ignore the clear exploitative nature of these images and require an innocent child to exhibit lust, wantonness, sexual coyness, or other inappropriate precocity. This would be a perversion of the statute. *See United States v. Wolf*, 890 F.2d 241, 246 (10th Cir. 1989).

The Defendant's reliance on *Hillie* is unpersuasive.[1] *Hillie*'s interpretation of lascivious exhibition, which focuses on the minor's "sexual desire" or "inclination to engage in sexual

---

[1] The Defendant also relies on *United States v. McCoy*, 55 F.4th 658 (8th Cir. 2022). However, *McCoy* is no longer good law because the opinion was vacated after the Eighth Circuit decided to rehear the case *en banc*. *See* United States v. McCoy, 2023 U.S. App. LEXIS 5920, 2023 WL 2440852, at *1 (8th Cir. Mar. 10, 2023). Nevertheless, the Court finds its conclusion that it was not relevant "whether the videos were intended to appeal to the defendant's particular sexual

7

activity," finds no support in any other circuit. *Hillie*, 38 F.4th at 243 (Rao, J. dissenting). This definition also ignores sections of the production statute which target an offender who "employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . [the lascivious exhibition of the genitals]." 18 U.S.C. § 2251(a). By solely focusing on the minor's conduct these verbs are rendered seemingly meaningless. *Hillie*'s definition also fails to recognize that the lascivious exhibition of the genitals can be of any person, not merely a minor. *See* 18 U.S.C. § 2256(2)(A)(v) ("'sexually explicit conduct' means actual or simulated lascivious exhibition of the anus, genitals, or pubic area of any person"); *see, e.g., United States v. Lohse*, 797 F.3d 515, 518 (8th Cir. 2015) (upholding defendant's conviction for production when defendant filmed himself naked with his penis on or near his three-year-old victim's face while she was sleeping and clothed). In short, not only is *Hillie* non-binding but its legal conclusions are unconvincing.[2]

In sum, the Court finds that it properly instructed the jury on the Defendant's motive and intent in creating the video and therefore the Defendant was not substantially prejudiced by the instruction.

---

interest" unconvincing. As discussed above, a voyeur's intent for a video to appeal to his "peculiar lust" can support a finding that the image is of a lascivious nature. *See United States v. Boam*, No. 21-30272, 2023 U.S. App. LEXIS 13248, at *26 n.12 (9th Cir. May 30, 2023).

[2] This case is also distinguishable from those cited by the Defendant because the Defendant was charged with both the completed and attempted production of child pornography. Attempt requires the specific intent to commit the crime, which directly places Defendant's motives and intent at issue. Indeed, the Eight Circuit made this point in *McCoy* when it found that the producer's subjective intent was not relevant where the defendant was charged only with the completed offense. *See McCoy*, 55 F.4th at 662 ("Here…the jury was instructed on a completed offense under 18 U.S.C. § 2251(a) rather than attempt under 18 U.S.C. § 2251(e)"); *see also Hillie*, 38 F.4th at 241, n.1, (Kastas, J., concurring) (noting that evidence that Hillie "surreptitiously recorded girls 'by hiding a video camera in the bathroom ceiling vent and in a bedroom dresser'" could be relied upon by the jury in *attempted* production charge to "readily infer that his interest in the girls was sexual, not sartorial or urological" and "[g]iven that, the jury could further infer that Hillie hoped to capture sexually explicit conduct, not merely things like changing clothes or using the toilet.").

8

**IT IS THEREFORE ORDERED THAT** the Defendant's Motion for a Judgment of Acquittal under Rule 29 of the Federal Rules of Criminal Procedure, or a New Trial under Rule 33, (Doc. No. 56), is **DENIED**.

**SO ORDERED.**

Signed: June 13, 2023

Kenneth D. Bell
United States District Judge

9

**JA520**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )    DOCKET NO. 3:22-CR-157
                     )
      vs.            )
                     )
DAVID TATUM,          )
                     )
        Defendant.    )
_____)

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
NOVEMBER 8, 2023

APPEARANCES:

On Behalf of the Government:

    DANIEL CERVANTES, ESQ.
    MARK T. ODULIO, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    RYAN PATRICK AMES, ESQ.
    SeiferFlatow, PLLC
    2319 Crescent Avenue
    Charlotte, North Carolina 28207

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

JA521

2

P R O C E E D I N G S

THE COURT:  The next matter is United States versus Tatum, docket number 3:22-cr-157.  Mr. Tatum was convicted following a jury trial on May 4, 2023.

Mr. Tatum, the probation office prepared a presentence report which the Court has received and reviewed. Have you read that report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand what's in it?

THE DEFENDANT:  Yes.

THE COURT:  Have you had all the time you would like to discuss it with your attorney?

THE DEFENDANT:  Yes, I have.

THE COURT:  All right.  Mr. Ames, you have several objections to the report so let's take them up in the order that they appear in the presentence report.  The first being -- I guess you have an objection that would not affect the guidelines.  Well, let's just start with paragraph 33, the application of 2G2.2(b)(2), the material involving a prepubescent minor or a minor who had not attained the age of 12.  Let me hear from you on that.

MR. AMES:  Thank you, Your Honor.

So I think if we're considering the universe of images and videos that would fall under this particular section, I would say that it's in total -- or total candidates

**JA522**

that could apply to this section are there are four total videos:  The first being the one from the cabin in Maine; the second being the one was titled "LS" that was on a bed between two women; the other two were the webcam videos that were found on a desktop computer that were seemingly a bit older that involved two people.  There were longer videos of what looked like a webcam type of thing.

So starting with the videos, Your Honor, with reference to this specific section, I think the video from Maine we can exclude because it's pretty well established that the victim in that case was 15.

The remaining three videos we do not have any identified person.  We don't know how old any of the people involved in those videos were.  And I wouldn't dispute that there are sexual acts going on in those videos; however, this enhancement is based on age.  We do not have any corroboration of how old they are.  We don't know their dates of birth.  We don't know who they are.  So we're beholding to making estimates, I suppose.

THE COURT:  Well, let me ask you about that because the enhancement applies if the person involved has not yet attained 12 years of age or is prepubescent.

MR. AMES:  Yes, Your Honor.

THE COURT:  So can't the Court view the images and determine whether the person depicted is prepubescent?

**JA523**

4

MR. AMES:  I suppose the Court can, Your Honor, but --

THE COURT:  Isn't that what I have to do?  I'm not begging to do that, but you've put me in a position where I have to because the Court has to determine whether any of these images depict prepubescent minors.

MR. AMES:  And, Your Honor, the problem that I run into with this particular section is there's no definition for prepubescent; and that may sound silly, but there isn't.  So puberty, or when a person hits puberty, is not a definitive line the way an age is.  It's different for different people.

It's also not clear if it means -- what does it mean?  Does it mean you've got to the end of puberty?  Does it mean literally before you have any indicia of any puberty?  And what is the evidence of being prepubescent versus postpubescent or going through it?  I imagine it might be secondary sexual -- or functions and such and, you know, growing body parts and all the rest.  But determining that without really a definition -- and I haven't found any particular good case law, to be frank with you, Your Honor, that --

THE COURT:  Well, there are many definitions of it both in dictionaries and in medical journals, which the Court researched some yesterday.  And it's essentially if there is no physical indication of the onset of puberty, which in the

**JA524**

5

case of females is no breast development, no widening of the hips, no pubic hair. Those are the three largest indicators, although not the only.

And so as you say -- and I also could not find, at least in the Fourth Circuit, any case law that says here's what courts should look at to determine whether the images are of a prepubescent minor. But I do think that the dictionary definitions and the medical definitions give the Court sufficient guidance.

So if you insist, I will view those images, although my memory from the trial is there were no indications of the onset of puberty of the girls who were shown in that I think it was approximately 9-minute video on the bed. But if you want to press the point or if you want to argue to me that there are indications of the onset of puberty, we can do that.

MR. AMES: Your Honor, it's -- well, at a minimum I think that the versions or clips played at trial were, of course, truncated and shorter versions. Whether or not there are indicia and whether or not it's something that is clearly known -- for instance, I believe in a significant portion of the webcam videos, they're mostly videos of them being topless and having underwear on, to my recollection.

THE COURT: Mostly doesn't matter.

MR. AMES: I understand that, Your Honor. I say that to say that it's -- even viewing it -- particularly we're

**JA525**

6

talking about some older videos that are grainy or whatnot with a webcam that are harder to see things. And I think it's a difficult determination with no guidance.

And when -- I have also done the research and looking into, like, the purpose of adding that in because it was added in about 1991 to this framework. And in essence, what it -- I was able to glean from the legislative records and comments and whatnot was that this was so that in a circumstance, I guess, like this where we don't know the age of a person, it gives the ability to at least have this guideline apply when someone is very much under the age of 12.

THE COURT: Well, that's fine for you to say. That's not the law. It's not very clearly prepubescent or much below adolescence. That's not what the guidelines and the statute say, so let's stick to what the law actually is.

And also, while we're on this topic, what about the modified images created from teengallery.com; wouldn't those also be subject to consideration for the enhancement?

MR. AMES: They may, Your Honor. I mean, I would say similar situation. We don't know who those people are. We don't know --

THE COURT: Same answer. Look, your arguments are heard when they're made. They're not heard any better or more persuasively the fifth time you say them.

MR. AMES: Well, with respect to Teen Gallery, as

**JA526**

7

the name implies, it's presumably a website where there are images of teens which would imply 13 as the age range.

THE COURT: It's the Deepfake modification that would render them child pornography, right, of a prepubescent minor?

MR. AMES: Yes, Your Honor, I understand. The AI portion of it, whether or not it rendered -- well, whether or not it rendered -- I guess we basically have to be in a situation where that -- those images, I guess, didn't render visible breast development, didn't render the other -- you know, hips and the other things that you mentioned. I mean, my recollection of those, they all had breast development in those and that's generated by the AI. So I think the enhancement could apply to someone who's under -- who's 11 or younger if the person is that age. If the person is -- it's a good question, actually, whether --

THE COURT: Let me cut to the chase here.

Mr. Cervantes, does the government intend to present to the Court these images for its determination of whether they're prepubescent?

MR. CERVANTES: We're prepared to do so, Your Honor. The Court can rely either on its memory of what was presented at trial or I could play it and remove all doubt right now.

THE COURT: Well, the Court's memory is pretty clear with respect to the video and the modified Teen Gallery

**JA527**

8

images, that at least some, and I think it was essentially all that were put into evidence, I don't know about what was in the entirety, were all prepubescent showing no indicia of the onset of puberty.

Now, Mr. Ames, if you want the Court to look at something and argue that based upon what the Court is looking at, there is evidence that puberty is onset, the Court will look at any exhibit for which you want to make that argument.

MR. AMES:  If I can have one second, Your Honor.

(Counsel and defendant conferred.)

MR. CERVANTES:  Your Honor...

THE COURT:  Yes.

MR. CERVANTES:  If I may also add just in terms of the definition of prepubescent, while the government agrees with everything that the Court said, there is some guidance at least in the statute.  The statute, 18 U.S.C. 2252A(b)(2), where it describes the penalty for possession of child pornography, it says that when the offense involves a prepubescent minor or a minor who had not attained 12 years of age.  I think there, at least, Congress is giving us some indication about what prepubescent means.

THE COURT:  Well, it's not particularly helpful because, again, when I was doing some reading yesterday for females, puberty generally is anywhere from 9 to 13.  So that's not a lot of guidance either.  That's why I'm sure the

**JA528**

9

statute says and the guidelines say but we're going to definitely draw the line at 12, whatever is happening with puberty.

So the problem with -- and the Court's -- you know, unless it's obvious, the Court is uncomfortable looking at the face and saying, okay, prepubescent, over and done.

And I think in your response to the objections to the draft presentence report, you argued that one of the witnesses -- and I think this is with respect to the photo of the four girls that had been doctored -- that she had testified that they were all prepubescent minors.  She didn't say that.  I'm looking right here at the transcript.  She did estimate their ages, one of which was as young as 10, which is probably prepubescent but not medically necessarily prepubescent, which is why I want to focus on the images themselves.  We don't have to guess.  We can look at the images.

I have looked at the images and am of the strong opinion, well beyond a preponderance of the evidence, that those images show no onset of puberty.  But if you want to show me one and say -- tell me why I'm wrong, I'll do that.

MR. AMES:  Well, Your Honor, I mean, I would have to show you all of them and convince you of all of them, I suppose, for the guideline not to apply.

THE COURT:  Well, you know the ones that the

**JA529**

10

government is relying upon.  So if you want to -- if you want to knock them down one at a time --

MR. AMES:  I'm sorry, Your Honor, but I'll just -- even in their response what I'll note -- and I understand the Court's argument and position on the prepubescent portion of it.  But in their own response they say the Passport contains a video of child pornography, two naked minor girls approximately 11 to 13 years old.

THE COURT:  Which is only half the consideration.

MR. AMES:  I understand, Your Honor.  But the approximation that's been given by the government itself is these are either 11, 12 or 13, and they're not sure which, in that range.  And so --

THE COURT:  Let's try this again, Mr. Ames.  I'm not basing this on the age, although I could certainly with respect to the one who was testified to have been 10 years old because that is under 12.  The others were either -- either 12 or 13, so that's not helpful, or clearly above 12.  But the Court could easily go with the testimony that was not controverted that at least one of the girls in the photo that was modified was 9 or 10.  Okay.  Well, that gets us below 12.

MR. AMES:  Well, Your Honor, I would dispute that being the case.  The -- again, these are also estimates of somebody that was recalling when a photograph was taken from approximately 15 years ago when they were younger, and that's

**JA530**

11

the basis for it.  There was nothing corroborating:  I know I was in this grade because of this.  I know it was 1996.

THE COURT:  Oh, no, that's exactly how she did it.  That's exactly how she dated the photos.  She remembered what age she was, where she was in school at the time the photo was taken and then backed up from there.  And lest you are arguing that she should not be credited or found credible by the Court, the Court does find her credible; that her estimates are accurate and reliable.

And again, one of the frustrations the Court has had in this case is that we keep going around and around the same things, making the same arguments without actually getting to the point.  So let me try this one last time.

Mr. Ames, are there any of the images that the government relies upon for this enhancement that you say show indicia of puberty?

MR. AMES:  I think that either -- that they may or it may be unclear, but, again, Your Honor, I don't know the definition -- I don't know what the definition is.

THE COURT:  Okay.  Let's just stop here.

The Court finds -- well, let me ask the government this first.  What consideration can the Court make of the file paths that were in the folders?  I know that the videos themselves were not recoverable, but there were, I think, tens of thousands of file paths in a folder that were clearly

12

related to under 12 child pornography.  Can the Court make any consideration of those?

MR. CERVANTES:  I think the answer -- I think the answer is no, Your Honor, because that -- that speaks to his intent which could show the Court what he's looking for and why he's interested in these other pictures that we're discussing.  But ultimately, the picture itself has to depict the prepubescent minor.  And so I think the more appropriate analysis would be to objectively view the picture and make a determination based on what is depicted in the photograph using the factors that the Court mentioned about development of the minor.

THE COURT:  Well, wasn't the trial testimony from your expert witness that those -- or at least some, a good many of those video files had been viewed at one time?

MR. CERVANTES:  Yes.  The problem is that the enhancement applies to images and images does require a real person.  And without the actual images and videos in that list, we cannot be for certain what it is that they actually depicted.

THE COURT:  So even though we have thousands of photos with the moniker preteen hardcore and some of the file descriptions talking about 3- and 4-year-olds, without seeing them you think that that's insufficient for the Court to find by a preponderance of the evidence that those contained visual

**JA532**

13

depictions of child pornography under the age of 12.

MR. CERVANTES:  In an abundance of caution, Your Honor, I'd say -- I'd recommend to the Court not to do that. There's sufficient --

THE COURT:  I think I am going to do that as an alternative and as an additional basis for finding the enhancement because -- I hear what you're saying:  We don't know; we don't see it.  But if you've got thousands -- and there was a lot of testimony about what pthc means.  I think the agent testified in their experience with respect to such files that they almost uniformly show exactly what they describe.  The Court in a lot of cases -- it sees way too many of these cases -- has seen pthc photos that in the file line say 4-year-old such and such disgusting act or 3-year-old such and such disgusting act, and by golly that's what they show.

So the Court finds, absent a meaningful argument to the contrary, that the video of the two girls on the bed described to be between 11 and 13 showed no evidence of the onset of puberty and are thus prepubescent.

And also, with respect to the Court's recollection of the exhibits that were put in of the modified images from the teengallery.com also showed no evidence of the onset of puberty and are thus prepubescent.

That the photo of the four girls who ranged, apparently, in age from 9 or 10 up through later teens, that

**JA533**

14

those had also been modified in a way that showed bodies that showed no indication of the onset of puberty and are thus prepubescent.

And the Court is also persuaded by a preponderance of the evidence that the thousands of file photos that were testified about in court that contained very graphic descriptions of child pornography of children as young as at least 3, that the Court is persuaded by a preponderance of the evidence that the viewing of those images did occur at one time by Mr. Tatum and that they did include depictions of child pornography of a child yet -- under 12 years old.

And so for those reasons combined, the Court overrules the objection to paragraph 33.

Now, the next objection is to paragraph 34, the enhancement for sadistic and masochistic depictions of sexual abuse in infants or toddlers.

Mr. Ames.

MR. AMES:  Your Honor, I think that -- well, I would suppose that the objection in general is that that doesn't apply to any child pornography, meaning an image or video with a minor in it.  I believe that the -- that enhancement, as far as I can understand the government's position, is that it's related to the anime.

THE COURT:  That's right, isn't it, Mr. Cervantes?

MR. CERVANTES:  Yes, Your Honor.

**JA534**

15

THE COURT: And of course, I'm sure you've read their response to your objection to the presentence report where they argue at length 2G2.2(b)(4), and a distinctive nature of that is the offense involved material that then portrays certain described things. So their argument is if the offense involved material and then this is what's in the material, then the enhancement applies. So that's their hook to get to the anime.

MR. AMES: Yes, Your Honor, and that's my understanding as well. I believe that the -- I guess the theory would be 1466A, I think, 1466A would be the obscenity statute that that would hypothetically be prosecuted under, correct? So I think that's the way that the -- I suppose the material where it becomes a consideration as part of this case in spite of not being charged with it, I suppose that's where it comes in.

THE COURT: And is relevant conduct under 1B1.3.

MR. AMES: Yeah. So if the Court is inclined to agree that the phrasing of it as material means that it is distinguished and distinct from the -- like the prior objection where it does require a minor, it doesn't meet that definition of child pornography which requires a person, then -- if that's the Court's position as well, then I don't really have much to argue as far as the -- that it wouldn't apply to certain images. I'm just making it clear it's not

**JA535**

16

applicable to child pornography. But if it's applicable to something related that is material, then that portion I can --

THE COURT: Well, I was unable to find any case that had ever upheld the position that you are making. I'm not necessarily as good a researcher as you are. Are you aware of any such authority?

MR. AMES: Your Honor, I'm not aware, frankly, of this enhancement being applied to anime in the history of America that I can find, so I don't know. That's the thing. This is, in a lot of ways, a novel situation. And the prosecution for cartoons or digital images and now as we get into the brave new world of these AI websites, I imagine in the future there will be more -- it will be something that there's -- some case law develops on.

Right now I scoured and looked. I mean, as a lead -- as a lead charge, I think, ever, maybe this 1466A has been prosecuted, like, five times or six. It's not very many, as a lead charge without, like, having a child pornography charge either ahead of it or attached to it. I think that's really it. I couldn't find any -- I can certainly be wrong, but I couldn't find any indication of any time when the 4-point enhancement for that was applied. It may exist; I just couldn't find it.

So, you know, it's one of those things too because 1466A, as I think the government concedes as well, doesn't

**JA536**

17

apply to the image count, for example.  So under the guidelines as well, the number of images that are counted do not include these animated images.  They would only include one with an actual depicted minor.  So how and where we apply these, it's a difficult question because I don't know how often it's been done, to be frank.

THE COURT:  I expect your prediction is right that as AI and other such technology develops, that those who are inclined to this sort of conduct will engage in it and the courts will be faced with this question.

But, Mr. Cervantes, let me hear from you on the government's theory as to the applicability of this.

MR. CERVANTES:  Your Honor, the government reaffirms its position in its brief which I won't belabor.

The government would like to move in evidence Sentencing Exhibit Number 1 which is a compilation of a sampling of the anime so that it's in the record and the Court doesn't just have a reference to it in the PSR.  My understanding is that defense counsel is not objecting to foundation and authenticity, just the application of the anime to the guidelines as he described.

THE COURT:  And is there any dispute that the images shown in that anime, if this is an applicable enhancement, would otherwise fit the description of sadistic and masochistic depictions or sexual abuse of infants or toddlers?

**JA537**

Is there a dispute that that's what those images show?

MR. AMES: If the -- if the Court applies the standard to an animation or cartoon in the same general fashion it would to an actual video, no, I don't think there would be a particular dispute particularly if we're talking about definitionally, I suppose. I mean, as far as the case law I have read, the -- it's crass, but sexual intercourse with someone 3, 4, toddler age, in and of itself is a violent image and meets that standard and that's what a lot of courts have held.

THE COURT: Correct.

MR. AMES: So I think that there's -- on that just at face value, yeah, I imagine the Court would find that if that's the standard.

I would note the other -- the other hiccup and the other problem with all of this is in some sense there is still the 1466A standard where this is an obscenity matter that requires some analysis anyway, I suppose, of whether or not it's obscene or not because it's not pornography; it's obscenity that we're talking about. So whether or not in the grand scheme of the whole thing, has it got any literary/artistic merit or value according to the community?

THE COURT: Well, you're going to have to convince some other court of that.

MR. AMES: I understand, Your Honor.

19

THE COURT: All right. So the Government's Exhibit 1 is admitted into the record.

(Government's Exhibit Number 1 was received into evidence.)

THE COURT: There doesn't seem to be any dispute about what it portrays and the Court finds as a matter of law that the -- those images as described and agreed to would trigger the enhancement under 2G2.2(b)(4).

All right. The next objection was to paragraph 35, 5-level increase relating to engaging in a pattern of activity involving abuse or exploitation of a minor.

Mr. Ames.

MR. AMES: Yes, Your Honor. So my understanding of the government's position on that would be that, first of all, the production count in this case would be part one of the pattern. And then part two of the pattern would be one of the prior bad acts that were discussed in trial.

I'm not going to belabor certainly the point that, you know -- I understand what the precedent is. I don't think you can have a pattern with two. That's neither here nor there.

THE COURT: It struck me as odd when I first took up this profession that a RICO requires a pattern of activity, by which they mean two. I have trouble discerning a pattern from just two dots, but so say the law.

**JA539**

20

MR. AMES:  I agree, Your Honor.  And so I think that ostensibly there's two instances generally where the government would go with this.

Number one is a -- there was some testimony about a video that was allegedly taken some years ago, probably around the year 2000, maybe before or maybe after, where there was a surreptitious camera footage recording in a bathroom or shower area in a family member's home in Atlanta that captured allegedly the defendant's sister and another cousin.

THE COURT:  Well, the Court finds credible that testimony, including the testimony that the defendant admitted to such conduct; and so the Court accepts as fact that that occurred as described by the witness.

MR. AMES:  Yes, Your Honor.  I suppose what I would -- what my position would be is that nonetheless, the witness that testified has not -- does not know the content of the video, has not seen the content of the video.  There's no evidence that there was nudity in it.  There's no evidence that there was -- if anything was -- how much or if anything was visible, the angle of it.  There's nothing.  We literally have no evidence of what's in it.

And I honestly think it's similar to kind of the position and the point Mr. Cervantes is making about the file paths.  We can't see it.  How can we determine if it's pornography if we can't see it, we can't review it?

**JA540**

21

So as a general matter -- I mean, the testimony at trial was, "I was told by somebody else who did not testify, I was told that this video existed."  There was no description of what's in it.  The age estimate was unclear how that was arrived at.

THE COURT:  No, the Court was persuaded with the general accuracy of the date on that and it was well below 18 without any real doubt.

MR. AMES:  Right, Your Honor.  I guess my point is that how does that person know when the video was made if they've never seen it?

THE COURT:  Well, as I understand it, it was from the defendant telling her when it was made.

MR. AMES:  My recollection, Your Honor -- and again, I will defer to the Court certainly, but my recollection was that it -- he acknowledged making a video or putting a camera somewhere and showing the witness, you know, where it was and how he did it.  And it was through a -- there was a vent or a fan or something in an attic or ceiling.  And it was an old video, like an old handheld type camcorder because this was probably in the late '90s or something.  But as to when it occurred, what was on it, that kind of thing, I believe at the trial there was no evidence.  And it's not her fault.  She hasn't seen it.  So --

THE COURT:  Yeah, I get your point on that one.

**JA541**

22

What do you say about the two what have been called up-skirt videos of this former patient?

MR. AMES: Your Honor, with respect to that, Your Honor, so -- I mean, as a -- I suppose I would say, number one, as a matter of law, it's not child pornography for a couple of reasons. Number one, the person in the video was 18 years old. And number two, there was no actual, to my understanding, exhibition or nudity. It was an up-skirt photo that --

THE COURT: I'll disagree with you on that of what it showed. I think the video did show a lascivious focus on inappropriate parts of that patient.

And with respect -- there's no doubt that she was not actually under age at the time they were made. She turned 18 five days before. But what about the government's argument that the defendant believed she was under 18 as reflected in his notes made of that session and that that would make it an attempt and an attempt under the statute would qualify for consideration of part of the pattern?

MR. AMES: Your Honor, on that point I would say, number one, that the -- the reliance there is on a medical record, as the Court is aware. That same medical record is self-contradictory in a couple of ways.

Number one, it indicates on the initial page, the first page, that -- it's a write-up of a summary of the

**JA542**

appointment where it's indicated that she is 17. But on the final page of the report it says she's 18. And that's also something that the defendant would have prepared if we're looking at the total document.

Number two, Your Honor, the description in the document of what the subject of that video is wearing is jeans. And this is an up-skirt photo where the description of the clothing that the person is wearing is "well groomed in a T-shirt and jeans." So --

THE COURT: So we know that's not true.

MR. AMES: Know that's not true.

And my hunch and understanding of this all would be that this is a person that met with Dr. Tatum on a regular basis. That these reports probably got filled out every single time and there was probably a lot of filling in some blanks and leaving some other stuff in there and there's some phrasing that just gets left into these reports. And I say that because I have reviewed those reports and that's exactly what's going on.

So there are a series of appointments stemming back to March or April of 2015, all of which that same section begins with essentially the same phrasing, and it is that the "patient is a pleasant 17-year-old white female who I saw individually today." And that's the same opening line of every single appointment going back months and months.

24

THE COURT: Well, which does indicate on the day in question that that's what he thought she was: 17-year-old pleasant white female.

MR. AMES: Your Honor, that's possible. But I think more likely is that there are certain sections that get updated to fill in some new things. The rest of it is kind of treated as boilerplate and it's continued on. Because, again, I can -- I have all of these in front of me. The jeans portion of it -- or what she was wearing was jeans. For four months she's wearing the same thing. It says the same thing as far as what she's wearing.

The other paragraphs -- the second reference to age 17 in a later section on that report on the day in question, which was June 17, 2015, there's another -- the "patient is a 17-year-old girl with a chaotic childhood" and so on. That's later on in the report. That phrasing is also in every single one, including the one that comes a week later where the age is correct and says 18 on the first page. It still says 17 on the second page. Then it says 18 at the end.

So additionally, Your Honor, if the Court wants to review -- I mean, I have highlighted all of the various ways in which this report is just repeating certain language and keeping it in there and only updating other things.

THE COURT: Well, what would have been helpful to the Court with respect to the argument you're making is if you

**JA544**

had actually filed a presentencing brief and attached things you wanted the Court to look at. It's a bit unfair to the Court and to the parties, everybody who's spending time on this, to say, Judge, please right now while we sit here look at all these things I want you to see and consider. I take a great deal of time getting ready for sentencing hearings and I would have been glad to do that if you would have put this up there. But I do not appreciate, Judge, I have all of these reports. You should look at them and see how repetitive they are. I'm not going to do that while I sit here. You're going to have to be -- if you want to have real specifics on something -- and I think you've said what you have to say, but I'm not going to review copious records for consistencies and inconsistencies, as you described, for the first time during a sentencing hearing.

MR. AMES: Your Honor, I apologize, but I said this at trial. I said it in the closing. I said it --

THE COURT: And so the Court should have sua sponte said, please, Mr. Ames, prior to sentencing if you would provide me with those records so that I can anticipate your argument at sentencing and be prepared? That's what I should have done?

MR. AMES: Your Honor, the document that was entered into evidence in and of itself is self-contradictory. It says she's 17 and it says she's 18.

26

THE COURT: Okay. I hear you.

MR. AMES: It's a preponderance of the evidence. It's more likely than not. If there's two equally viable positions, that doesn't meet the standard.

And again, we're not just talking -- we're talking about a number on a paper to establish an intent to produce child pornography, a typo, and when the same document says she's 18 and the same document says she is wearing jeans.

THE COURT: I understand your argument.

Mr. Cervantes, let me ask you a couple of things.

For the pattern enhancement, the government, as I understand it, is relying on four things: The count of conviction, count two; the testimony regarding, I think it was early 2000s video that was taken of the two girls in the cabin; and then these two up-skirt videos of the patient; is that correct? Those are the four that the government relies upon?

MR. CERVANTES: Yes, Your Honor. Each one of those videos of the patient would count on their own, by the way.

And the Court said that the testimony -- with respect to the testimony about the video that he made previously, the Court said cabin. It wasn't in the cabin. The cabin was the place in Maine. The witness, Ms. E.S., testified that the defendant's sister had described this video that the defendant's sister saw where the defendant's sister

**JA546**

and the witness were depicted naked in the shower.  And the witness confronted the defendant about that.  He admitted to it.  And he showed her how he did it, where he did it.  And the witness testified as to the age of her and the defendant's sister at the time.  Her testimony was that they were both under 18.  I think she said 15 and 16.

THE COURT:  What about Mr. Ames' argument that we don't know what those videos showed by way of like a lascivious display?

MR. CERVANTES:  I think based on a preponderance of the evidence, the Court has sufficient there to show what it actually displayed.  Also, the witness testified to what was in the video as relayed to her by hearsay, which is admissible in a sentencing hearing; and the Court need only determine whether that testimony is credible.

THE COURT:  Can you point me in the transcript precisely to where that testimony was.

MR. CERVANTES:  I'm sorry, I don't have a copy of the transcript, Your Honor.

MR. AMES:  Your Honor, I can probably pull that up.

THE COURT:  I've got them.

MR. AMES:  It's -- I know it's probably --

THE COURT:  Remind me the...

MR. CERVANTES:  Ms. E.S.

THE COURT:  Ms. E.S.

28

MR. AMES: It's probably late morning on the second day, Your Honor.

(Pause.)

THE COURT: Well, Mr. Cervantes, I've read that part of Ms. E.S.'s testimony. And she does recount the defendant admitting to taking the video and showing her how he took the video, but there's nothing in here about what the video would have shown. I mean, I can guess.

MR. CERVANTES: Your Honor, I would also add that similar to the theory with the patient video, what he's trying to --

THE COURT: The intent.

MR. CERVANTES: -- attempt is still on the table. And the jury told us what his intent was specifically because the Court responded to that question that they had.

Plus here is where all the other evidence comes into play about what he intended to do and where the list of thousands of videos also informs the Court about what the intent was in recording and setting up that camera in the bathroom.

THE COURT: And what about Mr. Ames' argument regarding the inconsistencies of the patient records that would inform us what Mr. Tatum thought was the age of his patient?

MR. CERVANTES: I think it cuts against him because

**JA548**

29

it shows in fact the fact that he updated the record to show that she was 18 shows that it's not just a copy and paste.  In fact, he is paying attention to the age and he's writing down what he believes.  And based on a preponderance of the evidence, I think the evidence shows that he believed that she was a minor.  And we're talking about five days' difference.  So unless there's something else that would suggest that he knew that it was her birthday, there's no -- there's no record of them talking about her birthday celebration or anything like that in the notes.  And so there's nothing indicating that he would have known that she turned 18 until later in the records.

Mr. Ames pointed out a document from July 10, 2015, in the patient's records where that same sentence says, "F.L. is a pleasant 18 yo white female who I saw individually today."  So that shows the Court -- that's July 10, 2015.  And the video -- so her birthday is ████████ 1997, right?  So this is a month later he's seeing her again and a month later when he is writing down his notes, he updates the age.  That shows the Court by a preponderance of the evidence that when he met with her in June five days after her birthday, he believed she was still a minor.

THE COURT:  All right.  And so the part of the clinical notes from that day when the videos were made and the part where it shows a date of birth, is that -- because I

30

think that's what Mr. Ames said, correct?

MR. CERVANTES: Yes, Your Honor.

THE COURT: And where does that appear? I guess I should look at at least that one. I'm not going to look at everything Mr. Ames wants me to look at.

MR. CERVANTES: That is Exhibit 11 that was introduced and admitted at trial. I'm not aware of anywhere --

THE COURT: Does anyone have a hard copy of that?

MR. AMES: I do, Your Honor. It's the second to last page. I can approach --

THE COURT: Well, I want to see the whole thing, the whole clinical notes from that day.

MR. CERVANTES: Your Honor, I have it digitally and I could --

THE COURT: It might be easier for me to just thumb through it --

MR. CERVANTES: Sure.

THE COURT: -- rather than each of you point out the parts of it you want me to see.

MR. CERVANTES: Actually, Your Honor, I do have a full copy of it here. May I approach?

THE COURT: Please. And identify again what trial exhibit this was.

MR. CERVANTES: 11. And for the record, I'm showing

31

defense counsel.

THE CLERK: I just gave you a PDF of it as well.

THE COURT: I've got a PDF of it. I can pull it up.

MR. CERVANTES: Your Honor, I would also add to the argument that the notes are done after the visit and so his belief is when he's making the recording, not after when he prepares the notes.

THE COURT: Is there -- is there an indication in this exhibit as to when the report was prepared? Is there a prepared date in here?

MR. AMES: It's prepared that day. I'm not sure that --

THE COURT: It says reviewed 6/17.

MR. AMES: Your Honor, what I'm pointing to as far as the 18 thing, I think, should be probably the second to last page. It's the page that has some blue boxes and says "MEDICINE" in big letters. That's where there's a description of the patient that says "18-year-old female, provider David Tatum" right beneath it where there's some prescription medication information and so on.

MR. CERVANTES: Your Honor, that is -- that appears to be an automated entry. That is not -- we're referring to his actual notes.

THE COURT: That looks like an automated entry to me that the system would pull up from its document retention

**JA551**

32

system.

MR. AMES:  Your Honor, the -- I guess A, first, that there's no -- we don't know that.  And B, we don't know when exactly these reports are prepared.  And C, I think the government, as they alluded to, the following appointment, box 1 is updated to say 18, box 2 below for the medical decision-making history still says 17.  So there's still a typo below.  And that persists.  Other language just persists.

That's the point here is we're trying to derive an intention -- we're trying to derive knowledge or intent from this defendant based upon what -- even if the Court is not convinced it absolutely is, very well could be a typo and there's a very distinct possibility.  And we're ascribing a knowledge to him that he intentionally said I know this person is 17, I know this person --

THE COURT:  No, believed.  Doesn't have to know.  Has to believe.

MR. AMES:  Or believe, Your Honor.

And I think I stated this at trial as well.  What's all this going to tell us here?  The videos that were created were done on June 17, five days after this person's 18th birthday.  That would suggest that the defendant knew when her 18th birthday was and took the first opportunity to take a video after she was in the age of majority.  It would certainly be a reasonable conclusion, rather than what would

33

be an apparent coincidence, that it just so happened after that date.

There's no other videos of this particular person that I'm aware of prior to the 17th of June in the months and months that he's been treating her. It's only immediately after the 18th birthday.

And the only reason, the only reason this can even be alleged as an attempt is because a medical record that we don't know how it was prepared has a typo or some information that's not updated in addition to a bunch of other information that clearly isn't updated. If we're talking about the face of this document, we're saying -- we're deriving an intent to do something, his belief that she was 17. Was his belief also that she was wearing jeans?

THE COURT: Well, here's what I find to be the most indicative part of this report that would inform us about Mr. Tatum's belief at this time. It's on page 4 and it's under the "Chief complaint/reason for encounter" section. And it is very detailed about what was said, what was discussed between them on that day. That section is all about that day. And on that day he says, "F.L. is a pleasant 17-year-old white female who I saw individually today," and then goes on to describe in detail what they talked about that day.

So a lot of this is clearly, at least by a preponderance of the evidence, I think pretty clearly

34

generated by the system itself, which would explain some of the inconsistencies that you referred to.

MR. AMES:  Your Honor --

THE COURT:  But again, by a preponderance of the evidence, the Court finds that the most reliable indication of the defendant's belief at the time that he took these up-skirt videos was that the victim was 17 years old.  And so the Court will overrule that objection.

Let me put one other finding on the record with respect to the video of the two relatives in Atlanta.

The Court would find by a preponderance, but not by any higher standard, but by a preponderance that the defendant was attempting to make recordings of lascivious displays of underage girls consistent with his obvious intent to do that with respect to count two and his history in general with trying to get and viewing such material, including this up-skirt one.  So that's the weakest of the four, but by a preponderance of the evidence, the Court finds that that was an attempt to produce child pornography and thus finds a pattern sufficient for the enhancement.

Now, I think there was -- the next one was paragraph 37, the enhancement for the number of images.  I believe -- although you objected to the draft presentence report, the government, I guess, came to an agreement with you because there's not a further objection with respect to that.  That

**JA554**

35

was reduced to fewer than 600 images in the final report.  So there's nothing to resolve there, correct?

MR. AMES:  That's correct, Your Honor.

THE COURT:  Now, the last one, I think, is the obstruction of justice enhancement.  So let me hear from the government first on that because obviously they have the burden of -- well, they do with all these enhancements, but --

MR. CERVANTES:  Your Honor, in support of this enhancement we have three exhibits that we would move in evidence marked as Sentencing Exhibits 2, 3, and 4.

Exhibit 2 is the actual recording that's discussed.  This is referenced in paragraph 15 of the PSR.

Exhibit 3 is the email from the ex-wife attaching the recording and sending it to the FBI agent.

And Exhibit 4 is the list of -- basically the full list of files referenced in that same folder path that has files with the name pthc.  So as described in the government's response, the trial exhibit was really a reduced version of the files -- all of the files that are in the same folder path.  The totality of all of the files in that folder path is 10,308 rows.  We filtered that so that only the file names with pthc were the government exhibit, and that reduced the list to 1,000 -- just over 1,000.  That's what was introduced at trial.  To make it clear what we're talking about, just focus on the pthc part.

**JA555**

36

For sentencing, we would move the entire list into evidence. There's 10,308 rows which have other descriptions. The Court has experience seeing these kind of file names and they're all consistent with child pornography. And we would move these three exhibits in evidence in support of the government's response to this objection. And I don't believe that the defense has an objection to the authenticity and foundation. It's just an application. And if that's correct, I would move these exhibits into evidence and seek permission to publish the exhibits.

THE COURT: Yes, they're admitted. And publish what you think the Court should see and your accompanying argument.

(Government's Exhibits Nos. 2, 3, and 4 were received into evidence.)

MR. CERVANTES: Publishing Sentencing Exhibit 2 which is the recording. And I'm playing from the beginning to minute 2:33.

THE COURT: I think you're the only one seeing it.

THE CLERK: Yeah, I think you need to hit HCMI 2.

MR. CERVANTES: One moment, Your Honor. The audio doesn't seem to be cooperating with me.

(Government's Exhibit Number 2 was published.)

MR. CERVANTES: I'm fast forwarding to 3:40 to 3:57.

(Government's Exhibit Number 2 resumed.)

MR. CERVANTES: And the reason why I fast forwarded,

**JA556**

Your Honor, is because a portion of that audio is redacted so just to move over the white noise that's inserted into the audio.

The government publishes Sentencing Exhibit 3. I'll leave this on the screen until the Court tells me.

(Court peruses Government's Exhibit Number 3.)

THE COURT: So the phrase is he needed to get rid of something, and then he said "getting rid of evidence" and "trying to stay out of jail." Are those phrases -- can they be heard on the call because I didn't -- I don't think I heard them just now.

MR. CERVANTES: No, I think those are just her paraphrasing her memory of the call.

THE COURT: All right.

MR. CERVANTES: And then --

THE COURT: It's just that they were in quotes so I wanted to make sure that's her -- not a quote, but her reporting of her recollection of the call.

MR. CERVANTES: Yes, Your Honor.

And Sentencing Exhibit 4, this is the full list that I had mentioned. It's 240 pages. I'll scroll down to the bottom. There's 10,308 rows.

And I'm going to go to page 9. And here the Court can see starting -- starting around 357, and these are going to be chronological now, I guess, just because of the way the

38

file convention is, but they start describing the ages of the victims.  And so we start with 3-year-old.

Once we get to row 370, there's 4YO.

Row 386 talks about 5YO.

When we go to page 10, we continue with 5YO.

Then we move on to 6YO.

And the descriptions are consistent with the Court's memory of these kind of descriptions and I won't read them into the record.

Moving on to page 11, the ages go to 7YO, 8YO.

Going on to 12, 9YO, 10YO, and so forth and so on.

And so the obstruction of justice enhancement is based on the government's description.  I won't belabor it more than what was already written in the response.  But the fact that he went -- the timeline is also important which is described in the PSR.  The timeline is that he met with the government.  Got a copy of discovery.  Understood what was happening.  And then he goes into the attic.  Gets rid of this hard drive.  He makes his initial appearance the following month.  He was very well aware that charges were coming.  And the audio shows what it is that he was trying to do.

And Ms. Tatum's description of it also, I think, is important.  That was her interpretation of the conversation and why he was going into the attic.  It was to get rid of something.

**JA558**

And forensically, we have the evidence that shows that there is a missing hard drive. And I think from a preponderance of the evidence, I think the Court can easily conclude that that missing hard drive with the list of 10,000-plus file names that are consistent with child pornography is the hard drive that he went and got from the attic and he destroyed. And under the obstruction of justice enhancement in Section 3C1.1, that conduct squarely fits this kind of conduct.

THE COURT: Put on the record again the forensic tie between what's referred to as the missing hard drive and these file paths for child pornography.

MR. CERVANTES: Sure. So the forensic analyst, Jason Whitt, testified that this list of pthc came from the MacBook. And it's a list that's generated when the user plugs a hard drive into the computer and the computer, to help the user, will remember all the file names and it records that. So the next time you plug the hard drive in, it moves faster. It operates faster. It's trying to help the user out.

And so this list is generated and saved inside of the MacBook. That's how we're able to generate this list. We don't have the actual hard drive that had this list of files, we believe, because it's the hard drive that he took from the attic and destroyed.

THE COURT: All right. Thank you.

**JA559**

40

Mr. Ames.

MR. AMES: Your Honor, I guess a couple of things.

Number one, this -- this would not technically be a list of images; rather, it's probably a list of QuickLook thumbnails that the MacBook generates automatically, not upon access in the sense of opening it, reviewing it. It's merely a procedural thing that happens. I just plugged my little drive into my laptop. If you do that on a Mac with anything, and Mr. Whitt testified about that too, thumb drives, all kinds of stuff. Anything that can generate a thumbnail, anything at all that can generate any sort of quick view type of thumbnail can generate this automatically on the device. You can't actually see the images because they're in a cache folder, as he called it in Windows, QuickLook on Macs.

THE COURT: So you -- I mean, I get what you're saying. You can't see -- if all you had was the MacBook, you can't see where these file paths would have taken you.

Isn't the importance of this that at some point some hard drive had those paths on it and that is proven by the fact that it's -- those are on the MacBook in that format?

MR. AMES: Your Honor, I would say -- I would say first that a significant number of the images and things that were presented at trial were thumbnail-based and did exist on the Mac in that thumbnail form.

So for instance, there were -- the video from

**JA560**

41

Rochester with the patient, there was a thumbnail of that video on the Mac. The video wasn't there, images on it, but the thumbnail in that folder existed so you could actually see it. These file paths do -- there is no even thumbnail whatsoever. They are just a string of texts that exist.

They want to make the inference on -- it's layered inferences. Number one, that these images were at some point in time on this device or a device that had some images with these names was plugged in. We don't know when or by whom or what the circumstances were.

THE COURT: Well, I think that it's even more basic than that. What this shows is that at some time another hard drive of evidentiary value, whatever it actually showed, but of evidentiary value was connected to the MacBook and never found.

MR. AMES: Maybe. We don't know.

THE COURT: Something else had to be connected to it, was the testimony of the forensic expert.

MR. AMES: Yes, but we don't know what, we don't know when, and we don't know anything period.

THE COURT: Right. Tell me if you disagree with this. The forensic testimony was that at some time some other device had to be connected to the MacBook to generate those file paths and that that device, whatever it was, was never located.

**JA561**

42

MR. AMES:  I'd say that was the testimony, yes, Your Honor.

THE COURT:  So then the question becomes -- and all it has to be is whether it's of evidentiary value.  It doesn't have to be the smoking gun.  It doesn't have to be 30,000 movies of child pornography.  Just of evidentiary value.

Now the question becomes -- since we, I think, are fully persuaded that there is a missing hard drive that was of evidentiary value, now the question becomes whether Mr. Tatum's conduct with respect to visiting the attic and the phone call with his wife, whether that is sufficient for the Court to find by a preponderance of the evidence that that's the missing hard drive and that his intent was to put that evidence beyond the reach of the investigators.

MR. AMES:  Well, Your Honor, I would say we don't know that -- we don't know that this is the drive.  We don't.

THE COURT:  I don't have to know.  I just have to be persuaded by a preponderance of the evidence.

MR. AMES:  I understand, Your Honor.

This was a conversation -- a portion of a conversation that we can try and infer the context certainly of what was going on in and around this time frame, but we don't know specifically what's being referenced.  This could be some other unrelated matter, Your Honor.  Just -- I'm not putting anything on him, but if there was evidence of some

43

other crime or evidence of a crime that someone else committed or some other piece of damning information that was on there that may exist. We don't know if it's specifically related to this case or something else or if there's -- we just don't have any information with respect to that. We don't know even what these images are.

Again, I understand what the Court is saying. They're suggestive file paths. We don't dispute that. But we don't know anything other than speculation about how they got where they got or what they were. We don't know if they're anime. We don't know if they're pornography. We don't know how many years ago they were -- or if ever --

THE COURT: Doesn't have to be any of that. Again, you're jumping over how the Court tried to frame the discussion. If this missing hard drive was of evidentiary value, to argue that it may not have had good evidence on it doesn't answer the question.

MR. AMES: Well, I'm saying if we don't know what's on it, how do we assess the evidentiary value?

THE COURT: Well, one of the ways we can assess the evidentiary value is to see what conduct Mr. Tatum took with respect to it. He went into his attic at night and hurriedly gathered something up and rushed past his wife. So he thought it was important whatever this was. And his too clever by half explanation to his wife that he didn't want to talk about

**JA563**

44

it so she would have plausible deniability or even actual deniability. You can't testify to what you don't know. So obviously it had some evidentiary value about something.

And she asked specifically, "Up in the attic was it a hard drive?" And he said again, "Plausible deniability." Which the reasonable inference from that is, yes, but plausible deniability. Because otherwise it would have been: "No, it wasn't a hard drive, but I'm not going to tell you what it is."

And then sort of the icing on the cake is his statement that -- and this is in reference to going to the attic, getting something, leaving, and not admitting to his wife what it is. "It's a lot better that this happened." Meaning there's a lot less evidence now that I've done this.

That's the Court's finding by the preponderance of the evidence; that it is most -- more likely than not -- I'd say most likely that what he retrieved that night was the missing hard drive that would have been of evidentiary value -- I expect extreme evidentiary value, but certainly of evidentiary value -- and that he acted intentionally in retrieving that and putting it beyond the reach of the investigators. And so the objection to that enhancement is overruled.

Now, I think that's all of the objections to the presentence report, which means that the Court accepts the

45

presentence report without change and finds that before consideration of departure or variance, the guidelines provide for an offense level of 43, criminal history category I, which under the guidelines calls for a life sentence, but because of the statutory maximums, the guideline range is 2 -- 720 months, which is 60 years.

Now, we went through all that exercise because, of course, the Court's first mission is to correctly calculate the guidelines, which I think I have. Now the question turns to what is an appropriate sentence under the 3553(a) factors. Those are not the same questions.

So let me hear from you, Mr. Ames, with respect to an appropriate sentence.

MR. AMES: Thank you, Your Honor.

As the Court noted, he is a record level I. Has no record at all other than one speeding ticket perhaps.

He is a very bright, very intelligent person who, as he has -- or we have, I think, discussed previously and I maybe got in trouble for it a little bit, but was going -- has sought out help and therapy for this.

Ostensibly where the -- the onus or the crux where this ultimately comes from in his background and history, Your Honor, as far as I can tell in knowing him, is he was bullied quite significantly as a child back in his days of middle school. That sort of was a major factor in sort of the

46

turning to pornography and that kind of thing as an outlet for whatever he was feeling at the time.  I'm no medical expert.  Obviously I'm no doctor about that, but that's -- in the treatment that he's done and others that have worked with him think that that -- and his family and his parents as well, think that that is a big part of it.

In addition, Your Honor, he was diagnosed at a young age with ADHD and so was -- once prescribed medication for the ADHD, started excelling.  Did very well in school.  Kind of came around.  Became much more happy, I think, in the high school and college years.  But perhaps that can also, you know, spur on -- the ADHD as a diagnosis can spur on some of the behavior.  I'm not suggesting, certainly, that that absolves him of blame.  All I'm suggesting is trying to create and figure out what is -- what's the reason, right?  Because -- what's the reason to have these Japanese cartoons on your computer?  What's the reason to put a camera in a shower area of a family member?  Is it just happenstance?  I don't know.  But there may be some compulsory things that he's gone through, and I think that's a legitimate portion of all of this because I think anybody that is in this situation has some sort of demons to reckon with.

I apologize, my computer is not turning on.

One thing I will discuss as well and I do know, we submitted to the Court some letters on his behalf from some

**JA566**

47

friends, family members, colleagues, and so on there, Your Honor.

And so again, with respect to his characteristics, I think, Your Honor, as noted in the presentence report, the probation officer did a very good job of outlining his background, his work history. He excelled in school. He has been a successful practitioner as a psychologist in various regions and most recently here in Charlotte. By all accounts a very good record as a doctor. Again, the -- my hunch probably is that there was an expectation perhaps that, well, when we investigate this and there's this sort of AI morphed pornography stuff and this person is a doctor to patients that are young, well, this is going to be a huge, really messy situation if we find out that there's something untoward going on with patients.

In the investigation there was the handful of instances that the government produced with respect to Rochester which was the up-skirt video that we've been speaking about from 2015, in that time frame. In Charlotte there's no evidence of any impropriety with any patient, no evidence of anything untoward with anyone. Reviews have been -- reports have been nonexistent. There's been -- the -- his place of employment is aware of, obviously, what he's charged with. He self-reported to the medical board when this got underway. Cooperated with them. Provided them

**JA567**

information.  When he was ultimately indicted on the superseding indictment, at that point in time that nixed any real hope of him having his medical license.  But nonetheless, he was cooperative with them.  They recommended he go and seek counseling and treatment.  He did that.  And so he takes very seriously and I think by all accounts was a good doctor to many people notwithstanding what happened to the victim in this case.

Your Honor, with additional respect to -- reflecting the seriousness of the offense, certainly, Your Honor, the Court is well aware 2251 is a serious -- is as serious as it gets in general short of a literal physical violence type of criminal activity.  It's a statute that obviously requires a mandatory minimum of 15 years and requires that presumably because it's kind of multifaceted in general.  It's one that involves victimhood in the sense of the abuse that happens to the minor at the time and the re-victimization that occurs when that imagery is out in the world forever and ever.  And particularly it's a statute that's designed to go after people that in tandem take the action of abusing a minor, which is horrific in and of itself, but doing so for the purpose of then later on profiting or humiliating and sharing with other people the image that they created.  That's why this is such a serious charge.  That's why this is such a serious statute and a serious sentence.

That said, Your Honor, when we're considering the guidelines -- reflecting the seriousness of the offense, we do have to consider the offense in question and not the more generalized, broad, what these usually are.  In this particular case if we're considering what this is, it's not -- what I mean to say, Your Honor, it's not a blanket situation. There's a spectrum of offenders and the Court should take into account this behavior and compare it to other defendants and compare what type of sentences they received based upon the conduct that occurred.

In Mr. Tatum's case, he never physically abused anyone.  He never physically assaulted, coerced, or did anything of that nature.

Never -- never produced a video with the intent to share it or give it to anybody else.  There's been no evidence of that.  I don't think that exists.

And again, there's only -- well, there's only one actual video in evidence that would constitute a production count which is the video in Maine.  I understand the position the government would take is that there are -- there were attempts or unproven allegations with respect to Atlanta with the cousin and the hospital one with the patient who was 18. But nonetheless, this was not a situation of a prolific producer of pornography.  That doesn't exist.  It was one video from a number of years ago in -- couched within a bunch

50

of other voyeurism videos.

And that, Your Honor, is kind of the crux of a lot of Mr. Tatum's problem is that he does have an apparent predilection for voyeurism, meaning the liking -- basically, being able to surreptitiously watch and observe somebody. And that, in large part, is the bulk of -- you know, there are numerous videos, numerous images of this happening to numerous people. The vast majority of which are either adults or -- I'm not sure who they are. But they certainly are not a treasure trove of a whole bunch of instances of Mr. Tatum going around and targeting minors for production purposes. There is one video and there are a couple of pieces of evidence that are not very specific about him engaging in what is ultimately voyeuristic activity, which is placing a camera where somebody doesn't know where it is, putting it in a locker room, putting it in a shower, that sort of thing, where a person can see another person in the nude.

And, Your Honor, I think there is a big distinction between that, as horrible as it is -- and we have never shied away from the fact that that's horrible, but there's a federal statute for voyeurism. There's a federal statute that does target that specific behavior. There's certainly state statutes as well that target that behavior. The -- I mean, the voyeurism statute from the federal law is from right around the same time, honestly, as the *Ashcroft* case and

**JA570**

51

everything back in -- and PROTECT Act back in 2003.  I think there was -- a lot of it came into play back then.  And it, you know, specifically goes into instances of when a person has a reasonable expectation of privacy and they are filmed in a private area and their breasts are filmed, and it goes into a lot of the behavior that has been described as far as Mr. Tatum is concerned.

The Congressional Record and the commentary and everything likewise specifically indicates within it that this is to -- the purpose of that voyeurism law is to curb the filming of locker rooms, the filming of gyms and showers and areas.  And it specifically references places where minors would be, schools, and so on.  It's in there, meaning the statute was contemplated to prevent the activity where a person does something voyeuristic where it falls short of this level of being the production of child pornography.  There are some cases that deal with that where, like, some coaches were filming people naked but not doing so in a way that is pornographic; it's a picture of somebody naked.  And that's why that statute exists because not every case is this and not every case certainly can prove that there was a lascivious exhibition or what the person's intent is.

So as far as Mr. Tatum is concerned, a lot of what his conduct is is voyeuristic in nature and generally targeted toward that, and that's what the evidence would show as far as

52

any production because there really aren't any beyond that and this series and handful of some morphed images that were, I think, roughly -- Mr. Cervantes can correct me if I'm wrong. There was maybe a dozen or so total that were saved, I think. I could be wrong.

And like I said, Your Honor, never shared, never distributed, never posted, never for anyone's eyes but his. And it doesn't make it right. But also it doesn't make him a person that targeted children for the purpose of profiting or sharing or giving away private images of them after sexually assaulting them. If we're looking at the statute for the production charge (A) through (E), it's raping a child, committing acts of sodomy and incest with a child, it is bestiality. It is as horrific as horrific gets.

And the final one is a lewd and lascivious exhibition, which is probably the only one that doesn't require actually committing rape. That section also has a series of -- or that definition of child pornography when it's -- what is lewd and lascivious? You know, we believe certainly in every case like this, but in the trial as well with the *Dost* factors, what is that and what constitutes lewd and lascivious? And that can be any number of things.

And here it was more or less that these images were pretty benign in the grand scheme of things. And a lot of the argument came down to what was his intent? And that's what

**JA572**

53

the argument has been today.  What was his intent in doing this?  He attempted to do it -- his intent was to film a person that was naked.  Again, I say that not to condone it, but to say that in the grand scheme of things, in the world of people that get charged and convicted under this statute, I imagine there are very few who in their entire lives have been found to have one single video that constitutes production of child pornography after a thorough investigation.  And it's not just the items they seized initially.  There was Google searches, there were Cloud drives, and so on and so forth.

If this was a person that was doing this around his patients, if this was a person that was committing sexual assaults on anybody, I imagine we would have heard about it. We haven't.  There's been no evidence of any untoward.  This is a person who engages in voyeurism.

The morphing thing is part and parcel of that as well.  It's a program that a person can use to make somebody naked and they don't know it.  And he never shared it with anybody.

There does need to be adequate deterrence for the conduct.  The production statute is quite adequate, I think, at deterring conduct in a variety of ways because it does require a mandatory 15 years.  It does require significant post-supervised release once the person -- if they ever get out.  I understand, Your Honor, that -- I mean, well, the kind

**JA573**

54

of sentences that are available in this particular case, it's a mandatory minimum.  There's not much wiggle room, certainly, in the type of sentence available in terms of it being served as a prison sentence.

I know that Mr. Tatum will request, and his family would really appreciate if he had the ability to go to a facility where he can receive treatment himself as trying to rehabilitate, help himself, but also, when appropriate, counsel others.  Because regardless of everything, he's a good doctor.  He's somebody that has helped people.  And to make use of his time in a positive way, I think he does have the ability to perhaps help fellow people who are going and struggling through this.  So I know that he would appreciate any recommendation the Court may be able to give with regard to any sort of treatment or facility that may have some sort of programs that might be suited to him.

Again, the guidelines range here is what it is. It's life, Your Honor.  I would just submit that that's not appropriate for this defendant.  Your Honor, life in prison for somebody, again, who has not ever touched or harmed somebody with physical violence.

Again, I'm not suggesting that there aren't victims here.  We've certainly known that, acknowledged it.  The families, I'm sure they will tell you just about how broken up everything is and how much this has damaged and impacted them.

**JA574**

55

So it's not like I'm saying that there's nobody that's been harmed here. And I'm not saying that nobody has a lack of long-term harm. I know that there's trauma that comes with the knowledge that you have been filmed in the nude or an image of your body has been created and it's out there. That's part of why this statute is so serious. That's why. Because it re-victimizes over and over again if it's out there.

The thing -- it may not give much solace, but I hope it gives a little bit, is that -- and this isn't just me as a defense attorney saying this. It's what the evidence bore out. There was no sharing of images. There was no posting, there was no giving to anybody. The government had password protected drives they had to get into. These were not distributed on the internet. Just as far as any victim in the case is concerned about that, that aspect, there was no evidence of sharing it and it -- and certainly the federal government has protocols in place that in this trial setting it does not get distributed in this setting either. So I just want to make sure that people are aware that that has not occurred in this case.

I'd also note just the volume as well, Your Honor, to take into consideration here as well. Again, if we're considering the wide breadth of these type of cases -- I know Your Honor has done plenty of these at this point. Part of

**JA575**

56

the consideration, certainly, is the nature of what the stuff is.  And part of the consideration is how much of the stuff there is.  Again, for the production count, there is one video.  There are four videos that have been -- in total of a pornographic nature that have been given as evidence.  There are some other images of the morphed variety that were also given as evidence.  That's the extent of the child pornography images that exist in this case.  That's why the guidelines recommendation is the 300 to 600 images because it's four videos which get you to 300 and then a little bit above that, but not as much as 600.

There are certainly cases that have far more than that and are far more egregious.  If I'm thinking about, like, relative sentences and things to compare things to, well, first, for just the possession aspect of it, the things that were possessed, off the top of my head I know, you know, I had the case with Mr. Bonds a year or so -- a year or two ago.  If you recall, Your Honor, that was the case where the defendant probably inadvertently uploaded a bunch of files he didn't want to to a Google drive when he was backing up a computer. NCMEC caught it in their filter and ultimately found that there were 150 videos that constituted child pornography that were on his device.  Those videos were an absolute horror show.  I don't do a lot of these cases, but I do enough to know that that was the worst I've seen.  And I think -- Your

**JA576**

Honor I don't think had the -- I won't say privilege, but you didn't get to see those images. That was a plea situation. But the descriptions of them, if I recall, Your Honor said, "That's about the worst I've ever seen." And I wouldn't disagree. Mr. Odulio was there, I think, too.

And the sentence there, there was a similar situation in some context to Mr. Tatum in the sense that that defendant, Mr. Bonds, had no criminal record. It was zero points. Also, there was no evidence of him sharing, transporting these images other than, you know, going from a laptop of his to a Google drive of his. That was the only, sort of, transport of any kind. No distribution. No criminal record. But a whole lot of -- 40 times as many videos that were attributed to Mr. Tatum. And again, with respect -- those were the worst of the worst.

The videos here, again, we made argument certainly that some of the images that are here aren't -- don't even qualify under the statute as child pornography. May qualify, as the government argues, as an attempt at it, but not actually fully completing that offense.

So the number of images is significantly lower than a person that is often in these proceedings in the federal system. I believe Mr. Bonds' sentence was ultimately -- for the possession count was 84 months, again, for 40 times as many images and ones that were significantly worse than what

**JA577**

58

were on Mr. Tatum's devices.

I know the government will say there's -- well, he had these lists and he had these file paths and he had anime. And that's correct, Your Honor. There's copious amounts of animated images. And again, it's not me condoning or saying it's good. It's me saying in the grand scheme of things, if we're looking at the spectrum or looking at a scale here of what's the appropriate punishment for an offender, the person who has actual images of actual minors, toddlers, and so on, actually being violently harmed is the person that deserves life in prison. The person that has animated pictures, the person that has images of people that are 11 or 12 or maybe 13 where it's unclear or we're having to have a discussion about whether or not they're pubescent or not to determine whether it qualifies under certain aspects for an enhancement, those are the type of cases where the highest of the high punishment is not what I believe the Court should do because if -- it's hard to imagine a case that doesn't -- it's hard to imagine a situation where -- particularly as we discussed in the brave new world of AI, it's coming and these prosecutions are coming.

And I do know and I certainly do -- concede the argument that there needs to be a showing that this isn't appropriate behavior and that it will be punished, but the punishment should not be for the purposes of sending a

**JA578**

59

message. It should not be for the purposes of putting a head on a stake and saying here's what happens when you do this. It should be appropriate to the conduct that occurred and the images that he had.

The vast majority of the evidence that is put forth by the government that is so damning is largely evidence of things that there is -- they don't have and are speculating about the contents of. Just in particular, Your Honor, the reason why I go -- I spent so much time belaboring this file list and while at trial with Mr. Whitt I made him sit there all day answering all my questions was specifically for this reason. We don't know what it is. And in particular, this is a person that the government has just said has maybe the biggest anime collection they've ever seen, that has, as Your Honor heard earlier, sadomasochistic, whatever, images, cartoons on the device. But they also want to simultaneously say, hey, I know you didn't find any of that -- you didn't find any sadomasochistic infant stuff anywhere on all the 21s you found, but these file paths are definitely child pornography. They're not anime. They're not nothing. They're definitely child pornography.

Again, we don't know. We don't know if they're real children. We don't know if they're animated. We don't know if they're cartoons. We don't know if they're not any of those things. We don't know. The file path, in fact,

**JA579**

60

frankly, Your Honor, that precedes all those names is a file path that's the same as a bunch of anime as well. It's Lolicon something or other and day in the life. It's an anime folder path that is housing a lot of these. And again, we don't know what they are. But there's just a blank implication like that -- they're definitely preteen hardcore actual children.

THE COURT: You may not know the answer to this, but the file names for the anime, do any of them go on to the point like some of the other file names and end with "3-year-old with dad"? I mean, is that how any of the anime films are described?

MR. AMES: I'll be honest, Your Honor, I'm not a connoisseur.

THE COURT: No, I just thought you had looked at this a lot more than I have. What I'm trying -- the point of the question is, is there a discernible -- is there a way to be confident to any extent that when you're looking at a file name, that's probably anime; and if you're looking at another file name, that's probably real kids?

MR. AMES: I don't -- and -- I don't know. I mean, there's -- there's -- the file lists have -- again, it's a lot of images. And again, we're also -- I haven't even discussed the fact there's also just regular adult pornography too. Again, we're talking about somebody that had a problem with it

**JA580**

61

and has coped with it and had a large collection.

But in a collection that vast and that large, where we're talking about tens and tens and tens of thousands of images, they found four total videos that could even reach the definition of child pornography. They found a handful, a dozen or so of morphed images. And they found other file paths. They found a whole lot of anime. They found a whole lot of adult porn, probably some that isn't all that, you know, straightforward, I guess. They found voyeurism videos and all the rest. But they didn't find a treasure trove of actual child pornography, but they found a lot of perverse things. And they want to -- and they are pushing for a life sentence largely on the basis of evidence that we don't have.

And I understand that the system has guidelines and practices. And I understand that the standard at sentencing hearings is preponderance. But I just ask the Court to keep in mind that the enhancements involved that take this from what would be an otherwise 20ish-some-odd-year sentence and push it to the maximum that's allowed under the law is based upon, in many ways, presumptions, assumptions. We think probably this happened. We're inferring this. This is most likely what it is. And we're relying upon in many cases testimony and recollections from things that happened a very long time ago and in some cases things that people had no actual firsthand knowledge of. Ages of when something was

62

taken. What was the contents of a video that that person has never seen? These are some of the bases for -- a piece of paper that says 17 instead of 18 is potentially the difference between a sentence -- it's ten extra years.

So in the grand scope of it, I ask Your Honor to consider this is not a case where, hey, there's a giant bucket of everything. We got him dead to rights. This is a case that has certainly a lot of nuance, but certainly a lot of speculation as well. And we can infer, but at the end of the day, Your Honor, I think there needs to be some -- at least some deference given to the relative lack of evidence that we're having to just assume, well, it must have existed at some point and so therefore we will go forward on that assumption.

I would say, Your Honor, I mean, I think even in the western district, last time I looked, a production count, the average sentence that a person receives on production is probably somewhere in the ballpark of 2, 250 months, or something along those lines. For possession charges it's somewhere in the ballpark of probably 70 to 80. And here the recommendation is 720, I believe. And...

THE COURT: It's okay to stop. You've said a lot.

MR. AMES: I know, Your Honor.

THE COURT: I know you're afraid to sit down and then think, oh, dang, I meant to say that.

**JA582**

63

MR. AMES:  My entire life is always that, Your Honor.

THE COURT:  I remember.  I used to stand right there.

Look, I think I understand all of your arguments and the equities on your client's behalf.

Mr. Tatum, you have the right to address the Court if you'd like to, but you don't have to say anything.  Is there anything you'd like to say?

THE DEFENDANT:  No, Your Honor.  I'm going to remain silent.

MR. AMES:  Your Honor, could I please --

THE COURT:  You did think of something else.

MR. AMES:  I did think of something else.

THE COURT:  I knew you would.

MR. AMES:  I just want to -- I don't want to talk directly to everybody, but please know that there's -- Mr. Tatum is not speaking on the advice of me.  It's my fault.  And, Your Honor, we're in that --

THE COURT:  Look, Mr. Ames, I understand.  He's right to do that.  He went to trial.  I'm confident he will appeal.  I encourage that he appeal.  He doesn't want to make any self-incriminating statements that could be used against him in the event that he's successful on appeal.  And he's afraid that if he doesn't incriminate himself, he's going to

**JA583**

64

upset the Court for not showing remorse.  So no harm, no foul by him not wanting to speak.

MR. AMES:  Yes, Your Honor, and I appreciate that. I certainly -- I've told Mr. Tatum this too, is that I would never -- in the times I've been in front of you, that's always been the case; that you do not hold that against anybody and -- but I also want to just say it because -- in case those who may not be privy to these proceedings and not understand that -- why someone can't just say, hey, I really regret this or I'm sorry.

THE COURT:  Right.  Understood.

MR. AMES:  Yes.

THE COURT:  Mr. Cervantes.

MR. CERVANTES:  Thank you, Your Honor.

First I'd like to address the 3553(a) factors. Next, there are some victims present in court and online that would like to make some statements.  Then I'll address restitution and special assessments very briefly.

THE COURT:  I hate to inconvenience all these people.  We've been here for -- is it noon?

THE CLERK:  Yes.

THE COURT:  We've been here for 2-1/2 hours -- not you all, but we have -- and I think some of us would probably appreciate a 15-minute break.  I'm sorry to delay folks.  But not only do we want to get this right, but we don't want to be

**JA584**

65

uncomfortable while doing it, especially our intrepid court reporter who has to pay attention at all times.

All right.  So we're going to take a 15-minute recess.

(Brief recess at 11:59 AM.)

(Court back in session at 12:10 PM.)

THE COURT:  All right.  Mr. Cervantes.

MR. CERVANTES:  Thank you, Your Honor.

There's been a lot of discussion about voyeurism and these videos that the defendant has made, and I'd like to address that and show for the Court a sampling of some of these videos.  There's seven videos that the government has identified.  We would ask to move them into evidence unless there is an objection.  They're Sentencing Exhibits 5 through 11.  These are videos that have come from the defendant's devices showing the surreptitious recordings.  And what's important about them is the nature of the recording, the extent to which he was doing this stuff, and it also addresses some of the arguments that the defense was making.

THE COURT:  All right.  They're admitted.

(Government's Exhibits Nos. 5, 6, 7, 8, 9, 10, and 11 were received into evidence.)

MR. CERVANTES:  Publishing Sentencing Exhibit 5.

(Government's Exhibit Number 5 was published.)

MR. CERVANTES:  Publishing Sentencing Exhibit 6.

**JA585**

66

(Government's Exhibit Number 6 was published.)

MR. CERVANTES:  I'm pausing it at 10 seconds to note the sound of a scale and this is a scale where I've stopped. And I would direct the Court's attention to the videos that were introduced at trial, one of them of the patient showed that she was being weighed at a scale.

THE COURT:  I recall.

(Government's Exhibit Number 6 resumed.)

MR. CERVANTES:  Publishing Sentencing Exhibit 7.

(Government's Exhibit Number 7 was published.)

MR. CERVANTES:  Pausing at 18 seconds to show his face there in the video.

(Government's Exhibit Number 7 resumed.)

MR. CERVANTES:  Publishing Exhibit 8.

(Government's Exhibit Number 8 was published.)

MR. CERVANTES:  Pausing at 7 seconds to note this here, this is a white coat.  This is another doctor that he was working with.

(Government's Exhibit Number 8 resumed.)

MR. CERVANTES:  That one goes on for 3 minutes and 39 seconds and it's just conversation with the camera pointed directly up her skirt.

Publishing Exhibit 9.

(Government's Exhibit Number 9 was published.)

MR. CERVANTES:  I'll stop there for a moment to note

**JA586**

67

even in that last video we see the defendant using deception to walk his victim to the car, having a conversation about work; and without her even knowing, as she's reaching into the car, he violates her and records what he records.  So the defense was talking about and a lot has been made about how nobody at work ever came out and said anything.  These people don't know what's happened.  And part of the problem is that we can't identify who they are.  The patient, what seems like a patient that's being weighed at the scale, how old is she?  I don't know.  Maybe a minor.  Given the scope of his work, I would assume that she is a minor.  And who was she?  I don't know.  We tried to find out who she was, but it was just not possible.  We ran into dead ends.

And so this notion that these are -- and the suggestion is these are sort of one-offs or he didn't do it to other people at work, that everybody at work thought that he was, you know, upstanding, it's probably true.  And it's all related to this facade that he's put on in front of everyone, even in front of his family about who he is versus who he really is and nobody has known who he really is until this case came to light.

And I understand it's very difficult for some people to really accept the reality of what the defendant has done, but he has preyed on so many women.  As described in the presentence investigation report at paragraph 17(f)(i),

**JA587**

68

there's a folder in his hard drive where there's 51 of these videos of up-skirts. And to show that they're not just -- first of all, they're saved there, right, because they're taken with a phone and they only get there if someone purposefully takes them from the phone and organizes them and puts them together. Plus there's 256 screen shots of those videos showing the parts that were interesting to him.

And this isn't just about voyeurism, you know, and going around recording people at work, potentially patients. There may be other production charges there that we just weren't able to develop. But there's also Sentencing Exhibit 10 shows this went beyond to even other bathroom videos. So I'll publish Sentencing Exhibit 10.

(Government's Exhibit Number 10 was published.)

MR. CERVANTES: Stopping at 13 seconds, the Court may recall, this is the -- looks like the same red bag that was used to hide the phone that was placed in the bathroom. In the video related to count two, the production video, there is an orange sort of banner that looks like a bag where the phone was hidden inside of. And here we see it again. And this shows -- this is like the serial recorder who has an MO, who has an operation. This isn't some fleeting moment of interest in recording people. He's got a manner in which he does this and he continues to do it.

(Government's Exhibit Number 10 resumed.)

69

MR. CERVANTES:  He shows his face in this video just like he did in the video in count two.

And fast forwarding to 5:49.  I'm not going to play that part, but it does depict -- a female does come into the bathroom to bathe and he captures her as well.  She does look more developed in that video so I don't know if that's a minor.  But there are bathroom videos in addition to videos of people at work.

And not just that, Sentencing Exhibit 11, this one shows really the...

(Government's Exhibit Number 11 was published.)

MR. CERVANTES:  This one shows the depravity of the defendant stocking a woman at the grocery store with her two kids in a grocery cart.

One moment, Your Honor.

That last one shows the nature and the extent -- the nature and circumstances of the defendant's MO in recording women in the community, females.  He was indiscriminate. We're not dealing with simply a peeping Tom or voyeur.  We're dealing with someone who's creating content.  He's producing this kind of content, whether it's minors or adults.  And this is digital content that can be stored indefinitely.  It can be shared.  I understand that there wasn't evidence in this case about distribution, but that's the problem.  And we all know that digital images remain indefinitely depending what you do

**JA589**

70

with them.  And each time that the defendant watched these videos, these victims are re-victimizing -- or being re-victimized by the defendant's conduct.

So like it or not, let's call it -- whether you call it a voyeur that's interested in looking at people or not, when the voyeur records children naked in the bathroom, that's child pornography.  When the voyeur is trying to record the private areas of a minor during a private session, that's child pornography.

So the defense talked about what the statute was designed to do and suggested that this production statute was really designed to criminalize people for producing and then sharing.  And that's not true, as the Court knows.  There's a separate statute for the distribution of child pornography and that's not what he was charged with.  He's charged with production.  And the simple fact of producing child pornography is what the statute is designed to criminalize. It is designed to criminalize the exact conduct that the defendant has done in this case.

The defense talked about only one video of production, but that's not entirely true.  There were three videos of the patient who testified, Ms. F.L., at trial.  And I don't know how many other videos that he made of his patients at work who are minors because we couldn't identify other minors.

**JA590**

71

The defense also talked about not having a treasure trove of images and videos here. And that's kind of ironic because we don't have that mainly because he destroyed that evidence and so he shouldn't get the benefit of the doubt whatever doubt there may be. We know what the file names were. We know in our experience what those files are. We know in our experience that those files, when they have those descriptions and you open them, they're not anime. They are exactly what they purport to be. And we don't have the actual videos and images listed in that exhibit that I displayed to the Court at Exhibit 4 because it was destroyed by the defendant, as the Court rightly found in the obstruction of justice enhancement.

The defense also cited to another case called Bonds. Bonds is not similar to this case. Bonds pled, number one. He was not charged with production, number two. He pled to possession. He got 84 months, but he pled.

A better comparison would be the case called Deritis which is a case that this Court was involved in and this Court sentenced Deritis to 50 years in February -- February 28, 2023, of this year. He produced. He was charged with production. He was a hands-on offender, but he was charged with production. And there were bathroom videos as well. He got 50 years.

So what we're dealing with here is someone who is

**JA591**

72

indiscriminate about who his victims are.  He has victimized his cousins, his sister, minors, adults, a mom of two kids at a grocery store, colleagues at work, patients.

And he told the FBI what he did with this material. He masturbated to it.  That was his own admission, with the material that he collected and viewed.

He put himself in a position of trust.  He put himself in a position of trust with children to learn their deepest, darkest secrets that they may not even be telling their patients and he took advantage of that.  And using that he recorded at least one victim.  He's been doing this for a long time.

The pretrial sentencing report at paragraph 17(f)(i) shows that the earliest surreptitious recording is dated March 2008.  This is a long-standing issue.  And it's escalated.  It's escalated into his own profession to the point where he was so bold that he would just videotape anyone, even this lady that he walked to her car.  And just a quick snap and now that's recorded forever in his library to do as he wishes.

The destruction of evidence is an aggravating factor that the Court should consider.  When faced with the reality of what was about to happen, he didn't come clean.  He didn't -- which is his right.  He doesn't have to -- he has a right to a trial, which he took advantage of.  But the reality

**JA592**

73

is that when he was faced with charges, he destroyed evidence. And that is an aggravating factor. And we consider these aggravating factors in determining what to do, what to recommend to the Court, and whether there's anything mitigating in the record that would suggest that he should get a downward variance from the guideline range.

This is someone with means, intelligence, support of a family. There's no reason for him to have done this. Which makes him arguably even more dangerous, and doing it for such a long time.

With respect to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, there are few things that are more serious than preying on minors. And it's not just the video of Ms. M.C., it's also the list that shows exactly what he was interested in, the list of 10,000-plus files. What he did to Ms. M.C. was unfair and inexcusable. He was family. She trusted him. She trusted him also in the context of his role as a doctor. And he violated that trust for his own sexual gratification.

The use of AI also shows the dangerousness of this case and the importance of this case. It shows the dangerousness he poses to society where he can take any innocent photo of anyone, of someone's childhood, something that happened years ago, and convert it into a sexual tool for

**JA593**

74

his pleasure.  We only need to listen to the victim impact statements to understand the impact the defendant has had on their lives as a result of his selfish conduct.

The need for the sentence imposed to afford adequate deterrence to criminal conduct.  With regard to that factor, this is an appropriate case to send a message of what happens when people use technology to create child pornography.  That message should be strong and it should be clear that it will not be tolerated.  It will be prosecuted.  And it's not something that the government will look to very kindly.

The message should be sent.  But even if the public won't be deterred -- and I have been in the courtroom where the Court has addressed that issue and determined -- or questioned the deterrence impact of a sentence imposed in this -- in any particular case.  Are offenders actually deterred by sentences?  Even putting that aside, this Court should deter this defendant from his conduct which he has been doing for a long time and will continue to do unless this Court sentences him to a lengthy sentence.

With regard to the need for the sentence imposed to protect the public from further crimes of the defendant, no woman, no matter their age, was safe around the defendant.  A guideline sentence is appropriate to keep him away from further violating the women in this community.

Although the -- the guideline range is 720 months,

**JA594**

75

Your Honor.  We think he should get every single day of that. However, we're asking for 600 months -- it's a variance of 120 months -- because the defendant is 40 years old and a 600-month sentence, we believe, is appropriate.  It's sufficient but not greater than necessary to punish and deter the defendant's conduct.

There's nothing mitigating about this case that we can think of.  The defense's argument seems to be minimization of the type of conduct involved in this case, which the jury decided emphatically that he was guilty of.  And the guidelines are what they are.  Congress has told us what this offense -- the sentencing commission has told us what this offense should be -- what the guideline range should be for this kind of offense.  And so we would ask that the Court impose a sentence of 600 months on the defendant which is the equivalent of 50 years.

Your Honor, at this time the government has -- would like to present the victim impact statements from six individuals.

THE COURT:  All right.  Thank you.

MR. CERVANTES:  The government will first ask Ms. M.C. to make a statement.

MS. M.C.:  Hello.  Can everyone hear me okay?

THE COURT:  Yes.

MS. M.C.:  Firstly I would like to thank the Court

76

for their flexibility and accommodations in letting me give my statement virtually today.

My name is M.C. and I was unknowingly videotaped by the defendant when I was a child.  He videotaped me undressing, showering, and dressing again in the family cabin that has had five generations of my family walk through its doors.

We had one main cabin bathroom that he taped me in and I wonder if I will ever be able to face returning to the cabin that was once the safe space for much of my family.  Even if I make it back, I am prepared to find out that it has been tainted for me.  The defendant has ruined the sanctity of the space my family has congregated at for generations, a space I know will never be replicated.

The same summer I was videotaped, I confided in the defendant about mental health issues I was having.  His career in psychiatry and my trust in him at the time made him the ideal confidant.  His trust in our family also led my parents to seek his advice.  I constantly wonder if he decided to surreptitiously videotape me before or after he learned I was struggling.  Regardless, these events couldn't have been more than a few days apart.

He kept and accessed the video he took of me until it was seized in 2021.  That summer he also began asking me deeply personal questions with sexual undertones.  Asking if I

**JA596**

77

was a masochist, if I liked to get hit, and if I liked getting my hair pulled.  He then pulled my hair.  Because I was 15 I thought all of this was fun between cousins.

I was first called by the FBI in September of 2022 and I believed it was a scam.  I had no idea why they would be calling me.  I sat in a chair across from an agent and a victim specialist who had several manila folders containing evidence.  I can't describe the moment when they showed me my 15-year-old naked body.  First, I was confused.  Second, I was humiliated.  Third, I was disgusted.  And lastly, I felt betrayed.

It is hard to even remember what happened that day and for the days after.  I remember calling my mom and trying to explain and make sense of what happened.  I remember not being able to look at myself in the mirror for weeks.  I remember obsessing over my privacy in a way that I never had before.  Since that day I have felt uneasy showering or using the restroom even in my own home and I often check for cameras or anything else that could be out of place.

Since my involvement in this case came to light, my entire family has been turned upside down.  While parts of my family have been incredibly supportive to me and the other victims, other relatives promise that this trial of his peers would prove his innocence.  Messages from his family came through the grapevine often, letting the victims and my family

**JA597**

know that he was an addict but definitely not a pedophile.  It did not matter that I was a child when he violated me.  He was such a successful doctor and this entire case was an orchestration against poor Baby Day Day, the name family members called the 40-year-old man indicted on these heinous crimes.  I was told over and over what happened to me was bad but not bad enough to ruin his promising life.  I must forgive him and move on.  There has never been responsibility taken for his actions or even acknowledgment.

During the trial the defendant and his family consistently sat outside the courtroom or courthouse during a break in session making it impossible for me and the other victims to move around, use the restroom or leave for the day in peace.  We were made to feel like a thorn in his side this entire process.

On May 4 when we heard the jury's verdict, guilty on all counts, I hoped that this was everyone's opportunity to move on.  Our justice system prevailed and we could move forward.  I could go home and get back into a normal routine along with the other victims.  I could begin the healing process with the family that has had my back from day one: blood relatives, non-blood relatives, family and friends.

I wish this was the case.  Instead of that being respected, the defendant's family has harassed me and the other victims forcing us to keep reliving what has happened

79

over and over.  I cannot listen to people tell me he was a wonderful father before he was caught.  I cannot listen to people tell me over and over that there is this set of alternate facts that we are not privy to that would have, could have, or should have proven his innocence.  We all watched him set up the camera to tape me, my other cousin, and his patient.

The constant campaign for the redemption of a child sex predator is impeding me from healing.  I have been told that I cannot formulate my own opinions or thoughts, my mind has been poisoned, and I will live a life void of happiness if I do not forgive the defendant and move on.  I have lost many family members through the last year due to this, which was extremely difficult to come to terms with.

I want to move forward on my own terms.  I will not forgive the defendant.  Our family will not be the same moving forward and I am at peace with that.  There is no excuse for what he did to me, my cousins, his ex-girlfriends, and his patient.  He needs to be held accountable for his actions.  I hope he doesn't have the opportunity to have any contact with any children and endanger them in the future.

Thank you for listening.

THE COURT:  Thank you.

MR. CERVANTES:  The government would call E.H. who's here in person.  Up front, Your Honor?  She would like to read

**JA599**

80

her statement.  May she come to counsel table?

THE COURT:  She may.

MS. E.H.:  Hello, Your Honor.  My name is E.H. I dated the defendant in high school and accompanied him to his senior prom.  My memories of my whole high school experience are tainted by this trial and the information it has brought to light.  It now disgusts me that as a child I deliberately chose to spend time with the defendant.  I feel debased, horrified, ashamed, and unclean.  I'm outraged that he chose to create and keep such pictures of me.  In this digital age it is horrifying to realize that pictures of me, innocent pictures, may be taken and twisted without my consent for purposes that are illegal and disgusting.  I am angry because I feel I have been dragged unwillingly into an untenable situation.  I feel used as an object rather than acknowledged as a person.

I feel that I cannot trust cameras and cameras are literally everywhere in our lives.  I was a child when the photos were taken that have now been so horribly twisted.  How can this be that there exist pictures of me for which I did not pose or consent?  I did not in any way commit any poor judgment that might result in such pictures, except that of having previously interacted with the defendant.  To put it plainly, this mess is not my fault, but it is now part of my life to deal with.

**JA600**

81

I now live with fear that some day these pictures may surface in a public setting. These awful things never should have existed in the first place. I live with the feeling that there is something unclean very close to me that I'm unable to wash away. I feel very strongly that wrong has been done to me and that I have done nothing to deserve it.

Worse than for myself alone, I now also live with the fear that my two children may some day be confronted with the ugliness contained in these pictures. What if my two children should some day be subject to harassment or worse because of these pictures? If I did not deserve this, they certainly did not deserve it. I'm trying to raise my children to be compassionate, kind people who understand that every life has dignity and value. As a parent I think it's important to demonstrate the values that we hope to instill in our children. That's one reason why I chose to travel to be here physically in this courtroom. I took time off from my work as a nurse, a bedside nurse, at the hospital to travel to be here. I want to physically stand for basic human decency and also for our American justice system.

During our time in high school, the defendant and I both participated in a volunteer program called Youth Court. Teenage volunteers like us would take on the roles of lawyers, judge, and bailiff. Minors who had committed misdemeanors would come before Youth Court and receive a sentence of

**JA601**

82

restitution in the form of community service and a letter of apology. I mention all this because it was the culture at Youth Court to take into consideration whether the offender had admitted their guilt. If the offender appeared to realize the negative consequences of their actions or the hurt that they had caused to others, then the teen volunteers would hand down a lighter sentence.

I mention this because it's ironic. One of the most difficult things about this trial for me is how it has been such a long, drawn out process and how staunchly the defendant appears to believe that he has done nothing wrong or illegal. The defendant had many chances during this time to admit his guilt and seek to make amends. At no point did he choose to do so. The outrage of being forced to publicly show my face alongside these twisted pictures ought never to have happened. Rather than making amends and attempting to heal some of the hurt that he has caused, the defendant has spent his time and energy attempting to skirt responsibility for his actions.

I would ask the Court that since it appears that the defendant is still not ready to take responsibility for his actions or try to make amends, that the Court please do so for him. I would ask the Court for the maximum penalty for the defendant. In this way I would hope that the defendant would realize the gravity of his actions. The hurt and damage caused by him are immeasurable, but some amends should be

**JA602**

83

made.  I ask for restitution for myself.  I also ask that the Court to do all in its power to prevent other children from being so harmed by the defendant in the future.

While I have previously stated, and it's true, that I have been greatly impacted by the events of the past few years leading up to this trial, and while my negative experiences have been extreme, I also want to unequivocally state that I am stronger than ever.  By his actions the defendant attempted to reduce me to an object, to less than a person.  His attempts have failed.  I am stronger than that.  While I am afraid, I am able to rise above my fear.  He has not won.  While I am disgusted, I am constantly finding beauty and joy in life.  While I'm outraged, I am standing calmly now for justice.  I will not be beaten down.  I will not be broken and I will not be silenced.  I have passed through this crucible and I will go on with my life.  And I have a greater understanding and compassion for all other women and children so affected.  I will rise above all this ugliness and I will continue to turn toward the light.

Thank you.

THE COURT:  Thank you.

MR. CERVANTES:  Next, Your Honor, the government has a statement written by Ms. S.B.J.  May I read it?

THE COURT:  You may.

MR. CERVANTES:  "As a parent I am reminded daily how

**JA603**

84

quickly my children transform into young men, then adults, and perhaps have their own families one day. We only get 18 birthday celebrations before they are off on their own, 13 first day of school pictures, a video of their first bike ride without training wheels, one graduation day, and so on. Special memories made and pictures taken to document these precious times. A childhood photo of a milestone often pinpoints the relationships that were important to you at the time, friends and family who gather in the photo. A single image or a single moment holds so much meaning.

"It's a very strange and unsettling realization that as an adult woman in her 40s, I became a victim of child pornography. These shocking and unfathomable words offered to me over the phone in a scary and surreal phone call. The day that I learned of David Tatum and what he did to me shook my world. So many questions were unanswered. Who is he? Why does he have a picture of me? Has he been stalking me? What did he do with this picture? Who has seen it? I felt violated, overwhelmed, and unable to do much else except to cry and try to make sense of this shocking news.

"I then show up in life as the person I wanted to be during this time. What David Tatum did to me has taken an emotional toll on me. In the images that David Tatum manipulated, I was 15 years old, the second oldest person in the picture of six children assembled in front of my home for

85

a quick back to school picture before the bus picked us up. David Tatum turned a childhood memory, a picture of me, my siblings, and our closest family friends into a pornographic picture. David Tatum took the excitement of a new school year, the love and support of great family friends, and closeness of me and my siblings and he created an image to sexualize us children for his benefit. David Tatum took that cherished memory and turned it into a new memory, one that elicits nausea, fear, and overwhelming discomfort and distrust within me.

"Upon learning what David Tatum did to me, I was immediately negatively impacted. I hid in the bathroom to make and take phone calls for fear of my children learning about what had happened to me and their aunt. I experienced sleepless nights, absent-mindedness and sadness. I cried a lot. I missed work and I wasn't the leader or teammate I promised to be in my business. My business suffered from the emotional toll this has taken on me. My mind was and still is occupied by what he did to me and others. I have lost some trust in others and I fear how others will victimize me and my children.

"I am afraid to show up in court today. I am afraid of showing my face on screen today by participating virtually. Will he get off on seeing me? Will he sexualize me? I fear that when he created child pornography using my image online,

**JA605**

86

others will have access to that image as well.  I fear coworkers, family, community members or other pedophiles will have access to this image.

"David Tatum's sentencing sets a precedent for other perpetrators who use AI to create child pornography.  He should get the highest jail time possible to establish a standard with which pedophiles using AI are held to in the future.  Images of children and AI technology are very accessible on the internet so I believe this type of crime should be addressed with firm repercussions from the courts.

"I have also lost some trust in medical professionals because of David Tatum.  In addition to jail time, I hope that the courts will revoke his medical license or any credentials that will allow him access to children in the workplace.  He should be placed in the National Registry for Sex Offenders and any other state or national system that protects children from pedophiles.  The repercussions of his actions on my life are significant and I hope to stop this from happening to other children.  It makes me sick to my stomach to know that he had access to children in his daily life at work as a child psychiatrist.  I want justice for my sister, for my friends, for myself, and for the other victims David Tatum has impacted.

"Sincerely, S.J."

Your Honor, may I read the statement of Ms. L.C.?

**JA606**

87

THE COURT: Yes.

MR. CERVANTES: "A photo that Mr. Tatum had altered for the purpose of pleasuring himself was of me, my sisters, and our neighbors on our first day of school. We were a group of children waiting for the school bus. It was a happy memory. I was going into my last year in middle school and I had only turned 13 a couple months earlier. Mr. Tatum has taken that memory and turned it into something grotesque and obscene. When I found out about his crimes against me and my loved ones, it brought so much fear, anger, and confusion into my life. Now, when I think of that time in my life, my middle school years, he is always a part of my thoughts. When I think of our friends who were in the photo with me, he is always a part of my thoughts. He has inserted himself into my relationship with my sisters whom he also violated.

"I fear artificial intelligence because of him and when I see or hear of AI, there he is in the back of my head. I fear social media because of him. I worry for my own children's safety far beyond what I already feared prior to knowing of his crimes against me, my loved ones, and those that trusted him. I have been unable to see a therapist since I learned of his profession and how he used his authority to violate his patients.

"The saddest part is that I don't even know this man. Have never met him before in my life. But he has

**JA607**

88

impacted it so much and in such a negative way. I often think about how his actions have impacted those that trusted him, both as a loved one and an authority figure. And knowing that a man who is capable of such horrible and evil actions used an image of me to pleasure himself makes me feel disgusted, demeaned, and violated all the more. This man has committed heinous crimes and the impact of his actions even to the least of his victims has been immense. I wish that he had never inserted himself into my life or the lives of my loved ones, but he never gave me the choice.

"L.C."

Your Honor, at this time the government would ask Ms. F.L. if she wants to make a statement.

MS. F.L.: Hello. I am Ms. F.L.

It started off like almost every other day, waking up and barely able to breathe. My chest burned and I felt as if I was drowning in my own body. Instead of going home after school, finding a smoke spot was the intention to rid of the troubles in my mind and at home. Smoking went from once in a while to all the time. I couldn't eat without it. It started to get complicated being a senior in high school needing a substance constantly to calm the nerves. I couldn't imagine a day without it. The pain seemed unbearable this day. I couldn't live like this anymore. With no outlets and no one to confide in, I found a ride to the hospital, my last resort.

**JA608**

89

I knew it went against my father's wishes.  Everything was fine; and if it wasn't, I was ungrateful.

Upon arriving to the hospital, I was terrified.  I couldn't notice my surroundings besides the overwhelm of an overpopulated room.  I wanted the help, but I was losing grip.  The heavy breathing and panic had activated.  It felt worse than ever.  The desk asked for my name, but I couldn't speak.  It was late at night by the time I was admitted to 3900, the child psych unit.  From there I was assigned a room.  Exhausted from experiencing flight or fight for hours, I passed out quickly.

Waking up I was in an unfamiliar place.  The floors slate and the walls dove.  The light was too bright for my eyes after the darkness of sleep and the air contained an undertone of bleach.  There was nothing in the room besides the white bed I had slept on.  There were many nurses and other teens on the floor, but what set me apart was that I had come voluntarily.  Although I had come close to suicide many times, I was in an extremely vulnerable position.  Anyway, I met with the treatment team daily throughout the duration of my week's stay to discuss new practices of sober and healthy living.

This is when I was assigned to Dr. David Tatum, child psychiatrist.  It was a good fit for me at the time.  I couldn't connect well with women due to my existing

**JA609**

90

abandonment issues stemming from my incarcerated alcoholic mother.

Upon discharge I continued to see Dr. Tatum through outpatient. He was transferring at the same time as me. I thought it was meant to be and I trusted him. I had fallen through the cracks for so long, felt alone for so long. No one looked out for me, but I thought Dr. Tatum did. Finally I had somebody. I never wanted more than a doctor/patient relationship. Although the truth I'd hear eight years later would come as a huge shock.

In February of this year I was contacted by the FBI. They showed me a picture of under my dress. I was so confused. I knew it was me immediately, but I didn't understand where in the world this was coming from. When I heard the doctor's name, my heart fell to the floor. The one person that I thought had looked out for me had been violating me. I felt so uncomfortable, skeeving from my own body. Later I viewed a video of the defendant placing a video camera underneath my dress. I could hear my personal information in the background. I had no idea and I couldn't believe that.

I immediately questioned myself and my adequacy considering my memory was so different from this. I doubt my own judgment. I even looked for the doctor years later to potentially help my traumatized sister who's in middle school. God, how would I have ever lived with myself if that

91

potentially proceeded inappropriately.

I was, I am so betrayed. It's nearly incomprehendible. Not only was this the one adult I thought I had, but he was my psychiatrist. I confided in him. In his profession he took an oath. My psychiatrist is supposed to be someone I could put my faith into. And now I don't trust. I'm skeptical of my own current therapist and anyone else's genuine motives.

Nevertheless, now I spend my time talking of the defendant instead of many other aspects in my life that need to be addressed. I still wonder what I did. I've been diagnosed with PTSD. This hits me at random times and completely flusters me. It's been incredibly difficult to write because I've been on constant high alert and solely existing on survival mode.

When this first came up, I nearly felt as if I was the senior in high school of the past, my emotions unmanageable. I don't want to sit and think about what you did to me because it shatters the little worth of myself I have left. The truth is now no one was there for me. You deceived me and you used me for your personal gain. I thought you were great. But humans are multidimensional and you were harmful to me as well. This has been detrimental, more than an inconvenience to my life really. Every time it comes back up my life seems to spiral. I have fallen back on old habits

92

looking for an escape. I failed all of my college courses for the semester. Dealing with the FBI, having to travel, testifying in court was all too much, too stressful. And you are still taking from me. I was notified in February, cooperating in April, flying in May. Received another call in October. Now I'm here again in November. This is taking up my life.

Because of what you did, I'll never have a male psychiatrist again. And that's really too bad. The lack of responsibility is another form of malpractice, insinuating I might be lying.

At last I'm just glad I've had the opportunity to tell this Court how the defendant's actions have impacted my security, my safety, my self-worth, my self-confidence, and my everyday life.

Thank you.

THE COURT: Thank you.

MR. CERVANTES: The government calls Ms. E.S.

MS. E.S.: The last time I took a shower without thinking about being filmed was in 2002. I was 18. I've spent my entire adult life checking every bathroom I enter for a camera before I use it. I check hotel rooms, bars, restaurants, airports, baseball stadiums, Disneyland. Even the homes of my friends and acquaintances do not feel safe. I have been looking for cameras so often and for so long that I

93

completely lost track of the fact that normal people don't do this. It is humiliating. Just knowing I've been filmed before is enough to make me want to climb out of my skin. I can never loosen the grip of this intrusive thought that will shower with me for the rest of my life. It is the kind of filth you can never wash off.

This impact was particularly insidious. At 18 I couldn't comprehend how problematic it was that there was a tape out there of me and David's sister, both obviously underage, taking turns showering after a swim. For a long time I successfully compartmentalized my anxiety about bathrooms and my adoration for David who I had known, loved, and looked up to my entire life. He said he was sorry and I believed him.

In November 2021 David confessed he was seeking help for sex addiction and that he might be in some trouble. I believe good people can make bad mistakes and still deserve the chance to do better, so I offered to accompany him to Kansas where he would undergo an assessment to determine his fitness to remain a licensed physician. I thought I was supporting my cousin on his tenuous first steps toward recovery.

This impact hit harder. While I did not know the breadth of David's crimes on the Kansas trip, David did. Days after I had returned home, I still felt deeply unsettled. In

**JA613**

94

hindsight, I can see the sudden and stark incongruence between David's words and his actions. He was not humbly seeking help for an illness, but, rather, looking to do or say whatever it took to beat the test and get back to work. I now know the breadth of David's crimes and when I think too much about the Kansas trip, I feel physically ill.

By far the most damaging impact of David's crimes has been the impact to our family; specifically, to my relationship with his sister who is my lifelong best friend. We have watched our family disintegrate into something unrecognizable. One of our most beloved and vocal members remains heavily in denial. David does not grant his family peace. Instead, he doubles down and fans the fire.

My best friend and I have talked to each other nearly every single day about every single thing for more than 25 years. She is now stuck in an impossible situation that shows no signs of improving. We are distant, reduced to superficial pleasantries as we each try desperately to protect the other from further harm. We are being torn apart through no fault of our own and it is destroying us. The agony is indescribable and it feels like part of me has died.

For over a year I was included in regular email blasts which detailed David's plight as an unfairly maligned victim of a vengeful ex. It is a special hell to be a victim reading about how wonderful your victimizer is. It became so

**JA614**

95

unbearable I sent an impassioned plea to my entire family begging them to see the truth and accept it. Even with all that I have lost as a result, I do not regret sending that email.

The response was swift and cruel. Behind my back the family was cautioned that I'm extremist and toxic. They were encouraged to stop talking to me all together. I was accused of influencing other victims with my hatred, as if they were incapable of having their own feelings about their victimization. I was publicly shamed and called severely mentally ill for spreading lies about David. I was scary and demented, an angry woman hell-bent on revenge. Nobody spoke up for me. And this is the narrative that persists to this very moment. David is a victim and I'm the problem.

David violated my sense of privacy and safety forever and he has irreparably destroyed my family. I've come a long way since 2002. I have learned that when someone shows you who they really are, you should believe them. David continues to inflict pain despite knowing how much pain he has already caused.

I hope the Court considers just how far David still has to go in his recovery and provides him the opportunity to engage in meaningful treatment for his attraction to minors and voyeurism. But above all, I hope the Court considers a sentence that ensures David cannot hold a position of

**JA615**

96

authority over a child ever again.

Thank you.

THE COURT:  Thank you.

MR. CERVANTES:  Your Honor, just a few words on restitution and the special assessment.

THE COURT:  I was going to ask where we stand on restitution.

MR. CERVANTES:  On restitution we're almost there. Out of the six victims, we have requests from -- finalized requests from five and so just one is pending.  I have discussed this with defense counsel.  He's aware.  And we'll try to work it out, but we do ask the Court to set the restitution hearing for 90 days from now just to have more time to finalize that.  We anticipate finalizing it well before the 90 days.

THE COURT:  That impacts any consideration of the special assessments as well.

MR. CERVANTES:  Yes, and I was about to get to that, Your Honor.

So I think the Court can take into account that four of the victims are asking for the minimum which is 3,000.  So that's $12,000.  And the one that's pending I don't think is going to be much more than that.  So it would be 12,000 plus the pending request for restitution.

So unless the Court has questions about that, I'll

**JA616**

move on to the special assessment.

THE COURT:  All right.  Please.

MR. CERVANTES:  So with regard to the special assessment, the government is asking that the Court issue an order of $50,000 in total for counts one, two, and three.  As the Court knows, the Court has to consider the factors in 3553(a) and 3572.  The government reincorporates its previous arguments with respect to 3553(a).  And with respect to 3572(a), the first, second, and fourth bullets of that subsection are particularly relevant and important for the Court's consideration we think.

The first one with regard to the defendant's income, earning capacity, and financial resources has been pretty obvious throughout the trial, the PSR as well, given his profession.  I recognize he probably won't practice again, but he's extremely talented and intelligent.

And with regard to financial resources, the supplement to the PSR confirmed that the sale of the marital home happened last month and so there's a significant amount of money there that the defendant will have access to in addition to his own bank accounts which are detailed in the PSR.

With regard to the burden that the fine -- the special assessment will impose upon the defendant, we believe that it is appropriate and that it will not -- it is $50,000,

98

but it won't burden him to the extent that he won't be able to do anything else in his life given the resources that he has access to.

And the fourth factor is the one that I think the Court was alluding to, whether restitution is ordered and the amount of that restitution.  I think ultimately the restitution -- 12,000, plus the pending victim -- is not going to go beyond 50,000.  I think it's going to be a lot closer to 12,000, but I don't know that for sure yet.

THE COURT:  I think I also read that of the proceeds from the recent sale of the marital home, his intention was to set aside a hundred thousand of his share of that for the upkeep of his daughter.

Am I remembering that correctly, Mr. Ames?

MR. AMES:  I don't remember the exact number, Your Honor.  I'll have to ask about that.  But that's correct.  So there was a joint bank account that the wife took into her possession when this all got started.  That was roughly a hundred thousand, I think, a little bit more than that.  He hasn't requested that back in general and has allowed that to be part of the keeping of the upkeep of his daughter while this has played out over the last couple of years.  But that was essentially the primary account that the couple had.

There was some, you know, money in equity in the house which did sell last week.  I sent the probation office

**JA618**

99

some documentation of that. Those funds are being held in a trust account currently by, to my understanding, his wife's attorney pending resolving their equitable distribution and divorce.

But I can tell the Court that I've spoken with Mr. Cervantes today. Mr. Tatum is more than willing to make sure that the restitution is paid in the short-term when that process goes through and distributed. I've explained to him the order of operations and sort of how these funds go out and that the restitution is right towards the top. And so I think there can be an arrangement, particularly with the sale of that house. I believe the total proceeds are around 360ish thousand. Obviously that's marital, not taxed yet, I presume, and split in some fashion. So it's not all his, but there will be some that can go to that purpose.

There is also the consideration, obviously, Your Honor, that this is a case where he has a daughter that's 5 years old that he loves very much. And we know for certain it's 15 years either way and he is not going to be a person that is in her life while she is a minor and able to take care of her the way he could before. The ability for him to support his daughter and the child support that he can give to her is, frankly, limited to whatever assets he currently has which have to go a long way and last until another 13 or 14 years. So I ask the Court to take that into consideration,

that it's probably either a lump sum or a trust situation so that he can try to make sure as best as he is able to provide for his daughter over the coming years.

And as Mr. Cervantes mentioned, I mean, I think it's a foregone conclusion that his ability to earn money as a professional practicing psychiatrist is over. His medical license is not coming back. Whenever he is out and trying to find work in the future some day, it will not be in that profession and so there's limited means, basically.

But we understand the appropriateness of the restitution and I have spoken to him. We will get that paid quickly. And any remaining portion will have to be, I guess, resolved as the divorce goes and the equitable distribution goes, Your Honor. So that's kind of the overview.

THE COURT: All right. Anything else, Mr. Cervantes?

MR. CERVANTES: No, Your Honor. Thank you.

THE COURT: Let me -- you can sit down, Mr. Ames.

Let me first talk to the victims in this case. I know you're worried about these pictures popping up and the re-victimization that would come from that. In fact, the re-victimization of even having to worry about them popping up, that's one of the things that informs sentencings in most child pornography cases, most of which are different from this one because most of them do involve sharing. There are these

101

despicable photos and videos that are created, often by the caregivers of these children, and the inhuman acts that are done on them, and they're created for the purpose of sharing and they're out there forever.  And that's why a lot of victims in these cases get notices from courts all over the country notifying them that they are once again victims because the government has identified their depictions of abuse as having been once again seen.

That's not going to happen to you.  There is no reason to believe that the images involved in this case were ever shared or ever can be shared.  I don't know if you have any more trust in me than you do in some others, but I have no reason to believe that these videos were ever shared or ever can be.  So as traumatizing as all of this is, please don't carry that with you the rest of your life.

Now, to get down to the considerations that the Court is required to make in fashioning an appropriate sentence.

The Court understands the childhood difficulties that your lawyer addressed.  And I don't doubt that you have some sort of disease or defect that has influenced your conduct in this.  Indeed, people engaged in these offenses have to be one of two things, evil or mentally ill, because nobody else wants to look at this stuff.  Now, that's an explanation, not an excuse.

**JA621**

102

I have listened to the victims, of course. And it's always moving. And you do have to take into account, you know, what is the exact seriousness of this offense? Well, you can hear some of it in their voices.

Now, I know that some of you folks will not be satisfied for anything less than the longest sentence the Court can give. I'm not going to do that. That's 60 years. He's 41 almost, in weeks. It is a de facto life sentence. And not only is a de facto life sentence unjust, I believe, there does have to be room among these various defendants.

If he was a stepfather who sexually molested his 3-year-old stepdaughter, put it out on the internet and it was shared for the rest of that girl's life, his guidelines would be exactly the same. There's got to be a distinction. As reprehensible as this conduct is, as many victims as it created -- and when I say victims, I mean not just you all, but even the women and perhaps girls who are completely unaware that they've been victimized, but they have been.

The families have been victimized. I read the letters before coming into court that were read today. Mr. Tatum has destroyed this family, broken it up, perhaps irreparably. You still have your supporters. I understand when mothers or grandmothers or any other family member still love you and will support you and be there for you. I don't understand -- well, I do understand. But I caution that

**JA622**

ignoring reality and thinking that you're not guilty of this offense, because you are, you're very guilty, and I hope people can come to accept that and still love you. Being guilty of this offense does not make you unhuman or unworthy of love, but it shouldn't split your family up.

You know, one thing you can do if this case is upheld on appeal and so your Fifth Amendment rights are no longer necessary, I hope you will reach out to all of your family and say, "I did this, I'm sorry. Please come back together."

The Court also notes from paragraph 67 of the presentence report that the defendant has been classified as a medium risk group on sexual recidivism for males scale. So the Court does have to consider that it's not that he's unlikely to recidivate, nor is it, you know, some sort of certainty.

The Court also does consider what are called unwarranted sentence disparities among defendants, and that's some of what I was talking about before: That these would be the guidelines for people who committed a lot worse acts. I am not minimizing anything that happened to you all, but I do have to be a little bit realistic. These are nudes. These aren't 3-year-olds being raped. I have to take that into account. Some of these are not even you, as you know. It's just your head. I know it's disturbing to look at that and

see an adolescent or preadolescent body on your head, but it's not you.  And that's different than some cases and I have to make a distinction in those.

Now, a couple of cases have been pointed out specifically to the Court.  The case against Mr. Bonds, some of the distinctions I think Mr. Cervantes pointed out.  One, he only had one count, I think, of possessing with intent to view.  I believe that's correct.  And he did plead guilty, acknowledging his guilt, showing some remorse, doing what he could to make things better for those he had hurt.  And he hadn't created any child pornography.  He was just downloading it and viewing it.  So he's less culpable than Mr. Tatum.

Mr. Deritis, who I think was also pointed out either by -- I guess, Mr. Cervantes.  One of the distinctions -- two of the distinctions that come most to mind about Mr. Deritis who did get a 50-year sentence, as I recall, he was a hands-on offender with his -- I think it was his stepdaughter, not his actual daughter but his stepdaughter.  Creating photographs of his own stepdaughter, including of a sexual hands-on nature.  And he testified and told some of the biggest whoppers you ever heard in your life.  Far beyond failing to show remorse, he just lied his tail off.  And he's worse than Mr. Tatum because of that.

And so, you know, what the Court is supposed to do is -- and this is in the statute -- impose a sentence that is

**JA624**

sufficient but not greater than necessary to apply all of the factors that the Court is required to consider.  And of course, that's a great challenge.  But I think in balancing all the things we've talked about, I think I can achieve that.

So pursuant to the Sentencing Reform Act of 1984 and *U.S. versus Booker*, it is the order of the Court, having considered all of the 3553(a) factors, that the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 120 months on count one, 360 months on count two to be served consecutively to count one, 240 months on count three to be served concurrently with counts one and two, for a total sentence of 40 years.

Forty years may be a de facto life sentence.  I know there are lots of ways you can earn time off in prison, but you're going to be mid 70s and up probably when you're eligible.  I don't intend to give a de facto life sentence, but I recognize that could be the rest of your life.  But it's still a just sentence under these circumstances.

It is recommended that he be incarcerated at FCI Butner because they have excellent medical facilities and I believe they have probably the best in the BOP for sexual predator violators and can provide some treatment I hope that will do some good here.

It is ordered that the defendant be required to support all dependents from prison earnings while incarcerated

**JA625**

as outlined in the presentence report.

The Court further recommends that he be allowed to participate in any educational and vocational opportunities while incarcerated.

The Court calls to the attention of the authorities that he has a history of mental health issues and recommends that he be allowed to participate in any available mental health treatment programs and also recommends that he participate in a sex offender treatment program while incarcerated.

Upon release from imprisonment, the defendant is placed on supervised release for a term of 30 years. I think that will cover the rest of your life no matter when you get out. This term consists of 30 years on each of counts one, two, and three, all such terms to run concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons, you are to report in person to the probation office in the district into which you are released. And while on supervised release, you shall not violate any federal, state or local law, and shall comply with each of the discretionary conditions of supervised release that have been adopted by this Court and each of the standard sex offender conditions of supervised release. The need for each of those I hope is obvious to any reviewing court. But nonetheless, no objections were filed to the anticipated imposition of those

conditions. The Court has reviewed them with respect to this particular defendant and finds that each of them is necessary, appropriate, and proper for this defendant's supervised release.

As a special condition of supervised release, the defendant shall participate in a mental health evaluation and treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise the defendant's participation in the program, and the defendant shall take all mental health medications as prescribed by a licensed health care practitioner.

As a second special condition, the defendant shall not communicate or otherwise interact with child victim 1, either directly or through someone else, without first obtaining the permission of the probation officer.

And as a final special condition of supervised release, the defendant shall not engage in an occupation, business, profession, or volunteer activity that would require or enable him to have access to minor children without the prior approval of the probation office.

Now, let me state with respect to the sentence, obviously the Court had to resolve several objections to the presentence report. And although the Court believes it got each of those correct, the court of appeals might disagree.

**JA627**

108

But whatever the guidelines are, if the court of appeals disagrees with this Court's decisions, this Court's sentence of 40 years is what it considers the appropriate 3553(a) sentence. Whether that is a downward variance from some other guidelines, within some other guidelines, or an upward variance of some other guidelines, the Court finds that that is the appropriate sentence under 3553(a) and within the statutory maximums.

It is ordered the defendant pay the United States a special assessment of $300.

The Court is not going to impose a fine since there are restitution obligations as well as some upcoming special assessments, and that a fine is unnecessary and perhaps impossible.

But the Court has considered the financial information appearing on pages 18 and 19 of the presentence report and finds that in addition to an anticipated restitution amount somewhere between 12,000 and let's call it 30 -- I can't imagine it being any more than that; but even if it was a little bit more than that, it wouldn't matter. The Court finds that he has the financial wherewithal without harm to himself or to his other obligations to make the following special assessments which are imposed.

A special assessment of $5,000 per count pursuant to 18 U.S.C. Section 3014 and the provisions of the Justice for

**JA628**

Victims of Trafficking Act of 2015, and a special assessment of 50,000 -- $17,000 per count on each of counts one and three and 50,000 on count two pursuant to 18 U.S.C. Section 2259A and the provisions of the Amy, Vicky and Andy Child Pornography Victim Assistance Act of 2018.

The Court will leave open for 90 days the question of the restitution amounts to the particular victims in this case.

The defendant shall make an immediate payment towards monetary penalties in the amount of $500.

If the defendant is unable to pay any monetary penalty immediately, during the period of imprisonment, payments shall be made through the Federal Bureau of Prisons Inmate Financial Responsibility Program.

Upon release from imprisonment, any remaining balance shall be paid in monthly installments of no less than $50 to commence within 60 days until paid off.  Throughout the period of supervision, the probation officer shall monitor the defendant's economic circumstances and shall report to the Court with recommendations as warranted any material changes that affect the defendant's ability to pay any court-ordered penalties.

Mr. Tatum, you can appeal your conviction, and I encourage you to do so.  You can also appeal your sentence. But any notice of appeal has to be filed within 14 days of

**JA629**

entry of the Court's judgment.  If you're unable to afford the cost of an appeal, if you ask, the clerk of court will prepare and file a notice of appeal on your behalf at no cost to you.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  This matter is concluded. Mr. Tatum is remanded to the custody of the marshals.

The Court is in recess.

(End of proceedings at 1:28 PM.)

*****

**JA630**

111

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

          I, Cheryl A. Nuccio, Federal Official Realtime Court
Reporter, in and for the United States District Court for the
Western District of North Carolina, do hereby certify that
pursuant to Section 753, Title 28, United States Code, that
the foregoing is a true and correct transcript of the
stenographically reported proceedings held in the
above-entitled matter and that the transcript page format is
in conformance with the regulations of the Judicial Conference
of the United States.


          Dated this 22nd day of December 2023.



                         s/Cheryl A. Nuccio

                         Cheryl A. Nuccio, RMR-CRR
                         Official Court Reporter

**JA631**

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Western District of North Carolina

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | (For Offenses Committed On or After November 1, 1987) |
| **V.** | ) | |
| | ) | |
| **DAVID TATUM** | ) | Case Number:  DNCW322CR000157-001 |
| | ) | USM Number:  07837-510 |
| | ) | |
| | ) | Ryan Patrick Ames |
| | ) | Defendant's Attorney |

**THE DEFENDANT:**

☐   Pleaded guilty to count(s).

☐   Pleaded nolo contendere to count(s) which was accepted by the court.

■   Was found guilty on count(s) 1s, 2s, 3s after a plea of not guilty.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s):

| Title and Section | Nature of Offense | Date Offense Concluded | Counts |
|---|---|---|---|
| 18 U.S.C. §§ 2252A(a)(5)(B) & 2252A(b)(2) | Possession of Child Pornography through Interstate Commerce by Computer | 09/22/2021 | 1s |
| 18 U.S.C. § 2251(a) & (e) | Employ, Use, Persuade, Induce, Entice, and Coerce any Minor to Engage in Sexually Explicit Conduct for the Purpose of Producing Child Pornography | 09/22/2021 | 2s |
| 18 U.S.C. § 2252A(a)(1) & (b)(1) | Transportation and Shipping of Child Pornography | 09/22/2021 | 3s |

    The Defendant is sentenced as provided in pages 2 through 9 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984, United States v. Booker, 125 S.Ct. 738 (2005), and 18 U.S.C. § 3553(a).

☐   The defendant has been found not guilty on count(s).

■   Count(s) in the Original Indictment are dismissed on the motion of the United States.

    **IT IS ORDERED** that the Defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay monetary penalties, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Date of Imposition of Sentence:  11/8/2023

Kenneth D. Bell
United States District Judge

Date: November 9, 2023

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: David Tatum                                                      Judgment- Page **2** of **9**
Case Number: DNCW322CR000157-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of ONE HUNDRED TWENTY (120) MONTHS AS TO COUNT 1s, THREE HUNDRED SIXTY (360) MONTHS AS TO COUNT 2s TO BE SERVED CONSECUTIVE TO COUNT 1s AND TWO HUNDRED FORTY (240) MONTHS AS TO COUNT 3s TO BE SERVED CONCURRENT TO ALL OTHER COUNTS FOR A TOTAL TERM OF FOUR HUNDRED EIGHTY (480) MONTHS.

■ The Court makes the following recommendations to the Bureau of Prisons:
1. Placed in FCI Butner if possible, consistent with the needs of BOP.
2. Participation in any available educational and vocational opportunities.
3. Participation in any available mental health treatment programs as may be recommended by a Mental Health Professional.
4. Defendant shall support all dependents from prison earnings.
5. Participation in the Federal Inmate Financial Responsibility Program.
6. Participation in sex offender treatment programs, if eligible.

■ The Defendant is remanded to the custody of the United States Marshal.

☐ The Defendant shall surrender to the United States Marshal for this District:

☐ As notified by the United States Marshal.
☐ At _ on _.

☐ The Defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ As notified by the United States Marshal.
☐ Before 2 p.m. on _.
☐ As notified by the Probation Office.

## RETURN

I have executed this Judgment as follows:

_____

_____

Defendant delivered on _____ to _____ at

_____, with a certified copy of this Judgment.


_____
            United States Marshal

                                          By: _____
                                                         Deputy Marshal

**JA633**

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: David Tatum                                                                              Judgment- Page **3** of **9**
Case Number: DNCW322CR000157-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>THIRTY YEARS (30) YEARS AS TO EACH OF COUNTS 1s, 2s, AND 3s TO BE SERVED CONCURRENT TO EACH OTHER</u>.

☐    The condition for mandatory drug testing is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

## CONDITIONS OF SUPERVISION

The defendant shall comply with the mandatory conditions that have been adopted by this court.

1.  The defendant shall not commit another federal, state, or local crime.

2.  The defendant shall not unlawfully possess a controlled substance.

3.  The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the Court (unless omitted by the Court).

4.  The defendant shall cooperate in the collection of DNA as directed by the probation officer (unless omitted by the Court).

The defendant shall comply with the discretionary conditions that have been adopted by this court and any additional conditions ordered.

5.  The defendant shall report to the probation office in the federal judicial district where he/she is authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.

6.  The defendant shall report to the probation officer in a manner and frequency as directed by the Court or probation officer.

7.  The defendant shall not leave the federal judicial district where he/she is authorized to reside without first getting permission from the Court or probation officer.

8.  The defendant shall answer truthfully the questions asked by the probation officer. However, defendant may refuse to answer a question if the truthful answer would tend to incriminate him/her of a crime.  Refusal to answer a question on that ground will not be considered a violation of supervised release.

9.  The defendant shall live at a place approved by the probation officer. The probation officer shall be notified in advance of any change in living arrangements (such as location and the people with whom the defendant lives). If advance notification is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

10.  The defendant shall allow the probation officer to visit him/her at any time at his/her home or any other reasonable location as determined by the probation office, and shall permit the probation officer to take any items prohibited by the conditions of his/her supervision that the probation officer observes.

11.  The defendant shall work full time (at least 30 hours per week) at lawful employment, actively seek such gainful employment or be enrolled in a full time educational of vocational program unless excused by the probation officer. The defendant shall notify the probation officer within 72 hours of any change regarding employment or education.

12.  The defendant shall not communicate or interact with any persons he/she knows is engaged in criminal activity, and shall not communicate or interact with any person he/she knows to be convicted of a felony unless granted permission to do so by the probation officer.

13.  The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer.

14.  The defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

15.  The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential informant without first getting the permission of the Court.

16.  The defendant shall refrain from excessive use of alcohol and shall not unlawfully purchase, possess, use, distribute or administer any narcotic or controlled substance or any psychoactive substances (including, but not limited to, synthetic marijuana, bath salts) that impair a person's physical or mental functioning, whether or not intended for human consumption, or any paraphernalia related to such substances, except as duly prescribed by a licensed medical practitioner.

17.  The defendant shall participate in a program of testing for substance abuse. The defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of the testing. The defendant shall participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, intensity) (unless omitted by the Court).

18.  The defendant shall not go to, or remain at any place where he/she knows controlled substances are illegally sold, used, distributed, or administered without first obtaining the permission of the probation officer.

19.  The defendant shall submit to a search if the Probation Officer has a reasonable suspicion that the defendant has committed a crime or a violation of a condition of supervised release. Such a search may be conducted by a U.S. Probation Officer, and such other law enforcement personnel as the probation officer may deem advisable, without a warrant or the consent of the defendant. Such search may be of any place where evidence of the above may reasonably be expected to be found, including defendant's person, property, house, residence, vehicle, communications or data storage devices or media or office.

20.  The defendant shall pay any financial obligation imposed by this judgment remaining unpaid as of the commencement of the sentence of probation or the term of supervised release in accordance with the schedule of payments of this judgment. The defendant shall notify the court of any changes in economic circumstances that might affect the ability to pay this financial obligation.

21.  The defendant shall support all dependents including any dependent child, or any person the defendant has been court ordered to support.

22.  The defendant shall participate in transitional support services (including cognitive behavioral treatment programs) and follow the rules and regulations of such program. The probation officer will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, intensity). Such programs may include group sessions led by a counselor or participation in a program administered by the probation officer.

23.  The defendant shall follow the instructions of the probation officer related to the conditions of supervision.

**JA634**

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

---

Defendant: David Tatum                                                    Judgment- Page **4** of **9**
Case Number: DNCW322CR000157-001

ADDITIONAL CONDITIONS:

24.   The defendant shall participate in a mental health evaluation and treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, and intensity). The defendant shall take all mental health medications as prescribed by a licensed health care practitioner.

25.   The defendant shall not communicate, or otherwise interact, with Child Victim 1, either directly or through someone else, without first obtaining the permission of the probation officer.

26.   The defendant shall not engage in an occupation, business, profession, or volunteer activity that would require or enable the defendant to have access to minor children without the prior approval of the probation officer.

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: David Tatum                                                                 Judgment- Page **5** of **9**
Case Number: DNCW322CR000157-001

## SEX OFFENDER

## CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court and any additional conditions ordered.

1. The defendant shall have no direct or indirect contact, at any time, for any reason with any victim(s), any member of any victim's family, or affected parties in this matter unless provided with specific written authorization to do so in advance by the U.S. Probation Officer.

2. The defendant shall submit to a psycho-sexual evaluation by a qualified mental health professional experienced in evaluating and managing sexual offenders as approved by the U.S. Probation Officer. The defendant shall complete the treatment recommendations and abide by all of the rules, requirements, and conditions of the program until discharged. The defendant shall take all medications as prescribed.

3. The defendant shall submit to risk assessments, psychological and physiological testing, which may include, but is not limited to a polygraph examination and/or Computer Voice Stress Analyzer (CVSA), or other specific tests to monitor the defendant's compliance with supervised release and treatment conditions, at the direction of the U.S. Probation Officer.

4. The defendant's residence, co-residents and employment shall be approved by the U.S. Probation Officer. Any proposed change in residence, co-residents or employment must be provided to the U.S. Probation Officer at least 10 days prior to the change and pre-approved before the change may take place.

5. The defendant shall not possess any materials depicting and/or describing "child pornography" and/or "simulated child pornography" as defined in 18 U.S.C. § 2256, nor shall the defendant enter any location where such materials can be accessed, obtained or viewed, including pictures, photographs, books, writings, drawings, videos or video games.

6. The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which the defendant resides, works, is a student, or was convicted of a qualifying offense.

7. The defendant shall have no contact, including any association such as verbal, written, telephonic, or electronic communications with any person under the age of eighteen (18) except: 1) in the presence of the parent or legal guardian of said minor; 2) on the condition that the defendant notifies the parent or legal guardian of their conviction or prior history; and, 3) has written approval from the U.S. Probation Officer. This provision does not encompass persons under the age of eighteen (18), such as waiters, cashiers, ticket vendors, etc. with whom the defendant must deal, in order to obtain ordinary and usual commercial services. If unanticipated contact with a minor occurs, the defendant shall immediately remove himself/herself from the situation and shall immediately notify the probation officer.

8. The defendant shall not loiter within 100 feet of any parks, school property, playgrounds, arcades, amusement parks, day-care centers, swimming pools, community recreation fields, zoos, youth centers, video arcades, carnivals, circuses or other places primarily used or can reasonably be expected to be used by children under the age of eighteen (18), without prior written permission of the U.S. Probation Officer.

9. Except as required for employment (see Condition 4), the defendant shall not use, purchase, possess, procure, or otherwise obtain any computer (as defined in 18 U.S.C. § 1030(e)(1)) or electronic device that can be linked to any computer networks, bulletin boards, internet, internet service providers, or exchange formats involving computers unless approved by the U.S. Probation Officer. Such computers, computer hardware or software is subject to warrantless searches and/or seizures by the U.S. Probation Office.

10. The defendant shall allow the U.S. Probation Officer, or other designee, to install software designed to monitor computer activities on any computer the defendant is authorized to use, except for that of an employer. This may include, but is not limited to, software that may record any and all activity on computers (as defined in 18 U.S.C. § 1030(e)(1)) the defendant may use, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. The defendant shall pay any costs related to the monitoring of computer usage.

11. The defendant shall not use or have installed any programs specifically and solely designed to encrypt data, files, folders, or volumes of any media. The defendant shall, upon request, immediately provide the probation officer with any and all passwords required to access data compressed or encrypted for storage by any software.

12. The defendant shall provide a complete record of all computer use information including, but not limited to, all passwords, internet service providers, email addresses, email accounts, screen names (past and present) to the probation officer and shall not make any changes without the prior approval of the U.S. Probation Officer.

13. The defendant shall not have any social networking accounts on networks used or reasonably expected to be used by minors without the approval of the U.S. Probation Officer.

14. The defendant shall not be employed in any position or participate as a volunteer in any activity that involves direct or indirect contact with children under the age of eighteen (18), and under no circumstances may the defendant be engaged in a position that involves being in a position of trust or authority over any person under the age of eighteen (18), without written permission from the U.S. Probation Officer.

Defendant: David Tatum                                                                 Judgment- Page **6** of **9**
Case Number: DNCW322CR000157-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the Schedule of Payments.

| ASSESSMENT | JVTA ASSESSMENT | AVAA ASSESSMENT | RESTITUTION | FINE |
|---|---|---|---|---|
| $300.00 | $15,000.00 | $84,000.00 | TBD | $0.00 |

■ The determination of restitution is deferred until 2/5/2024. Upon such a determination an *Amended Judgment in a Criminal Case (AO 245C)* will be entered. Failing such a determination by 2/5/2024, restitution amount becomes $0.00 without further Order of the Court.

## INTEREST

The defendant shall pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the Schedule of Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

■ The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

    ■ The interest requirement is waived.

    ☐ The interest requirement is modified as follows:

## COURT APPOINTED COUNSEL FEES

☐ The defendant shall pay court appointed counsel fees.

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: David Tatum                                                      Judgment- Page **7** of **9**
Case Number: DNCW322CR000157-001

## RESTITUTION PAYEES

The defendant shall make restitution to the following payees in the amounts listed below:

| NAME OF PAYEE | AMOUNT OF RESTITUTION ORDERED |
|---|---|
| TBD | TBD |

☐ Joint and Several Restitution is Ordered as follows:

☐ Defendant and Co-Defendant Names and Case Numbers *(including defendant number)* if appropriate:

☐ Associated Defendant Name(s) and Case Number(s) *(including defendant number)* if appropriate:

☐ Court gives notice that this case may involve other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

The victims' recovery is limited to the amount of their loss and the defendant's liability for restitution ceases if and when the victim(s) receive full restitution. Any payment not in full shall be divided proportionately among victims.

Pursuant to 18 U.S.C. § 3364(i), all nonfederal victims must be paid before the United States is paid.

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

---

Defendant: David Tatum

Case Number: DNCW322CR000157-001

Judgment- Page **8** of **9**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ■ Lump sum payment of $500.00 due immediately, balance due
    ☐ Not later than_____
    ■ In accordance with ☐ (C), ■ (D) below if the defendant is unable to pay any monetary penalty immediately; or

B ☐ Payment to begin immediately (may be combined with ☐ (D) below); or

C ☐ Payment in equal **monthly** installments of **$50.00** to commence **60 days** after the date of this judgment; or

D ■ In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision through the Financial Responsibility Program, payments shall be made in equal **monthly** installments of **$50.00** to commence **60 days** after release from imprisonment to a term of supervision. The U.S. Probation Officer shall pursue collection of the amount due, and may request to modify a payment schedule if appropriate 18 U.S.C. § 3572.

Special instructions regarding the payment of criminal monetary penalties:

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court costs:

☐ The defendant shall forfeit the defendant's interest in the following property to the United States

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment. **All criminal monetary penalty payments are to be made to the United States District Court Clerk, 401 West Trade Street, Room 1301, Charlotte, NC 28202**, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program. All criminal monetary penalty payments are to be made as directed by the court.

**The Defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245B  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: David Tatum                                                      Judgment- Page **9** of **9**
Case Number: DNCW322CR000157-001

## STATEMENT OF ACKNOWLEDGMENT

I understand that my term of supervision is for a period of _____months, commencing on _____.

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I understand that revocation of probation and supervised release is mandatory for possession of a controlled substance, possession of a firearm and/or refusal to comply with drug testing.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed)    _____    Date: _____
                       Defendant

(Signed)    _____    Date: _____
                       U.S. Probation Office/Designated Witness

☐ The Court gives notice that this case may involve other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>DAVID TATUM,<br><br>        Defendant. | Docket No. 3:22-cr-157-KDB<br><br>NOTICE OF APPEAL |

NOW COMES the Defendant, pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure, and hereby gives notice of his appeal to the United States Court of Appeals for the Fourth Circuit from the final judgment entered in this matter on November 9th, 2023.

RESPECTFULLY SUBMITTED, this the 21st day of November, 2023.

s/ Ryan P. Ames
Ryan P. Ames
North Carolina Bar # 49651
SeiferFlatow, PLLC
2319 Crescent Ave.
Charlotte, NC 28207
Telephone: 704-512-0606
Fax: 704-314-0677
Email: ryan@seiferflatow.com

1

**JA641**

## CERTIFICATE OF SERVICE

I hereby certify that that on this 21st day of November, 2023 the foregoing document was served electronically on the United States through ECF filing.

s/ Ryan P. Ames

Ryan P. Ames

2

**JA642**

AO 245C  (WDNC Rev. 01/2020) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Western District of North Carolina

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| | ) (For Offenses Committed On or After November 1, 1987) |
| **V.** | ) |
| | ) |
| **DAVID TATUM** | ) Case Number:  DNCW322CR000157-001 |
| | ) USM Number:  07837-510 |
| | ) |
| **Filed Date of Original Judgment: 11/9/2023** | ) Ryan Patrick Ames |
| (Or Filed Date of Last Amended Judgment) | ) Defendant's Attorney |
| | ) |

**THE DEFENDANT:**

☐　Pleaded guilty to count(s).

☐　Pleaded nolo contendere to count(s) which was accepted by the court.

■　Was found guilty on count(s) <u>1s, 2s, 3s</u> after a plea of not guilty.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s):

| Title and Section | Nature of Offense | Date Offense Concluded | Counts |
|---|---|---|---|
| 18 U.S.C. §§ 2252A(a)(5)(B) & 2252A(b)(2) | Possession of Child Pornography through Interstate Commerce by Computer | 09/22/2021 | 1s |
| 18 U.S.C. § 2251(a) & (e) | Employ, Use, Persuade, Induce, Entice, and Coerce any Minor to Engage in Sexually Explicit Conduct for the Purpose of Producing Child Pornography | 09/22/2021 | 2s |
| 18 U.S.C. § 2252A(a)(1) & (b)(1) | Transportation and Shipping of Child Pornography | 09/22/2021 | 3s |

　　　The Defendant is sentenced as provided in pages 2 through 9 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984, <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), and 18 U.S.C. § 3553(a).

☐　The defendant has been found not guilty on count(s).

■　Count(s) <u>in the Original Indictment</u> are dismissed on the motion of the United States.

　　　**IT IS ORDERED** that the Defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay monetary penalties, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Date of Imposition of Sentence:  11/8/2023

Kenneth D. Bell
United States District Judge

Date: January 29, 2024

AO 245 C  (WDNC Rev. 02/11) Judgment in a Criminal Case revTitle

Defendant: David Tatum                                    Judgment- Page **2** of **9**
Case Number: DNCW322CR000157-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of ONE HUNDRED TWENTY (120) MONTHS AS TO COUNT 1s, THREE HUNDRED SIXTY (360) MONTHS AS TO COUNT 2s TO BE SERVED CONSECUTIVE TO COUNT 1s AND TWO HUNDRED FORTY (240) MONTHS AS TO COUNT 3s TO BE SERVED CONCURRENT TO ALL OTHER COUNTS FOR A TOTAL TERM OF FOUR HUNDRED EIGHTY (480) MONTHS.

■ The Court makes the following recommendations to the Bureau of Prisons:
1. Placed in FCI Butner if possible, consistent with the needs of BOP.
2. Participation in any available educational and vocational opportunities.
3. Participation in any available mental health treatment programs as may be recommended by a Mental Health Professional.
4. Defendant shall support all dependents from prison earnings
5. Participation in the Federal Inmate Financial Responsibility Program.
6. Participation in sex offender treatment programs, if eligible.

■ The Defendant is remanded to the custody of the United States Marshal.

☐ The Defendant shall surrender to the United States Marshal for this District:

    ☐ As notified by the United States Marshal.
    ☐ At _ on _.

☐ The Defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ As notified by the United States Marshal.
    ☐ Before 2 p.m. on _.
    ☐ As notified by the Probation Office.

## RETURN

I have executed this Judgment as follows:

_____

_____

Defendant delivered on _____ to _____ at

_____, with a certified copy of this Judgment.

_____
United States Marshal

            By: _____
                        Deputy Marshal

**JA644**

AO 245C  (WDNC Rev. 01/2020) Judgment in a Criminal Case

---

Defendant: David Tatum                                                                      Judgment- Page **3** of **9**
Case Number: DNCW322CR000157-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>THIRTY YEARS (30) YEARS AS TO EACH OF COUNTS 1s, 2s, AND 3s TO BE SERVED CONCURRENT TO EACH OTHER</u>.

☐   The condition for mandatory drug testing is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

## CONDITIONS OF SUPERVISION

The defendant shall comply with the mandatory conditions that have been adopted by this court.

1.   The defendant shall not commit another federal, state, or local crime.

2.   The defendant shall not unlawfully possess a controlled substance.

3.   The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the Court (unless omitted by the Court).

4.   The defendant shall cooperate in the collection of DNA as directed by the probation officer (unless omitted by the Court).

The defendant shall comply with the discretionary conditions that have been adopted by this court and any additional conditions ordered.

5.   The defendant shall report to the probation office in the federal judicial district where he/she is authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.

6.   The defendant shall report to the probation officer in a manner and frequency as directed by the Court or probation officer.

7.   The defendant shall not leave the federal judicial district where he/she is authorized to reside without first getting permission from the Court or probation officer.

8.   The defendant shall answer truthfully the questions asked by the probation officer. However, defendant may refuse to answer a question if the truthful answer would tend to incriminate him/her of a crime.  Refusal to answer a question on that ground will not be considered a violation of supervised release.

9.   The defendant shall live at a place approved by the probation officer. The probation officer shall be notified in advance of any change in living arrangements (such as location and the people with whom the defendant lives). If advance notification is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

10.  The defendant shall allow the probation officer to visit him/her at any time at his/her home or any other reasonable location as determined by the probation office, and shall permit the probation officer to take any items prohibited by the conditions of his/her supervision that the probation officer observes.

11.  The defendant shall work full time (at least 30 hours per week) at lawful employment, actively seek such gainful employment or be enrolled in a full time educational of vocational program unless excused by the probation officer. The defendant shall notify the probation officer within 72 hours of any change regarding employment or education.

12.  The defendant shall not communicate or interact with any persons he/she knows is engaged in criminal activity, and shall not communicate or interact with any person he/she knows to be convicted of a felony unless granted permission to do so by the probation officer.

13.  The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer.

14.  The defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

15.  The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential informant without first getting the permission of the Court.

16.  The defendant shall refrain from excessive use of alcohol and shall not unlawfully purchase, possess, use, distribute or administer any narcotic or controlled substance or any psychoactive substances (including, but not limited to, synthetic marijuana, bath salts) that impair a person's physical or mental functioning, whether or not intended for human consumption, or any paraphernalia related to such substances, except as duly prescribed by a licensed medical practitioner.

17.  The defendant shall participate in a program of testing for substance abuse. The defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of the testing. The defendant shall participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, intensity) (unless omitted by the Court).

18.  The defendant shall not go to, or remain at any place where he/she knows controlled substances are illegally sold, used, distributed, or administered without first obtaining the permission of the probation officer.

19.  The defendant shall submit to a search if the Probation Officer has a reasonable suspicion that the defendant has committed a crime or a violation of a condition of supervised release. Such a search may be conducted by a U.S. Probation Officer, and such other law enforcement personnel as the probation officer may deem advisable, without a warrant or the consent of the defendant. Such search may be of any place where evidence of the above may reasonably be expected to be found, including defendant's person, property, house, residence, vehicle, communications or data storage devices or media or office.

20.  The defendant shall pay any financial obligation imposed by this judgment remaining unpaid as of the commencement of the sentence of probation or the term of supervised release in accordance with the schedule of payments of this judgment. The defendant shall notify the court of any changes in economic circumstances that might affect the ability to pay this financial obligation.

21.  The defendant shall support all dependents including any dependent child, or any person the defendant has been court ordered to support.

22.  The defendant shall participate in transitional support services (including cognitive behavioral treatment programs) and follow the rules and regulations of such program. The probation officer will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, intensity). Such programs may include group sessions led by a counselor or participation in a program administered by the probation officer.

23.  The defendant shall follow the instructions of the probation officer related to the conditions of supervision.

AO 245C  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: David Tatum                                                    Judgment- Page **4** of **9**
Case Number: DNCW322CR000157-001

ADDITIONAL CONDITIONS:

24. The defendant shall participate in a mental health evaluation and treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise the defendant's participation in the program (including, but not limited to, provider, location, modality, duration, and intensity). The defendant shall take all mental health medications as prescribed by a licensed health care practitioner.

25. The defendant shall not communicate, or otherwise interact, with Child Victim 1, either directly or through someone else, without first obtaining the permission of the probation officer.

26. The defendant shall not engage in an occupation, business, profession, or volunteer activity that would require or enable the defendant to have access to minor children without the prior approval of the probation officer.

AO 245C  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: David Tatum                                          Judgment- Page **5** of **9**
Case Number: DNCW322CR000157-001

## SEX OFFENDER

## CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court and any additional conditions ordered.

1. The defendant shall have no direct or indirect contact, at any time, for any reason with any victim(s), any member of any victim's family, or affected parties in this matter unless provided with specific written authorization to do so in advance by the U.S. Probation Officer.

2. The defendant shall submit to a psycho-sexual evaluation by a qualified mental health professional experienced in evaluating and managing sexual offenders as approved by the U.S. Probation Officer. The defendant shall complete the treatment recommendations and abide by all of the rules, requirements, and conditions of the program until discharged. The defendant shall take all medications as prescribed.

3. The defendant shall submit to risk assessments, psychological and physiological testing, which may include, but is not limited to a polygraph examination and/or Computer Voice Stress Analyzer (CVSA), or other specific tests to monitor the defendant's compliance with supervised release and treatment conditions, at the direction of the U.S. Probation Officer.

4. The defendant's residence, co-residents and employment shall be approved by the U.S. Probation Officer. Any proposed change in residence, co-residents or employment must be provided to the U.S. Probation Officer at least 10 days prior to the change and pre-approved before the change may take place.

5. The defendant shall not possess any materials depicting and/or describing "child pornography" and/or "simulated child pornography" as defined in 18 U.S.C. § 2256, nor shall the defendant enter any location where such materials can be accessed, obtained or viewed, including pictures, photographs, books, writings, drawings, videos or video games.

6. The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which the defendant resides, works, is a student, or was convicted of a qualifying offense.

7. The defendant shall have no contact, including any association such as verbal, written, telephonic, or electronic communications with any person under the age of eighteen (18) except: 1) in the presence of the parent or legal guardian of said minor; 2) on the condition that the defendant notifies the parent or legal guardian of their conviction or prior history; and, 3) has written approval from the U.S. Probation Officer. This provision does not encompass persons under the age of eighteen (18), such as waiters, cashiers, ticket vendors, etc. with whom the defendant must deal, in order to obtain ordinary and usual commercial services. If unanticipated contact with a minor occurs, the defendant shall immediately remove himself/herself from the situation and shall immediately notify the probation officer.

8. The defendant shall not loiter within 100 feet of any parks, school property, playgrounds, arcades, amusement parks, day-care centers, swimming pools, community recreation fields, zoos, youth centers, video arcades, carnivals, circuses or other places primarily used or can reasonably be expected to be used by children under the age of eighteen (18), without prior written permission of the U.S. Probation Officer.

9. Except as required for employment (see Condition 4), the defendant shall not use, purchase, possess, procure, or otherwise obtain any computer (as defined in 18 U.S.C. § 1030(e)(1)) or electronic device that can be linked to any computer networks, bulletin boards, internet, internet service providers, or exchange formats involving computers unless approved by the U.S. Probation Officer. Such computers, computer hardware or software is subject to warrantless searches and/or seizures by the U.S. Probation Office.

10. The defendant shall allow the U.S. Probation Officer, or other designee, to install software designed to monitor computer activities on any computer the defendant is authorized to use, except for that of an employer. This may include, but is not limited to, software that may record any and all activity on computers (as defined in 18 U.S.C. § 1030(e)(1)) the defendant may use, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. The defendant shall pay any costs related to the monitoring of computer usage.

11. The defendant shall not use or have installed any programs specifically and solely designed to encrypt data, files, folders, or volumes of any media. The defendant shall, upon request, immediately provide the probation officer with any and all passwords required to access data compressed or encrypted for storage by any software.

12. The defendant shall provide a complete record of all computer use information including, but not limited to, all passwords, internet service providers, email addresses, email accounts, screen names (past and present) to the probation officer and shall not make any changes without the prior approval of the U.S. Probation Officer.

13. The defendant shall not have any social networking accounts on networks used or reasonably expected to be used by minors without the approval of the U.S. Probation Officer.

14. The defendant shall not be employed in any position or participate as a volunteer in any activity that involves direct or indirect contact with children under the age of eighteen (18), and under no circumstances may the defendant be engaged in a position that involves being in a position of trust or authority over any person under the age of eighteen (18), without written permission from the U.S. Probation Officer.

AO 245C  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: David Tatum                                              Judgment- Page **6** of **9**
Case Number: DNCW322CR000157-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the Schedule of Payments.

| ASSESSMENT | JVTA ASSESSMENT | AVAA ASSESSMENT | RESTITUTION | FINE |
|---|---|---|---|---|
| $300.00 | $15,000.00 | $84,000.00 | $30,000.00 | $0.00 |

## INTEREST

The defendant shall pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the Schedule of Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

■ The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

   ■ The interest requirement is waived.

   ☐ The interest requirement is modified as follows:

## COURT APPOINTED COUNSEL FEES

☐ The defendant shall pay court appointed counsel fees.

**JA648**

AO 245C  (WDNC Rev. 01/2020) Judgment in a Criminal Case

---

Defendant: David Tatum                                             Judgment- Page **7** of **9**
Case Number: DNCW322CR000157-001

## RESTITUTION PAYEES

The defendant shall make restitution to the following payees in the amounts listed below:

| NAME OF PAYEE | AMOUNT OF RESTITUTION ORDERED |
|---|---|
| Monica Connell | $15,000.00 |
| Emily Claire Heinz | $3,000.00 |
| Jessica Morgan Drutchas | $3,000.00 |
| Sarah Breedlove Jackson | $3,000.00 |
| Laura Cramp | $3,000.00 |
| Alexis Drutchas | $3,000.00 |

☐ Joint and Several Restitution is Ordered as follows:

  ☐    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)* if appropriate:

  ☐    Associated Defendant Name(s) and Case Number(s) *(including defendant number)* if appropriate:

  ☐    Court gives notice that this case may involve other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

The victims' recovery is limited to the amount of their loss and the defendant's liability for restitution ceases if and when the victim(s) receive full restitution. Any payment not in full shall be divided proportionately among victims.

Pursuant to 18 U.S.C. § 3364(i), all nonfederal victims must be paid before the United States is paid.

AO 245C  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: David Tatum                                               Judgment- Page **8** of **9**
Case Number: DNCW322CR000157-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ■ Lump sum payment of $500.00 due immediately, balance due
   ☐ Not later than_____
   ■ In accordance ☐ (C), ■ (D) below; or

B ☐ Payment to begin immediately (may be combined with ☐ (D) below); or

C ☐ Payment in equal **monthly** installments of **$50.00** to commence **60 days** after the date of this judgment; or

D ■ In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision through the Financial Responsibility Program, payments shall be made in equal **monthly** installments of **$50.00** to commence **60 days** after release from imprisonment to a term of supervision. The U.S. Probation Officer shall pursue collection of the amount due, and may request to modify a payment schedule if appropriate 18 U.S.C. § 3572.

Special instructions regarding the payment of criminal monetary penalties:

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court costs:

☐ The defendant shall forfeit the defendant's interest in the following property to the United States

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment. **All criminal monetary penalty payments are to be made to the United States District Court Clerk, 401 West Trade Street, Room 1301, Charlotte, NC 28202**, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program. All criminal monetary penalty payments are to be made as directed by the court.

**The Defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245C  (WDNC Rev. 01/2020) Judgment in a Criminal Case

Defendant: David Tatum                                                    Judgment- Page **9** of **9**
Case Number: DNCW322CR000157-001

## STATEMENT OF ACKNOWLEDGMENT

I understand that my term of supervision is for a period of _____months, commencing on _____.

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I understand that revocation of probation and supervised release is mandatory for possession of a controlled substance, possession of a firearm and/or refusal to comply with drug testing.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.


(Signed)    _____    Date: _____
                    Defendant

(Signed)    _____    Date: _____
                    U.S. Probation Office/Designated Witness


☐ The Court gives notice that this case may involve other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.